Appendix
11-1322

KAREN L. HAAS
CLERK

H–154 THE CAPITOL

GERASIMOS C. VANS
DEPUTY CLERK

# Office of the Clerk
## U.S. House of Representatives
### Washington, DC 20515–6601

August 30, 2006

According to the House Journal, House Concurrent Resolution # 219 was agreed to by the House on June 19, 1948, and passed by the Senate without amendment. The names of those House Members who agreed to H.Con.Res. 219 were not entered in the House Journal. The House Journal and the Congressional Record of June 19, 1948 states that H.Con.Res. 219 was agreed to by unanimous consent, but it does not state whether a quorum was present.

H.Con.Res. 219 was not sent to President Truman for his approval or disapproval. Yes, the Speaker of the House did sign bill HR 3190 in the absence of a quorum. Attached is a copy of pages 771-72 from the House Journal and page 9348 from the Congressional Record of June 19, 1948. We hope the provided information has answered your questions.

Sincerely Yours,

*Karen L. Haas*

Karen L. Haas
Clerk, U.S. House of Representatives

# Office of the Clerk
## U.S. House of Representatives
### Washington, DC 20515-6601

September 11, 2006

Thank you for contacting the Office of the Clerk.

After conducting a thorough examination of the journals, I found no entry in the journal of the House of any May 12, 1947 vote on the H.R. 3190 bill, although pages 343-344 of the Journal of the House of Representatives from the 1st Session of the 80th Congress indicates that the bill was amended, purportedly passed, and transmitted to the Senate for concurrence. The Senate took no action on the H.R. 3190 bill prior to the December 19, 1947 sine die adjournment.

Page 5049 of the Congressional Record, 80th Congress, 1st Session indicates 44 Members voting 38 to 6 to amend H.R. 3190 on May 12, 1947. Therefore by counting the total yea and nay vote a quorum was not present.

According to House Rules, when less than a majority of a quorum votes to pass a bill, the journal must show the names of Members present but not voting. I found no record of any names for the May 12, 1947 vote. I hope this information has answered your questions.

Sincerely Yours,

*Karen L. Haas*

Karen L. Haas
Clerk, U.S. House of Representatives

LORRAINE C. MILLER
CLERK

DEBORAH M. SPRIGGS
DEPUTY CLERK

ROBERT F. REEVES
DEPUTY CLERK

H–154 THE CAPITOL

# 𝔒𝔣𝔣𝔦𝔠𝔢 𝔬𝔣 𝔱𝔥𝔢 𝔆𝔩𝔢𝔯𝔨
## 𝔘.𝔖. 𝔥𝔬𝔲𝔰𝔢 𝔬𝔣 𝔯𝔢𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔞𝔱𝔦𝔳𝔢𝔰
### 𝔚𝔞𝔰𝔥𝔦𝔫𝔤𝔱𝔬𝔫, 𝔇𝔆 20515–6601

September 25, 2009

Thank you for contacting the Office of the Clerk.

The vote on May 12, 1947 was a voice vote on an amendment. A voice vote may be taken as long as 1/5[th] of a quorum is present; essentially 44 Members, which is how many were present on May 12, 1947. We have enclosed pages from the House Journal which is the Official Record of proceedings held in the US house of Representatives, pages from the Congressional Record, and the House Calendar which provides a legislative overview of HR 3190 throughout it's process in becoming a law. According to the House Journal, the House and Senate were in session on June 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, and 19th of 1948. Title 18 was passed by the Senate and the Hose on June 18, 1948 and became Public Law 80-772 on June 25, 1948. Special Sessions of the House of Representatives were held on July 26, 27, and 29, 1948. We hope the provided information will aid in your research.

Legislative Resource Center
Office of the Clerk
US House of Representatives

Office of the Law Revision Counsel
U.S. House of Representatives
Washington, D.C.  20515

January 21, 2010

]
]
U.S.P. Canaan
P.O. Box 300
Waymart, PA  18472

Dear Mr.

This is in response to your letter to the Office of the Clerk of the House of Representatives asking whether ''the enactment of Public Law 80-773 effectively repeal[ed] 28 U.S.C. Section 371 (1940) ... when Public Law 80-772 enacted 18 U.S.C. Section 3231.'' Your letter was referred to our office for a response.

The section 371 of title 28 you refer to was based on section 256 of the act of March 3, 1911, ch. 231. 36 Stat. 1160, as amended. That section was expressly repealed by section 39 of the act of June 25, 1948, Pub. L. 80-773, ch. 646, 62 Stat. 992, 996. The act of June 25, 1948, Pub. L. 80-772, ch. 645, 62 Stat. 683, which enacted title 18 as a positive law title, did not expressly restate or repeal section 371 of title 28. Moreover, the historic and revision notes in the U.S. Code for section 3231 of title 18 do not include section 371 of title 28 as a source law for section 3231.

I have enclosed 62 Stat. 869, 992, and 996 for your information.

Sincerely,

Peter G. LeFevre
Law Revision Counsel

Encl.

amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status

quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases;

that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

Appellate Case: 11-1322 . Document: 39-2 Date Filed: 02/01/2012 Page: 7

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that had assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

XCIII——319

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that

they were purely a codification. But there are some changes in this bill (H. R. 3198). I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

### EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

### REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

79th Congress, 2d Session

House Document No. 769

# CONSTITUTION
## JEFFERSON'S MANUAL

AND

# RULES OF THE HOUSE OF REPRESENTATIVES

### OF THE UNITED STATES
#### EIGHTIETH CONGRESS

By

### LEWIS DESCHLER
#### PARLIAMENTARIAN



TEXAS STATE LIBRARY

Austin, Texas

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1947

## CONSTITUTION OF THE UNITED STATES

§§ 51–54.

The statutes of the United States provide specific methods for institu-

§ 51. Laws of Congress not binding on the House in its function of judging its elections.

tion of a contest as to the title to a seat in the House (I, 678, 697–706); but the House regards this law as not of absolute binding force, but rather a wholesome rule not to be departed from except for cause (I, 597, 719, 825, 833), and it sometimes by resolution modifies the procedure prescribed by the law (I, 449, 600).

Decisions of the Supreme Court of the United States:

Reed v. County Commissioners, 277 U. S., 376; Barry v. U. S. ex. rel. Cunningham, 279 U. S., 597.

§ 52. The quorum.

\* \* \* and a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

§ 53. Interpretation of the Constitution as to number constituting a quorum.

Out of conditions arising between 1861 and 1891 the rule was established that a majority of the Members chosen and living constituted the quorum required by the Constitution (IV, 2885–2888); but later examination has resulted in a decision confirming in the House of Representatives the construction established in the Senate that a quorum consists of a majority of Senators duly chosen and sworn (I, 630; IV, 2891–2894). So the decision of the House now is that after the House is once organized the quorum consists of a majority of those Members chosen, sworn, and living whose membership has not been terminated by resignation or by the action of the House (IV, 2889, 2890).   (Speaker Clark, May 9, 1913, Record, p. 1457, 63d Cong., 1st sess.)

§ 54. The theory of the quorum present; and the count by the Speaker.

For many years the quorum was determined only by noting the numbers of Members voting (IV, 2896, 2897), with the result that Members by refusing to vote could often break a quorum and obstruct the public business (II, 1034; IV, 2895, footnote; V, 5744).   But in 1890 Mr. Speaker Reed directed the Clerk to enter on the Journal as part of the record of a yea-and-nay vote names of Members present but not voting, thereby establishing a quorum of record (IV, 2895). This decision, afterwards sustained by the Supreme Court (IV, 2904),

[18]

CONSTITUTION OF THE UNITED STATES

§ 55.

established the principle that a quorum present made valid any action by the House, although an actual quorum might not vote (I, 216, footnote; IV, 2932). And thenceforth the point of order as to a quorum was required to be that no quorum was present and not that no quorum had voted (IV, 2917). At the time of the establishment of this principle the Speaker revived the count by the Chair as a method of determining the presence of a quorum at a time when no record vote was ordered (IV, 2909). The Speaker has permitted his count of a quorum to be verified by tellers (IV, 2888), but did not concede it as a right of the House to have tellers under the circumstances (IV, 2916), claiming that the Chair might determine the presence of a quorum in such manner as he should deem accurate and suitable (IV, 2932). The Chair counts all members in sight, whether in the cloak rooms or within the bar (IV, 2970). Later, as the complement to the new view of the quorum, the early theory that the presence of a quorum is as necessary during debate or other business as on a vote was revived (IV, 2935–2949); also, a line of rulings made under the old theory were overruled, and it was established that the point of no quorum might be made after the House had declined to verify a division by tellers or the yeas and nays (IV, 2918–2926).

The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business (IV, 2952, 2953), and the point of no quorum may not be withdrawn after the absence of a quorum has been ascertained and announced by the Chair (IV, 2928–2931). But when an action has been completed, it is too late to make the point of order that a quorum was not present when it was done (IV, 2927). But where action requiring a quorum was taken in the ascertained absence of a quorum by ruling of a Speaker pro tempore, the Speaker on the next day ruled that the action was null and void (IV, 2964). But such absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason (IV, 2962), and where the assumption that a quorum was present when the House acted was uncontradicted by the Journal, it was held that this assumption might not be overthrown by expressions of opinion by Members individually (IV, 2961 . A point of no quorum may prevent the report of the Chairman of a Committee of the Whole. (Speaker Gillett, Dec. 13, 1924, p. 624, 68th Cong., 2d sess.) If a question as to a quorum is raised before the reading of the Journal a quorum must be ascertained before the reading may begin (IV, 2732, 2733). While messages are received in the absence of a quorum they are not read (IV, 3522; V, 6600, 6650). No motion is in order on the failure of a quorum but the motions to

§ 55. Relations of the quorum to acts of the House.

App. 74

THE STATE LIBRARY
AUSTIN, TEXAS

59TH CONGRESS }
2d Session }                HOUSE OF REPRESENTATIVES               { DOCUMENT
                                                                   { No. 355

# HINDS' PRECEDENTS

OF THE

# HOUSE OF REPRESENTATIVES

OF THE

## UNITED STATES

INCLUDING REFERENCES TO PROVISIONS
OF THE CONSTITUTION, THE LAWS, AND DECISIONS
OF THE UNITED STATES SENATE

By

ASHER C. HINDS, LL. D.

Clerk at the Speaker's Table

## VOLUME IV

PUBLISHED BY AUTHORITY OF THE ACT OF CONGRESS
APPROVED MARCH 4, 1907

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

App. 81

# Chapter LXXXV.*

## THE QUORUM.[1]

1. Provision of the Constitution.  Section 2884.
2. Interpretation of the Constitutional provision.  Sections 2885–2894.
3. Ruling of Mr. Speaker Reed as to quorum present.  Sections 2895–2904.
4. Rule for counting a quorum and its interpretation.  Sections 2905–2908.[2]
5. Reestablishment of the Speaker's count.  Section 2909.[3]
6. Review of Senate practice.  Sections 2910–2915.[4]
7. Speaker's count final.  Section 2916.
8. Making the point of no quorum.  Sections 2917–2931.
9. All business, including debate, suspended by failure of quorum.  Sections 2932–2965.[5]
10. Failure of quorum in Committee of the Whole.  Sections 2966–2979.

2884. **A majority of the House constitutes a quorum to do business.**— The Constitution of the United States provides in Article 1, section 5, that—

A majority of each [House] shall constitute a quorum to do business.

2885. **Out of conditions arising between 1861 and 1891 the rule was established that a majority of the Members chosen and living constitutes the quorum required by the Constitution.**—On July 19, 1861,[6] Mr. Charles B. Sedgwick, of New York, moved the previous question on the engrossment of a joint resolution to provide for the selection of a site for the Naval Academy. Fifty-two Members having voted in favor of and 41 Members having voted against seconding the same, the Speaker[7] declared that the previous question was seconded.[8]

---

* See Volume VI, Chapter CCVIII.
[1] A majority of a committee is a quorum.  Section 4540 of this volume.
Quorum of Senate sitting for impeachment trial.  Section 2063 of Volume III.
Senate counted during impeachment trial.  Section 2105 of Volume III.
As to quorum of managers in impeachment trial.  Section 2035 of Volume III.
[2] Principle that legislator detained by force may be counted.  Section 356 of Volume I.
[3] See also section 1653 of Volume III.
Illustration of former practice of ascertaining presence of.  Section 2733 of this volume.
[4] Elaborate Senate discussion.  Section 630 of Volume I.
[5] Oath administered to Members in absence of.  Sections 174–178 of Volume I.
Must be present before reading of Journal.  Section 2733 of this volume.
Motion to reconsider in absence of.  Sections 5606–5608 of Volume V.
Point of no quorum held dilatory.  Sections 5724–5730 of Volume V.
[6] First session Thirty-seventh Congress, Journal, p. 117; Globe, p. 210.
[7] Galusha A. Grow, of Pennsylvania, Speaker.
[8] The previous question no longer requires a second.  (See sec. 5443 of Vol. V of this work.)

App. 86

2937. On March 7, 1838,[1] during the debate in Committee of the Whole on an appropriation bill, Mr. John Reed, of Massachusetts, said he had some remarks to make, but there was no House to make them to. The Chair then appointed tellers to count the House, when it was found that there were but 72 Members in their seats—not a quorum. So the committee rose and reported the fact to the House.

2938. On February 24, 1875,[2] the Speaker,[3] in the course of a decision, said:

> If any gentleman raises the question that business is proceeding without the presence of a quorum, it is within the competence of the Chair to decide that a quorum is present; and he will not allow the business of the House to be interrupted by any dilatory proceeding. He assumes the responsibility for that purpose of declaring that a quorum is present, because no business can proceed without a quorum. When a gentleman speaking is entitled to have a quorum present. If the point be raised, a gentleman addressing the Chair may be taken off the floor by any Member raising the point that no quorum is present.

2939. On February 12, 1877,[4] a question of order was raised that debate could not proceed without a quorum.

In the course of the discussion of the question Mr. Nathaniel P. Banks, of Massachusetts, a former Speaker, said:

> If any Member states that a quorum is not present, the Speaker counts the House, as he is bound to do, and if a quorum is found not to be present, business is suspended and a motion for a call of the House may be made.

The Speaker[5] said: "The House is not a House without a quorum," and the debate was not permitted to proceed.

2940. On Wednesday, January 21, 1891,[6] the Journal of the proceedings of yesterday's sitting having been read, and the question being on its approval,

Mr. William McKinley, jr., of Ohio, demanded the previous question, when Mr. W. C. P. Breckinridge, of Kentucky, made the point of order that no quorum was present.

The Speaker[7] ruled that the point of order that no quorum was present could only be raised when that fact was established by a division.[8]

---

[1] Second session Twenty-fifth Congress, Globe, p. 224.
[2] Second session Forty-third Congress, Record, p. 1733.
[3] James G. Blaine, of Maine, Speaker.
[4] Second session Forty-fourth Congress, Record, pp. 1488, 1489.
[5] Samuel J. Randall, of Pennsylvania, Speaker.
[6] Second session Fifty-first Congress, Journal, p. 162; Record, p. 1630.
[7] Thomas B. Reed, of Maine, Speaker.
[8] The actual transaction is recorded as follows in the Record:

Mr. McKINLEY. Mr. Speaker——
The SPEAKER. The gentleman from Ohio [Mr. McKinley] is recognized.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order——
Mr. McKINLEY. I move the previous question.
Mr. BRECKINRIDGE, of Kentucky (continuing). That there is no quorum in the House to do business.
The SPEAKER. The gentleman from Ohio [Mr. McKinley] moves the previous question.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order that there is no quorum present.
The SPEAKER. That will be determined by the vote. As many as are in favor of ordering the previous question will say "aye."

Mr. J. Warren Keifer, of Ohio, said:

Mr. Chairman, I make the point of order that the gentleman from Illinois in charge of the bill has the floor, making a speech, and the distinguished gentleman from Mississippi is not entitled to take him off the floor.

After debate the Chairman[1] held:

The Chair is of opinion that a question of order involving the presence of a quorum may be raised, and the Chair will count to ascertain whether a quorum is present.

**2950. A quorum not being present, no motion is in order but for a call of the House or to adjourn.**—On February 5, 1846,[2] the House was in Committee of the Whole House on the state of the Union, considering joint resolution (No. 5) of notice to Great Britain to "annul and abrogate" the convention between Great Britain and the United States of the 6th of August, 1827, relative to the country "on the northwest coast of America, westward of the Stony Mountains," commonly called Oregon. Finding itself without a quorum, the committee rose. A motion to adjourn having been decided in the negative, on motion of Mr. George W. Jones, of Tennessee, a call of the House was ordered; and the roll having been called as far as the name of Stephen Adams, of Mississippi, a motion was made by Mr. Robert B. Rhett, of South Carolina, that further proceedings in the call be dispensed with. And the question being put, it was decided in the affirmative.

A motion was made by Mr. Howell Cobb, of Georgia, that the House take a recess until 7.30 o'clock.

Mr. Robert C. Winthrop, of Massachusetts, raised the question of order that, a quorum of Members not being present, it was not competent for the Chair to entertain a motion for a recess.

The Speaker[3] decided that, it appearing from the record that there was not a quorum present, no motion was in order except for a call of the House or to adjourn.

In this decision the House acquiesced.

**2951. The absence of a quorum having been disclosed, the only proceedings in order are the motions to adjourn or for a call of the House; and not even by unanimous consent may business proceed.**—On May 24, 1872,[4] the House, while considering the bill of the Senate (No. 569) for the relief of Thomas B. Wallace, of Lexington, Mo., found itself without a quorum on the vote on the passage of the bill. A call of the House was ordered, and then a motion to adjourn was defeated, a yea and nay vote being had on each of these motions.

At this point Mr. James A. Garfield, of Ohio, proposed that by unanimous consent further proceedings under the call be dispensed with, and that the bill be acted on by a rising vote, on the assumption that a quorum was present.

The Speaker pro tempore[5] said:

The vote upon the passage of this bill by yeas and nays has disclosed the fact that there is not a quorum in the House. The House thereby becomes constitutionally disqualified to do further business,

[1] Edgar D. Crumpacker, of Indiana, Chairman.
[2] First session Twenty-ninth Congress, Journal, p. 355.
[3] John W. Davis, of Indiana, Speaker.
[4] Second session Forty-second Congress, Globe, p. 3855.
[5] Clarkson N. Potter, of New York, Speaker pro tempore.

except that business which the Constitution authorizes the House to do when a quorum is not present, to adjourn, or to order a call of the House, and the proceedings in respect to that bill fell, and the bill, should there be a quorum in the House, must again come before the House for its passage.

**2952. The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business.**—On February 28, 1849,[1] at an evening session, Mr. Caleb B. Smith, of Indiana, moved a resolution to close debate in Committee of the Whole on a bill to establish the Territorial government of New Mexico.

On this motion the question stood, ayes 41, noes 64, no quorum voting. On a motion for a call of the House no quorum voted.

Mr. Samuel F. Vinton, of Ohio, proposed that by common consent they go into committee and take up the amendments of the Senate to the Indian appropriation bill.

The Speaker[2] said the Chair was obliged to state to the gentleman from Ohio that the last two votes showed that there was no quorum present. There must be a quorum of record before the House could proceed to business.

**2953.** On February 11, 1901,[3] Mr. James D. Richardson, of Tennessee, moved that the House adjourn. The yeas and nays being demanded and ordered, there appeared, yeas 59, nays 80, answering present, 6.

The result being announced, Mr. William S. Knox, of Massachusetts, announced his purpose to call up a report of the Committee of the Whole House on the state of the Union, in relation to an occurrence in the committee.

The Speaker said:

The Chair, however, is compelled to take cognizance of the fact that the House is without a quorum and not in a position to do business.

**2954. The absence of a quorum being disclosed, a motion to fix the day to which the House shall adjourn may not be entertained.**

**A motion which was by the rules more highly privileged than the motion to adjourn was not entertained after an affirmative vote on a motion to adjourn.**

On February 21, 1894[4] no quorum appearing, Mr. Richard P. Bland, of Missouri, moved that the House do now adjourn, pending which motion, Mr. J. Fred C. Talbott, of Maryland, moved that when the House adjourn to-day it be to meet on Friday next.

The Speaker[5] declined to entertain the motion of Mr. Talbott, for the reason that a quorum was required to decide it, the roll of the last preceding vote not having disclosed a quorum.

The question being put, Will the House adjourn? it was decided in the affirmative, yeas 141, nays 107.

Before the result of the foregoing vote was announced, Mr. Julius C. Burrows, of Michigan, moved that when the House adjourn to-day it be to meet on Friday next.

---

[1] Second session Thirtieth Congress, Globe, p. 624.
[2] Robert C. Winthrop, of Massachusetts, Speaker.
[3] Second session Fifty-sixth Congress, Record, pp. 2286, 2287.
[4] Second session Fifty-third Congress, Journal, p. 188.
[5] Charles F. Crisp, of Georgia, Speaker.

The Speaker [1] overruled the point of order on the ground that when the order was made the absence of a quorum was not disclosed by any proceeding in the House and did not appear in the Journal of the House, and that the statements of Members on the subject were merely expressions of their individual opinions.

2962. The absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason.—On June 9, 1856,[2] Mr. George W. Jones, of Tennessee, moved that the Journal of the preceding legislative day be amended by striking out the notice of a bill filed by Mr. Edwards, there being no quorum present on that day.[3]

It was objected in opposition to this motion that the Journal of that day did not show the absence of a quorum; but Mr. Jones urged that it was a matter of common knowledge that there was no quorum present.  This was not denied.

Various attempts to dispose of the motion were made, but failed for lack of a quorum until June 20, when Mr. Jones's motion was laid on the table, yeas 89, nays 38.

2963. When a vote taken by yeas and nays shows that no quorum has voted it is the duty of the Chair to take notice of that fact.—On June 5, 1884,[4] the House having under consideration a bill forfeiting certain land grants, the yeas and nays were ordered and taken on the passage of the bill.  After the vote had been taken the Speaker [5] announced that no quorum had voted and that the bill had not passed.

Upon the question being made by Mr. Poindexter Dunn, of Arkansas, that no Member had made the point that a quorum had not voted, the Speaker decided that when a vote was taken by yeas and nays it would be entered on the Journal of the House, and it was the duty of the Chair to take notice of the fact that a quorum had not voted and that the bill had not passed by a constitutional vote.

2964. The previous question having been ordered on a bill by unanimous consent in the absence of a quorum, the Speaker on the next day ruled that the action was null and void.—On February 19, 1873,[6] pending the demand for the previous question on the bill of the House (No. 2354) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by the States in the war of 1812, a quorum failed to vote and a call of the House was ordered.  After the roll had been called, the doors closed, and excuses offered, on motion of Mr. Leonard Myers, of Pennsylvania, by unanimous consent, this order was agreed to.

*Ordered,* That all further proceedings under the call be dispensed with, that the previous question shall be considered as seconded, and the main question ordered, upon the bill of the House (H. R. 2354) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by said States in the war of 1812, and that the House shall now adjourn.

The House accordingly, at 12 o'clock m., adjourned.

On the next day, the Journal having been read, Mr. Nathaniel P. Banks, of Massachusetts, made the point of order that the main question on the bill of the

[1] Charles F. Crisp, of Georgia, Speaker.
[2] First session Thirty-fourth Congress, Journal, pp. 1079, 1095; Globe, pp. 1379, 1427.
[3] Formerly bills were introduced by leave, and a previous notice was required.
[4] First session Forty-eighth Congress, Journal, p. 1385.
[5] John G. Carlisle, of Kentucky, Speaker.
[6] Third session Forty-second Congress, Journal, p. 447; Globe, p. 1518.

App. 90

Objection having been made, the following resolution was offered by Mr. John Dalzell, of Pennsylvania, and agreed to by the House:

*Ordered,* That the clerk be directed to return to the Senate the enrolled bill (S. 5718) providing for the sale of sites for manufacturing or industrial plants in the Indian Territory, with the information that the House has considered the request of the Senate that the House vacate the action of the Speaker in signing said enrolled bill, and that the unanimous consent necessary to enable such action to be taken was refused.

3458. **The Speaker may not sign an enrolled bill in the absence of a quorum.**—On May 20, 1826,[1] Mr. Jacob Isacks, of Tennessee, from the Joint Committee for Enrolled Bills, reported that the committee had examined an enrolled bill entitled "An act making appropriations for the public buildings in Washington, and for other purposes," and had found the same to be duly enrolled.

When a quorum not being present, objection was made by a Member to signing the said bill by the Speaker.[2]

And thereupon the House adjourned.

3459. **Proceedings in correcting an error where the Speaker had signed the enrolled copy of a bill that had not passed.**—On March 14, 1864,[3] the Speaker stated to the House that—

the Secretary of the Senate having inadvertently, on Friday last, announced the passage by the Senate of the Court of Claims bill No. 116, instead of the bill of the House (H. R. 116), and having since corrected said error by certifying to the bill which actually did pass, the Speaker, with the consent of the House, will cause the Journal of that day to be amended by the insertion of the title of the bill which actually passed, in lieu of the one originally announced; and when reported by the committee he will sign the proper enrolled bill, canceling his signature of H. R. C. C. 116.

The unanimous consent of the House was given to the course indicated by the Speaker.[4]

3460. **It is a common occurrence for one House to ask of the other the return of a bill, for the correction of errors or otherwise.**—On April 11, 1810,[5] the House proceeded to consider the amendments of the Senate to the bill entitled "An act regulating the Post-Office Establishment."

Mr. Ezekiel Bacon, of Massachusetts, moved that the following words, "Section 25, lines 2 and 3, strike out the words 'each postmaster, provided each of his letters or packets shall not exceed half an ounce in weight,'" appearing to have been an interpolation in the amendments sent from the Senate after the same were received by this House, be expunged therefrom.

Pending consideration a message was received from the Senate requesting the return of the bill and amendments,

it having been discovered that an inaccuracy had taken place in stating the amendments of the Senate.

The House ordered the bill returned, and the same day a message from the Senate returned to the House the corrected amendments.

---

[1] First session Nineteenth Congress, Journal, p. 639.

[2] John W. Taylor, of New York, Speaker.

[3] First session Thirty-eighth Congress, Journal, p. 377; Globe, p. 1096.

[4] Schuyler Colfax, of Indiana, Speaker.

[5] Second session Eleventh Congress, Journal, pp. 355, 356 (Gales and Seaton ed.); Annals, pp. 650 (Vol. I) and 1769 (Vol. II).

The Speaker then said:

The first part of that clause declares that "each House shall be the judge of the election, returns, and qualifications of its own Members, and a majority of each shall constitute a quorum to do business." This is the broad charter given in the Constitution by which the two Houses transact all their legislative business. It includes, of course, within its range of power the authority to lay down an order of business, to decide when they shall meet, and what business they shall or shall not take up when they do meet. This is the power conferred by the Constitution upon a quorum of each House.

The clause then concludes by giving certain powers to less than a quorum. "A smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent Members, but in such manner and under such penalties as each house may provide." They must, therefore, compel the attendance of absent Members in such Manner as each House (which means a quorum thereof) shall have provided anterior to that time. It follows, the Chair thinks, by the plain reading of the Constitution, that a minority of each House, less than a quorum, can not have, as the gentleman from Ohio (Mr. Schenck) argues, larger power than a majority of each House sitting as a legislative body. If the point of order made is correct, less than a quorum has more power than more than a quorum, an anomaly never recognized by parliamentary law nor conferred by the Constitution, in the opinion of the Chair. The limitation of the power of less than a quorum is absolute. They may do certain things in such manner and form and under such penalties as each House (which means a majority thereof) shall have previously provided.

The Chair, therefore, overrules the point of order on three grounds: First, that both Houses of Congress, at the opening meeting of the first session of this Congress, considered this provision of the Constitution, when it declared for exactly such an adjournment as is provided for in the pending resolution. That is a parliamentary precedent not questioned at that time, as the Chair understands, by any Member in either branch—certainly not appealed from in either branch—but spoken of latterly, when it was supposed there might not be a quorum present on the 3d day of July.

The Chair overrules it for a second reason, which is, that a majority of each House, when there was a quorum present, have determined that when Congress assembled on the 3d of July, if there was not a quorum present the absent Members should not be coerced, but that the presiding officers of both branches, who were simply the organs and servants of the two Houses to execute their orders, should then adjourn Congress without day, with full notice to every Senator and Representative of what would be the specific order of business on the 3d day of July, and what would be the result if a majority of either House failed to appear on that day.

The Chair overrules it on the third ground, that at the conclusion of long sessions the two Houses have sometimes provided for an adjournment at a specified day and hour, but that after a certain date only formal business, such as the signing of bills, shall be transacted, and at the final adjournment of such first session less than a quorum has been present.

If the point of order made by the gentleman from Ohio be correct, then if there were no quorum present at such a time the absence of a quorum would render null the concurrent resolutions of quorum of both the House and the Senate.

Mr. Schenck having appealed, the Chair was sustained, yeas 125, nays 14.

On July 20,[1] the Congress took another recess until November 21. When it reassembled the roll of the House was not called, and no notice of the presence of a, quorum was sent to either Senate or House. The Speaker (Mr. Colfax) also assumed that the first business in order was the reading of the Journal of the last day before the recess.

6687. A recess of Congress is a real, not imaginary time, when it is not sitting in regular or extraordinary session.

---

[1] First session Fortieth Congress, Journal, p. 253; Globe, p. 768. The resolution providing for this recess was in the ordinary form, providing simply that the presiding officers adjourn their respective Houses to meet on November 21. (Journal, p. 250.)

*Jorge Castillo and Ismael Arenas - 6.75*
*the same person or George.*    Case No. _____

## AFFIDAVIT FOR SEARCH WARRANT

I state under oath that I have reason to believe that at the place, in the vehicle or on the person known or described as:

1118 West 41st Ave., a white two story house, with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

in the City of Denver, County of Denver, State of Colorado, there is now located the following described property or contraband:

Controlled substances (including but not limited to coca leaves, coca leaf derivatives, opium derivatives, depressant drugs, methamphetamine, hallucinogenic drugs, tranquilizers) and marijuana and marijuana concentrate all as defined in Colorado Revised Statutes 18-18-102, as amended, together with such vessels, implements and furniture used in connection with the manufacture, production, storage or dispensing of such substances and articles of personal property tending to establish the identity of person or persons in control of or possession of the place or vehicle or in control of the contraband related paraphernalia consisting in part and including, but not limited to fingerprints, utility company receipts, rent receipts, canceled mail envelopes, photographs, keys, currency, coins, firearms, vehicle registration(s), credit card receipts, repair bills, and articles of clothing, believed to be situated at the place, in the vehicle or on the person known or described as:

1118 West 41st Ave., a white two story house, with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

The facts tending to establish the grounds for issuance of a Search Warrant are as follows:

Your affiant, Daniel E. Rojas #83026, has been a Police Officer for over 20 years. Your affiant was assigned to the Denver Police Department (heretofore referred to as DPD) Vice Narcotics Bureau in February of 2000 as a detective. Your affiant currently holds this position.

As a narcotics detective, your affiant has received training in the area of drug identification, undercover techniques, surveillance techniques and identification of narcotics traffickers. Also your affiant has personally participated in numerous search warrants. The majority of these search warrants were for controlled substances in which illegal drugs, documents, weapons, assets, vehicles and sums of money were seized. Your affiant has also arrested and assisted in the arrest of hundreds of individuals involved in the manufacture, sale, distribution and transportation of controlled substances.

Your affiant has debriefed, interviewed and discussed with hundreds of defendants, confidential sources and highly experienced narcotics investigators, the techniques and methods of illegal drug distribution. Your affiant also continues to keep himself abreast of current trends in the trafficking of controlled substances by continually talking with other law enforcement officials at the State and Federal level. Your affiant has received training regarding drug trafficking and enforcement techniques from the DEA, State and local law enforcement agencies.

## On or about February 15, 2004:

Your Affiant received information from a previous reliable confidential informant, (hereafter referred to as CI #1) regarding the distribution of crack cocaine, by a Hispanic male party known as "JORGE." CI #1 informed that he became aware of Jorge through a friend, who purchased crack cocaine from Jorge on a regular basis. CI #1 informed that on several occasions he/she went to meet Jorge when the friend purchased quantities of crack cocaine. CI #1 further related that Jorge did not generally sell drugs at the house but instead he employed a call and delivery system by use of a cell phone (Jorge is 720-435-9635.) CI #1 states that a person answering to the name of Jorge

Affidavit for Search Warrant

Page 2

answers the phone and receives the illegal drug orders then arranges to meet and make the deliveries of drugs to the customer, who is directed to wait in the area of W. 41st Ave. and Kalamath St., Denver, Colorado.

Through interviews that your affiant has had with the CI, your affiant was made aware that the informant is familiar with the appearance of heroin and crack cocaine. The CI is also familiar with how heroin and cocaine are commonly packaged and sold due to the Confidential Informant's past use of controlled substances. The CI has never provided your affiant with information that has proven to be false or incorrect.

**February 24, 2004:**
Your Affiant, with other members of the Denver Police Department, conducted a controlled buy operation in the area of W. 41st Ave. and Kalamath St. utilizing CI #1. Before responding to W. 41st Ave. and Kalamath St., your affiant caused CI #1 to be searched and determined that he or she was not in possession of a controlled substance or U. S. currency. Your Affiant then provided CI #1 with U. S. currency the serial numbers of which had been pre-recorded. A cover team of DPD detectives positioned themselves near and around the address to assist in surveillance.

Your affiant then directed CI #1 to make phone contact with Jorge and request a quantity of crack cocaine. CI #1 then dialed number #720-435-9635, and spoke to a male, who answered to the name of Jorge. CI #1 requested a quantity of crack cocaine and Jorge agreed to meet CI #1 near the intersection of W. 41st Ave. and Kalamath St. Your Affiant followed CI #1 into the area and kept CI #1 under constant surveillance until he met with a white male that walked up to meet CI #1 at W. 41st Ave. and Kalamath St. After a brief conversation between CI #1 and the white male Your Affiant observed a Hispanic male walk out of the alley next to the house that was later identified as 1118 W. 41st Ave. and meet with CI #1. The white male walked away and was last observed walking into the back yard of 1118 W. 41st Ave. The second man who walked up to meet with CI #1 talked to CI #1 for more than 20 minutes, walking him around the neighborhood until returning to W. 41st Ave. and Kalamath St. and then parting ways. This man was later identified by name of Jorge Castillo, date of birth 10-28-63. CI #1 returned to Your Affiant and informed he/she was unsuccessful in making the purchase.

The following information was related to Affiant by CI #1 upon debriefing: CI #1 stated that the first man who met with CI #1 was a white male who Jorge sent out to talk to CI #1. After a brief conversation with the white male Jorge walked up and told the white male he could return to the house. The white male left and Jorge began to question CI #1 regarding how he came to obtain his (Jorge's) cell-phone number, who, how and when had he come to buy drugs with. After answering many questions and after walking around the neighborhood Jorge finally told CI #1 that he would sell drugs to CI #1 but not before he talked to CI #1's wife and questioned her to insure CI #1 was not with the police. CI #1 talked to Jorge in attempt to convince Jorge that CI #1 was not with the police and again asked him for a quantity of crack cocaine. Jorge stood firm and told CI #1 that he was not totally convinced that CI #1 was not working for the police but since he did not know CI #1 he had to refuse to sell drugs to CI #1. The investigation stalled but was followed up with sporadic surveillance conducted by Your Affiant.

**Surveillance:**
During the following weeks after the attempt buy Your Affiant conducted sporadic surveillance at 1118 W. 41st Ave. and observed Jorge and the same white male enter and leave the house on several occasions and meet with parties nearby. Some parties were observed going directly to 1118 W. 41st Ave. Some of these parties arrived in vehicles and others arrived on foot or on bicycles. In most cases the parties were observed leaving a short time after their arrival and some of the parties were observed entering through the back yard gate and going to a truck with camper for a short period of time and leaving within five minutes after arrival. Your Affiant observed that the house was a white two story single family residence, with a 6' privacy fence around the property. The property is

L.H.L., 05/2?/0?
2

(5)

Affidavit for Search Warrant

Page 3

located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, or fence. Affiant also observed that their was a single story white house next door to the East of the white two story house, on the corner, facing Jason St., and that house appeared to be part of the same property with the white two story house. The single story white house was vacant (and is still vacant) and bears the numbers 4059 or the front wall above the door and has a FOR RENT sign on the front window with contact phone number of 303-916-7890. Through the Internet (Denver Real Estate Property Tax Records) Affiant found that 4059 Jason St. is recorded as one **single story**, two bedroom house built in 1908 and owned by Mark Pelz and Alison M. Steiskel. The property next door, which appeared to be in the back yard of 4059 Jason St., is 1118 W. 41st Ave. and is recorded as one **two story**, two bedroom house, built in 1908 and owned by Mark Pelz and Alison M. Steiskel. (No other properties are recorded with address in the 1100 block of W. 41st. Avenue.)

**Information from second informant:**

On or about the last week of April to the first week of May, Your Affiant received information from a second Confidential Informant (hereafter referred to as CI #2) who related that he/she observed a man known as Jorge in possession of a quantity of heroin and crack cocaine in a two story, white house near 41st Ave. and Kalamath St. Through interviews that your affiant has had with CI #2, Your Affiant was made aware that CI #2 is familiar with the appearance of heroin and crack cocaine. CI #2 is also familiar with how heroin and cocaine are commonly packaged and sold due to the Confidential Informant's past purchasing and use of this type of controlled substance. CI #2 has never provided your affiant with information that has proven to be false or incorrect.

*This is the same exact as CI #1 except now*

Your Affiant debriefed CI #2 and learned the following: That Jorge was distributing heroin and crack cocaine and that a white male named Wayne was working for Jorge, running heroin and crack cocaine out to the customers. CI #2 describes Wayne as a white male, approximately 40 to 45 years old, tall and slender build, with short brown graying hair. CI #2 also informed that Jorge was very cautious in his modus operandi and explained that Jorge keeps a small supply of drugs in the house sometimes but most often **keeps the drugs concealed in the yard somewhere (possibly in one of the vehicles or the trailer located there)**. CI #2 further related that the two men sold drugs to some of the customers at the house but with most customers Jorge employed a call and delivery system by use of a cell phone. CI #2 states that Jorge requires all customers to call first and he always answers the phone (#720-435-9635). Upon phone contact Jorge will then either invite the customer to the house or will take the drug order and then will send Wayne out to make the deliveries of heroin or cocaine to the customer.' The customer is directed to wait a block away from the house on Jason St. or on Kalamath St.

*No previous mention of trailer*

On 5-14-04, Your Affiant met with CI #2 and transported CI #2 to the area of W. 41st Ave. and Kalamath St. in order to identify the location of the house where Jorge was keeping a supply of heroin and crack cocaine. CI #2 pointed out the house, which was identified as 1118 W. 41st Ave. Denver, Colorado. In effort to identify Jorge and Wayne, Affiant conducted close surveillance and observed several cars, a brown van, white van, a truck with camper and a streamline trailer home all in the back yard. Four male parties were observed in the back yard next to the truck with camper. Two of the males were on bicycles and left in hurry. One of the males was on foot and was a white male. He appeared to enter the camper, while the fourth male walked out of the back yard and onto the sidewalk area. Affiant recognized this party to be the same person who met with CI #1 on February 24, 2004 and known as Jorge. Affiant made contact with this man in effort to identify him. Upon requesting identification from Jorge he stated he did not have ID but stated his name was Jorge Castillo, date of birth 10-28-63. Affiant left 1118 W. 41st Ave. and later conducted a criminal history check on the NCIC/CCIC for Jorge Castillo. Jorge Castillo is currently on probation through Denver District Court for a 2003 drug possession case. Jorge Castillo has a second Denver arrest and conviction in Denver District Court for possession of controlled substance in 2001. Affiant examined

*The 2003 drug case of Castillo is the same case from 2001, but I Castillo was convicted on 2003.* LHt., 05/29/04.

3

Affidavit for Search Warrant                                                                                                Page 4

DPD mug photo #19568121 of Jorge Castillo and made positive ID. Affiant displayed the same mug photo to CI #1 as well as CI #2 and both made positive identification stating this was the person known as Jorge.

Controlled Purchase:

Your Affiant arranged to conduct a controlled purchase operation utilizing CI #2. The controlled buy was made within the past seventy-two hours and between the dates spanning 5-21-04 and 5-24-04. Before responding to 1118 W. 41st Ave., Affiant caused the CI to be searched and determined that he or she was not in possession of a controlled substance or U. S. currency. Affiant then provided the CI with U. S. currency the serial numbers of which had been pre-recorded. A cover team of DPD detectives positioned themselves near and around the address to assist in surveillance. During surveillance Detective Jason Carrigan observed a party matching the physical description of Jorge Castillo walking around the property and meeting with persons on the sidewalk in front of 1118 W. 41st Ave. and then observed the man walk into the property through the 6' privacy fence on the north side of the property.

Affiant directed CI #2 to make phone contact with Jorge and request a quantity of heroin. The CI informed that Jorge had changed his phone number recently and his new cell phone number is 720-298-1416. CI #2 dialed number 720-298-1416 and spoke to a male, who answered to the name of Jorge. After the phone call CI #2 informed Affiant that Jorge invited CI #2 to his home to conduct the drug transaction. Affiant then escorted CI #2 to 1118 W. 41st Ave. Denver, Colorado. Upon arrival Detective Jason Carrigan observed CI #2 enter the property through the north side door of the 6' privacy fence surrounding 1118 W. 41st Ave. CI #2 was kept under constant surveillance until CI #2 stepped onto the property and through the door of the 6' privacy fence. CI #2 did not stop or make contact with anyone before arriving at 1118 W. 41st Avenue. After a period of time had passed CI #2 exited the property through the north side door of the 6' privacy fence and returned directly to your Affiant, without stopping anywhere or contacting anyone along the way. Upon contact CI #2 handed Affiant a quantity of heroin purchased from Jorge.

Upon debriefing CI #2 he/she stated the following: That Jorge invited CI #2 into the two-story house previously identified as 1118 W. 41st Avenue. Once inside Jorge engaged CI #2 in conversation for a period of time before he stepped out onto the back yard. Soon after Jorge went into the back yard at 1118 W. 41st Ave. he returned and sold CI #2 a quantity of heroin, which CI #2 surrendered to your Affiant. CI #2 stated that Wayne was also in the house as well as other customers, who also purchased illegal drugs. Note: Jorge was not seen leaving the property before CI #2 left, indicating that Jorge obtained his supply of heroin from somewhere in the yard.

Your Affiant placed the suspected heroin purchased from Jorge Castillo at 1118 W. 41st Ave. in the Denver Police Department Property Bureau with a request for a presumptive screening analysis. Forensic Chemist Charles Butler conducted a chemical analysis on the suspected heroin. Charles Butler reports that the substance tested positive for Heroin.

Over the past 10 days surveillance was conducted at 1118 W. 41st Ave. During surveillance there were numerous vehicles and persons noted coming and going from 1118 W. 41st Ave. A white male matching the description of Wayne was observed walking out from 1118 W. 41st Ave. and meeting with parties a short distance away, such as at 40th and Jason St. to Kalamath St. and 41st and Kalamath St. to Lipan St. Some of the parties visiting 1118 W. 41st Ave. were adult males arriving on bicycles. On one occasion Affiant followed two adult males leaving 1118 W. 41st Ave. (both Hispanic males, in late 20s to mid thirties.) After leaving 1118 W. 41st Ave. the two males rode directly to the area of Park Ave. and Curtis/Champa St., which is an area known for open air drug dealing. From Affiant's knowledge and experience the aforementioned activity observed at 1118 W. 41st Ave. is consistent with drug dealing and drug use and match the information supplied by both CI #1 and CI #2.

*L.H.L., 05/24/04*

On May 24, 2004, Affiant dialed the number on the sign in the window of 4059 Jason St. and spoke to a male who identified himself as Mark Pelz, owner of the property. Mr. Pelz informed that he was renting 4059 Jason St. and that it is now vacant. Mr. Pelz also informed that the home behind 4059 Jason St. (identified as 1118 W. 41st Ave.) was also his property but it was already rented to someone. Mr. Pelz states that the back yard between 4059 Jason St. is a common area for both houses and is to be shared by occupants of both houses when they are both occupied.

Based on the Aforementioned information contained in this affidavit your Affiant respectfully requests that a search warrant be granted for the address of 1118 West 41st Ave., a white two story house. with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

_Daniel E. Rojas 83026_
Signature of Affiant

Subscribed under oath before me on this 24th day of May, 2004 at 4420 in the City and County of Denver, CO

READ + APPROVED BY
?.P.A. L. LEVINE, #21939.

05/28/04, 1621 Hours.

Signature of Judge

MICHAEL A. MARTINEZ
Printed Name of Judge

# SEARCH WARRANT

County/District Court
City and County of Denver, Colorado    ) THE PEOPLE OF THE STATE OF COLORADO

To Daniel E. Rojas #83026, or any officer authorized by law to execute a Search Warrant in the County in which the property is located in Colorado. The affiant, Daniel E. Rojas, has filed an Affidavit for a Search Warrant in conformity with the provisions of the Colorado Rules of Criminal Procedure for the following described property:

1118 West 41st Ave., a white two story house, with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

Controlled substances (including but not limited to coca leaves, coca leaf, derivatives, opium derivatives, depressant drugs, hallucinogenic drugs, tranquilizers) and marijuana and marijuana concentrate all as defined in Colorado Revised Statutes 18-18-102, as amended, together with such vessels, implements, and furniture used in connection with the manufacture, production, storage, or dispensing of such substances and articles of personal property tending to establish the identity of person or persons in control of or possession of the place or vehicle or in control of the contraband and related paraphernalia, consisting in part and including, but not limited to fingerprints, utility company receipts, rent receipts, canceled mail envelopes, photographs, keys, currency, coins, firearms, vehicle registration(s), credit card receipts, repair bills, and articles of clothing, believed to be situated at the place, in the vehicle or on the person known or described as:

1118 West 41st Ave., a white two story house, with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

City of Denver, County of Denver, state of Colorado; upon one or more of the grounds set forth in the Colorado Revised Statutes and the Colorado Rules of Criminal Procedure, namely; that this property is stolen or embezzled; or is designed or intended for use as a means of committing a criminal offense; or is or has been used as a means of committing a criminal offense, or the possession of which is illegal; or would be material evidence in a subsequent criminal prosecution in this state or another state; or the seizure of which is expressly required, authorized or permitted by any statute of this state.

Based upon the affidavit of the above named affiant, which is incorporated by reference, I am satisfied that there is probable cause to believe that the property described is located at the place, in the vehicle or on the person above described. YOU ARE THERFORE COMMANDED to search the place, vehicle or person described for the property described, and to make a return of this Warrant to the undersigned judge within ten days, and to deliver to the person from whom the property is taken, a copy of this Warrant together with a receipt for the property taken, or, to leave a copy of the Warrant and receipt at the place from which the property was taken.

Date 5/24/04 , Time 442 p
in Denver, Colorado

_____
Signature of Judge

MICHAEL A. MARTINEZ
Printed Name of Judge

*Michael A. Martinez*

## IMMEDIATE ENTRY SEARCH WARRANT

YOU ARE FURTHER INSTRUCTED THAT YOU MAY ENTER THE ABOVE DESCRIBED PLACE TO BE SEARCHED FORCIBLY WITHOUT FIRST KNOCKING AND ANNOUNCING YOUR IDENTITY AND PURPOSE.

_____
Signature of Judge

000076

**JEFFREY A. TRUJILLO, Attorney at Law**

◆ ◆ ◆

1321 Bannock St.
Denver, Co. 80204
◆
Phone 303-893-2179
Fax 303-825-1160

October 13, 2004

Jorge Castillo
#193291

Dear Mr. Castillo:

I have received both of your letters. I represented you in Denver District Court Case # 04F22213. That case was dismissed by the DA's office which effectively terminated my representation of you with respect to the possession of a weapon by a previous offender charges.

I can tell you that at least 45 days ago I turned over *everything* I had in my possession regarding your case to your defense counsel in the Federal case.

Best Regards,

Jeffrey A. Trujillo

*this case is when was in the State level but is the same case in the Federal level 04-Cr-282WyD and the state Claim A Gun only without Drugs but Now the Federal Claim Drugs also.*

City and County of Denver
State of Colorado

*Page 2*                                                                    500243

Property
Management #_____

# RETURN AND INVENTORY

DPD Case # _____

I, *Q. ROJAS 83026* , received a Search Warrant issued by Judge *Michael Martinez*

on *5-24-04* , to search the place, vehicle or person known or described as:

*1118 W. 41st Ave*

City of *Denver* , County of *Denver*

On *5-28-04* , at *845* o'clock *P* M, I executed it by searching the place, vehicle or person described in

the Search Warrant and left a copy of the Search Warrant and this inventory with:

*1118 W. 41st Ave*

Location or place searched, or owner or name of person searched together with an inventory of the property taken.
The following is an inventory of property taken pursuant to the Search Warrant.

### DESCRIPTION OF ITEMS

List property/evidence in this order whenever applicable:
1 - MONEY     2 - CONTRA BAND DRUGS/NARCOTICS     3 - WEAPONS     4 - REMAINING PROPERTY/EVIDENCE
Article descriptions must be complete as possible. Gun descriptions must include make, type of action, caliber and serial number.
Indicate the Status (S) of each article invoiced into the Property Section.     E - Evidence     P - Personal Property     F - Found Property

SERIAL NUMBERS CHECKED BY: _____

| # | ARTICLE TYPE & BRAND NAME | MODEL # | COLOR | SERIAL NUMBER / CAD or CASE NUMBER | S | BIN | BY |
|---|---|---|---|---|---|---|---|
| 1 | US Currency Various Bills # 83026 on suspect Jorge Castillo | Bills | # | 1445 oo (Found by Det. Rojas) B-011947 | E | CASH | |
| 2 | (3) Crack Pipes ( Det. Rojas on susp Jorge Castillo) | | | | E | F048 | |
| 3 | Pocket-Tech Scale (blk) (Det. Wilson 93-3 on top of refrig) | | | | E | F048 | |
| 4 | Scale (Blk) (Tech Garcia 96-008 Living Rm on stereo stand) | | | | E | F048 | |
| 5 | S&W 32 caliber Gun | | | # 35776 (mattrs) N. Bedroom under of Jeffers | E | GUN | |
| 6 | 4 Rounds 32 Caliber (Found inside of Gun by ofc Jeffers 99061 | | | | E | F048 | |
| 7 | Suspected Marijuana ( by dresser in N. Bedroom by ofc Jeffers 99061 | | | | E | F048 | |
| 8 | Suspected crack cocaine in 2 bags from Wayne Dibble (found by Rojas) | | | | E | DRUG | |
| 9 | Suspected crack cocaine found by officer Hughes 01078 from Wayne Dibble | | | | E | DRUG | |
| 10 | Cellphone (720-365-0400) | | | from Wayne Dibble | E | 1754 | |
| 11 | Cellphone (720-298-1416) | | | | E | | |
| 12 | Misc. Papers from house | | | | E | | |

This inventory is a true and detailed account of all property taken pursuant to the Search Warrant and was made by:

_____ 85702     in the presence of _____ 85026

Signature of Officer                                                       Signature of Another Officer or Credible Person

DPD 373 (Rev. 8/88)

Detective around the yard at 1118 W. 41st Ave. He pointed out several locations, under a large tree stump and in the weeds and near a shed. William Bateman stated he observed Jorge hide bags of drugs in the recent past in these locations. No drugs were found. Bateman related that Jorge did not trust anyone and was very good at hiding his drugs. He stated that Jorge was in possession of a bag of crack cocaine just minutes before Police arrival.

## RECOVERY OF EVIDENCE:

### Items #1 and #2,

Reporting Detective entered the residence after METRO/SWAT had secured the occupants. Reporting Detective took custody of suspect Jorge Castillo and conducted search of his person. Reporting Detective found Item #1, $1445.00 in U.S. currency (mostly small bills) from Castillo's pants pockets. Also found on Castillo were three new glass crack pipes, item #2. Reporting Detective inspected the contents of Castillo's wallet and copied same (at HQ) including a Wells Fargo Bank receipt for a deposit of $1600.00 made at 3:38 PM on 5-28-04 (account #5686678383). Reporting Detective placed Castillo's wallet in the DPD Property Bureau as Personal Property (item #13).

### Item #3

Upon entering the kitchen area Reporting Detective observed a box of Latex gloves, two walkie talkies and a notebook on the kitchen table along with some drug packaging material torn pieces of plastic bags (both on the table and under the table). This was photographed and not recovered. Detective Robert Wilson #93003 recovered item #3, a Pocket-Tech digital scale from on top of the refrigerator.

### Items #4, 5, 6 and 7,

Found in the living room, on the stereo stand was item #4, a grey digital scale, found by Technician Alfonso Cervera #96008. Officers turned their attention to the upstairs north bedroom. Officer Brian Jeffers #99061 found item #5, a loaded S&W 32cal. Revolver, found under the bed and mattress. Item #6 were the four live 32cal. rounds removed from the gun and placed in evidence separately. **Item #7 was a small amount of marijuana** found by Officer Jeffers on a dresser.

### Items #8 and #9,

Technician Cervera took custody of Wayne Dibble and after transporting to the District One station, conducted a custodial search. Technician Cervera found **2 bags of suspected crack cocaine** in Wayne Dibble's right front shorts pocket. This was placed in evidence as item #8. Later after Dibble was placed in holding cell #2, at the District One Station, Officer William Hynes #01025 and paramedic Leslie K. Sparrow, were called to check Dibble and upon contact Dibble was found clutching a small amount of suspected crack cocaine and observed dropping same to the floor. Officer Hynes took custody of this evidence and handed it to Officer Hana Ruiz #03024, who placed the suspected crack cocaine in evidence as item #9.

Item #10 was a Kyocera cell phone with phone number 720-365-0400, belonging to Wayne Dibble.

Item #11 was a Kyocera cell phone with phone number 720-298-1416, belonging to Jorge Castillo.

Item #12 were documents which found in the kitchen, including a large mailing envelope from the Public Defender's Office, which had been mailed to Jorge Castillo at 1118 W. 41st Ave. Denver, CO. A piece of paper with handwritten notes and a notebook with several pages of handwritten business ledger style notes, both found on the kitchen table.

## Information from landlord:

On May 29, 2004 Reporting Detective contacted Mark Pelz, the landlord of 1118 W. 41st Ave. and explained in brief the action taken by Police. Reporting Detective asked for information regarding the lease. Mr. Pelz stated that Jorge Castillo paid the rent and he was on the lease along with his girlfriend, Sharon. Mr. Pelz relates that

0 0 0 1 8 5

Case No.:

## Denver Police Department
## STATEMENT

| | |
|---|---|
| NAME (LAST, FIRST, MIDDLE INITIAL) **JEFFERS, BRIAN T** | MAKING STATEMENT IS: ☒ OFFICER ☐ WITNESS ☐ PERSON ADVISED |

| RESIDENCE STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE (720) 913-0483 | SOCIAL SECURITY NO. | DATE OF BIRTH/SERIAL NO. 99061 |
|---|---|---|---|

| BUSINESS STREET ADDRESS 1311 W. 46TH AVE | CITY DENVER | COUNTY DENVER | STATE Co | ZIP CODE 80211 |
|---|---|---|---|---|

| OFFICER TAKING STATEMENT | SERIAL NO. | DATE | | TIME |
|---|---|---|---|---|

| CONCERNING AN INCIDENT AT 1118 W. 41ST AVE | LOCATION WHERE STATEMENT TAKEN DIST. 1 |
|---|---|

On 05-28-04 at approximately 2030 hours while working car 1155C, with Tech. Cervera (96008), we responded to 1118 W. 41st Ave to assist with a search warrant.

Upon our arrival and when the scene was secured I assisted with the search. During the search I located a .32 caliber Smith and Wesson revolver, serial #H78404, underneath the mattress of the bed upstairs. The bed was in the north bedroom. I also located a baggy that contained a small amount of suspected marijuana behind the dresser on the north wall.

I was asked by one of the detectives on scene to transport two wanted parties to Dist. 1. Dibble, Wayne (04-19-55) and Bateman, William (05-14-83), who both had warrants, where transported to Dist. 1.

While at the station Tech. Cervera (96008) told me that he had found to baggies of suspected crack-cocaine in the right front pocket of Dibble, Wayne. The evidence was recovered and placed in the property bureau and the paperwork was completed.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

05 28 10⁴
Date

2240
Time Statement Completed

Signature of person making statement    99061

000017        EXHIBIT NO. 2

200424372

# DENVER POLICE DEPARTMENT
## INTER-DEPARTMENT
## CORRESPONDENCE

TO:      Detective Daniel Rojas

FROM:    K Kelso, ASA III

DATE:    September 6, 2006

SUBJECT:   Property Sign-Off

The attached item(s) have been confirmed as a valid hit.  If the item is available to be released or shipped to the victim or agency reporting it stolen, please complete a property release printout form.  A copy of the form will be sent to the property bureau and a copy to Det. Gene Lund or Det. Sue Moran of the Property Recovery Unit, who will notify the victim or agency that the item(s) is available for release or to be picked up. This will prevent sending out multiple notices on the same item(s).

We ask for your corporation in this matter and would welcome any suggestions on how we can alleviate this problem.  You can contact us at 720-913-6032.

Smith & Wesson pistol revolver ser/H78404
Reported stolen out of Golden, CO PD
OCA/023266

In the property bureau under invoice #680248

ST ... _____ 2048 ____ CASE204 ____

$6: PR2    D E N V E R   P O L I C E   D E P A R T M E N T
*** 10/19/05 07:15 ***
PROPERTY SECTION INVENTORY SYSTEM - INVOICE DETAIL FOR INVOICE: 680240
------
THIS PROPERTY HAS BEEN HELD FOR 1 YEAR OR MORE, OR HAS BEEN SCHEDULED
FOR RELEASE. MARK THE APPROPRIATE DISPOSITION, SIGN AND RETURN TO THE
PROPERTY SECTION WITHIN 10 DAYS. (SEE OPS. MANUAL SEC. 106 00)
OFFICER NOTICE DATES: 06/30/04 , , ,
*** RELEASE___ TOTAL___ CIRCLED ITEMS ONLY___ TAKE PHOTO___ OWN PROOF___
TO:_____ ADDRESS_____ ZIP_____
___ OWNER NOTIFIED___ (Y/R) NOTIFIED DATE_____ CARD SENT?___ (Y/N) BY/SER. NO.____
*** DISPOSE OF___
*** HOLD____ CASE #_____ PENDING ?____ WARRANT ?____ APPEAL ?____
OTHER_____ REQ'D_____ APPROVED_____

SIGNED/OFF.NAME_____ Wood ____ SER. NO. 7972 DATE 1-9-6
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
DISPO INFO CALL: - FELONIES/720.865.9060  STATE MISD/720.865.7820
GSS&C/720.865.8301 (OPTION 7)
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

INVOICE NMBR: 680248 ,              INVOICE DATE: 05-28-04
RECEIVED BY: C1754 C1754 , OFFICER(S) RECOVERING: 83026
CASE NUMBER: , CAD NUMBER: 0
DETECTIVE(S) ASSIGNED: , LOC CODE: 31
WHERE RECOVERED: 1118 W 41ST
COMMENTS: NARCS    HLD ALL ITEMS EXCEPT #1 PER 88-14 060504 C1348; REL
: EASE PNAU HOLD PER 88014 101905/C1615

PRISONER: CASTILLO, JORGE
AGE: 0 , DOB: 63-10-28 , ARREST DATE: 05-28-04 , CHARGE: PCS
PRISONER: DIBBLE, WAYNE
AGE: 0 , DOB: 53-04-19 , ARREST DATE: 05-28-04 , CHARGE: PCS
'C/O/F/VICTIM': N,A
ADDRESS: PHONE: 0.
...... ITEM NMBR 1 - DISPOSITION _____ TO GF DON 84002 JAN 14 2006
SECURITIES TYPE: FR
EVIDENCE: X
BIN NO: SE0504
SERIAL NO: 3011562
$ VALUE: 144500
COMMENTS: US CURRENCY $1,445.00  *DOG SNIFF 062304*

...... ITEM NMBR 2 - DISPOSITION Destroyed
ARTICLE NAME: PIPE
EVIDENCE: X
BIN NO: F048
QUANTITY: 3                 2006 JAN -9 AM11:57
COMMENTS: CRACK PIPES  VIEWED BY ROSE 83026
: HLD PER 88-14 060504 C1348

PROPERTY SECTION INVENTORY SYSTEM - INVOICE DETAIL FOR INVOICE: 680248 CONT'D

```
. . . . . . ITEM NMBR 3 - DISPOSITION    destroyed
        ARTICLE NAME: SCALE
EVIDENCE: X
    BIN NO: F048
    BRAND: POCKET-TECH
    COLOR: BLK
QUANTITY: 1
COMMENTS: VIEWED BY ROJAS 83026
        : HLD PER 88-14 060504 C1348

. . . . . . ITEM NMBR 4 - DISPOSITION    Destroyed
        ARTICLE NAME: SCALE
EVIDENCE: X
    BIN NO: F048
    COLOR: BLK
QUANTITY: 1
COMMENTS: VIEWED BY ROJAS 83026
        : HLD PER 88-14 060504 C1348

. . . . . . ITEM NMBR 5 - DISPOSITION    Destroy 1-23-06 7052
GUN/WEAPON TYPE: PR
      MAKE: SW
EVIDENCE: X
    BIN NO: CASE04
    BRAND: SMITH&WESSON
   CALIBER: 32
     MODEL: 31
SERIAL NO: H78404
  QUANTITY: 1
COMMENTS: VWD 060304 BY ATF MILLER/C1565; HLD PER 88-14 060504 C1348;
        : PD GOLDEN STEAL OCA/023266 TO PSR 060904/C1615
        : 062104 VWD BY ATF DIPERRO

. . . . . . ITEM NMBR 6 - DISPOSITION    Destroyed
        ARTICLE NAME: AMMO
EVIDENCE: X
    BIN NO: F048
   CALIBER: 32
  QUANTITY: 4
COMMENTS: ROUNDS OF LIVE AMMO  VIEWED BY ROJAS 83026
        : HLD PER 88-14 060504 C1348
. . . . . . ITEM NMBR 7 - DISPOSITION    DESTROYED, DB 77046 JAN 1 0 2006
NARCOTICS: MARIJU
EVIDENCE: X
    BIN NO: N0504E
COMMENTS: SUSP MARIJUANA
        : HLD PER 88-14 060504 C1348

. . . . . . ITEM NMBR 8 - DISPOSITION    DESTROYED, DB 77046 JAN 1 0 2006
NARCOTICS: COCAIN
EVIDENCE: X
```

PROPERTY SECTION INVENTORY SYSTEM - INVOICE DETAIL FOR INVOICE: C80258 CONT

BIN NO: N0504E
COMMENTS: SUSP COCAINE VIEWED BY ROJAS 83026
: HLD PER 88-14 060504 C1348

                                        DESTROYED, DD 77046  JAN 1 0 2006

          ITEM NMBR 9 - DISPOSITION_____
NARCOTICS: COCAIN
EVIDENCE: X
BIN NO: N0504E
COMMENTS: SUSP COCAINE VIEWED BY 83026
: HLD PER 88-14 060504 C1348

          ITEM NMBR 10 - DISPOSITION___ *Destroyed*_____
      ARTICLE NAME: TELEPH
EVIDENCE: X
BIN NO: F048
SERIAL NO: 4539032A5
QUANTITY: 1
COMMENTS: CELL PHONE VIEWED ROJAS 83026
: HLD PER 88-14 060504 C1348

          ITEM NMBR 11 - DISPOSITION *Destroyed*_____
      ARTICLE NAME: TELEPH
EVIDENCE: X
BIN NO: F048
SERIAL NO: 432P5A1F
QUANTITY: 1
COMMENTS: CELL PHONE VIEWED ROJAS 83026
: HLD PER 88-14 060504 C1348

          ITEM NMBR 12 - DISPOSITION *Destroyed*_____
      ARTICLE NAME: PAPER
EVIDENCE: X
BIN NO: F048
COMMENTS: MISC PAPERS VIEWED ROJAS 83026
: HLD PER 88-14 060504 C1348

          ITEM NMBR 14 - DISPOSITION *Destroyed*_____
      ARTICLE NAME: AMMO
EVIDENCE: X
BIN NO: F048
CALIBER: 25
COMMENTS: LIVE AMMUNITION VIEWED ROJAS 83026

Mr. Castillo rewrote Det. Rojas Summons 6US-6626 verbatim because you can barely read Rojas. Also the summons is dated 5-13-2004

I believe that Det. Fabricated this summons weeks or months after the raid trying to cover the fact that there is No record in headquarters or — any where else of the defendants arrest of 5-28-2004.

_Exhibit _____ First Page_

Members at the Denver police Department responded to 1118 W. 41st Ave to execute a Narcotics related Search — warrant. upon entry the Defendant was Contacted in the yard. The defendant was listed as tenant of 1118 W. 41st Ave. Detectives Searched the house. and found a loaded .32 Smith & wesson revolver in defendant's (1) (2) bedroom, Also found were numerous items of evidence indicating drugs Sales, and use. including scales X2 Crack pipes Packaging. Material and residue on scales. Three other parties were Contacted outside in yard (3) with Defendant. one was in Possesion of Crack Cocaine and all were arrested For Felony warrants, Defendant is Currently on probation For Denver drug Case and has 2 felony drug Convictions (5)

Respectevely, Jorge Castillo's I. A. U. Claims.

## REBUTTAL BELOW.

THE FACTS BELOW; "ABOVE IS INVALID because is untrue." is the true.

(1) – The sleeping arrangements at my house; The upstairs bedrooms weren't used by anybody on this month and Date 05-28-04; in the upstairs bedrooms were only a matress. an Boxspring and bed frame.

(2) – Jorge Castillo was living downstairs where a bed was Completely set up Containing blankets, Sheets, etc. on 05-28-04.

(3) – DET. Rojas Says that all parties where Contacted outside in yard with Defendant. The truth is, they Contacted 2-in the house, and 2 in yard.

(4) – Mr. Rojas Says that all of us have warrants, Castillo didn't have a warrant.

(5) – Mr. Rojas Says, Castillo has 2- felony, Castillo has only one Felony in Denver

(6) – Mr. Rojas Says, Castillo had Crack pipes, Castillo didn't have any Crack pipes.

THIS IS A LEGAL DOCUMENT   PLEASE PRINT CLEARLY, PRESS FIRMLY AND PROVIDE ALL INFORMATION REQUESTED:

NOTICE TO SHERIFF: IF THE DEFENDANT IS NOT RELEASED ON BOND HE/SHE IS TO BE BROUGHT TO THE FIRST PERIOD OF THE COURT DAY FOLLOWING FOR ARRAIGNMENT

DPD 237 (04-03)

GENERAL SESSIONS SUMMONS AND COMPLAINT
IN THE COUNTY COURT IN AND FOR THE CITY AND COUNTY OF DENVER AND STATE OF COLORADO, THE CITY AND COUNTY OF DENVER
BY AND ON BEHALF OF THE PEOPLE OF THE STATE
OF COLORADO, PLAINTIFF, AND/OR THE PEOPLE OF THE STATE OF COLORADO, PLAINTIFF, VS.

EVENT #:

GD-782628   DPD #

**DEFENDANT**

LAST NAME _____ FIRST _____ MIDDLE _____ DOB 10 28 65

COMPLETE HOME ADDRESS-INC. APT., CITY, COUNTY and STATE: 1118 W. 41 Ave.   Denver   Co.   ZIP CODE 80211

EMPLOYER - BUSINESS NAME   BUSINESS ADDRESS   BUS. PHONE   HOME PHONE   SSN

RACE W  SEX M  HGT. 5'6  WGT. 180  EYES  CORR. LENS  HAIR  DRIVER'S LIC. #   STATE

☐ SUMMONS
☐ JAILED

APPROX. LOCATION OF OFFENSE IN THE CITY AND COUNTY OF DENVER AT 1118 W. 41 Ave.   DATE AND APPROXIMATE TIME OF OFFENSE 5 28 04 AT 8:45 A ☐ PCT. #

☐ Domestic Violence Involved
☐ Gun Involved

You are hereby summoned to call 720-985-8040 or appear before _____ to schedule a future court date in DENVER COUNTY COURT, 1437 BANNOCK ST. ROOM 140, DENVER, COLORADO, 80202 (City and County Building) to answer the charge(s) of violation of the Revised Municipal Code of the City and County of Denver, Colorado 1982 as amended and/or the Colorado Revised Statutes. If this date falls on a Saturday, Sunday, or court holiday, you are to respond on the next regular court business day following this date. Office hours are 8:00 a.m. to 5:00 p.m. Monday - Friday. **IF YOU HAVE BEEN JAILED AND ARE ON BOND, THE DATE ON YOUR BOND IS YOUR MANDATORY COURT DATE.** NOTE: Some fines may be paid without a court appearance. See the back of your summons for further instructions. **WARNING: IF YOU FAIL TO RESPOND TO THIS SUMMONS, A WARRANT WILL BE ISSUED FOR YOUR ARREST AND ADDITIONAL COSTS ASSESSED.**

| | | |
|---|---|---|
| ☐ 38-31 Interference | ☐ 38-74 Damaging, Defacing or Destruction of Private Property | ☐ 38-93 Urinating in Public |
| ☐ 38-32 Resistance | ☐ 38-88 Loitering | ☐ 38-115 Trespass |
| ☐ 38-40 Unlawful to Give False Information | ☐ 38-89 Disturbing the Peace | ☐ 38-117(a) Concealed Weapon |
| ☐ 38-43 Violation of Court Orders | ☐ 38-91 Disturbance by Use of Telephone | ☐ 38-117(b) Unlawful Carrying of a Weapon |
| ☐ 38-51.5 Shoplifting | | ☐ 38-117(c) Flourishing a Weapon |
| ☐ 38-51.5 Petty Theft | ☐ 38-92(a) Threat to Injure a Person or Damage Property | ☐ 38-157 Unlawful Public Indecency as Defined in 18-167 |
| ☐ 38-61 Damaging, Defacing or Destruction of Public Property | ☐ 38-98 Assault | |

☐ 38-158(A)(7) Performing, offering or agreeing to any act of prostitution
☐ 38-158(A)(7) Soliciting for Prostitution
☐ 39-3 Park Curfew
☐ 38-15(a) Glass Bottles Prohibited in Park

☐ C.R.S. 12-47-901(1)(h) Public Consumption of Alcohol
☐ C.R.S. 18-18-406(1), Possession of Marihuana Under One Ounce
☐ C.R.S. 18-18-428(1), Possession of Drug Paraphernalia

Other Violations: Code # and Describe:
Possession of a
Weapon by Previous
offender (Gun)

**COMPLAINT**

The undersigned states that he/she has reasonable grounds for believing and believes that the above-named offense or offenses were or committed in fact; and was/or were committed by the Defendant against the peace and dignity of, the People of the City and County of Denver and the People of the State of Colorado.

COMPLAINANT (1) A.J.S. Rojas   Ser. # 85026

OFFICER (2) _____ Ser. #

I hereby test on this date _____ Mo. ___ Day ___ Year ___ a copy of this Summons & Complaint was duly served upon the above Defendant according to law.

Subscribed and sworn to before me this date _____

_____ Officer/Ser. #   _____ Deputy Clerk

I am a police officer for the City and County of Denver, Colorado, and have knowledge regarding the arrest of Jorge Cotillo
DOB 10-28-65 _____ who was apprehended on the date of 5-28-04 at 8:45 a.m./p.m. at the location
of 1118 W. 41st Ave. _____ in the City and County of Denver, State of Colorado, for the following:

☐ Municipal Code of the City and County of Denver Violation _____
☑ Colorado Revised Statutes Violation 18-12-108

The probable cause for the arrest the above-named individual is as follows: Members of the Denver Police Dept.
responded to the above address to serve an arrest warrant. Upon entry the Def. was contacted in the basement. While searching the bsmt. at 1118 W. 41st
Detectives searched the residence and found a loaded
.32 S&W revolver in Defendants bedroom. Also found
were numerous items of evidence indicating drug sale
and use, including scale & 2 crack pipes, packaging
material and residue on scale. Three other parties were
contacted outside in yard with Def. one was in possession
of crack cocaine and all were arrested for felony warrants.
Defendant is currently on probation for a Denver
Drug case and has 2 felony drug convictions.

I swear under penalty of perjury that the statements made by me and true to the best of my knowledge and belief.

_____ Signature of officer signing statement of probable cause.
D.E. Rojas   85026

☐ Probable Cause FOUND   ☐ Probable Cause NOT FOUND

Comment: _____

_____ Signature of Judge/Magistrate   Printed Name   Date and Time of Determination

000831

OFFICE OF THE STATE PUBLIC DEFENDER

*on 07-09-04 the probation department requested a warrant for my arrest, in results of the search warrant of 5-28-04 requested by Det Daniel Rojas)*

*4-1*

COLORADO
PUBLIC DEFENDER
THAT JUSTICE ESCAPE NONE
ESTABLISHED 1970

DAVID S. KAPLAN
STATE PUBLIC DEFENDER

April 14, 2005

Mr. Jorge Castillo, Inmate
Jefferson County Jail
200 Jefferson County Parkway
P.O. Box 16700
Golden, CO 80401

Re:    Case No. 03CA0846 [01CR969]

Dear Mr. Castillo:

I am in receipt of your letter dated April 5, 2005. As you know, I was appointed to represent you on direct appeal in Case No. 03CA846. On December 9, 2004, the Court of Appeals affirmed your conviction but remanded your case with directions to hold a hearing on your *pro se* Crim. P. 35(c) motion. The Court of Appeals issued the final mandate in your case on April 1, 2005. As such, your appeal is final at this time.

I am in receipt of the Crim. P. 35(b) questionnaire that you filled out and will prepare a Motion For Sentence Reconsideration on your behalf. However, it is not likely the court will grant such a motion in your case. The district court sentenced you to probation in this case. The minute orders reflect that on March 12, 2004, you admitted to violating your probation, and the district court revoked your probation and resentenced you to two additional years of probation plus thirty days of jail. The minute orders further reflect that on July 9, 2004, the probation department requested a warrant for your arrest for your alleged failure to comply with the terms and conditions of probation. The minute order dated January 3, 2005, states as follows: "The Court received the Court of Appeals order & instructions, but the district court is unable to set a hearing to hear the matters as the defendant is currently on wanted status." Therefore, it is my opinion that the chance of the court granting a motion for sentence reconsideration in your case is very slim. Nevertheless, I will prepare and file the motion.

As you know, I did not represent you in the district court. The minute orders reflect that you were represented by Steven Flavin at your March 12, 2004 hearing. If you have not already done so, I suggest that you contact Mr. Flavin and inform him that you are currently incarcerated at the Jefferson County Jail and need to take care of the outstanding warrant in this case. His address is: Denver Public Defenders Office, 110 Sixteenth Street, Suite 1300, Denver, CO 80203.

APPELLATE DIVISION • 110 16TH STREET, SUITE 800 • DENVER, COLORADO 80202
PHONE: (303) 620-4888 • FAX: (303) 620-4931

# Exhibit

please see how these two reports have been tampered. One page report made by officer Cervera it Clearly Shows that it was made. Specifically in regard to one suspect only, and not two, as you can see, where it still shows suspect 1-OF-Suspect 1 in officer Cervera hand writting, and on the First line you will see the total page Count was changed From sheet 1-OF-1, to sheet 1-OF-2. and the extra page, (Page number 2) Concerning Jorge Castillo it shows that was done entirely in Det. Daniel E. Rojas hand writting. This report dose not have Det. Rojas signature to verify that he took Part in writting that report.

See the other one page report, it shows that officer name Rios made this report, See under the written name of wayne dibble that something else was previously written and erased and after erasing the previous information the name wayne Dibble was added, and was subsequently determined to be a clear match as Mr. Cervera Report too, with the summons of Mr. Rojas that is written by hand by Det. Rojas, Such summos have this #GD-782628. This Report like the other one dose not have Det. Rojas signature to verify that he took Part in writting those reports.

AS you can tell that it is A Fact that these two reports where intentionally unlawfully tampered by Det. Rojas, Constituting Forgery. Also if you where to review my intire Case file you will Find out that there is no officers Reports made in behalf of the officers tha Det. Rojas Claim in his affidavit dated 5-24-2004 that supposedly took part in the events claimed in that affidavit to Substain Det. Rojas statements of his affidavit dated 5-24, 04. And Det. Rojas, Affidavit dated 5-24, 04 you also will See that Det. Rojas gives only one officer name and the rest of the officers names that supposedly took Part on Such events are unknowing.

# DENVER POLICE DEPARTMENT   GENERAL INCIDENT REPORT

200424372

Sheet 1 of 2   ☐ Domestic Violence   ☑ Suspect Arrested

**OFFENSE**

Location of Offense: 1118 W. 41st Ave   Apt #   Precinct 122

☑ Original
☐ Additional
☐ For Record Only

| Date/Time Offense | Date 5-28-04 | On or Between | 24 hour time 2135 | Day FRI | Offenses | Susp | Attmpt / Comp |
| | Date 5-28-04 | | 24 hour time 2145 | Day FRI | 1. Possession of Controlled Substance | 1 | |
| Date and Time Reported | Date 5-28-04 | | 24 hour time 2145 | Day FRI | 2. Possession of a Weapon by Previous Offender | 2 | |
| | | | | | 3. | | |

#1 TOTAL NUMBER OF VICTIMS   VICTIM CONNECTED TO OFFENSE # ABOVE 1 ☐  2 ☐  3 ☐

**VICTIM**

VICTIM NAME (Last, First, MI) or COMPANY: SOC (State of Colorado)

Residence Address:    City    County    State    Zip Code   Written Statement Yes ☐ No ☐   Ordered to Appear on:   Residence Phone

Business Name and Address:    City    State    Zip Code   Business Phone

TYPE OF VICTIM - CHECK ONE
I ☐ Individual
B ☐ Business
F ☐ Financial
G ☑ Government
R ☐ Religious
S ☐ Society / Public
O ☐ Other
U ☐ Unknown

RACE
☐ White
☐ Black
☐ Native American
☐ Asian
☐ East Indian
☐ Unknown

DENVER RESIDENT
☐ Yes
☐ No
AMB ☐

SEX
☐ Male
☐ Female
☐ Unknown

Trip ☐

AGE   DOB
HGT   WGT   SBI
Hospital / Physician

Assault / Homicide Circumstances (Check up to Two)
01 ☐ Argument
02 ☐ Assault on Law Officer
03 ☐ Drug Dealing
04 ☐ Organized Crime
05 ☐ Gang Related
06 ☐ Domestic Violence
07 ☐ Doctor Assisted
08 ☐ Other Felony Involved
09 ☐ Other Circumstances
10 ☐ Unk Circumstances

Injury Type (Check up to Five)
N ☐ None
B ☐ Broken Bones
I ☐ Possible Internal Injuries
L ☐ Severe Laceration
G ☐ Gun Shot
M ☐ Other Minor Injury
O ☐ Other Major Injury
T ☐ Loss of Teeth
U ☐ Unconsciousness
S ☐ Stabbing
C ☐ Strangulation / Choking

RELATIONSHIP OF VICTIM TO THE SUSPECT: (For Multiple Suspect Relationships, enter suspect number(s) in circle)
SE ☐ Spouse
CS ☐ Common-Law   Spouse
PA ☐ Parent
SB ☐ Sibling
CH ☐ Child, Juvenile
GP ☐ Grandparent
GC ☐ Grandchild
IL ☐ In-Law
SP ☐ Stepparent
SC ☐ Stepchild
SS ☐ Step-sibling
OF ☐ Other Family
AQ ☐ Acquaintance
FR ☐ Friend
NE ☐ Neighbor
BE ☐ Babysitee (Baby)
BG ☐ Boy/Girlfriend
CF ☐ Child of BG above
HR ☐ Same Sex Relationship
XS ☐ Ex Spouse
EE ☐ Employee
ER ☐ Employer
OK ☐ Otherwise Known
ST ☐ Stranger
VO ☐ Victim Was Suspect
RU ☐ Relationship Unk

**SUSPECT**

Susp #1 of Susp 1

Name (Last, First MI): DIBBLE, WAYNE   Alias
Home Address: 1118 W. 41st Ave   City Denver   State Co   Zip 80211   DPD #   Home Phone
Employed by    Business Address    Business Phone   Social Security #

☑ Arrested   ☐ At Large   Charge: ☑ Offense 1  ☑ Offense 3  ☐ Offense 2  ☐ Other:   DOB/Age 4-19-55   Sex M   Race N   Hgt 5'11"   Wgt 140   Hair Color / Style BLN   Eye Color BLN

Ordered-in Date    Scars Marks and/or Tattoos: M

Misc.    Clothing: Blk Jacket / Blk T-Shirt / Tan Shorts

**WITNESSES**

Total # of Witnesses 1

Witness #1
Name (Last, First MI): CERVERA, ALFONZO # 96-8
Address: 1811 W. 46th Ave
Home Phone    Cell Phone
Business Phone: 720-913-2455
DOB

Witness #2
Name (Last, First MI): JETTERS, BRIAN T. 99001
Address: 1311 W. 46th Ave
Home Phone    Cell Phone   Business Phone: 720-913-0483

Statement Made ☑ Yes ☐ No   Ordered to Appear on    DOB

Reported By: J. Cervera   ☑ Victim ☐ Officer ☐ Other
Residence Address    City    County    State    Zip
DOB/Badge 96-8   Home Phone    Business Phone
Statement Made ☐ Yes ☐ No   Ordered to Appear on

Officer Taking Report / Serial Number: J. Cervera 96-8

Approved by    I affirm this information is true and correct.   96-8

Exhibit
Page

# DENVER POLICE DEPARTMENT ADDITIONAL INCIDENT REPORT

ADDITIONAL SUSPECT AND/OR WITNESS INFORMATION    SHEET 2 OF 3

200424372

| Location of Offense | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1118 W. 41st Ave | | | Date of Report 5-28-04 | | | Time of Report 2145 | |

**Name (Last, First, MI)** Castillo, Jorge    Alias    DPD #

Home Address 1118 W. 41st Ave    City Denver    State CO    Zip 80211    Home Phone

Employed by    Business Address    Business Phone    Social Security #

Charge: Offense 1 / Offense 3 / Other    DOB/Age 10/28/63    Sex M    Race H    Hgt 5-6    Wgt 180    Hair Color/Style BLK/Long    Eye Color Brown

☑ Arrested  ○ At Large  ○ Ordered-in Date    Scars, Marks and/or Tattoos:

Misc.    Clothing

---

**Name (Last, First, MI)**    Alias    DPD #

Home Address    City    State    Zip    Home Phone

Employed by    Business Address    Business Phone    Social Security #

Charge: Offense 1 / Offense 3 / Other    DOB/Age    Sex    Race    Hgt    Wgt    Hair Color/Style    Eye Color

○ Arrested  ○ At Large  ○ Ordered-in Date    Scars, Marks and/or Tattoos:

Misc.    Clothing

---

**Name (Last, First, MI)**    Alias    DPD #

Home Address    City    State    Zip    Home Phone

Employed by    Business Address    Business Phone    Social Security #

Charge: Offense 1 / Offense 3 / Other    DOB/Age    Sex    Race    Hgt    Wgt    Hair Color/Style    Eye Color

○ Arrested  ○ At Large  ○ Ordered-in Date    Scars, Marks and/or Tattoos:

Misc.    Clothing

---

**Name (Last, First, MI)**    Alias    DPD #

Home Address    City    State    Zip    Home Phone

Employed by    Business Address    Business Phone    Social Security #

Charge: Offense 1 / Offense 3 / Other    DOB/Age    Sex    Race    Hgt    Wgt    Hair Color/Style    Eye Color

○ Arrested  ○ At Large  ○ Ordered-in Date    Scars, Marks and/or Tattoos:

Misc.    Clothing

---

**Name (Last, First, MI)**    Alias    DPD #

Home Address    City    State    Zip    Home Phone

Employed by    Business Address    Business Phone    Social Security #

Charge: Offense 1 / Offense 3 / Other    DOB/Age    Sex    Race    Hgt    Wgt    Hair Color/Style    Eye Color

○ Arrested  ○ At Large  ○ Ordered-in Date    Scars, Marks and/or Tattoos:

Misc.    Clothing

---

DPD 250A 8/03

Appellate Case: Document: 39- Filed: 02/01/2012 Page: 39

EXHIBIT
Pager

| How many premises were entered | Method of Entry | Force ☐ No Force |
| --- | --- | --- |

☐ Door ☐ Window ☐ Remained Inside ☐ Other

**ACCESS LOCATION**
☐ Door single swing
☐ Door - Garage
☐ Patio / Sliding
☐ Window non moveable
☐ Window moveable
☐ Other Unknown
☐ Skylight
☐ Roof
☐ Balcony

**METHOD OF ENTRY**
☐ Removed Lock / door knob
☐ Window Smash
☐ Brick / Rock
☐ Bodily Force
☐ Popped Door Lock

☐ Pry
☐ Cut
☐ Unlocked
☐ Kick /Punch
☐ Other

**LOCATION OF OFFENSE:** (Check only One) (Enter Code Number for Offense #2 _____ and #3 _____)

| | | | |
| --- | --- | --- | --- |
| 01 ☐ Air / Bus / Train Terminal | 09 ☐ Drug Store / Dr Office / Hospital | 19 ☐ Rental / Storage Facility | **TYPE OF CRIMINAL ACTIVITY** Check up to 3 |
| 02 ☐ Bank / Savings and Loan | 10 ☐ Field / Woods | 20 ☐ Residence / Home | B ☐ Buying / Receiving |
| 03 ☐ Bar / Night Club | 11 ☐ Government / Public Building | 21 ☐ Restaurant | C ☐ Cultivating / Manufacturing / Publishing |
| 04 ☐ Place of religious worship | 12 ☐ Grocery / Supermarket | 22 ☐ School / College | D ☐ Distributing / Selling |
| 05 ☐ Commercial / Office Building | 13 ☐ Highway / Road / Alley | 23 ☐ Service Station (Gas Station) | E ☐ Exploiting Children |
| ☐ Construction Site | 14 ☐ Hotel / Motel / Etc. | 24 ☐ Specialty Store (T.V. Fur. etc) | O ☐ Operating / Promoting / Assist |
| 07 ☐ Convenience Store | 15 ☐ Jail / Prison | 25 ☐ Victim's Vehicle | P ☐ Possessing / Concealing |
| 08 ☐ Department / Discount Store | 16 ☐ Lake / Waterway | 26 ☐ Suspect's Vehicle | T ☐ Transporting / Transmitting Importing |
| | 17 ☐ Liquor Store | 27 ☐ Other / Unknown | U ☐ Using / Consuming |
| | 18 ☐ Parking Lot / Garage | | |

**TYPE OF WEAPON / FORCE INVOLVED** (Check up to 3) (Enter A in box if fully Automatic)

| | | |
| --- | --- | --- |
| 11 ☐ Firearm (Type not Stated) | 20 ☐ Knife / Cutting Instrument | 65 ☐ Fire / Incendiary |
| 12 ☐ Handgun | 30 ☐ Blunt Object | 70 ☐ Narcotics Drugs |
| 13 ☐ Rifle | 35 ☐ Motor Vehicle | 85 ☐ Asphyxiation |
| 14 ☐ Shotgun | 40 ☐ Bodily Force | 90 ☐ Other |
| 15 ☐ Other Firearm | 50 ☐ Poison | 95 ☐ Unknown |
| | 60 ☐ Explosives | 99 ☐ None |

**OFFENDER(S) SUSPECTED OF USING**
(Check as many as apply)
☐ Alcohol
☐ Computer Equip
☐ Drugs
☐ Not Applicable

☐ Crime Lab Called
☐ Neighborhood Survey
☐ Photographs taken

*None in the House*

| Type of Property Loss / Evidence | Item # | QTY | Stolen Property Description Make, Model, Size, Type, Serial #, Color | Value |
| --- | --- | --- | --- | --- |
| 1 ☐ None | | | | |
| 2 ☐ Burned | | | | |
| 3 ☐ Counterfeited/Forged | | | | |
| 4 ☐ Damaged/Destroyed | | | | |
| 5 ☐ Recovered | | | | |
| 6 ☐ Seized | | | | |
| 7 ☐ Stolen | | | | |
| 8 ☐ Lost / Unknown | | | | |

**TOTAL VALUE of STOLEN PROPERTY**

Briefly Describe Evidence
SUSPECTED CRACK COCAINE (2 BAGGIES)
32 cal Smith + Wesson

Prop. Sec. Invoice #
680248

| Suspect Vehicle | Year | Make | Model | Victim Vehicle / Bicycle | Year | Make | Model |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Color Top | | Color Bottom | Body Style | Color Top | | Color Bottom | Body Style |
| Identifying Characteristics | | | | Identifying Characteristics | | | |
| LIC | LIS | LIY | LIT | LIC | LIS | LIT | LIY ATF Notified (Date) (Time) |

**NARRATIVE**

R/O's responded to the listed location to assist with a search warrant. Wayne Dibble 4/19/55 was contacted on the premises during the execution of the search warrant. The suspect was found to have outstanding warrant. Search incident to arrest R/O located two baggies of suspected crack cocaine in the suspect's right front pocket. During search of bedroom a hand-gun was found and suspect Jorge Castillo was arrested.

Case Inactive / No Further Investigation Recommended ☐

Counter Reports / Telephone Reports / Mail-in Reports – Fill in shaded areas on front and back.

000015

**DENVER POLICE DEPARTMENT**
**PROPERTY INVOICE AND RECEIPT**

Case # _____

☐ Offense Report Made
☐ Additional Invoice

Property Number 830243

CAD Event # _____

Date _____  Time _____  ☐ AM ☐ PM

| Officer Recovering Property | Serial No. | Assignment | Detective Assigned | Serial No. | Assignment |
|---|---|---|---|---|---|
| Rojas, D.E. | 83026 | Nivc | Rojas | | |

| Name of Prisoner | Age/DOB | Date Arrested | Charges: ☐ Petty Offense ☐ Misdemeanor ☐ Felony |
|---|---|---|---|
| Jorge Castillo | 10-28-63 | 05-28-04 | Poss of weapon by Prev. |
| Wayne Dibble | 4-19-53 | 5-28-04 | PCS |

Location of Offense and/or Where Property Recovered  1118 W. 41st Ave.

☐ Victim (Name, Address, Zip Code, Phone #)
☐ Owner
☐ Finder
☐ Prisoner

☐ Card Sent
☐ PADF

Date _____

List money/evidence in this order whenever applicable:
1 - MONEY    2 - CONTRABAND DRUGS/NARCOTICS    3 - WEAPONS    4 - REMAINING PROPERTY/EVIDENCE

Article description must be as complete as possible. Gun description must include make, type of action, caliber and serial number.

Indicate the Status (S) of each article invoiced into the Property Section:    E - Evidence    P - Personal Property    F - Found Property

SERIAL NUMBERS CHECKED BY: _____

| # | ARTICLE TYPE & BRAND NAME | MODEL # | COLOR | SERIAL NUMBER | CAD or CASE NUMBER | S | BIN # | BY |
|---|---|---|---|---|---|---|---|---|
| | See Return + Inventory | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

DPD 122 (Rev. 4/99)    1 - Property Management    2 - Detective    3 - Officer

Dear Ms. Friedman, I wrote this report for your information in Spanish that I be able to e:
myself better to you. Please, review it and use every issue you read from here. Would you p.
have your interpreter write these 28 pages in English and please send me a copy of 28 page
English? I have no access to use the telephone for [...] and as soon as I get access to it I will ca
If you have anything to say about this report, please tell me, if you can come to see me in perso
please do it. I hope I hear from you soon, thank you.

"Notice" with this report I am sending you 150 pages of handwritten documents and letters that I
wrote to the other attorneys and ~~court judges~~ some official documents as exhibits of this 28 page report *Find all.*
[End of handwritten text]

*unlawful —* Main actions by officers and alleged witnesses and contradictions between them. "Observe that in
this case there is no physical body" that those who accuse me can provide. "Nor was there ever.
There has only been and there is false written accusations and false sayings by the voices of the
accusers. But there never was effective physical and material evidence for them to prove without
any doubt that in reality the accusations were made and obtained "under" a reality of truth and
nature of actions and events " that in truth have happened. For them to have a real foundation that
support said accusations of the alleged criminal charges that I have been falsely accused of. "I,
Ismael Arenas, *affirm* that this case 04F22213 and 04-cr-00282 have been falsely and shadily built,"
by the state and federal officers in agreement with the attorneys from the lower courts. If you truly
are paying a lot of attention, analyze thoroughly the actions and main acts of the state and federal
officers and the actions of the attorneys and alleged witnesses and judges and prosecutors who
helped with and assisted with this case until the date of Sept 29, 2010. "You will notice that they
didn't even require or ordered that a person be hired with a professional license on falsification of
handwriting to prove the falsification of the documents *alter* by the detective Daniel Rojas, accuser
in this case, " nor because they knew that the state case #04F22213 was always and has been the
only foundation in all sense of this federal case 04-cr-00282. They didn't even consider and accept,
order or require the official investigation of these documents and actions and the facts and actions
mentioned below.

(Fact 1.) This state case #04F22213 was premeditated; planned on how to start *it* and predict it by *unlawfully*
detective Daniel E. Rojas and the officer in this case. For this real reason the officers of the state do
not have any legal reason or pretext that they can use to not have built efficient evidence, physical
and material, effective to be used as foundation, in all aspects of the criminal actions claimed in
writings and confessed by word by the state officers and alleged witnesses in this state case
#04F22213; for instance:

(Fact 2.) The affidavit that was made in collaboration with detective Daniel Rojas dated May 24,
2004, claims his premeditated acts, like the supposed act of confidential informer #1, who
supposedly asked me for drugs, but did not succeed in obtaining illegal drugs from me, to give them
to detective Rojas; this claim by the real fact that they DO NOT have photographs or any type of
recording, nor any other type of physical or material evidence to support and sustain this claim
regarding this supposed informer #1 "*I, Ismael A: G: Affirm* that this claim regards to CI#1 is really false, and at
the same time *I affirm that is false* because this supposed informer #1 DID NOT exist in the events mentioned
in the affidavit dated May 24, 2004, in relation to him or her *because any of those events never occurred.*

*Page 1 of, 12.*



Fact 3.- Similar. Analyze the following fact in this same affidavit dated May 24, 2004 where he ,Rojas claims his action the [female] confidential informer #2 who supposedly bought illegal drugs from only me one time with money marked by the detective or by state officers. "This writing that claims in by Det. Rojas is switching — that are false on reference to informer 2 in an obvious sense by claiming premeditated acts by detective Daniel Rojas and state officers; as professionals by NOT having built evidence of these supposed acts and events with photographs and some type of recording or any other type of physical or material evidence to support and sustain effectively this accusation of illegal acts." This Relate telling on affirm detective Rojas and the state officers themselves, because it is obvious that this way they only affir that this accusations written regarding informer #2 is really false; in connection with this see that " not accusation of criminal act nowhere in that affidavit dated May 24, 2004 does say or testify that not or affirm detective Rojas or the officer have recovered the marked money from the supposed purchase, nor does state that may have made any arrests as a consequence of the illegal drugs that it says that affirming informer #2 gave them it "DOES NOT" testify in a precise way the date and time of (First reason) when supposedly the female informer #2 supposedly made such buy that they claim in this affirming affidavit. (Second reason) it "DOES NOT" say or testify to any type of reason that would help any legal reason of the facts of why the marked money was NOT recovered. (Third reason) it "DOES NOT" give a reason why NOBODY was arrested as a consequence of that buy of illegal drugs. (Fourth and affirming reason,) there is NO recording or material image that states as evidence that the telephone numbers dated 5-24-04 mentioned in this affidavit have been used to do illegal drugs acts. (Reason 5,) there are NO and affirm recordings or material images that prove and show that the male or female informer #1 and #2 assisted in the events stated by detective Rojas in the affidavit dated May 24, 2004. (Reason 6,) there is NO official record that verifies or proves that the male or female informer #1 and #2 has been There is no legally hired according to the regulation or rules of law of this country. For instance, A permit from Rojas the immigration department, proving a legal permit for him or her to work legally for him or the officer that hired her in order not to have any setbacks regarding deportation with the process and work as informer. This fact was obviously premeditated illegally under the fact that detective Rojas claims in the affidavit several years of experience as officer detective. This fact states that detective Rojas, as well as other government officers, knew and know the rules and requirements to hire an undocumented as informer, but detective Rojas in federal district court at his illegal convenience in reference to him, the supposed informer #2 only testified that simply the male or female informer #1 and #2 described in the affidavit dated May 24, 2004 had been deported by immigration to his/her country of origin. Without having been presented a single time in any of the courts, even judge though the federal district court asked for him/her to be presented. There isn't either in this case affirming anything in writing by the informer #2 that testifies that he/she DID or DID NOT assist in the events that the affidavit dated May 24, 2004 claims to support the accusation written by detective Rojas" [# Rojas # 7;] please notice that in the affidavit dated May 24, 2004 he only claims that they only did an illegal one time only Rojas buy with the male or female informer #2, and even then, neither him nor the officers who wrote the 5-24, 04.- not and Date affidavit could write down in the affidavit a precise hour of the only time when supposedly they bought illegal drugs from me, through the male or female informer #2. (#8,) please when you receive and read the affidavit dated May 24, 2004, you will realize that neither Detective Daniel E. Rojas nor officer Detective Jason Carrigan mentioned in the affidavit as participants in such alleged events DO NOT state or affirm in any legal way if in truth one of them personally truly saw me selling illegal drugs "before they wrote down the accusations in the affidavit dated May 24, 2004. Neither of them

Page 2-of, 12.



mentions either nor affirm in the accusation ~~A~~ *wroted* in the affidavit dated May 24, 2004 that William, Sharon Bateman and Wayne Dibble have been informers to Detective Daniel E. Rojas and Jason Carrigan from the beginning of this case, *04F22213* since before they wrote the affidavit dated May 24, 2004, to ask for the search warrant, <u>under this fact the testimony of these Batemans and Mr. Dibble that they gave after that date May-28-2004 "after" searching the house where I lived ARE NOT admissible to prove and sustain the accusations in the affidavit dated May 24, 2004</u>, they ARE NOT admissible because in that affidavit he *R0745* doesn't mention nor affirm that these Batemans and Mr. Dibble have given a report or testimony to detective Rojas or the officers "before" this date of May24, 2004 against me "before" writing this affidavit dated May 24, 2004. <u>"Under this fact" the testimony of Batemans and Mr. Dibble, which they gave "after" May 28, 2004, CANNOT be used to prove</u> ~~A~~ *probable cause* to prove a cause of legal reason "for the affidavit dated May 24, 2004 to be approved *and granted* legally for the search warrant dated May 24, 2004 to be approved." (#9) the affidavit dated May 24, 2004 was not sustained supported not sustained by written reports by the state officers or detectives "before the affidavit was approved by the State Magistrate Judge on this date of May 24, 2004, <u>"and there is not any record as material evidence that states that</u> *the* <u>government officers have given oral testimony in person on this date of May 24, 2004 to obtain the search warrant on this date 5-24, before the State Magistrate Judge."</u> (#10) these ten facts truly strongly support the real truth that the affidavit written by detective Daniel E. Rojas on May 24, 2004, is without a doubt truly false. <u>I, Ismael Arenas state under oath</u> *affirm* <u>that I "never received nor have I received any type of efficient physical</u> ~~or~~ <u>material evidence" which are necessary to show and prove the contrary of all these ten facts and of other illegal acts that I am claiming in this list of acts and facts."</u> And never in my life did I meet the supposed informer #1 and #2 mentioned in the affidavit dated May 24, 2004. And I was never involved in illegal drug businesses. You will notice when reviewing and reading the last chapters on page 3 of the affidavit dated May 24, 2004 that they also accuse me falsely of having had an illegal drug conviction in 2001 and another illegal drug conviction in 2003 in the state of Colorado, when the truth is I only had one conviction in 2003. <u>If you investigate my criminal record in Denver, CO from 2001 to 2003, you will notice that I was only convicted in 2003</u>. And if you review and read page 4 of this same affidavit dated May 24, 2004, in chapter #2 and 3 you will find the name of detective Jason Carrigan, who is the same false intellectual detective from the criminal case against me in 2001, of the charges that I was illegally blamed in 2003, of illegal drugs for a real cause that before they accuse me of those charges in 2001, this case started for this *main* cause intentionally, by fraud and treachery. <u>Before 2001 I rented a place in a commercial lot from a man named Luis or Luy who pretended to be the legitimate owner of the property I rented and after I paid him the first and the last month of rent and the deposit, in case of damages to the property, in a few months I realized that he was not the owner of the property because the true owners of the property appeared soon after Luis had rented it to me and I had to pay again to the owners of that place, which was a repair shop that I was using to work straightening out bodywork and getting the cars ready for painting, then I reported the so called Luis or Luy "and the judge who took the case gave me a win and ordered Mr. Luis or Luy to pay me my money"</u> but soon after that I realized that Mr. Luis or Luy has a daughter that works for the government, I'm not sure if it is his daughter or a close relative, but the thing is Luis never paid me my money and instead of paying me I think he used his influence with the government officers, because after I won the case the policemen from that county started harassing me going to the shop and they didn't leave me alone until the occasion

*Page 3- OF, 12.*



presented itself to take me to jail on that date of January 18, 2001, with false accusations, you yourselves can check the main lies and contradictions of the officers that detective J. Carrigan send on that date January 18, 2001, with this report find 17 pages that give more details in that regard; among these pages there are eight pages of reports and documents from the officers in that case of 2001 that prove their mean, illegal and false statements. "Therefore review pages 4 and 5 of the affidavit dated May 24, 2004, you will notice that detective Rojas was in contact with J. Carrigan and Mr. Mark Pelz on that date of May 24, 2004, or before that date, May 24, 2004. Based on what detective Rojas states in his affidavit, these acts show the possibility that the three of them spoke much more than what only detective Rojas states in the affidavit dated May 24, 2004", comparing the testimony that the owner Mark Pelz gave and detective J. Carrigan, you are going to see on your own that detective Rojas and detective Jason Carrigan and Mr. Mark Pelz already knew each other and had agreed on what is related to this state case #04F22213 since before the affidavit dated May 24, 2004 was unlawfully granted by the Magistrate Judge on May 24, 2004. "Likewise you will see that "none of the attorneys" in this federal case 04cr-00282 challenged officially in court the main unlawful actions and facts of the state officers that I state on page 1 to 5 of this report." "And they didn't challenge either" the illegal and main fact and actions of the state officers, of May 28, 2004.

(First,) the officers on May 28, 2004, took photos of legal objects inside the house located in 1118 West 41st Ave. This action shows that they brought a camera to take photographs but did not take any photographs inside the house at 1118 West 41st Ave. of any of the objects mentioned in the "returns and inventory" report of illegal objects.

(Second,) they did not challenge nor investigated officially the fact that the Batemans had not been at 1118 West 41st Ave. on the entire day on May 28, 2004, the Batemans arrived to that location for the first time about five minutes before the officers arrived on that day."

(Third,) they didn't challenge the fact and action that detective Rojas threw a copy of the search warrant dated May 24, 2004 to the cell in the jail where they had me on May 28, 2004 and it was the first time that I saw and knew of that search warrant of May 24, 2004.

(Fourth,) they did not challenge the fact and action that the Batemans were the only ones inside the house when the officers threw down the door of the house on May 28, 2004 and William Bateman was the only one that was found on the second floor of the house located at 118 West 41st Ave., in the room that they falsely claim having found a gun and marihuana."

(Fifth,) they "did not challenge" the fact that the officers that acted on the location at 118 West 41st Ave. on May 28, 2004 "DID NOT" report nor affirmed having found dirty instruments or objects with the substance or substances on that object that the Batemans claim having used a little before the officers arrived at the house on that date May 28, 2004. "If what the Batermans said in court had been the truth, that on May 28, 2004 they had been smoking crack all day long at my house, the officers would have found some dirty instrument or object with the substance that the Batemans claim having used that day a little before the officers arrived at 118 West 41st Ave.." But because all of that is a lie, and also what the officers said in court it is a bunch of lies, too this act of lies also shows the real fact that the Batermans "were not" at the house at all on May 24, 2004." The Batemans for the first time on that day came or arrived at the house that day, about five minutes before the officers arrived at the house. Before that arrival of the Batemans at the house at 118 West 41st Ave. on May 28, 2004, the Batemans had been in that house only 5 to 8 minutes at most on that day."

Page 4-of, 12.



Sixth, the attorney Thomas Richard Ward and Martha H. Eskesen, P.C. did not challenge officially in *also* the courts the fact that the attorney Jonathan S. Willet in 2005 stated to me that Sharon Bateman was testifying in court in Adams County, using under oath another name which was not hers, "and they didn't challenge officially either asking for a formal investigation to the court to investigate the past record of Sharon and William Bateman in reference to statements they have given in other cases, and in reference to their criminal records and mental health records."

Seventh, No attorney challenged the fact that detective Daniel E. Rojas supposedly on one occasion found Sharon Bateman with other people using illegal drugs and instead of arresting her or taking her to a hospital for rehabilitation, he just took her to a hotel. You will find this report in Geff Ederman U.S./Castillo, Case 2004-112, Investigative report: Interview with Sharon Bateman, Sep. 30, 2004, page 5. This report recounts the fact that Sharon and detective Rojas, since before that date of May 28, 2004, had a sexual relationship and an illegal agreement that she had the permission of Detective Rojas to use and have illegal drugs with her at any time she wished.

Eighth, they didn't challenge the fact that Sharon Bateman had been my ~~wife~~ *official girlfriend* with a formal and strong relationship, to the extent that she and I had agreed to join our lives for the rest of our life and we even had a daughter together called Jade, who is now about nine years old. "But it happened that in 2003 I couldn't fulfill [my promise] to Sharon because that is when the state officers put me in jail for the slander in the case of 2001 and that is when I think that she stopped living a healthy and normal life." When I was released from jail we tried to rebuild our life together but she could not recover her good spirits and morals and honesty and it came a time when I had to run her from the house at 118 West 41st Ave., because I did not know how to help her leave the illegal drug vice, after I tried at different times by giving her money to pay for rehabilitation at a rehabilitation place, but she lied to me telling me and making me believe that she was going to rehabilitation and when I realized that she was lying I tried one last time to help her, asking her to allow me to go with her to a rehabilitation place so that I could personally pay for her the cost of that program or hospital, but she refused me with very offensive arguments against me, insinuating that I did not trust her and for me to go to hell and at that time it was when I did not know what else to do and that is when I run her from the house. I packed all her things and placed them outside of the house and I think that is one reason why she is falsely testifying against me in this case, "and when she was arrested on May 28, 2004 she already had more problems, both moral and with the judicial system, of which I didn't know *knew* about and the same with William and Mr. Wayne Dibble, on May 28, 2004 the state was already looking for them to answer charges against them of which I didn't know *knew* anything about."

Ninth, they did not challenge the fact that Sharon Betman stated in court that I shot her on two or three occasions with a firearm of a different caliber and that the bullets went into her head through the same hole that the first bullet had made, and the attorneys in this case 04-cr-00282 never asked the court to take x-rays to see if she was lying to the court or not, and if they didn't order and didn't challenge that fact it was obviously ~~b~~ *that the attorneys and prosecutors and court officials knew* that she was lying and if this was the reason why the attorneys and the prosecutors and the judges in this case remained silent without requiring or *officials* ordering that they take x-rays of Sharon Berman, this reason shows all three groups of officers *or officials* as accomplices of illegally allowing Sharon Berman to lie in my courts with false confessions made under oath, "the same way they allowed Mr. William Bateman and Sharon Bateman to continue lying under oath in all their testimony, you can notice that in their own testimony which they gave

*for the Government*

*page 5 of, 12.*



all the times that they testified in court and before state and federal officers they show all their lies and contradictions." If you go to the eight exhibits that I wrote, you will notice that these false *in regards Sharon and William Bateman contradictions* witnesses who are the Batemans say pure lies with contradictions and also analyze the document that I am using as exhibits in that report, which prove said lies and contradictions, as in "exhibit #8; you will notice that Mr. Bateman was receiving training and advise illegally during the hours of my trial by agent Carrie Dipirro, which is illegal in this country," but the judge, prosecutor and attorney tolerated this illegal act, as well as they tolerated that also this other lie would be admitted during the trial when "Mr. Bateman falsely accused me that I kept money or deposited it in banks and that Sharon Bateman would accompany me to do that," and then Sharon Bateman confessed that that never happened, as far as she remembers.

Tenth, they did not challenge that William Bateman was supporting in every sense the lies of his sister Sharon. For example, the claim and statement about the bullets inside Sharon's head. "William falsely stated that he personally saw the hole in Sharon's head, saying that it was the size of a dime and stating that he never gave her medical care. But Sharon states that William treated her at her grandmother's house. At the same time William states having seen bloodstained human bodies and objects in the house at 1118 West 41st Ave., that he thinks I killed and murdered some human beings. "But these statements of criminal acts were completely ignored without doing anything in regards to the attorneys, prosecutors and judges in this case 04-cr-00282." *that* Eleventh, they didn't challenge in regards to all these libels in the affidavit dated May 24, 2004 and those of *False* the four witnesses in connection with the false documents of 2006 where they falsely state and *before my trial Date,* claim that all objects claimed in the Return and Inventory report were destroyed "and in reference *and Affirm* to the mentioned gun they state that they stole it from Golden COPD OCA/023266 and in another page they state that they destroyed it "when I, Ismael Arenas G, state that none of the objects mentioned in the Return and Inventory report existed in that house and were not found in the house at 118 West 41st Ave. "as you remember that on that date and day May 28, 2004 the officers had a camera to take pictures and only took pictures of illegal objects inside the house *on* May 28, 2004 and they didn't photograph specifically inside the house any of the objects that they claim in the Return and Inventory report being illegal objects even though they had a camera. These facts *Affirm* *and affirm* state and support the real truth that all claims of the officers and the false witnesses state nothing *the fact that* but despicable lies in connection to they didn't challenge this Return and Inventory report in the way I explain here.

Twelfth, in connection with all these facts of illegal corruption of the officers in this case 04cr-00282 which were not officially challenged by the attorneys, notice the corrupt fact of two pages of documents, written by the hand of two different state officers with identification number "For Record only 200424372" were altered by detective Daniel E. Rojas, obviously to falsely incriminate me with possession of a gun "and the fact that no attorney did anything when I asked them and begged them to officially ask the court to order that those two pages be subject to examination by an expert to prove the alterations of handwriting but I was ignored by the attorneys in this such important matter."

Thirteenth, they did not challenge the fact that a state document titled "Supplementary Report Case # 200424372, P invoice # 680248" was made twice making it seem like it had been done only once,

*Page 6-of, 12.*



but if you compare them you will find that in parts their versions are different, one has more versions than the other, which are not precise, "this action shows *that the* ~~officers~~ *are not sure on their own lies,* officers who made them and supports acts of corruption in connection with all these facts mentioned here *in this 12-pages Report".*

(Fourteenth,) they did not challenge any of the facts about the lies by Sharon Betman in any of the courts or in the trial, as well as the ones she said in Nov. 30, 2004. On page 40 of her deposition she states that the officers found a lot of methamphetamine in the trunk of the car and that she was not sure what the amount of the drugs was and on page 93 she states that this happened in July 2, 2004 and at the same time she states that those drugs were mine on page41, and that she was aware of the person who had lost those drugs, but was not aware that those drugs were in the car she was driving; "with that accusation Sharon Betman not only was falsely accusing me that the drugs were mine, at the same time she states *and affirms* that she personally knows the person whose drugs were stolen," but if you analyze the one page report of officer Manuel J. Aragón , dated July 2, 2004, it contradicts totally these accusations by Sharon B and support the fact that without any doubt Sharon said nothing but lies in the deposition of Nov. 30, 2004. Notice what the officer s Manuel J. Aragón *affirms* says who arrested Sharon on the same date of July 2, 2004, which is the same date that Sharon during the deposition where she states that the officers found the methamphetamine when in truth it was only one officer. First of all Mr. Aragón states in his report "the he only did the operation of searching the car and the arrest of Sharon." Second, he states that Sharon lied to him by giving him the name of Linda Betman. Third, he states that he found a scale under  the passenger seat and that he found pieces of wire sponge which is used to put in the pipe when someone smokes meth or crack, "and that he found a metal pipe with wire sponge burnt inside the pipe in an ashtray that was under the car radio," and that he found a box with a white substance and a box of baking soda, "then he asked Sharon if she had drugs on her and then Sharon started crying telling Mr. Aragón, "please officer give me a break" and that at that time Sharon took out a plastic bag that *[line scratched out with initals I.A.G. above]* had crystal and handed it to officer Aragón, and that the net weight of said crystal substance was 81.88 grams. as you can see for yourself that the report of officer Manuel J. Aragón shows completely the lies of Sharon Betman.

(Fifteenth,) they did not challenge in any of the courts the facts that I asked the attorneys in this case *officials* 04cr-00282 to ask the jail in Adams County Co. for a copy of the file that proves from what date to what date that jail had me under custody in 2004, in the month of June and July, to make sure that officer Aragón really arrested me in the month of June 30, 2004. And likewise, I also asked them to get me a copy of the file that proves which was the last court date and day that I had to go in 2004, in the month of June in Denver, CO, in this case 04F22213, "to prove if in reality officer Aragón arrested me in the month of June 30, 2004" because I was in Court in Denver, CO together with my attorney Trujillo in this case 04F22213, in this month of June 2004 approximately on the 26 or 27 of June and I remember that in this month of June I was arrested by officer Aragón one day after having been present in the state court in Denver, CO, and my doubt and the reason why I think that I was not arrested on June 30, 2004 "is because Mr. Aragón that time *lie to me and acted unlawful and* did not have nor did he serve me with any cause or reason to stop me and interrogate me and arrest me when I was walking along a sidewalk to a store that was about half a block from where Mr. Aragón stopped me and without giving me or showing me a reason, and without giving me a traffic violation arrested me,

*Page 7-of ,12.*



handcuffing me and locking me up in the back seat of his patrol car, for approximately 30 minutes, and after all that time of being arrested in his patrol car he simply told me that there was an arrest warrant." Mr. Aragón also did the following, before going to interrogate Sharon Bateman who was asleep in the front seat in the car she and I were traveling. He asked me her name about three times during the conversation, after he spoke *the officer to me then he spoke to her then* he took me where she was and gave her the car keys that I had and which I had been driving and he also gave her about 60 dollars of the money I had in my shorts pocket and told her in my presence "Ms. Sharon, *took* the car." Then Sharon left driving the car "but Mr. Aragón lies in his report when he states that she left walking to her house and that she was identified as Linda Batman. Mr. Aragón, just as he lied in *his* report, I think it is possible that the could have falsely written down any which date he wished in *his* report dated June 30, 2004," I am equally troubled by the attorneys, when they gave me that report they only gave me that page 2 of that report and until today *date* I have not seen page 1 of that report, "although I informed the attorneys that the page was missing and that other pages were missing from the documents they had given me but *up in to this date* I have been ignored, although I asked them to give me the pages I needed." Please, note that it is obvious that any officer who is told by someone that his partner is asleep in one's car, logically will ask her name before the officer goes to the car to wake her up and that is what really happened *that* day, "I told officer Manuel J. Aragón that my ex-girlfriend was asleep in the car and it was then when he asked me her name and I told him that she was Sharon Betman, approximately three times because the officer asked me about three times." Then he went to wake her up and talk to her and as confirmation that Sharon took the car in our presence the day that Mr. Aragón arrested me. Analyze Mr. Aragon's report. Observe the first two lines in Mr. Aragon's statement where he "states that I parked the car in Dawsun street." Then analyze page 41 of Sharon's deposition dated Nov. 30, 2004, line 14 to line 16 where "Sharon states that when I was arrested the car was given to her," this is true.

Sixteenth, the attorney did not challenge the fact that on May 28, 2004 I was arrested at 1118 West 41 St. Ave. and that until today I have not received a single report made and signed by the arresting officer and the officer that transported me from 1118 West 41 St. Ave. to the officer's department in Denver, CO, verifying his name and the reason for my arrest and why he transported me. "Likewise, no attorney has informed me if those reports exist, but I think *and believe* they do not exist." I only received the reports of the other three people that were arrested and transported from that location on that date to the police department, where it explains the reason why they were arrested and who transported them, and the names of the officers that transported them from 1118 West 41 St. Ave. to the police department. "I have not received these reports that verify who arrested me and who transported me from 1118 West 41 St. Ave. to the police department on May 28, 2004," although I have asked for it many times to the attorney of this case 04-cr-00282. This fact shows a despicable behavior on the part of the officers that arrested me and those that transported me on May 28, 2004 and of the attorneys that represented me at the Federal District Court and I think this is an illegal act under the laws of this country.

Seventeenth, they did not challenge the facts that are in the reports of the vile accusations by Mark Paez, Wayne Dibble, William Bateman and Sharon Bateman which clearly show their contradictions and racist hatred through their accusations confirmed in their reports before the courts and the attorneys' investigators and before federal and state officers. Examine the following here: 1.- "I,

*page 8-of 12.*



Ismael Arenas, state *affirms* that Sharon and William Bateman on this date came to the house located at 1118 West 41 St. Ave. for the first time on that day about five minutes before the officers and government police arrived at that house and at the same time I state that it had been several days that Sharon and William had not been to that house before the date of May 28, 2004." On that date of May 28, 2004, these Batemans, when the officers arrived, were the only people who were inside the house and William was the only that was there and an officer found him in the room were supposedly that officer found a gun and marihuana, now review what Mr. Wayne Diabble states *affirming* in *with →* his handwritten five page report dated March 23, 2005. On page 1 Mr. Dibble said: "Looking at the government exhibit I had not seen exhibit 1 before, it is a photo of a revolver. I never saw, at any time, any firearms in Catillo's property." Now examine one page from a three page report done by Detective Rojas, of which my attorneys gave me only page 3 of that report, without a date, signed by Detective Rojas, and *up* to this date I have not received pages 1 and 2. Notice that in that "page 3 Detective Rojas is stating and declaring that when the SWAT officers arrived at 1118 West 41 St. Ave., Mr. Bateman run to the upstairs room, stating that it was George's room, his reason for that was because Mr. Bateman had a bag of marihuana and that then the officers found that same bag, and that the marihuana was somewhat big and that worried him because Mr. Bateman was on probation and he would have violated it if he was found with the marihuana. Bateman has never seen a pistol in the house and did not know that there was a pistol under the mattress. He never has seen a pistol in George's house or cars. "Now, examine the one page report of officer Jeffers Briant dated May 28, 2004, signed by him and he states that on May 28, 2004 at 1118 West 41 St. Ave. in the upstairs floor, in the North bedroom, he found a caliber 32 Smith & Wesson pistol, serial number H78404, under the bed mattress in the upstairs bedroom, and that he also found a bag with a little marihuana behind the clothes closet in the North wall in the same room where he supposedly found the pistol and Mr. Bateman. If you pay attention, you will notice that this officer Briant does not state that that room was used by me, nor that that room was mine and no other officer states that that room was mine or was used by me, as Detective Rojas states on several *affirming* occasions in his reports, you can see that he and only Rojas states that that room was used by me, as well as he also states that Mr. Bateman on May 28, 2004 run to the second floor of the house when the officers arrived using the pretext that he had marihuana and that his probation could be violated. That report *shows* that in that report Mr. Rojas is who is speaking on behalf of Mr. Bateman, *that* defending Mr. Bateman. If you pay attention to the report you will notice that nowhere in that report does it say that Mr. Bateman mentioned this event to Mr. Rojas. That means that Mr. Rojas *falsely* *intentionally* → assumed on his own the meaning of this event to defend Mr. Bateman.

"The first reason" why I Arenas think that Detective Rojas illegally *unlawfully* defended the Batemans, one reason is because Sharon and Rojas already knew each other from much earlier than Sharon and I Arenas met for the first time, "as Mr. Bateman stated on Mr. Bateman's deposition of Nov. 30, 2004" that Rojas arrested many boyfriends of Sharon's before arresting me, this indicates that Sharon had those boyfriends before she met me.

Second reason, because "Sharon stated in an interview with the Detective of the attorney Jeff Edelman in the month of Sep. 30, 2004, that Detective Rojas one time found her with a lot of people with illegal drugs and they had illegal drugs and she was drugged and that Rojas took her alone to a hotel instead of arresting her. This confession you can find on page 5 of that report. This action

*page 9-of, 12*

confirms at the same time that Rojas and Sharon had a sexual relationship.

Reason 3) "Through the statements of Mr. Bateman in Mr. Bateman's deposition of Nov. 11 2004" *affirms*

*that —* Sharon Bateman was already collaborating with Detective Rojas in some way to incarcerate people together with Rojas, from much earlier than I was arrested on May 28, 2004. Next, "examine the interview of Johathan Willett with William Bateman of Nov. 17, 2004, page 6 of this report, chapter 4" where Mr. Bateman states that Sharon has never possessed a pistol, and that she does not *knew* *about* guns and that George all the time had guns. Now, examine the "interview of investigation with Sharon of Nov. 30, 2004, page four." Sharon states that her grandfather was a hunter and that she learned about firearms from her grandfather. Now "examine page 2 of the report which is handwritten by Wayne Dibble dated March 23, 2005" where he states that "Jorge cooks and packages his own crack" and that once in a while Mr. Dibble would help me package the way I package. Now "examine page four of this same report dates March 23, 2005" where Mr. Dibble *affirm* ~~states~~ that (exhibit 12 (b) it looks like packaged the way Jorge packages) Now "examine the report of the deposition with Sharon Bateman of the month of Nov. 30, 2004, page 87 and 88" where Sharon *affirm* ~~stated~~ in reference to exhibit 12, when she was asked if she had seen that crack before and she said "NO". Then she was asked "Q" if she knew where that crack had come from? and she said "Jorge's" then she was asked "Q" how did she know that? and she answered, because he had something before and then she also said that this one came from Wayne. Jorge gave it to Wayne. Then "Q" asked Sharon, how do you know that this one comes from Wayne? Who told you? and Sharon answered, Wayne was caught with it. "Q" asked her, how do you know this is the crack that they caught Wayne with? Sharon answered because this is the way Wayne packages it. "Q" asked then is this the way Wayne packages his crack? Sharon answered "YES". Now, likewise, "examine carefully this statement of mine, Arenas" I, Ismael Arenas, state that Mr. Wayne Dibble lived and resided at 1118 West 41 St. Ave. in the motor home parked in the yard of the property. Since Sharon and I "Arenas" moved to live in that house on that property. This happened this way: At that time the motor home where Mr. Dibble resided was already parked at that property and I did not know whose motor home it was and I didn't know any of the neighbors around and nobody was living on that property nor in the motor home on that property at the time and date when Sharon and I moved to live there and at that time Mr. Wayne Dibble went to ask permission of Mr. Mark Pelz to let him reside in the motor home in exchange for helping Mr. Pelz to remodel the house that Sharon and I rented in that property and Mr. Pelz gave him permission to live in the motor home under that agreement." All residents in this country know that any owner of any property has the power to throw out of his property anyone who lives there without his consent or permission. Now "examine the testimony that Mr. Mark Pelz gave in court during my trial dated Sept 27, 28 and 29 of 2010." You will find that in that testimony Mr. Pelz blames me for the fact that Mr. Dibble was living on his property. Now "examine and take notice how Mr. Pelz [incomprehensible] me and the Bateman family in a mean, critical and scornful way, without any effective physical or material evidence that would prove that I damaged in any way his home and property where Sharon and I were living. He accuses me falsely that I damaged and destroyed his property. "Examine the other report of Mr. Pelz dated August 17, 2004" where I, Ismael Arenas, state that Mr. Pelz incriminates me with his slander by saying that I had a lot of traffic with people coming and going from the house. I state that these are lies by Mr. Pelz. "Examine the supplementary report with property invoice 680248 and Case 200424372, without the signature of who prepared it nor the signature of the supervisor and

*Page 10-of 12.*

without a date of when it was prepared, where on pages 3 and 4 it shows that" Mr. Pelz states falsely that I invited Mr. Wayne Dibble to stay to live for a short time on his property and that I converted his property into a kind of fortress and that on May 31, 2004 I informed him that I told him that I only was keeping the gun for a friend. Now "examine or remember that in the report dated Nov. 12, 2004 case 2004-112, Mr. Pelz states that I and Sharon damaged his property and that Mr. Pelz pointed to some things that were squashed and destroyed in the house and that we did that damage. I think that Mr. Pelz is referring to the damage that the officers caused to Mr. Pelz's house on that date of May 28, 2004. But then "Mr. Pelz in a malicious way was quick to falsely blame me and Sharon for all the damage caused by the officers to his house and his property and at the same time to falsely accuse me that I told him that I was keeping a gun for a friend, when I never in my life mentioned to him or to anyone anything about firearms in any way and it isn't true either that there were people staying on his property in the cars or vans or in the house." All of this have been lies by Mr. Pelz. If you pay attention to the meanings and insinuations of all the reports and testimony of these four people Sharon, William, Dibble and Mr. Pelz and mine "Arenas" and those of the state and federal officers, in particular those of Detective Rojas, you will find that I am fighting against mean actions from each of these corrupt people and that I have been slandered by all of them. I state and affirm that I am innocent of these charges in this case 2004cr-00282. Finally, although there is a lot to show you, here I show you other illustrations as an obvious example. "On May 28, 2004 the officers that searched and destroyed part of the house at 1118 West 41 St. Ave." none of them claimed to have found crack pipes with crack residue, which supposedly were used by Sharon and William Betman a little before the officers arrived at the house and they didn't claim either to have found them on the Batemans that day, 5-28-2004 and if you pay attention to the report that Sharon gave on the day of my trial in the month of Sept. 27, 28 and 29 of 2010, page 122 from line 8 to line 13 on that page," Sharon stated that she did not have time for anything that she only jumped and that the officers arrived very quickly to the door when she was thrown to the floor in the ground floor of the house, then it is obvious that Sharon could not hide her crack pipes and that the officers obviously would have found them, "but since the Batemans are lying that they were smoking crack in my house soon before the officers arrived to my house, the officers did not find any crack or pipes on any of the Batemans and they also didn't find the crack pipes on any of them or in any place in the house." I hope that you can realize how their own testimony and report affirm and show the lies of all four false witnesses, Sharon, William, Dibble and Pelz. Likewise it shows the main actions and lies of the federal and state officers in this case 04-cr00282. I, Arenas, state and affirms that I was not nor I am a drug dealer and I never had illegal drugs to give to the Batemans or to anyone else. And I never gave drugs to anyone and I never had firearms in that house and property. Take into account also "this contradiction of Mr. Pelz when he claims that I turned his property into a type of fortress. On the other report he contradicts himself by saying that Sharon and I damaged his house and property, by saying that we turned his property and house into a type of fortress." ~~————————~~, I.A.G.

~~————————————————————————————————~~

~~————————~~. "I also want you to challenge "that I never waived nor signed any document that proves that I waived my rights to the time limit to take my case to trial." I also want you to challenge the fact that the "prosecutor and psychologists that work for the government and Judge Daniel Y Willey and the attorney Thomas R. Ward violated my rights of time limits for a

Page 11-of, 12.

speedy trial, using falsely the accusation and the law that I was not competent to go to trial.
Accusing me falsely that I had mental problems "and in this way they proceeded illegally without
complying with the law and legal regulations and they try to damage my physical and mental health
by ordering falsely that I was given chemical substances by force for mental retardation when I
never needed them nor need them" and I state and affirm here that I never took the substances that the Judge
ordered that I take by force for mental retardation. "Please, also take into account that when
attorney Thomas R. Ward, prosecutor and judge and the psychologists that work only for the
government accused me that I had mental problems, before these accusations they had already
violated my rights of time limits for a speedy trial" because about three years had already passed
from the time I had asked for a speedy trial and they had me in custody for over three about or—years before
they accused me of having mental problems and any of the Attorneys told me of my Rights For speedy—
trial. Sincerely made by Ismael Arenas González, on 10-8-2011.

Sincerely, Ismael Arenas González
    Ismael Arenas Gonzales
    Reg. # 32780-013

For the Court of the District of the United States
For the District in Colorado

Case number 04-Cr-00282-REB

(AS, George Castillo
(Ismael Arenas Gonzales V. United States of America

" Affidavit of the true Status and nature of this Case", and request
To this Trial Judge to grant this Issues and Fact Presented herein and Rule in accordance
with the true Laws of this Country in this case.

Ismael Arenas Gonzales, as George Castillo, the undersingned does hereby
Swears under oath that the declaretions and facts in this affidavit are True and
correct as Follows;

1). I, Ismael Arenas, G. Affirm that before and after this Federal case
# 04-Cr-00282 this entire case has Rested intirely in this State Case # 04F22213; That I
have never consumed substance for mental disorders, and without consuming
Substance for mental disorders I had been Competent the intire time to stand on trial
and to State the matters set forth herewith.

2). I affirm to have personal Knowledge of the facts stated here in, all
Facts stated herein are true, correct, and complete in accordance with
my best First hand knowledge and understanding.

Before this trial I, challash the prosecutor to prove wrong all facts herein,
3). On :5:28:04: C.E. at or around 9:55 Pm. I walked out of my
home, in to my house yard at that time I was Planing my work Schedule
for the next day when around 10:00 P.m. I was accosted by around ten
(10) members of a Swat-Team wherein I was Commanded by a yelling
voice to "Mr. George Castillo get on the ground. "At that time I immediat-
ely dropped to the ground not knowing what was going on I didn't
resist, and immediately after I dropped to the ground one cop ran up and
grabbed my arms pulling them up behind me dropping his knee several
times on my Back Causing me damage in my testicles and Severe pain
and yelling at me not to resist when I never resisted, he then Placed
a plastic tie around my wrists. All this happen at 1118 west 41st Ave.
4). Immediately Several of these terrorist Swat-Team-members then
breashed in my unlocked door using what appeared like a ramrod, they breached
Page 1-of, 22.

my house unlocked door without announcing nor knocking first, and
at no time during the search officers show me A search warrant, and
at no time during the search officers give me A search warrant, and
at no time during the search officers advised me ~~~~ ~~I·A· 'G·~~
~~~~~~ about them having A search warrant. ASK yourself,
that had they not been in a terrorist frenzy when they could have
simply turned the door knob and opened the door rather then
breached in, or they could simply asked me for the house door key,
or simply take the key away from me and opened with the key, but
they never did. The search warrant that appears in this case discovery
shows that is addressed to my name as George Castillo, and at the time
that the officers arrive to my house I was the first person  being
contacted by them, and they right oway knew that I was the one
they were looking fore, Now ask yourself, what was their
reason for them to use force and to do what they did, when I
was in their presents and the Door was unlocked and I also
had the house Door key with me. I affirm that when officers
arrive, I never try or attempted to enter my house, nor I
alerted the others in the house of anything, neither I try or
attempted to alerted the others in the house at no time.

5). Since the beginning of this case I am trying to understand the
reason why I have been singled out and accused of unlawfu wrong
doing by the Denver County police officials by using false defamatory
accusations against me. The only reason I have come up with, is
because the color of my sking, culture, and race, and because I
am a person that has no family that will protest on my behalf,
and I am a person that was unclear to be identified, and as well
as where I am from; As you will find out if you investigate that before
Page 2-of, 22.

The Denver County officials falsely defamed me with the prior case charges of 2001 and 2003 which is the same case, something happen to me, it hoppened about the last months of the year 2000 or about the first month of 2001, I took a man to Court, Charging him with False Impersonation and Fraud, because he rented me a six car garage at 4243 Delaware Street Denver Co. and it happened that the Judge in this Case ruled in my behalf and ordered this man, louis or louie to Pay me the damages and the money For rent which was taken from me, which he never payed me, After this, I found out that this man Louis has a relative or a daughter that at the time she was some kind of Denver County official, and it happened that louis instead of paying me my money, he used his Denver County official influence to falsely and unlawfully get back at me without paying what was owed to me and Since I have had this problem with louis I have had Problems with the Denver Police officials up to this Date. If you need more information on this matter you can Contact the Denver Court Clerks For dates and information on this subject.

6). As follows please see two pagas State reports, one Page of officer leuthauser, Jess A. Report where he falsely claims that he by himself "did an event on me, he falsly claimed saying "I then pushed the castillo "off of the items and → immediately recovered The baggeis ;. And the other hand you have officer Subia, Larry Report were he        Falsely Claims that him and officer leuthauser together grabed me and take me to the ground and he said that while we were handcuffing him he was still trying to destroy the baggies. After Castillo was handcuffed officer Leuthauser recovered both baggies, As you Can see these officers give Contradicting staxys and if you were to review the other officers reports and other reports in regard this case you wellfind a lotother contradictions, find attached herein—
A-14, Page Exhibits right next of this page.

Pag-3-of,22

This is an EXTRA in Reference officer Leuthauser and Subia Misconduct

This Page is to show you how many Contradictions I found only on this Two pages of officer Leuthauser and Subia Reports, in Reference of the only combiction that I have in the State of Colorado,

#1.) (A) is — in Reference officer Leuthauser.
affirms — that he by himself handcuff Castillo" on this date 1-18, 2001.

#2.) (B) affirms — is — in reference officer Subia.
that both of them together handcuff Castillo"

#3. Mr. Leuthauser affirm that happen about 2:05 PM and Mr. Subia affirms that was about 4:05 PM.

Leuthauser — (A) affirms, that He by himself Just pushed the castillo to recover items."

#4.) (B) affirms," that castillo was taken to the ground by both of them to recover items."
Subia →

#5.) (A) affirms, that items were recover immediately after the Push."
(B) affirms, that items were recover after castillo was secure on the ground"

#6.) (A) affirms, that Castillo was not taken to the ground to be secure."
(B) affirms, that castillo was indeed taken to the ground to be secure."

#7.) (A) affirms, that both parties, ignored his order and continued toward the garage area",
(B) affirms, castillo began walking away from us very quickly."

#8.) (A) affirms, to seize two separate baggies"
(B) affirms, to seize both baggies" One Plastic baggie"

I, Ismael Arenas Gonzales affirm and swear under Oath that the 2001 Case rests entirely in the false defamatory Fraudulently statements of Leuthauser, Jess A. and Subia, Larry officers reports presented with this Affidavit under the fact that this two oficers are the only ones that Participate in the false seized event and in the arrest events, because during the time while they arrested us and supposedly seized illega substance no other oficer was ther.   Other officers arrived to my location after these two officers where done with the supposed seized event. I, Ismael, A.G. affirm that on 1-18, 2001 officer Leuthauser and Subia did not seized any illega substance from me nor from that location at 4243 Delaware Street. On 2003-I was Convicted of this false accusations without officers having any arrest nor search warrants by — these two officers unlawful events of my arrest.

**STATEMENT**

| NAME (LAST, FIRST, MIDDLE INITIAL) | | | | MAKING STATEMENT IS: | | | |
|---|---|---|---|---|---|---|---|
| LEUTHAUSER, JESS A. | | | | X OFFICER | ☐ WITNESS | | ☐ PERSON ADVISED |
| RESIDENCE STREET ADDRESS | | CITY | | COUNTY | STATE | | ZIP CODE |
| RESIDENCE PHONE | BUSINESS PHONE | | | SOCIAL SECURITY NO. | | DATE OF BIRTH/SERIAL NO. | |
| | (303) 964-1106 | | | | | 96026 | |
| BUSINESS STREET ADDRESS | | CITY | | COUNTY | STATE | | ZIP CODE |
| 2195 Decatur Street | | Denver | | Denver | CO | | 80211 |
| OFFICER TAKING STATEMENT | | SERIAL NO. | | DATE | | TIME | |
| JESS A. LEUTHAUSER | | 96026 | | 1/18/01 | | 6:11 PM | |
| CONCERNING AN INCIDENT AT | | | | LOCATION WHERE STATEMENT TAKEN | | | |
| 4243 Delaware Street | | | | DISTRICT ONE STATION / 2195 Decatur Street | | | |

On 01-18-01, while working car 147, at approximately 1330 hours I assisted the Narcotics Unit of the Denver Police Department in reference to a search warrant.

At approximately 1405 hours, while working with Sergeant L Subia, #75060, we responded to the area of the 4200 block of North Delaware Street to assist in a traffic stop for Detective Carrigan. It was related via radio that there was a male and a female party inside of a white Plymouth Colt with a plastic back window and that the two parties had just left the residence where the search warrant was issued. In addition, Detective Carrigan related that he had received information that the male party was in possession of Cocaine. As we arrived in the area, I observed two parties exit a white Plymouth Colt with a plastic back window in front of the residence located at 4243 Delaware Street. The male was later identified as Jorge Castillo (10-28-63) and the female party was later identified as Barbara Martinez (04-24-72). I observed Castillo exit the driver's side of the vehicle and Martinez exited out the passenger side of the vehicle. A narcotics detective, which was in the area, related that the parties which I observed were the two parties which they wanted contacted.

As I approached the parties, both parties began to walk quickly into the driveway of the residence located at 4243 Delaware Street. I exited the marked Denver Police Department patrol unit, in full Denver Police Department uniform and identified myself as a Denver Police Officer and ordered both parties to stop. Both parties ignored my orders and continued Westbound towards the garage area. As I ran towards the parties, I observed Castillo throw two separate baggies that contained an unknown substance to the ground from his right hand. Castillo then attempted to destroy the evidence by grinding the baggies and there contents into the snow covered ground. I then pushed the Castillo off of the items and immediately recovered the baggies, one contained suspected Cocaine and the other contained suspected Crack Cocaine. I then placed the party into custody. After placing the party into custody, I observed the party had the keys for the before mentioned vehicle in his left hand.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

01 / 18 / 01
Date

1811 HL
Time Statement Completed

Signature of person making statement

000127

Denver Police Department

STATEMENT

| NAME (LAST, FIRST, MIDDLE INITIAL) SUBIA, LARRY | | | MAKING STATEMENT IS: X OFFICER   ☐ WITNESS   ☐ PERSON ADVISED | | |
|---|---|---|---|---|---|
| RESIDENCE STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE |
| RESIDENCE PHONE | BUSINESS PHONE 303-964-1106 | | SOCIAL SECURITY NO. | DATE OF BIRTH/SERIAL NO. 75060 | |
| BUSINESS STREET ADDRESS 2195 Decatur Street | | CITY Denver | COUNTY Denver | STATE CO | ZIP CODE 80211 |
| OFFICER TAKING STATEMENT | SERIAL NO. | | DATE 1/18/01 | TIME 6:22 PM | |
| CONCERNING AN INCIDENT AT 4243 DELAWARE STREET | | | LOCATION WHERE STATEMENT TAKEN DISTRICT ONE | | |

On 1-18-01 I was working as Cruiser 140, the supervisor for the District One NPO officers. At around 2:00 PM I became involved in a drug investigation with the Narcotics Detectives. *[1300]*

I waited on a perimeter surveillance with Officer Jess Leuthauser while undercover officers conducted an inner surveillance of 4418 Mariposa Street. At around 4:05 PM I was advised by Detective Jason Carrigan to stop a car which was headed to 4243 Delaware Street. The description given to us was a white Colt with a broken out rear window, which was covered by plastic. The detective advised that the vehicle with a suspect aboard was heading to that address. He stated to us that the Hispanic male, medium build, long dark hair, driving the car had just left 4418 Mariposa Street.

We then drove to the area of 4243 Delaware Street and were advised by Sgt. Kroenke, who was conducting surveillance at that location. He stated to us that the suspect vehicle was parking across the street from 4243 Delaware Street at that time. As we turned into that block we were notified that the parties crossing the street and walking away from the suspect vehicle were the parties we were supposed to contact.

We pulled up to the driveway area of the address and were in a fully marked Denver Police Unit. I, as well Officer Leuthauser were in full uniform when we announced our identities as police officers. Both parties, a female later identified as Barbara Martinez, 4-24-72, and the male suspect, later identified as Jorge Castillo, 10-28-63, began walking away from us very quickly. We had to run up a driveway to get to the parties. As we approached Castillo we saw him throw to the ground, 2 plastic baggies containing a white powder. Castillo immediately began to step on the baggies trying to destroy them. He was taken to the ground by us where we handcuffed him. While we were handcuffing him he was still trying to destroy the baggies. After Castillo was handcuffed Officer Leuthauser recovered both baggies. One plastic baggie

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

| 1/18/01 | |
|---|---|
| Date | |
| 6:22 PM | Sgt. Larry Subia 7560 |
| Time Statement Completed | Signature of person making statement |

Affidavit of Jorge Castillo Date 5-23-05

Page 1-of, 4-

1) MY Attorney Steven Flavin __WAS__ inefective Assistance of Counsel, By refusing to raise and present the facts and Issues below to the Jury trial, During trial of 1-28-03- and 1-29-03 I requested to the Judge to allow me to take the Stand to testify on my behalf, the Judge did allow me to testify, but I never took the Stand and testified, Because my Attorney Flavin right away requested the Judge to stop the Jury trial and ask for permission to the Judge for private time to talk to me outside the Court room which the Judge agreed to, then Mr. Flavin took me to a back room and threatened me Saing that if I tooke the Stand to testify on my behalf I will loose my Case and get a long Sentence in Pricer, he requested me not to take the Stand, he told me not to mess it up for him in trial!!

_____

These facts and issues I am raising and this writ of Habeas Corpus are the Same facts and issues that I requested to Attorney Steven Flavin months before my Jury trial for him to raise in Court, which Mr. Flavin at all times refused to present these facts and issues in all Court proceedings in my behalf.

_____

My Appeal Attorney Katherine Brien advised me that the only Issues She would be able to argue in my appeals are the Issues that my trial Attorney Mr. Flavin raised in Jury trial for this reason I was not able to raise these facts and Issues in the Court of Appeals.

_____

2.) -DET. Carrigan did a very Corrupted Action by Singling ME out by Filing an Affidavit Requesting for a Search warrant ——>

Appellate Case: 11-1322   Document: 39-2   Date Filed: 02/01/2012   Page: 60

Specifically for Ralph Salas and barbara Martinez
and by not Chargin barbara with any of those Charges wh
She was the one that DET. Carrigan Specifically obtained
the Search warrant for, other than Mr. Ralph Salas: On this
date 01-18-01, I Jorge Castillo at no time had been at or enter
ed in Ralph Salas house at 4418 Mariposa st,, On this date —
01-18-01, I reside at Erica's house and I was in Erica's hous

I Jorge Castillo believe that on 01-18-01 officer's followed
Barbara M. to Erica's house and from Erica's house officer's
Followed us to my Shop at 4243 Delaware.
    On 01-18-01, I Castillo gave a ride to Barbara M. She told me
that she was going to visit her father She said that her father
lives close to my Shop at 4243 Delaware.
On 01-18-01-I Jorge Castillo at no time posses any kind of
Contralled Substance, I don't use any kind of illegal drugs and I didn't
Posess any drugs at all.

On 1-18-01-I Castillo was  Renting the garage from the owner of that
    Property and I was          self enploed doing auto body
    Repair and Preperation for Paint with my own tools.
On 01-18-01- Officers did Illegal Search with No Search warrant they
went into my Shop at 4243 Delaware, after officers Searched
the Shop they left the Back door and Front door wide open of my Shop
they did not put any police tape around my Shop as a warning to
stay away from my Shop.

When I was released from Jail on about 1-19-01 I went to my shop and I found my shop empty all my tools and equipment, over $ 20.000 in vallie were Stolen I report it to the police the same day and they came and made a report of the incident. the pollice told me they will notify me if they find anything, since then I haven't heard from the officers in regard my tools and equipment.

DET. Carrigan I beleave is wrong by using a second hand testimony of an informant with no name, that informant never show up for any of the courts hearings.

Officer Larry Subia and Jess Leuthauser made illegal and corrupted claims in their own statements Dated 01-18-01; By seeing their own contridiction you will find out that officer Subia and Leuthauser made false statements, By officer Leuthauser Jess A. saying that he arrested me by himself that he, pushed the Castillo off of the items and immediatele recovered the baggies.".

On the other hand officer Subia Larry is saying that both of them together arrested me, when hi say, "He was taken to the ground by us where we handcuffed him " and he allso say," After Castillo was handcuffed officer Leuthauser recovered both baggies". (A) says, I immediatele recovered it, And (B) - says, after he recovered it. (A) says, "I then placed the party into costody "(B) says, " while we were handcuffing him he was still trying to destroy the baggies". (A) says, "After Placing the party into custody, I observed the party had the keys for the before mention vehicle in his left hand".

Affidavit of Jorge Castillo Date 2-23-05                Page-4-oF-4.

One of these officers says, I saw him throw the baggage into a pile of snow. And the other officer says, I saw him throwing the Baggage on the ground.

You will find these two statements in these officer's hand writien reports, because I don't have copies of these statements on hand.

one Arresting Officer allso say that they're Covered two separate baggage and the Lab man during Cross examination hearing Show in Court one single Pice of Plastic (NOT A BAGGAGE or BAGGAGE) The Lab man say, that the only thing he received from the officers and he showed to everyone, was the piece of Plastic, and he allso Said tha drugs were wrapped in that piece of Plastic.

If you canget ahold oF the rest oF my File you will find out many more Contradictions, Please try to get my holl Fille, Because this will prove that these officers made False statements to incriminate me — in this Case.

                        Ismael Arenas Gonzáles
                        Ismael Arenas Gonzáles as
                        George Castillo, Jorge.





# AFFIDAVIT FOR SEARCH WARRANT

County / District Court
City and County of Denver, Colorado

I state under oath that I have reason to believe that at the place or on the person known or described as:

4418 Mariposa a one story red brick housing unit with the front door facing South, and for the persons of Ralph Salas 06/23/1944 and a Hispanic female named "Barbara" approximately 28 to 32 years old 5'-3" 150 pounds who both reside at the address.

In the City of _Denver_, County of _Denver_, State of Colorado, there is now located the following described property:

Controlled substances (including but not limited to coca leaves, cocoa leaf derivatives, opium, opium derivatives, depressant drugs, hallucinogenic drugs, tranquilizers) and marihuana and marihuana concentrate all as defined in Colorado Revised Statutes 18-18-102, as amended, together with such vessels, implements and furniture used in connection with the manufacture, production, storage or dispensing of such substances and articles of personal property tending to establish the identity of persons in control of contraband, related paraphernalia consisting inpart and including, but not limited to utility company receipts rent receipts, canceled mail envelopes, photographs and keys, currency, coins and firearms and articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle, including, but not limited to utility company receipts, rent receipts, cancelled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys, and articles of clothing.

For which a search warrant may be issued pursuant to the provisions of the Colorado Rules of Criminal Procedure, on the grounds that this property is stolen or embezzled; or is designated or intended for use as a means of committing a criminal offense; or is or has been used as a means of committing a criminal offense; or the possession of which is illegal; or would be material evidence in a subsequent criminal prosecution in this state or in another state; or the seizure of which is expressly required, authorized, or permitted by any statute of this state.

The facts tending to establish the grounds for issuance of a Search Warrant are as follows:

That I Detective Jason Carrigan, #93024 a member of the Denver Police Department for approximately the past 7 years am currently assigned to the Criminal Investigation Division. Your affiant's present assignment is as a Detective in the Narcotics Bureau, Street Narcotics Enforcement Team, a unit which addresses narcotics complaints in the metropolitan Denver area. Your affiant has been involved in numerous investigations of parties involved in the illegal sales, distribution, and use of illegal narcotics. Your affiant has completed the United States Department of Justice Drug Enforcement Agency's Narcotics Investigators school. Your affiant has received training in drug identification, undercover techniques, surveillance techniques, and identification of drug traffickers and drug trafficking. Your affiant has worked in an undercover capacity and purchased Narcotics. Your affiant is familiar with the appearance, sales methods, packaging, and trafficking of Narcotics. Your affiant remains continually aware of new methods and techniques used by Narcotics dealers and users, and receives regular updates, special bulletins, and information from informants concerning such methods and techniques.

On today's date January 17, 2001, your affiant has received information from a previously reliable informant concerning narcotics, namely "cocaine", and "crack cocaine" that is being sold by "Ralph and Barbara" from inside their address at 4418 Mariposa. The informant

has been reliable 7 times within the past 90 days by supplying your affiant with information. On (3) two separate occasions the informant supplied your affiant with information resulting in arrests of persons wanted for felony warrants. Also the informant, on 5 other separate occasions, supplied information that led to the arrests of five persons in possession of cocaine. Those separate cases are currently in the judicial system. The informant has constantly supplied your affiant with information for the past 4 years. The informant has never provided your affiant with information that has proven to be false.

In the month of January 2001 your affiant received information from the informant concerning narcotics, namely "cocaine and crack cocaine" that is being sold by a Hispanic male known to the informant as "Ralph" and by a Hispanic female known to the informant as "Barbara" from inside of their address at 4418 Mariposa. The informant describes the male known to the informant as "Ralph" to be a Hispanic male about 60 years old with gray and black hair about 5'-7" tall 140 pounds. The informant describes the female known to the informant as "Barbara" to be a Hispanic female about 28 to 32 years old with black or brown hair medium length with brown eyes about 5'-3" tall and 150 pounds. The informant related to your affiant that the informant has been present inside the front room of 4418 Mariposa within the past 72 hours spanning the dates 01/15/2001 to 01/17/2001. The informant related that while inside the front room of the residence the informant has observed a Hispanic male known to the informant as "Ralph" and a Hispanic female known to the informant as "Barbara" selling amounts of what "Ralph" and "Barbara" state to be, "coke, crack, and cocaine". Your affiant learned from the informant that on several occasions the informant has been present inside of 4418 Mariposa and observed various males and females enter the residence and give "Ralph" or "Barbara" unknown amounts of US currency in exchange for small individually wrapped packages of what the informant heard "Ralph" and "Barbara" state was "cocaine" or "ready rock". The informant stated that constant traffic of people on foot come and go from the residence of 4418 Mariposa. The informant related that the occupants of 4418 Mariposa known to the informant as "Ralph" and "Barbara" always have cocaine and are never out of it.

With this information your affiant and members of the Denver Police Department responded to the area around 4418 Mariposa and met with the informant within the past 7 day's. Your affiant searched the informant and found that the informant had no currency, contraband or controlled substances on the informants person. Your affiant then instructed the informant to go to 4418 Mariposa Street and attempt to purchase crack cocaine from the residents inside. Your affiant and members of the Denver Police Department observed the informant walk to the front door of 4418 Mariposa and go inside. A short time later the informant was observed by your affiant and members of the Denver Police Department exiting out of the front door of 4418 Mariposa and go to the pre-determined meeting location. Your affiant observed that the informant did not meet with, stop, or talk to anyone or anything in-between leaving the residence of 4418 Mariposa and arriving with your affiant at the pre-determined meeting location. Your affiant then debriefed the informant and learned that the informant went inside of 4418 Mariposa and purchased an amount of what "Ralph" stated was "rock" in exchange for the pre-recorded US currency supplied by your affiant. The informant related that the transaction took place in the front room of the residence 4418 Mariposa. Your affiant placed the recovered purchased evidence into the Denver Police Department Property Bureau and had it analyzed. The Denver Police Department Crime Laboratory reported to your affiant that the evidence was tested and

$(4)$

found to be Cocaine Base (Crack Cocaine).

Within the past 72 hours spanning the dates 01/15/2001 to 01/17/2001 your affiant and members of the Denver Police Department again responded to the area around 4418 Mariposa and met with the informant. Your affiant searched the informant and found that the informant had no currency, contraband or controlled substances on the informants person. Your affiant then instructed the informant to go to 4418 Mariposa Street and attempt to purchase crack cocaine from the residents inside. Your affiant and members of the Denver Police Department observed the informant walk to the front door of 4418 Mariposa and go inside. A short time later the informant was observed by your affiant and members of the Denver Police Department exiting out of the front door of 4418 Mariposa and go to the pre-determined meeting location. Your affiant observed that the informant did not meet with, stop, or talk to anyone or anything in-between leaving the residence of 4418 Mariposa and arriving with your affiant at the pre-determined meeting location. Your affiant then debriefed the informant and learned that the informant went inside of 4418 Mariposa and purchased an amount of suspected crack from the Hispanic female known to the informant as "Barbara". The informant related that the female "Barbara" opened the door allowing the informant inside the front room of 4418 Mariposa and had the informant give her the pre-recorded US currency. The informant related that the females known to the informant as "Barbara" then went into a back bedroom leaving the informant in the front room with the male known to the informant as "Ralph". The informant related that "Barbara" then returned from the bedroom carrying a large plastic baggie which contained over twenty individually wrapped plastic baggies of what "Barbara" stated was "rocks". The informant was allowed to pick out an amount of these individually wrapped packages. The informant then observed the female known to the informant as "Barbara" return to the back bedroom with the large bag that contained the other packages. The informant was told by the male known to the informant as Ralph and by the female known tot he informant as "Barbara" to "come by anytime, and bring who ever needs some". Your affiant placed the recovered purchased evidence into the Denver Police Department Property Bureau and had it analyzed. The Denver Police Department Crime Laboratory reported to your affiant that the evidence was tested and found to be Cocaine Base (Crack Cocaine).

The informant is familiar with the appearance, uses, sales methods and packaging of cocaine, as the informant has been a user in the past. Your affiant knows through his experience and training as a Police Officer that cocaine is commonly packaged and sold in the manner described by the informant to your affiant. Your affiant knows that the terms "coke", "crack", "rock" and "ready rock" are slang terms used to describe cocaine and quality cocaine by narcotics users.

The informant describes 4418 Mariposa to be a single story "projects" in the "Quigg's". The informant related that the Hispanic male known to the informant as "Ralph" is the occupant renting 4418 Mariposa and that the Hispanic female known to the informant as "Barbara" lives there with "Ralph".

Your affiant responded to the location of 4418 Mariposa and found it to be as the informant described. Your affiant observed that 4418 Mariposa is a one story red brick housing unit located in the Quigg Newton Housing Neighborhood. Your affiant observed that the front

3

(5)

door of 4418 Mariposa faces South and the building sets in between Lipan and Mariposa Streets in the 4400 block. (third building North from 44th Avenue East end unit of that building). Your affiant responded to the Quigg Newton management office learned that the listed occupant of 4418 Mariposa is supposed to be Ralph Salas with a date of birth 06/23/1944. Your affiant learned that "Ralph" resided at 4418 Mariposa with his wife for several years but last year his wife died and an unknown female currently resided there with Ralph.

Your affiant and members of the Denver Police Department conducted 4 surveillance's of 4418 Mariposa Street at various dates and times within the past 10 days spanning the dates 01/07/2001 to 01/17/2001. Your affiant observed that during these surveillance's a high amount of foot and vehicle traffic was observed going to and coming from the address of 4418 Mariposa Street. Your affiant particularly noticed that all of the traffic both males and or females went to 4418 Mariposa, went inside, and then exited in less then two or three minutes. Your affiant knows through prior experience as a Narcotics investigator that this activity is similar to that of a residence where illegal narcotics are being sold from.

Your affiant conducted a Denver Police Department arrest record computer search on the name Ralph Salas with a date of birth of 06/23/1944. Your affiant found a prior arrest record number of #91148 for Ralph Salas 06/23/1944. Your affiant obtained a copy of this Denver Police Department Record #91148. Your affiant observed the record #91148 to contain an arrest mugshot photograph of Ralph Salas along with prior arrest information. Your affiant observed that Salas had been arrested 34 times by the Denver Police Department with the oldest arrest taking place on 02/04/1961 and the most current taking place on 05/03/1998. On 05/03/1998 Ralph Salas listed his home address to be 4418 Mariposa. Your affiant observed that Ralph Salas was arrested in the 60's and Early 70's for Narcotics, Rape, Burglary, Kidnapping, and Forgery. Your affiant observed that the arrest record indicated that Salas was arrested for misdemeanor offenses in the 80's and 1990's. Your affiant ran a National Crime Information Computer search on Ralph Salas 06/23/1944 and found him to have no outstanding warrants for his arrest. Your affiant met with the informant and showed the informant the mugshot photograph from Ralph Salas's record. The informant told your affiant that the informant recognized the person in the picture to be the Hispanic male known to the informant as "Ralph" who lives at and sells crack from inside of 4418 Mariposa.

Your affiant ran computer searches on "Barbara" and was unable to locate any information on her without knowing her last name.

Therefore based upon the information that has been supplied, your affiant would request that a search warrant be issued for  4418 Mariposa a one story red brick housing unit with the front door facing South, and for the persons of Ralph Salas 06/23/1944 and a Hispanic female named "Barbara" approximately 28 to 32 years old 5'-3" 150 pounds who both reside at the address.



County/District Court }
City and County of Denver, Colorado } THE PEOPLE OF THE STATE OF COLORADO

**SEARCH WARRANT**

To Detective Jason Carrigan #93024, or any officer authorized by law to execute a Search Warrant in the County in which the property is located in Colorado. The affiant, Detective Jason carrigan #93024, has filed an Affidavit for a Search Warrant in conformity with the provisions of the Colorado Rules of Criminal Procedure for the following described property:

4418 Mariposa a one story red brick housing unit with the front door facing South, and for the persons of Ralph Salas 06/23/1944 and a Hispanic female named "Barbara" approximately 28 to 32 years old 5'-3" 150 pounds who both reside at the address.

Controlled substances (including but not limited to coca leaves, coca leaf, derivatives, opium derivatives, depressant drugs, hallucinogenic drugs, tranquilizers) and marijuana and marijuana concentrate all as defined in Colorado Revised Statutes 18-18-102, as amended, together with such vessels, implements, and furniture used in connection with the manufacture, production, storage, or dispensing of such substances and articles of personal property tending to establish the identity of person or persons in control of or possession of the place or vehicle or in control of the contraband and related paraphernalia, consisting in part and including, but not limited to fingerprints, utility company receipts, rent receipts, canceled mail envelopes, photographs, keys, currency, coins, firearms, vehicle registration(s), credit card receipts, repair bills, and articles of clothing, believed to be situated at the place, in the vehicle or on the person known or described as:

4418 Mariposa a one story red brick housing unit with the front door facing South, and for the persons of Ralph Salas 06/23/1944 and a Hispanic female named "Barbara" approximately 28 to 32 years old 5'-3" 150 pounds who both reside at the address.

City of Denver, County of Denver, state of Colorado; upon one or more of the grounds set forth in the Colorado Revised Statutes and the Colorado Rules of Criminal Procedure, namely; that this property is stolen or embezzled; or is designed or intended for use as a means of committing a criminal offense; or is or has been used as a means of committing a criminal offense, or the possession of which is illegal; or would be material evidence in a subsequent criminal prosecution in this state or another state; or the seizure of which is expressly required, authorized or permitted by any statute of this state.

Based upon the affidavit of the above named affiant, which is incorporated by reference, I am satisfied that there is probable cause to believe that the property described is located at the place, in the vehicle or on the person above described. YOU ARE THERFORE COMMANDED to search the place, vehicle or person described for the property described, and to make a return of this Warrant to the undersigned judge within ten days, and to deliver to the person from whom the property is taken, a copy of this Warrant together with a receipt for the property taken, or, to leave a copy of the Warrant and receipt at the place from which the property was taken.

Date 1/17/01 ___ Time 9:35 P/M
in Denver, Colorado

_Mari A Celeste_
Signature of Judge

MARY A. CELESTE
Printed Name of Judge

---

IMMEDIATE ENTRY
SEARCH WARRANT

YOU ARE FURTHER INSTRUCTED THAT YOU MAY ENTER THE ABOVE DESCRIBED PLACE TO BE SEARCHED FORCIBLY WITHOUT FIRST KNOCKING AND ANNOUNCING YOUR IDENTITY AND PURPOSE.

_____
Signature of Judge

Case Number 200102698

Booking No. 1239083

OFFENSE: Possession Controlled Substances

VICTIM:     NAME: State of Colorado
            ADDRESS:
            CITY/STATE:
            PHONE:

Lab # 01-0483                                                    Property Invoice # 597114

| Date | Suspect Arrested - Name | Street Address | DOB | DPD No. |
|------|------------------------|----------------|-----|---------|
| 1/18/01 | 1. Jorge Castillo | 4243 Delaware | 10/28/63 | 587233 |
| | City: Denver     County: Denver     State: CO     ZIP: 80211 | | | |
| Date | Suspect Arrested - Name | Street Address | DOB | DPD No. |
| | 2. | | | |
| | City:     County:     State:     ZIP: | | | |

Filed in Court:  ☒ District     ☐ County     ☐ Juvenile     ☐ Other
☐ Unfounded     ☐ Exceptionally Cleared     ☐ Inactive, Not Cleared     ☒ Cleared by Arrest     ☐ Warrant Issued

Investigator          Serial Number                    Approved:

*Jason Carrigan   93-24*

Detective Jason Carrigan     #93024               Supervisory Officer

DETAILS:

In the month of January Detectives received information from an informant concerning Narcotics, namely cocaine and crack cocaine which were being sold by Ralph Salas and a female named Barbara from their address at 4418 Mariposa. Detectives conducted an investigation on the address and also conducted two controlled buy's from the address. Detectives conducted several surveillances on this address and observed a large amount of foot traffic coming and going from the residence. Detectives obtained a search warrant for 4418 Mariposa on 01/17/2001.

On 01/17/2001 Detectives learned from the informant that the female that lives at 4418 Mariposa took the informant to meet the "source". The informant related that Barbara took the informant to 4243 Delaware Street and introduced the informant to a male named "Jorge". The informant learned that "Jorge" was planning to bring Barbara and Ralph Salas a delivery of Cocaine on the next day 01/18/2001.

On 01/18/2001 Detectives set up a surveillance in the area around 4418 Mariposa and 4243 Delaware. At approximately 15:00 hours Detectives observed Barbara and Jorge drive from 4243 Delaware Street to 44th and Mariposa in a white Plymouth Colt station wagon (license #F1J-6887). Detective observed that this vehicle had no back window which was covered in plastic. Detectives observed the female "Barbara" and the male "Jorge" go inside of 4418 Mariposa Street. A short time later Detectives observed Ralph Salas go into the residence of 4418 Mariposa Street. At approximately 15:45 hours Detectives sent the informant inside 4418 Mariposa Street.

The informant exited a short time later and at the same time the female named "Barbara", and the male known as "Jorge" also exited the residence. Detectives observed "Barbara" and "Jorge" get back into the white Plymouth and drive East on 44th Avenue.

At this time the informant met with the Detective and related that the male "Jorge" was in possession of approximately 2 ounces of cocaine and crack cocaine which was in a clear plastic baggie in his right front pocket. The informant related that the informant had just seen this and that the female "Barbara" and the male "Jorge" were on their way to 4243 Delaware Street to get more cocaine. The informant also related that the male named "Jorge" had just dropped off crack cocaine to Ralph Salas at 4418 Mariposa.

At 16:00 hours members of the Denver Police Department executed a search warrant at 4418 Mariposa Street. At the same exact time Detectives related to uniformed Denver Police Officers that the white Plymouth S/W license #F1J-6887 needed to be pulled over in route to 4243 Delaware. Detective further related that the driver of the vehicle was in possession of controlled substances. Sergeant K. Kroncke was surveilling 4243 Delaware and observed the white vehicle arrive and park on the East side of the street. At this time Sergeant Larry Subia and Officer Jess Leuthauser arrived at 4243 Delaware to contact the suspects. As the uniformed Officers exited their marked Police car the driver of the vehicle "Jorge" quickly began walking up the driveway towards 4243 Delaware. Officers identified themselves by stating "Denver Police" as well as being in uniform. The male "Jorge" and the female "Barbara" both observed the officers and began quickly walking away from them in spite of the Officers attempt to contact them. At this time the Officers ran up the driveway to attempt to contact the two suspects. As the Officers got within several feet of the male "Jorge" they both clearly observed the male throw from his right hand two plastic baggies that contained a white powder substance onto the ground. The Officers know through prior training and experience as Police Officers that the actions of the male and the item observed are consistent with that of a person in possession of narcotics that is attempting to hide or destroy the narcotics to evade arrest. The Officers then contacted the suspect "Jorge" who was frantically trying to destroy the evidence by grinding it into the snow with his foot. At this time Officers took "Jorge" to the ground to handcuff him. Officers observed "Jorge" still trying to conceal the two baggies of cocaine into the snow with his hands as they were handcuffing him on the ground. As soon as the male "Jorge" was handcuffed Officer Leuthauser recovered the plastic baggies from the snow. Officers observed that one baggie contained white powder cocaine and the other contained suspected crack cocaine. Officers also contacted Barbara the female passenger.

Officers found the female to be Barbara Martinez 04/24/1972. Officer found her to have an outstanding warrant for Dangerous Drugs. Officers placed her under arrest and transported her to the District One Station.

Officers were given the name Jorge Castillo by an employee inside of 4243 Delaware Street. When asked for his name Jorge stated, "fuck you get my lawyer", "I'll be out tonight for that little bit". Eventually "Jorge" gave a DOB of 10/28/1963 then changed it to 1968 then 1956. Detectives believe that Jorge Castillo is a false name for his suspect.

The evidence recovered was taken to the Denver Police Department Property Bureau by Detective Carrigan.

Detectives recovered crack cocaine from Ralph Salas at 4418 Mariposa upon the warrant execution. That case is being filed by the Denver District Attorney's Office.

how the County State officials of Denver Co. since the year of 2001 have been falsely defaming me of wrong doing, as well you will findout that in the state of Colorado the only Prior Crimminal case I have been convicted with is the 2001 case, beside that I have no other convictions in the state of Co., and in reference to this 2001 case, same case above, I was arrested approxamatly on 1-18, 2001 and I was released a day or two after this date on a Pr-Bond upon my return to my shop I discovered my Garage door was wide open, All my cars were damaged, inside the cars upholstry were torn badly, it looked as if a knife was used inside the cars upholstry, and all the tires were flatened like with a knife, All of my tools used for working on vehicles were stolen. There was no sighn of the police leaving any kind of barricade, police tape, or any sighn of security or locking up after they search my property and my garage and left. These crimes comitted on my property clearly shows that was done by somebody that hates me and wants me gone, it shows it due to how the tires of all my cars were flatened and the interior damages and the robbery of my possesions, and the fact that the officials leave the garage Doors wide open and without sighn of the police leaving any kind of barricade or tape sighn of security or any other kind of security sighn.

7). My 5-28, 2004 unlawful corrupted search and arrest was Proceeded and doned quite similar like my 1-18, 2001 search and arrest. On 5-28, 04 after the search and arrest upon my return to my houso I discovered my house door was not on place the house was unsicure, the door house was tore apart; All my cars were damaged, inside the cars upholstry were torn badly, including the motorhome was torn badly; And all of my tools used for working on vehicles were stolen. The house bathroom window had been shattered inward.

page 4-of, 22.

And There was no sighn of the police leaving any kind of barricade, police tape, or any sighn of security or locking up after they search my property and Home and left. These Crimes Comitted on my property and Home clearly shows that was done. To me by somebody that hates me and wants me gone, it shows it due to how the damaged cars and the house and motorhome and the robbery of my possesions and under the fact that the officeals that were at my property and Home leave the house Door destroy and without Door, and without sighn of the police leaving any Kind of barricade or tape sighn of security or any other kind of security sighn, they left the Fence gate wide open, and the two fence small doors were wide open too.

8). I, Ismael Arenas challang the prosecutor to prove wrong the followin Fact and Issues, During the search of my Home and Property I was shoved in to my once home Through my kitchen and into the downstairs were at that time I was resideing, were I had my bed the only bed that was being used by me in the whole house, were my bed was completed made, which was the only room were at that time had all my close, clothing and shoes and all my personal property, where on 5-28, 04 I was Forcefully lead to my bed and shoved to a sitting position being ordered to sit there, at that time and room an officer took photographs of my personal property that was seized from my body which were legal items only, officers during that search having camera can not take any photograph of illegal items or substance because I Ismael A. G. as George Castillo at no time was involved in any illegal business and at no time possesed nor had any illegal substance nor illegal items, so, under this fact on 5-28, 04 at no time during the search nor after the search officers found in the house any illegal substance nor illegal items to be photograph specifically in side the house, under this fact I. Ismael, A.G. affirm that this is the reason why the officers during search did not take photographs specifically inside the house that will show illegal substance and illegal items in the photographs taken inside the house, but they sure did take photographs of my personal legal items in side the house, I am refering only to the items that they seized from my body.

Page 5-of, 22.

9). On 5-28, 2004 durin the search at 1118 west 41st Ave.; Denver, Co. officers to unlawful defame me intentionally didn't took photograpts to the downstairs bed that was A complet bed and was completly made, that was the only bed in the whole hause that was being use by me For about two months before this date 5-28, 04, in the same downstair room in which my bed was, is were I had all my personal belongings as clothing, choes and everything that was mine, if you check the pictures that were kaiken by officers during search you will notice that no photographs were taken to any of my belongings that were in that downstairs room, were my bed was made, this officers acts shows and proves their evil wicked acts on their unlawful events during searching my house, as common sense the reason why they did not took any photographs to the downstairs mentioned property and bed, is because if they wouldit take such pictures, those pictures would. contradicted the real Fact of the downstairs room, that in fact was my room at that time of the search and not the upstairs room, because the fact of the pictures that were taken on the upstairs north room only shows an empty room with only an empty dresser and A naked mattress with bed Frame and box springs only, the pictures taken upstairs shwos no Gun, and proves that no body was residing in the north side upstairs room.

10). The reason why I am bringing this facts and issues to this court. is to bring to this court atention and to show that Det. Daniel E. Rojas official of the county of Denver of the state of Colorado initiate this corrupted and defamatory accusations falsely against me and to prove and show, that in this case Det. Rojas by himself initiate the defamatory accusations and falsely singled me out, this officer name appears to be Daniel E. Rojas # 83026. Mr. Rojas, he is that one man, in my case that intentionally missuse and abuse hes position as Reporter Detective specific-ally in this case as is describe it as Follows; On 5-24, 2004 Mr. Rojas out of his imaginatory mind falsely composed the affidavit to unlawfully request for the search warrant as well dated 5-24, 04. this entirely case rests on Reporter Detectiv Rojas false imaginatory Reports; Read Mr. Rojas affidavit written language to understand that Mr. Rojas affidavit presented page 6-0f, 22.

OF 10):

nothing but False gossipy to Judge Michael A. Martinez to obtain the 05-24,04 search warrant, also named Jorge Castillo as person to be searched. In the 5-24,04 affidavit you will find out that NO Factual physical evidence never exists to substain a Foundation of accussatory events, as you can see, Mr. Rojas second page of written language affidavit were he Prints his imaginatory False story using an imaginatory number 720-435-9635 and imaginatory CI #1 requestin a quatity OF Crack cocaine to my image and made his own imaginatorys False events with his imaginatory actors using my image, and name to in fact falsely incriminate—me of wrong doing by using A second imaginatory person that supposelly came to his CI #1 with a hearsays then Det. Rojas in fact affirms that his imaginatory CI #1 had inform him that another person came to him with a hearsay story, and under that hearsay Fiction story Sended his imaginatory CI #1 to my image to request for a quatity OF Crack cocaine to my image, but Det. Rojas imaginatory CI #1 didn't comply. And as you can see on page 1-of the affidavit, Mr. Rojas he put himself very highly affirming that he was train in the area of drugs identification, undercover techniques, surveillance techniques and identification of narcotics traffickers, but in this case he is defrauding me with his defamatory Fiction storys; AS well see the folowing Fact of Det. Rojas Fiction storys, Det. Rojas composed his imaginatory second CI # 2, basing it in a person that never existed in my case, and using a # 720-435-9635 that never existed in my case, Printing a writing language Falsly affirming that his imaginatory CI #2 talk to me and did all acts described on page 3- and 4 OF Det. Rojas False affidavit; He, Det. also used this other # 720-298-1416 with his imaginatory events, but in this case appears that Det. Rojas or nobody else produce factual phisical evidence to substain that his storys are not imaginatory Fiction storys, and after the federal court order the Prosecutor to present Mr. Rojas CI #2 in person to the court, Det. Rojas simply said that her name is Maria and that she wasn't available because she was gone; A convenience False story to defame me and Frauded me, to Falsly incriminate me with unlawful wrong doing. I, Ismael A.G. demend that if the prosecutor in this case can prove me wrong with true factual physical evidence to do it so. If not, than I Request to this court to dismiss all charges against me with prejudice, and realiss me imidially. see the affidavit dated 5-24-04 attach as exhibit right next of this page and 11-pages of Rules and Regulations of Laws requirements for this case.

11). before this Honorable County Judge I Challange the Prosecutor in this Case, that if he has nothing to hide, then to truefully verify before this Court his Personal Reason as why he didn't object to have the Motion dated 7-14, 2010 to seal mental evaluation Documents to be granted by the Court?. That SPECIFIC motion was Filed without my knowledge and behind my back by Attorney Eskesen. but the thing is that I don't want any of this Case documents to be seal because I have nothing to "hide", if the Prosecutor has nothing to "hide" than why he didn't object to grant such Motion.

12). before this Court I challang the prosecutor to prove before this Court that my 5th Amendment Right to due Process of Law and equal protection of Law Right has not been, violated while the Court Criminal Docket For this Case Reflects that Attorney Jeffrey Richard Edelman; Jonathan S. willett and Thomas Richard ward had enough time to take me to Trial, also Reflects that at "No" time I denounced my Right of A Fast speedy Trial. I, Ismael Arenas affirm that if any of these 3-Attorneys denounced this Right, they did it behind my back and without my knowledge which is unlawful and still A Violation of this Right by doing it without my consent and without my knowledge. The Criminal Docket also Reflects that Attorney Thomas Richard ward after he violated my Right of A Fast speedy Trial he was re-appointed in my case against my will and consent, then he Filed A motion on 3-19, 2007 behind my back without my knowledge under A frauded defamatory accusation of determination of Competency to stand Trial. Under the True Fact that Judge Wiley Y. Daniel in Conspiracy with prosecutor and Attorney ward grante that motion. And under A true Fact I, Ismael Arenas affirm in this Trial day that in fact I never Consumed the substance that were unlawfully ordered by Judge Wiley under Fraud and defamatory accusations. I did not consume them because is and was A Fact that by no means I had, or have any mental disorders, and under the Fact that since the beginning of this Case #04-Cr-00282 I had and have been more then competent to stand in my Trial, and to take the stand and testify in my Trial with my own personal knowledge of the Facts stated herein, I am competent in accordance with my best First hand knowledge and understanding and all ways had been. Under this Facts I did not Consumed the substance ordered by Judge Wiley and I keepted some of such substance to show to this Court as Prove that I did not consumed them. Under this True Facts presented herein I affirm that my Civil and Constitutional Rights, and 5th Amendment Right to due Process of Law and equal Protection of Law Right and my Fast, speedy Trial Right all of this Rights allready have been Violated by Prior Prosecutor and Prior Attorneys in Conspiracy with Judge Wiley in this case. Under this facts I request today to dismiss all charges with prejudice in this case and release me immediately. Find attache copy of Criminal Docket For this case.

page 8 of 22.

13). I, Ismael Arenas affirm that the government in conspiracy with the 3-last Prior Attorneys and Judge Wiley where sanctioning the defendant because I will not cooperate with them on taking a Plea-agreement and unlawfully and Falsely admite to them that I am guilty of False defamatory and fraudulent charges that the prosecutor has bring up against me. The government has been trying to unlawfully coverup its misconduct in this case by threatening to proceed with the False defamatory accusations that the defendant have mental disorders, in stead of Proceed with Trial; the Prosecutor in this case with the help of my Prior attorneys and agreement with Judge wiley where making me do time incarcerated under menace and duress by using long term of time without taking me to trial trying to make me take A Plea agreement against my will, as you can see the First Plea-agreement that was offered to me against my will was 18 Months in Jail and the las was dismissal of the charges under conditions not agreeable to me and unlawful and against my will, and as well making their 3-diferent Indictments and after they did all of this unlawful things violatin my Right OF A Fast Speedy Trial for about 3-to 4-years and refused their last Peal-agreement is when the begin to use Attorney Ward to Falsely accused me of not being competent for Trial. The reason I brough this true facts to this Trial Court atention, is to show that under this above factual unlawful acts my due process of Law right and my equal protection of Law right and my Fast Speedy Trial right had been violated under the true fact that since 2004 from the beginning of this case I have been requestin for Trial only and NO Plea-agreements. under this violations presente here above I am requesting, to this Honorable Court Trial Judge to dismiss all charges with Prejudice in this case and release me immediately. Find attache the 18 months Plea-agreement as Exhibit.

My 8th Amendment right to A setting of a reasonable Bail has been Violated too.

14).
Before this trial I challange the prosecutor in this case to truefully prove that the following facts and issues they are not violation of my civil and constitutional rights. The fact that this case has been unlawfully proceeded by prior attorneys and prosecutor taking as good and lawful only the prosecutor deputations without accepting and considering the true nature status. — of this case, while the state officials First reports prooves the fact that this case is based only on Detective Daniel E. Rojas defamatory false unsubstained stories. 1, As the fact that the state affidavit dated 5-24, 04 never had nor have any kind of factual phisical evidence that will substain the IC's hearsay supposed stories and their supposed events in my case. That affidavit is not supported with any kind of factual physical evidence that will in fact substain A true existance of Mr. Rojas CI#1 - and CI#2 claimed in the affidavit dated 5-24, 04. The fact that the state officials reports are not supported with true factual phisical evidence that will substain A fact that the state officials in fact actually found and seized on 5-28, 04 specifically in side of my home illegal items and illegal substances. And the facts presente in page 1-to-7 of this statements herein substain that the prior attorneys and attorney Eskesen exparte intencionally in faver of the prosecutors deputations, while the state officialls reports proves and substain the fact that this case is falsely based only and entirely in Detective Daniel E. Rojas false defamatory unsubstained accusations. 2, The fact that the state reports proves and substain the true fact that Det. Rojas is the only state official that specifically singled me out puting A label on me that specifically falsely incriminates me and only me with possession of illegal items and substance, That without substained evidence were supposedly found specifically in side of my home on 5-28, 04 and that I was the person that resided in the upstair north bedroom. 3, The fact that never at no time the state Det. Rojas had nor have in fact true factual phisical evidence that will substain A true existance of the CI#1 and CI#2 in my case that are claimed in his affidavit dated 5-24, 04. 4, The fact that never at no time the state officials destroyed evidence, items claimed in the state "Return and inventory" report, under the fact that such supposed evidence, items never in fact existed in my Home. 5, The fact that Mr. Rojas is the only state officer that altered state official documents as Mr. Rojas wrotte by hand in officer Cervera Alfonso Jr. Report statements against me, to make others believe that Mr. Cervera also did A report that specifically pointed me out, indoing wrong doing, this report also shows that Det. Rojas is the one that altered that specific report.

Page 10-of, 22.

6, The Fact that Det. Rojas wrotte by hand in other officer report that appears to be made by an officer named Rios in which Det. Rojas wrote statements against me, to make others believe that officer Rios also did a report that specifically point it me out in doing wrong doing, besides this act also shows that Det. Rojas altered that specific report that have Invoice # 680248. 7, The fact that in no were in officers Cervera report shows Det. Rojas signature to verify that he took part in writting that report, but Mr. Rojas hand writting sure appears in it, incriminating me falsely with possession of A Gun. 8, The fact that in no were in officers Rios report shows Det. Rojas signature to verity that he took part in writting that specific report, but Mr. Rojas hand writting sure appears in it, incriminating me falsly with possession of A Gun. 9, The fact that there is no other reports made by state officials besides Det. Rojas hand wrotten reports and machine printed reports that specifically point it me out with possessing of A Gun and also an being the one that on 5-28, 04 resided in the north upstairs bedroom at 1118 W. 4st Ave. 10, The fact that officer Brian Falsely claim that he Found A Gun betwee Mattress and Box-springs, this is falsely affirm in Mr. Brians state report dated 5-28, 04. and in Mr. Rojas supplementary report without signature and undated report, Mr. Rojas falsely affirms that Mr. Brian Found A Gun on the Floor under the bed, See this in page 3-of his report. 11, The Fact that Det. Rojas made an other false report undated and signed by Mr. Rojas, were he affirms that Mr. Bateman on 5-28, 04 when officers arrive, Bateman ran upstairs to George's bedroom with marijuana, that Mr. Bateman has never seen any guns in the house this statement was made by Mr. Rojas singled me out again. 12, The Fact that in u.S. / Castillo-case 2004-112 investigative Report Interview with Sharon Bateman on 9-30, 2004 in page 5, Sharon stated Rojas was taking her back to her hotel room when she was high with illegal drugs, this shows that Mr. Rojas was sexually abusing her an stead of taking her to A Reabilitation place or to Jail, he was acting unlawful as a policeman who was using his power as a Law inforcement officer to Control, manipulate and Strike Fear in to the informant. 13, The Fact that I had requested to Ms. Eskesen many Times to request, or get copy of some state documents that, I never receive from Prior attorneys, these state documents are very important to Prove my innocence in this case, and Attorney Eskesen didn't do anything to obtain these documents. 14, The Fact that on about 6-30, 2004 without any Probable Cause Officer Aragon M.J. ID# 01-23 of Adams county Co. Pulled up next to me and got out of his car and asked me for my name while I was walking over to 7-11-store without Charge me with the Commissission of any Crime nor awared me of any warrant yet he handcuffed me and ordered me to sit in the back seat of his Police Car, he make me wait approximately (30) minutes before he teld me that I had A Federal warrant, this action shows anlawful arrest.

page 11 of, 22.

15, The Fact that after I requested to have my $ 1,445.00 Dollars return to me, The money that was seized during search on 5-28, 2004 with Invoice #CB0248-1. The city and County of Denver Co. answer me stating that because I took over 30-days to claim my money my request was denied, their answer make no sense under the Fact that the money was held For evidence, supposedly to prove my unlawful wrong doing and suppose to be presented as evidence during Trial Date. 16, The Fact that my right of speedy and Public Trial under the provisions of 18 U.S.C. § 3161 had been violated specifically and intentionally unlafully by Prior attorneys that were appointed by the court in my case in Conspiracy with prior Prosecutor and Judge Wiley Y. Daniel they violated this right without my Consent, and without my knowledge. 17, The Fact that all Det. Rojas hand wroten statements and machine Prited Statements are very clearly notable that were made under defamatory False accusatory statements to intentionally defamed me and frauded me, but Attorney Eskesen had deny me this true unlawful Fact and refuse to raise them in Court Throughout Motions or Petitions telling me that is more likely that the Judge will never get to see and review these such state officials Documents, that such documents are not necessary, that such documents are useless For my deFense. 18, The Fact that I Ismael Arenas am not the only one that affirms that is been falsely deFamed and frauded by Detective Daniel E. Rojas# 83026; I, Ismal Arenas meeted two other man in Jail that affirm that they also were abuse and falsly deFamed and Frauded by the same Det. Rojas which one of this man name is Ricardo Valenzuela; Mr. Valenzuela provided me with A Swore Affidavit were he affirms such abuse of Mr. Rojas authority, the other man name is Melquiades Ocana Rascon and Mr. Ocana also has Provided me with A Swore Affidavit were he affirms such abuse of Mr. Rojas authority this two Affidavits I have them to day here with me available for this court or any body that will like to review them, as well I have meet in Jail few other man beside Mr. Valenzuela and Mr. Ocana that also were affirming that they also were abuse and deFamed and frauded by Mr. Rojas abuse of authority. 19, The Fact that in A letter dated 10-13, 2004 From A Prior State Attorney Jeffrey A. Trujillo affirms that the State Prosecutor in this case# 04F22213 dismissed the count with respect to the Possession of the weapon,

But in the Federal First indictment I was charge with two false counts while, The state charge me with only one Count being that this Federal case, is entirely based on this State case# 04F22213, Mr. Trujillo letter also shows that he turned over to the Federal Attorney all that he had of that state case, but Prior attorneys nor Attorney Eskesen aware me nor proviedes me with A copy of such File, eventhough I regueted them to Provied me with A Copy of that Specific State File, this acts shows that my own attorneys were and are working For the Prosecutor to have me unlawFully convicted.

page 12-oF, 22.

20. The Fact that my Prior Attorneys and Attorney Eskesen had denied me my right to see and have A Copy of the Denver Police Department statements, officers Reports; The Statements that were made about me being arrested on 5-28, 2004, A report that will show which officer transported me From my house at 1118 West 41st Ave to the District One Station of Denver, Co., A Report that will show the name of the officer that Transported me, and the Reason why he or she transported me From my house to the District One on 5-28-04; The Attorneys provieded me with Copies of such reports about all the other that were arrested in that same date and location, but they never provieded me with the State reports that will show name of officer that tranported me, date and Reason to Transported me From my house to District-1-on 5-28-04 like the Reports of the others that were arrested in the same date an location that I was arrested Shows all that. 21. The Fact that Prior Attorneys nor MS. Eskesen after I Reguested them For A Copy of the officer Aragon, MJ Report that suppose to be made on the date that he arrested me which was on about 6-30, 2004, and that suppose to be made in-regard the reason Why he stoped me while I was walking on the Side-walk over to A 7-11 Store to get something to drink, never provieded me with such copy of that Report. Offeces Aragon arrested me, in behalfe of the Federal Government, after he First unlawfully stoped me without Showing me probable cause to stoped me, and after he First unlawfully held me arrested inside of his Police Cax for about 30 minutes, then he aware me of A Federal warrant. Attorneys in this case only Provieded me with one Page of two page Report that officer Aragon had made For MS. Sharon Bateman dated 7-02, 04 where Mr. Aragon included me by useing over 3-lines of that report to lalk about When he arrested me Without affirming A Probable cause to First stoped me. This Fact # 20 and 21, can be taken in a different unlawful ways, acted by the attorneys and State officials. I, Ismael Arenas 6. Affirm that officer Aragon not only violate my right of arrested me unlaw Fully by stoped me to interrogated me without any probable cause but he also lie in MS. Bateman report, under the Fact that on, about, 6-30, 04 while he was interrogating me he asked me who was the gril that was sleeping in my Car I Told him that her name is "Sharon" and I Told the officer her name alist 3-times and he when to my Car and gat her up and talke to her right beside me Calling her Sharon and at not time Mr. Aragon identify her as Linda I Know this is true becas offecer let Sharon go First and let her take my car, but in his report he said That Sharon identify herself as Linda, without mantioning that I Told him who She was and her name and that he let her go First right in From of me. and held me there longer, also the Fact tha on about 6-29, 2004 I was with Attorney Trujello in Court hearing and if in Fact was A Federal warrant then, why I was not arrested in Court.
page 13 - of, 22

15). before this trial I challange the prosecutor in this case to truefully prove that the following facts and Issues they are not in violations of my civil and constitutional Rights denied by him; the prosecutor in this case is unlawfully using as witness Sharon and William Bateman under the true fact that these two Bateman's have allready testified before in court falsely affirming acts of wrong unlawful doings against me, Ismael Arenas as George, while these Bateman's give in court false defamatory statements against me, their statements are not only contradicted with the statements that they give to State officers but they also are very clear and notable that are false defamatory statements given against me, and is also very notable and clear that the prosecutor is unlawfully taking only part of their false stories to go against me which appears to be the part that he can fit in his convenient false defamatory charges that he is presenting against me, but he is not actknowledging the part that carry in a specified way charges that are alot more serious charges, that the ones he is presenting against me; In case that the Bateman's statements are granted by this trial court it will show and prove that my equal protection of rights are intentionally violated and my due process of law rights are violated too, under these facts and the ones as follows. 1. First of all Sharon Bateman was allready evicted by me two months before this date 5-28,04 and since I evicted her from my home at 1118 W 41st Avenue she never stayed in the house to spend the night. since I evicted her, she only came for short times to get help for my daughter Jade, and it happened that on 5-28,04 her and her brother came over while the police came 5 minuets after,2, please see Det. Rojas undated and unsigned supplementary report in Paragraph 4-and 5 of page 2- where Det. Rojas told the Bateman's that if they lead Det. to the locations of the drugs Det. would assist the Bateman's with their warrants. And also Det. Rojas claim that nothing was found after the Bateman's lead him, Det. Rojas also said that the dirt was recently dug, but he shows nothing that will substaine his false affirmetions.
Page 14-of,22.

3, I, Joshua C. Arenas, affirm that all the statements giving by the Bateman's in my case are False, here I am presenting some that are more notable. See supplementary Report of Det. Rojas. The Fact that the Bateman's affirmed that they had lead Det. to locations where I supposedly had drugs at that time on 5-28-04, but nothin was Found.

Lie # 2 - Sharon on page 3 of her report dated 9-30,04 u.s./Castillo - case 2004-112, last Paragraph of Pag 3 - she stated that I pointed at her with the First 25 revolver that she threw it away (the Gun), then that she didn't throw it away, that I threw it away. Lie #3, Sharon and William Bateman without any physical factual evidence Falsely said in their court reports and in State police reports that I was giving them illegal drugs and that I was involved with illegal drugs in different ways, while at no time I had nothing to do with drugs nor was I involved with any kind of illegal drugs and I never gave them any kind of drugs, nor gave them money to obtaine illegal drugs and I never had or have Guns in my home at 1118 W. 41st Avenue. Lie # 4, on Jeffrey R. Edelman, P.C. letter to Creseda Riccardi dated 9-29-04, where Sharon Falsely affirmed that Castillo purchased a 22 revolver and that I shot her with A bullet that ricocheted of the wooden wall and entered the back of her neck and the bullet still lodged in her head. Lie # 5, In Report of investigation submitted by Carrie DiPirro dated 8-20,04 where shows that Sharon falsely stated that I traded (2) 8-balls of drugs for A 25 revolver and that I shot her in the back of her neck with A bullet that ricocheted of the wooden wall and the bullet still in her head. Lie # 6, In investigative Report of her, dated 9-30-04 in Page #4 Sharon stated that I shot her with the First Gun in the back of her neck, that the bullet still there, but this time she was out side of the house and the bullet ricocheted again, and this time was with the same Gun that she claims that was being thrown away, First by her, then by me, that because it was useless. Compare this with Lie #2 in page 3 and page 4 of the same Report. Lie # 7, See Mr. William statements dated 11-17,04 in page 8 paragraph 1 - William stated George had Five or six different guns and in the same page in paragraph 4 he stated George always had Guns one or two at a time.

page 15 - of, 22.

Lie # 8, William Stated in his report dated 11-17,04 Page 8 Paragraphs 3-and-4, that he Knows about guns because his grandfather was in world war II - That he has shot-shis grand-mother's house so many times, and that Sharon does not Know about guns, She never realy messed with them. She never possessed a gun.

And in Sharon's report dated 9-30,04 in page 4 Sharon Stated that her grandfather had been a hunter, so She had "learned" about guns from him. you will see this in the First Paragraph.

Lie # 9, See Det. Rojas supplementary report undated and unsigned in page 2- last Paragraph5 Sharon and William asked to Det. Rojas, for help with their warrants, in return the Bateman's would tell Det. where I supposedly hid drugs. And in page 2-of 2-page report of Det. Rojas, William affirm that he has never seen any guns in George's house or cars, and that he did not know there was a Gun under the mattress. And in William report dated 11-17,04, in page 8, William Stated that he was afraid to tell the Government officials about how many guns George had, but now that will had immunity he would tell. And in othere Det. Rojas undated report, it shows, that william still not have immunity, and afficers affirm in that report, that william made a number of unsolicited Statements before Agent DePiro asked Det. Rojas to read william's Miranda rights. And in williams Report dated 11-17,04, in page 8, Paragraph 4- William Stated That I Kept the Guns in the Motor Home. And you will see in Sharon Reports that She allways Claimed that I was Kepting the Guns in Side of the Gouse.

Lie # 10, See in Page 8 and 9 of william Report dated 11-17, 04 william Stated, that George had a bloody Chainsaw, that he thinks that I Killed Somebody, that I was scary, That all mexican do anything. And in Paragraph 2-of Page 9- william affirm that I Shot Sharon in the back of her head. He said he wrote a note to grandma Telling her that he thinks that I Shot Sharon, and after he smoked some crack he drove over

Page 16-of, 22.

to my ... He said that he would Force me to give him some crack
for what I did to his sister, then he left, that he came back the same
day to my Home — and went with me and a mechanic to get
drugs and went back to the house, that then he went upstairs and woke
Sharon up but, he didn't look at her wound, then after 3-to-4 weeks
later he Finally saw his sister wound, and that it was a hole the size
of a dime, that she didn't go to the hospital because I kepted her
locked up in the house; will also said that I was a good-hearted guy;
Then he said that he thinks that I killed the drug dealer, that he thinks
that I robbed the guy; then he said that he thinks that somebody was
shot in my house bathroom, William thinks that under the house there's
a head. Now please see page 4-OF Sharon report dated 9-30,
04 in paragraph 4 where she claims that she went to grandmother's
house and william treated her wound, when in william's reports
he never claims that he treated her wound.

    before this trial I declear and affirm that if the prosecutor
have A right to request for emigration officers and officers that
where involved in my prior cases from the state of Oregon and
Colorado to testify in behalf of such convictions, but only the parts
that incriminates me of unlawful acts but not the part as how
my civil and constitutional rights where violated in the proceedings
of those prior cases; under this Fact I affirm that in order to
have my equal protection of right under the law and due process
of law protected under the law, This trial court Judge should deny-
trial and or in this Case. Or bring the prior attorneys that represent-
ed me in the state of Oregon cases, the ones that represented me
during Court proceings and the ones that represented me in
the apeals process, they can testify as how my civil and
constitutional rights where violated under defamatory
accusations. Otherwise this court will be in violation of my
civil and constitutional rights, violating my equal protection
under the law, and my due process of law right. I also affirm that
I was deported while my Oregon state Case was still pending
in Court of Appeals.

16). before this trial I challange the Prosecutor in this case to truefuly prove that is not unlawful to Falsely make up documents to try to unlawfully Justify charges against me as this Court can see the Denver police inter Department Correspondence, where is Falsly pretending asking for cooporation on how they can alleviate their False defamatory charges by claiming A Gun Reported Stolen out of Golden, CO PD OCA/023266 invoice# 680248. Also Please see that I was provided with two Pages of the Same report where they claim item #5 being destroy on 1-22,06 and in the other Same page report they are claiming item #5 which they refered to A Gun being destroy, and appears that an officer involved in making this report Crossed out where it said Destroy and the date, and right below he or she wroted returned Steal not destroyed. This report shows 3-diferent stories, not only that, but my attorney Just recently informed me that the Prosecutor now is claiming that they have the Gun as evidence, and that the state destroyed the evidence accidently that they didn't intend to destroyed them. This Present acts shows that my own attorney stand to be a witness to affirm as true the govern ment officials involved in this case corrupted acts and False defamatory statements. As also my Attorney — affirms to me, that the state events to search my home on 5-28,04 was legal under the fact that the "police" don't need A Probable cause to obtain a search warrant for a person that is in probation, that the police can legally search A Person that is in probation anytime they want to, without the authorization and Knowledge of the Probation officer in charge of the person, my attorney affirm this, meaning that Det. Rojas didn't need to show probabl cause to make his affidavit dated 5-24,04 to reguest for the search- warrant. My attorney said this because I reguested her to reguest to the prosecutor in my case for solid hard physical factual evidence that will substain the existence of the CI's and events claimed in Det. Rojas affidavit dated 5-24,04 to reguest for the search warrant because there is no such evidence. please see 7-Pages as Exhibits. This acts are in violations of my civil and Constitutional Rights.

page 18-of,22.

I, Ismael Arenas, 6 Affirm that under all facts and Issues that I have presented before this trial I have proved that my 5th Amendment right to due process of Law and my equal protection of Law right have been violated under the fact that I still remain unlawfully held under the same charges for over 6-years and unable to obtain the supposed evidence that would substain the state and Federal Government statements in my case by reasonable available means. See, California V. Trombetta, 467 U.S. 479, 489 (1984). As my right of A fast speedy Trial are violated too.

I am hereby to Challenge the prosecutor in this trial with the Grant Jury and its, "INDICTMENTS" with a Bill of Particulars supporting Jury Tampering and other Crimes Committed by the prosecution and the other accusers in my case, which criminal activity brought about and unlawful "Indictments" against me. I challenge an embracery of the grand Jury in violation of Constitutional Law, the Common Law and the abrogation of the Common law Known as Statutes, see statute Title 18 "united States code" §§ 1503 and 1504; Criminal Froud; Conspiracy to commit Froud; Prosecutorial misconduct; Malicious prosecution; Malfeason of office; Conspiracy against my rights, See Title 18 "u.s. code" § 241; deprivation of rights: under color of Law; Title 18 "u.s. code 242; Falsifying legal documents, Title 18 "u.s. code" § 1001; and other Crimes Committed by the prosecution.

In this trial I, Ismael Arenas challenge the prosecutor, prosecution, with secretly empanals grand juries and pleads their case For indictment(s). That the grand Jury is under the control and direction of the Prosecutors and the hearing(s) is/are exparte in favor of the prosecutors, or party empaneling the grand Jury. That the grand Jurors are, in great proportion, government officers, agents or people licensed in someway through the Prosecutors Principal, the corporate united States, and, therefore, are biased for the Corporate Government. Furthermore, the hearing being exparte, the Jurors are easily swayed by the persuasion of the prosecutors. The Prosecutors used negative human nature (the nature to always think badly of someone) to Fraudulently lead Jurors to accept the one-sided persuasions and brainwashing of the accused in order to obstruct Justice and overthrow the Constitution for the united States of America, the rights of the American people, and the American system of Justice. These facts and other facts that were prior presented in this case in court, supports that the Juries are stacked with government officers, agents, brokers, or intermidiaries, that the witnesses for the Prosecutors have permission to lie on the court stand, see Briscoe Et al. V. La hue Et. al. 460 U.S. 325, 75 L. Ed. 2d 96; that the Jurisdiction is Admiralty/maritime and not law; that the Judiciary is proceeding as a self-Initiating business; that the charges are statutes, the abrogation of the common law, and not the common law; That in this case the prosecutors and this Tribunal claims Jurisdiction through eminent domain; That the prosecutors purports that one must have a license to practice law (whatever is meant by Law), and yet by the grand Jury's actions it was practicing "law" without said license; That the INDICTMENT "contains Felony False conveyance of language, which makes it vague and is a Crime Done by the prosecutors under the law (Fraud) and the anti-law known as statutes under Title 18 "U.S. Code" § 1001; That Justice was obstructed; That I was denied due process of Law; That the prosecutors engaged in malicious Prosecution; That I am denied my equal protection under the law and my right of A Fast speedy public trial act, in as much as I am not permitted to present Lawful charges against the accusers but the Accusers, prosecutors can empanel as many grand Juries and grand Jurors as they choose and continue to unlawfully harass me and infinitum until they usurp Jurisdiction over me under False conveyance language; That the Prosecutors has assumed Jurisdiction over me through Fradulent contracts, those being, among others, through the payment of social security and the use of —

page 20 - OF, 22.

the Postal Service, See UNITED STATES OF AMERICA V. AUSTIN GARY COOPER, 89-109-Cr-Hoeveler, and through business with the banking-system, See Daves V. Elmira Saving, 161 U.S. 275 (1896) wherein it was declared that banks are instrumentalities of the Congress, thereby granting congress unlawful Jurisdiction over its principal "we the people"

The Prosecutors in my case as in others did willfully and Knowingly Commit these crimes against me and against the Sovereignty of this Country and "we the people" and against the degnity of said sovereignty with malicious intent.

Here today in this trial under all the facts and Issue that I have presented, are — sufficent proof of violations in the entire case. It is very clear that the charges against me "are not" supported with proper lawful official docqumetetion, and the documents that they have with statements against me are not substained with solid hard physical factual true evidence to lawfully be presented in this trial, under this facts the Indictments where unlawfully obtained.

Therefore I request this Honarable Trial Judge to assure that my due process of law and equal protection of rights under the law are corrected and cure with the best lawful remedy to insure all right of "defense" in this Case are met to my protection.

I, Ismael Arenas Gonzáles, Pro-se and without the benefit of counsel request to this Honarable Trial Court Judge to construe this Pleading liberally and hold it to a less stringent standard than formal Pleading drafted by lawyers; if the court can reasonably read Pleadings to State valid claims on which litigant could Prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentences structure, or litigant's unfamiliarity with Pleading requirements, Boag V. MacDougall, 454 U.S. 364, 70 L.Ed 2d 551, 102 S.Ct.

page 21-of, 22.

Therefore I, Ismael Arenas Gonzales as defendant in this Case I request to this Honarable Trial Court Judge under all violation done against me Presented to this trial to dismiss all Charges with Prejudice and release me immediately.

*Ismael Arenas Gonzáles*
Ismael Arenas Gonzáles
9-24, 2010

SUBSCRIBED AND AFFIRMED OR SWORN TO BEFORE
ME IN THE COUNTY OF _Jefferson_ STATE OF
COLORADO THE 24 DAY OF _September_ 20 10
_____
NOTARY PUBLIC STATE OF COLORADO
MY COMMISSION EXPIRES __07 / 25 / 2011__

page 22-of, 22.

Denver Police Department
## STATEMENT

Case NO.

| (LAST, FIRST, MIDDLE INITIAL) | | | MAKING STATEMENT IS | | |
|---|---|---|---|---|---|
| ROJAS, DANIEL | | | X OFFICER ☐ WITNESS ☐ PERSON ADVISED | | |

| RESIDENCE STREET ADDRESS | CITY | | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| | | | | | |

| RESIDENCE PHONE | BUSINESS PHONE | SOCIAL SECURITY NO. | DATE OF BIRTH/SERIAL NO. |
|---|---|---|---|
| | 720-913-6060 | | 83026 |

| BUSINESS STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|
| 1331 Cherokee Street | Denver | Denver | CO | 80204 |

| OFFICER TAKING STATEMENT | SERIAL NO | DATE | TIME |
|---|---|---|---|
| | | 08-23-04 | 8:00 PM |

| CONCERNING AN INCIDENT AT | LOCATION WHERE STATEMENT TAKEN |
|---|---|
| 1118 W. 41ST ST. | HQ |

On August 23, 2004, Reporting Detective and ATF Special Agent Cari Depiro responded to the Adams County jail for prisoner transport duty. William Joseph Bateman was transported to the Federal Court Building and turned over to U. S. Marshals custody. During the transport Bateman expressed his desire to relate certain information to us. Bateman made a number of unsolicited statements before Agent Depiro interrupted him and asked me to read Bateman the Miranda advisement, with an ATF form. After reading Bateman the advisement, Bateman agreed to waive rights and speak to us without an attorney. Bateman related the following information, that:

- He met Jorge Castillo (hereafter referred to as George) approximately 1 year ago through his sister.

- On the day that SWAT officers arrived at George's house, George had thrown a bag of crack cocaine down as they approached and that police never found this bag.

- George paid his and Sharon's bail. When George, Sharon and he were released from jail, George went back to the place in the yard where he was arrested and began searching for the bag of crack cocaine and told him that he was looking for the crack the police missed. George found the bag of crack cocaine among some weeds.

- George did not pay Wayne Dibbles' bond because George believed Wayne had stolen a quantity of crack cocaine (approximately 11 ounces) from George, when George was incarcerated on a prior occasion.

- Wayne had been working for George since long before he (Bateman) had known George and that George employed Wayne to deliver drugs for him. Wayne rode a bike to deliver drugs.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/____/_____
Date

_____
Time Statement Completed

_____
Signature of person making statement

Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 5

---

- belongings out of the house just before her birthday.  She said they were fighting often.  SHARON stated, "I found him in our bed with whores.  I walked in and he was in my bed with whores [crying].  I love him, but it's over.  My life's been going downhill since I met him."

- SHARON stated that on her birthday, she went to jail for "theft by receiving".  She stated the charges were dropped down to "theft by trade secrets".  She stated that JORGE bonded her out and she moved back in with her grandmother.

- SHARON stated that up until JORGE's arrest on May 28th, she would continue to return to the house to clean because JORGE would not clean the house.

- SHARON stated that on May 28th, "I was harassing JORGE, trying to get him to give me some crack.  He gave me almost an eightball and I smoked it all by the time the police came."

- SHARON stated that during the police search of the house, Detective Rojas told her he found a gun.  SHARON stated, "He asked me if JORGE had a gun.  I said, 'yeah'.  I knew where he kept it."

Regarding a prior incident with Detective Rojas, SHARON stated, "He [ROJAS] caught my friend with a lot of crack.  I was there with a lot of pipes and spoons, so I told him [ROJAS] I was a crackhead so he would think they were all mine and wouldn't bust me for distribution, only paraphernalia."  SHARON stated ROJAS was taking her back to her hotel room when she told him she never intended to quit smoking crack.  SHARON stated she said this to ROJAS, because she was high.

Exhibit # 8 -oF-8 .  page 1- of- 2.

I, Ismael Arenas aske you to notice as how Blackburn's Judge rejected my only best clear way For me to give my testimony in my behalf For my deFens in my trial days.

review page 140 line 4-to-13, oF my trial on 9- 27-to-29, oF 2010.

I, Ismael Arenas affirm that the reason as why I intented to have the Trial Judge hear my affidavit with 8-EXhibits dated 9-24, 2010 was because the barrier of English language, because my First language is spanish; And my Second reason was, because in writting I can be precise with the statements that I needed to be heard without leaving issues and facts out, and without forgetting important arguments for my deFense; Third reason because communicating to the court, directly me talking in spanish and have an interpreter translate what I say straight from my mind is almost impossible to accomplish in a precise way all the issues and facts described in my affidavit dated 9- 24, 2010; My Fourth reason I always believed that I had the right to deFend my rights in any legal way that will be aVailable for me under the law, and I believe that A testimony in writting is legal specially when I was there in person to affirm or reply any questions that they may had inregard my written testimony or statements of my affidavit dated 9-24, 2010.

IF you review everything that was said by Judge Blackburn's in reference to his rejection of my affidavit during trial days in this case 04-cr-00282-, you will have a better point of view as how this Judge unlawFully acted to rejected my right to have hear my written testimony or statement in my deFense in my trial days of my affidavit.

1    present your allegations and your statements which focus on

2    evidence that you believe has not been presented yet is for you

3    to exercise your right to testify.

4          I do not require you to testify.  I leave that

5    decision to you after careful consideration and consultation

6    with your attorney, but I will not receive that which you

7    consider to be evidence in this case that has been omitted

8    without affording the Government an opportunity to view it and

9    to challenge it and, therefore, you may, of course, consider

10   your further strategy in this case and whether or not to

11   testify with your attorney, but your request that I view that

12   which is, essentially, evidence on your part is respectfully

13   rejected.

14          (Pause in proceedings.)

15          THE COURT:  One minute, please.  Allow the interpreter

16   an opportunity to interpreter.

17          INTERPRETER:  Well, why don't they make a copy, then,

18   and give it to the prosecution so he can be made aware of what

19   I'm trying to argue here -- well, not only arguing but also

20   actually proving because it also comes with exhibits to show

21   that my rights have been violated since the start of this case.

22          THE COURT:  Mr. Arenas, this is not the time during

23   the trial for you to attempt to make the motion that you are.

24   After the Government has completed its case in chief, the Court

25   will conduct mid-trial proceedings.  Perhaps, and only perhaps,

Exhibit # 8 OF-8. Page 2-OF-2.

I, Ismael Arenas ask you to notice that regardless of what the Judge Said in reference to Mr. Bateman and MS. DiPirro meeting in private during Court Trial Process, MS. DiPirro and Mr. Bateman Violated the law and my rights; and regardless what Mr. Bateman said to the Judge in regard that meeting, the Law and my rights were violated by MS. DiPirro and Mr. william Bateman;

review page 179-180 and 181 OF my Trial days 27-to-29 of the 9-month of 2010 in regard Mr. Bateman being unlawfully meeting with ATF agent Carrie DiPirro during my Trial Process.

As well I want you to notice that Nobody can actually know what they were talking about in their private meeting, and that is more likely For anybody to assume that Mr. Bateman was being trained to lie in my Trial against me, as an obvious common sense Mr. Bateman was not going to admited that, that was the true Fact oF that meeting, and MS. DiPirro was not going to admited that Fact either; under this true Fact Mr. Bateman and MS. DiPirro Violated the law and my rights too, and Judge Blackburn's will know and knew this Facts, that the law and my rights were violated by allowing Mr. Bateman to testify after this violations were done by MS. DiPirro and Mr. Bateman; under this true Fact Mr. Blackburn's violated the Law and my rights too.

1          THE COURT:  Mr. Bateman, I have a few questions for

2    you.

3          THE WITNESS:  Okay.

4          THE COURT:  I believe I heard you testify that

5    yesterday you were visited by someone, and you discussed your

6    testimony for today.  Did I hear that correctly?

7          THE WITNESS:  I didn't discuss my testimony.  I was

8    just told how to answer questions in here, basically.

9          THE COURT:  All right.  Who visited you yesterday?

10          THE WITNESS:  The ATF agent.

11          THE COURT:  Where did that visit occur?

12          THE WITNESS:  Here.

13          THE COURT:  Is that ATF agent in this courtroom?

14          THE WITNESS:  Yes.

15          THE COURT:  Can you identify that ATF agent by where

16    he or she is seated and by what he or she is wearing, or do you

17    know the name?

18          THE WITNESS:  It's Carrie DiPirro, I believe you

19    pronounce it.  She's wearing the blue shirt over there.

20          THE COURT:  To the best of your recollection, what did

21    she say to you or ask of you during that conversation?

22          THE WITNESS:  She just, basically, told me how to

23    present myself when I talk and how to answer questions and use

24    full names and stuff and speak clearly.  Basically, how to try

25    to do what I'm doing now.

1       THE COURT: Where did that visit occur?

2       THE WITNESS: Here.

3       THE COURT: "Here" is where?

4       THE WITNESS: In the visiting cell, the federal

5   courthouse.

6       THE COURT: Approximately what time of day did that

7   visit occur?

8       THE WITNESS: Approximately 3:45 p.m.

9       THE COURT: How long did that visit last,

10  approximately?

11      THE WITNESS: Maybe five to eight minutes.

12      THE COURT: When you say she directed you or discussed

13  with you how to present yourself, what, if anything, do you

14  recall about what she said in that regard?

15      THE WITNESS: She told me make sure I speak clearly in

16  the microphone and just tell everything -- she said make sure I

17  tell the truth on everything. Anything I know. She said make

18  sure I actually heard it, seen it, or was there. She said

19  don't speculate on nothing. Don't tell anything that I'm not

20  sure of.

21      THE COURT: Did this discussion involve any of the

22  facts of circumstances of your testimony?

23      THE WITNESS: No. She said, just tell the truth on

24  anything that I know. She didn't specifically pick anything

25  out and say, I want you to say this or this or this. She just

1    said make sure I'm truthful with everything I say.

2        *THE COURT:* Have you told me all that you recollect

3    about this five- to eight-minute conversation yesterday at

4    about 3:45 in the federal courthouse?

5        *THE WITNESS:* The only thing I asked her for is when I

6    get out of custody, I told her if I ever need help, I told her

7    I would probably be homeless, if I could call you for anything.

8    Not for money. Who knows what. I know she's a good person.

9    That's what I need in my life, is good people. I don't need

10   things that are bad.

11       *THE COURT:* What response, if any, did she give you?

12       *THE WITNESS:* She said, yeah. She said if I needed

13   her to, she would write a recommendation letter for what

14   happened here. I told her I'm leaving this stuff alone. I

15   said I may need help for anything. Who knows. Maybe a good

16   place to look for a job or something or anything like that, but

17   I don't know. Maybe I'll never call her. That was just one

18   thing I wanted to ask her, if I ever needed help, can I call

19   her and ask her who I can get in contact with, if she could

20   give me good references.

21       *THE COURT:* That concludes the Court's examination.

22   Does it precipitate additional examination by any other party,

23   hearing first from the Government, Mr. Phillips?

24       *MR. PHILLIPS:* No. Thank you, Your Honor.

25       *THE COURT:* By the defense, Ms. Eskesen?

125

SHARON BATEMAN - Direct

1   Q   (By Mr. Phillips) You mentioned earlier in your testimony

2   that you saw Wayne Dibble sell crack cocaine from that

3   location; is that correct?

4   A   Yes, I did.

5   Q   Did you ever see what Wayne did with the money after his

6   sales?

7   A   Give it to George.

8   Q   And did you ever accompany George during the time of

9   November 2003 through May of 2004 -- did you ever see

10  Mr. Castillo with large amounts of money?

11  A   Yes, I did.

12  Q   Would he ever do anything, in particular, with that money?

13  I guess, did you ever accompany him anywhere with the money?

14  A   We went out to eat and stuff.  Like, I didn't go anywhere

15  to go purchase drugs with him.

16  Q   Do you know where he kept his money?

17  A   No.  He wouldn't let me know that either.

18  Q   Did you ever accompany him to any banks or anything of that

19  nature?

20  A   Not that I recall.

21       MR. PHILLIPS:  Nothing further.  Thank you, Your

22  Honor.

23       THE COURT:  Very well.

24       MS. ESKESEN:  May I have one moment, Your Honor?

25       THE COURT:  You may.  Thank you, Counsel.

## STATEMENT

- As a matter of fact George had sent Wayne out to deliver drugs during the afternoon on day of their arrest and Wayne had just returned (and received another bag of crack cocaine from George) only minutes before the SWAT team arrived and arrested them.

- George used the rubber gloves found in the kitchen, for packaging drugs so not to leave his fingerprints on the plastic packaging and also to avoid contaminating himself, which would cause him to have a positive UA test (which he often took for per terms of probation).

- Once George tried to strangle him (Bateman) with the rubber gloves on. George was outside when he noticed Bateman looking out the upstairs window. George became very angry and accused Bateman of spying on him to see where he was concealing the drugs and then grabbed him by his neck and strangled him.

- George also attempted to strangle Sharon at grandma's house once and he (Bateman) ran up to help stop him. He (Bateman) hit George over the back of the head as hard as he could to stop him. George would sometimes get angry for no good reason and became very violent.

- George sold everything from small to large quantities of heroin, crack cocaine and speed.

- On the time when George was arrested at the Hotel a year ago, he was able to beat the case against him because the police did not have a search warrant. Also Bateman learned that the police only found a small amount of drugs in that hotel room. George concealed the drugs by tying a string to the bag and concealing it in the pipes in the ceiling. George had more than a half an ounce of crack cocaine on that date at the hotel and he returned later to get the drugs back by breaking into the hotel room.

- Before arrest George had about two ounces of heroin, several ounces of crack cocaine and speed, which George concealed somewhere outside of the house.

- **8** Also about two weeks before the arrest at 1118 W. 41st Ave., George had three bags of cash on him. On one recent occasion George took Sharon to the bank with him to exchange money. Sharon should know where that bank is located. George took money to the bank earlier that day (before their arrest at 1118 W. 41st Ave).

- **9** The reason for this was because George feared police would get him with marked money.

- **10** He stayed overnight at the house on the night before they were arrested and slept downstairs behind the couch on the floor, because he was afraid of George.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/_____/_____
Date

_____
Time Statement Completed

_____
Signature of person making statement

Jeff Edelman
Appellate Case: 11-1322    Document: 39-2    Date Filed: 02/01/2012    Page: 99
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 5

belongings out of the house just before her birthday.  She said they were fighting often.  SHARON stated, "I found him in our bed with whores.  I walked in and he was in my bed with whores [crying].  I love him, but it's over.  My life's been going downhill since I met him."

- SHARON stated that on her birthday, she went to jail for "theft by receiving".  She stated the charges were dropped down to "theft by trade secrets".  She stated that JORGE bonded her out and she moved back in with her grandmother.

- SHARON stated that up until JORGE's arrest on May 28th, she would continue to return to the house to clean because JORGE would not clean the house.

- SHARON stated that on May 28th, "I was harassing JORGE, trying to get him to give me some crack.  He gave me almost an eightball and I smoked it all by the time the police came."

- SHARON stated that during the police search of the house, Detective Rojas told her he found a gun.  SHARON stated, "He asked me if JORGE had a gun.  I said, 'yeah'.  I knew where he kept it."

- Regarding a prior incident with Detective Rojas, SHARON stated, "He [ROJAS] caught my friend with a lot of crack.  I was there with a lot of pipes and spoons, so I told him [ROJAS] I was a crackhead so he would think they were all mine and wouldn't bust me for distribution, only paraphernalia."  SHARON stated ROJAS was taking her back to her hotel room when she told him she never intended to quit smoking crack.  SHARON stated she said this to ROJAS, because she was high.

**Attorney Work Product - Confidential**

# Jeffrey R. Edelman, P.C.
## Law Offices

18801 East Mainstreet, Suite 290
Parker, Colorado 80134
Telephone (720) 851-8440
Facsimile (720) 851-5874
e-mail: jredel@earthlink.net

Jeffrey R. Edelman, Attorney
Mindy Greenwald, J.D.
  email: MGreenwald@jeffreyredelmanpc.com
Julie M. Mesaros, Paralegal
  email: JMesaros@jeffreyredelmanpc.com

Nitzie Pabon-Ba, Paralegal
  email: NPabon-Ba@jeffreyredelmanpc.com
Cindy Nowell, Paralegal
  email: CNowell@jeffreyredelmanpc.com

September 29, 2004

<u>Via Facsimile [303-825-2374] & Regular Mail</u>

Ms. Creseda Riccardi
H. Ellis Armistead & Associates, Inc.
802 East 19th Avenue
Denver, Colorado 80218

Re:    United States of America v. Jorge Castillo
       Case No. 04-CR-282-D

Dear Creseda:

I would like to update you in matters in the above-referenced case. Mr. Castillo asked me to file a motion to withdraw because, amongst other reasons, he claims that I was not looking out for his best interests and did not visit him sufficiently enough in order to obtain adequate information to help prepare a defense and file the appropriate motions. At the hearing on September 28, 2004, which was also the date of the rearraignment on the superceding indictment, a copy of which you should have already received, Magistrate Judge Schlatter gave Mr. Castillo an opportunity to either represent himself or keep me as his attorney. Mr. Castillo chose to keep me as his attorney.

In addition, prior to the hearing, I met with Mr. Castillo and presented to him the enclosed Plea Agreement and Statement of Facts Relevant to Sentencing, which was rejected by Mr. Castillo once again as was a prior plea agreement.

Also enclosed is a September 23, 2004 cover letter from Mr. Till's legal assistant with discovery pages 155 through 171. Please direct your attention of particular interest to page 165, paragraph 2, in which Ms. Bateman is being interviewed by Special Agent of the ATF, Agent Carrie DiPirro, in which Ms. Bateman claims that Mr. Castillo purchased a .22 revolver from Adam LNU in exchange for two (2) 8-balls. Mr. Castillo then used the gun right away in the house and a bullet ricocheted off the wall and entered the back of her neck at the bottom of skull. Ms. Bateman claims that she did not seek medical treatment and still has the bullet

lodged in her head. This seems to me to be quite unbelievable. Perhaps, during an interview she will show you a scar on the back of her neck, if one exists. We may want to consider strategically whether or not to get the back of her head x-rayed, because if it in fact shows a bullet, it might not show the age of the bullet wound and that would substantiate her story, but not when it occurred. The lack of a scar or any evidence of a bullet might be more positively used against Ms. Bateman when she testifies on cross-examination. Ms. Bateman also claims to "know guns" so please pin her down with regards to the different caliber of the gun under the mattress and the one used to wound her since the discovery shows two different caliber guns.

Also enclosed is a non-bates stamped statement from Daniel Rojas, consisting of three (3) pages, and dated August 23, 2004 in which Rojas and DiPirro both heard alleged unsolicited statements from William Bateman, while he was being transported to the Federal Court Building, on the same date. I wanted you to have this additional discovery and also be updated on matters.

It is my understanding that an Order was issued granting the government's request to have the compelled testimony of Sharon and William Bateman. The Court has not ruled upon a motion ordering the depositions, but they will probably be scheduled shortly, at which time, Mr. Castillo has a right to be present. The depositions, when they take place, should be preceded by an interview with you and both of the Bateman's who appear to have consented to your interview. At that time, you may have an opportunity to question Ms. Bateman more about this bullet wound and examine the back of her neck for a scar. I probably will request that a video deposition be completed after your report back to me subsequent to your interview with Sharon and William and advise me whether or not there is any evidence of an entry wound, bullet or scar from a bullet entering the back of her neck.

As of this date, a trial has not yet been scheduled, however, the pre-trial conference and motions hearing is currently scheduled for November 15, 2004 at 9:00 a.m. I would like to be present at the Batemans' interviews. Thank you.

Sincerely,

Jeffrey R. Edelman

JRE/jm
Enclosures

cc:   Jorge Castillo

| ADDRESSED TO: MONITORED CASE INFORMATION | |
|---|---|
| Special Agent in Charge<br>Phoenix Field Division | Phoenix Field Division<br>FY-04<br>Report 006 |

| TITLE OF INVESTIGATION: | |
|---|---|
| CASTILLO, Jorge | |

| CASE NUMBER:<br>785025-04-0051 | REPORT NUMBER:<br>6 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Carrie DiPirro | SUBMITTED BY *(Title and Office)*<br>Special Agent, Denver I Field Office | SUBMITTED BY *(Date)*<br>08/20/2004 |
|---|---|---|
| REVIEWED BY *(Name)*<br>James Deir | REVIEWED BY *(Title and Office)*<br>Acting Resident Agent in Charge, Denver I Field Office | REVIEWED BY *(Date)* |
| APPROVED BY *(Name)*<br>Lester D. Martz | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Phoenix Field Division | APPROVED BY *(Date)* |

**DESCRIPTION OF ACTIVITY:**

Arrest of Sharon BATEMAN

**SYNOPSIS:**

On August 20, 2004, Special Agents (SA's) Carrie DiPirro and James Kennedy arrested Sharon BATEMAN who was being held on ATF Material Witness Warrant at the Adams County Detention Center.

**NARRATIVE:**

1. On August 20, 2004, SA's Carrie DiPirro and James Kennedy arrested Sharon BATEMAN without incident at 8:30 AM. She was being held on ATF Material Witness Warrant at the Adams County Detention Center. Adams County, Colorado (CO). BATEMAN was previously contacted by the Adams County Sheriff's Office, and was arrested on State drug charges. On August 19, Trini Atencio posted bond for her. Before she bonded out, Adams County saw the ATF warrant. SA DiPirro was notified the evening of August 19th of her pending release by the Adams County Detention Center, and the ATF Communications Center. BATEMAN was subsequently held overnight with the ATF hold.

2. SA DiPirro advised BATEMAN of her Statement of Rights from a card in her wallet. BATEMAN stated she understood her rights. BATEMAN told SA DiPirro she wanted to waive her rights. She stated she was outside CASTILLO's residence when Shawn LNU and Adam LNU brought a .25 caliber revolver to their house to trade for two (2) 8-balls of illegal drugs. She added CASTILLO used the gun right away in the

Appellate Case: 11-1322   Document: 39-2   Date Filed: 02/01/2012   Page: 103

| ADDRESSED TO: Special Agent in Charge Phoenix Field Division | MONITORED INVESTIGATION INFORMATION: Phoenix Field Division FY-04 Report 006 |
|---|---|

**TITLE OF INVESTIGATION:**
CASTILLO, Jorge

| CASE NUMBER: 785025-04-0051 | REPORT NUMBER: 6 |
|---|---|

house, and a bullet ricocheted off a wall and entered the back of her neck at the bottom of her skull. She did not seek medical treatment. She says the bullet is still in her head.

3   BATEMAN stated CASTILLO carried the gun with him daily. He cleaned it with alcohol and a cloth to wipe his fingerprints off, while wearing gloves. She saw CASTILLO hide the gun under the mattress at night.

4.   BATEMAN said one of CASTILLO's drug customers came to their residence to buy crack with an AK-47 rifle. She recognized the gun because she said she knows guns. After that night, Castillo told BATEMAN he was going to get a gun for self-protection while he was selling his dope. That is when he traded drugs for the gun. He always carried his gun when he was dealing drugs from the house.

5.   BATEMAN said CASTILLO sold crack, methamphetamine (meth), and cocaine. He sold in ounce quantities. He sold an ounce of crack for six hundred fifty (650.00) dollars US currency; an ounce of cocaine for six hundred ($600.00) dollars US currency, and she was unsure how much the meth was sold for. BATEMAN stated CASTILLO had four (4) to five (5) kilos at a time.

Attachments:
Copy of BATEMAN's fingerprints, photographs, and R-84
Copy of Removal of ATF Wanted Person from NCIC

Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report: Interview with Sharon Bateman
September 30, 2004
Page 3

---

- SHARON stated her brother, William BATEMAN (hereinafter referred to as WILLIAM) would sometimes stay overnight at the house. She stated that sometimes WILLIAM would sleep downstairs on a small mattress in the living room. She stated that sometimes WILLIAM would sleep on the floor in the second room upstairs. She stated that sometimes WILLIAM would sleep in the camper with DIBBLE.

- SHARON stated that JORGE would cook cocaine into crack in the house. She stated he would put a kilo of cocaine in a coffeepot with some baking soda and water, then he would use a heat gun to heat the mixture, until it was glob. She stated then they would let it cool and harden and break it up into little pieces.

- SHARON stated JORGE had four or five digital scales, some small and some large, which he used to weigh the drugs.

- SHARON stated that there was a school nearby but she did not know the name of it.

- SHARON stated that JORGE would strangle her. She stated she believed that cooking the cocaine to crack affected JORGE's brain. She stated sometimes WILLIAM would come over to stay at their house with her, because she was afraid of JORGE.

- SHARON stated she found out JORGE had a gun for the first time when he pointed it at her. She stated, "It was a twenty-five caliber revolver. I'm not sure where it came from." She stated, "He pointed it at me, so I threw it away. Well, I took the pin out, so it was useless, and he threw it away."

Attorney Work Product - Confidential

Appellate Case: 11-1322   Document: 39-2   Date Filed: 02/01/2012   Page: 105

- SHARON stated that her grandfather had been a hunter, so she had learned about guns from him. She stated, "He had rifles and thirty-aught-sixes and handguns."

- SHARON stated JORGE obtained his second gun from Shawn (LNU) and Adam (LNU), who gave the gun to JORGE in exchange for an eightball. She stated the gun was a "thirty-two revolver". She stated, "I tried to steal it but never really handled it."

- SHARON stated JORGE was paranoid and slept with a gun for protection. She stated sometimes JORGE would stick the gun between the mattress and the box springs. She stated sometimes JORGE would sleep in the living room.

- SHARON stated that sometime before April 17th, JORGE shot her with the first gun, "the twenty-five caliber revolver". She stated, "I took an ounce of crack from him and he wanted it back. I was talking on the phone to WILLIAM and threw the phone and jumped in the car. I took the car. I was leaving, was flooring it in reverse. He [JORGE] shot the gun three times. I heard three shots. A bullet hit me in the back of the neck. It's still there. I think it ricocheted. It's still in my head." SHARON stated that she did not go to the hospital for treatment, because she was high when this occurred. She stated that the wound bled a lot and burned. She stated she went to her grandmother's house and WILLIAM treated the wound while she was at her grandmother's house. SHARON allowed me to examine the back of her neck. I was unable to detect any scar or indication that a bullet entered her neck recently.

- SHARON stated her birthday is on April 17th. She stated that her relationship with JORGE began deteriorating in early April and she was moving her

Attorney Work Product - Confidential

*Exhibit # ___ of Castillo's Affidavit*
*Date ___*
*page. (12)*

Appellate Case: ___  Document ___  Date Filed: 02/01/2012  Page: 106

- incident at FDC, in combination with his earlier statement that he would be "suicidal if it ever happened again", FDC management had placed him in a cell all by himself, completely naked except for a restraining jacket. WILL stated that he did not want to be on suicide watch anymore.

- WILL stated his sister, Sharon BATEMAN (hereinafter referred to as SHARON) had been romantically involved with George CASTILLO (hereinafter referred to as GEORGE) for three to four years.

- WILL stated he had stayed frequently with SHARON and GEORGE during the time that SHARON and GEORGE lived together at 1118 W. 41st Avenue in Denver, Colorado.

- WILL stated that when the police raided the house on 41st Avenue, he had two warrants out for his arrest and SHARON had five warrants out for her arrest. WILL stated that these outstanding warrants were why "the government put us in jail even though we didn't do nothing wrong. Man, this is day 61 in jail and I didn't do nothing wrong."

- WILL stated, "I looked up Immunity 6001 to 6003. I've got immunity, man. There's no reason for me to lie."

- WILL stated, "Being a crack fiend, I totally hung out there [1118 W. 41st Avenue]. I'd clean for him [GEORGE], mowed his yard, watch the house, organize his wood 'cause he'd give me free drugs. He'd bitch us out, me and my sister, 'cause we'd kill a sack [of crack cocaine]. He would hide his eight balls and ounces on him. He'd have a huge sack with eight balls and ounces. My sister got so good at picking them off him while he was sleeping and we'd just get high."

**Attorney Work Product - Confidential**

*hideing Places of Drugs*

him. All his [GEORGE's] money was invested in that eleven ounces. He kicked WAYNE out for a while."

- WILL stated that he was afraid to tell the Alcohol, Tobacco, and Firearms agent and the Denver narcotics policeman the truth about how many guns GEORGE had, but now that WILL had immunity he would tell the truth about GEORGE's guns. WILL stated GEORGE had five or six different handguns. WILL stated, "Sometimes he [GEORGE] would brag and show them off to me."

- WILL stated that one night he went downstairs to the kitchen and he found GEORGE practicing pulling a gun from his pocket and pointing it at the exterior door in the kitchen. WILL stated that this frightened him. WILL stated, "That night I had to sleep by him. I crawled behind the couch because I was afraid of him."

- WILL stated that he knows about guns, because his grandfather was in World War II and had numerous guns. WILL stated that his grandmother's house has bullet holes all over it because he has shot off guns inside her house so many times.

- WILL stated that SHARON does not know about guns. He stated, "She never really messed with them." WILL also stated that SHARON never possessed a gun. He stated, "GEORGE would always have guns, one or two at a time, but he'd keep changing them." WILL stated that WAYNE and GEORGE kept the guns in the motor home.

- WILL stated, "He [GEORGE] had a chainsaw he'd keep right by the door the SWAT team kicked in." (see Figure 2) WILL stated, "One day it looked

**Attorney Work Product - Confidential**

Jonathan Willett
Appellate Case: 11-1322   Document: 39-2   Date Filed: 02/01/2012   Page: 108
U.S. v. George Castillo
Interview with William Bateman
November 17, 2004
Page 9

bloody, like a red oil was on it, instead of sawdust. Then it disappeared. I looked for it. It was gone. I think he killed somebody. That guy was scary."

- WILL stated that even though GEORGE would give WILL free drugs, WILL was very frightened of GEORGE. WILL stated, "You know those Mexican guys can be crazy. They'll do anything."

- WILL stated that GEORGE shot SHARON in the back of the head. WILL stated, "I got a call from my sister on her cell phone, 11:30 or 12 at night. She was whispering at me, 'cause George was nearby. We talked five minutes then George grabbed the cell phone out of her hand. It was still on so I heard them yelling at each other. She was screaming so loud I couldn't hear what she was saying. Then I heard gunshots --- just one gunshot. Then immediately afterward, she was quiet. I couldn't hear her. I called back. George answered. I asked him what that loud popping sound was and he said it was the door slamming because my sister had left."

- WILL stated, "I was at my grandma's house, so I wrote her a note. 'I think George shot SHARON.' I was fearing for my sister's life. After I smoked the rest of the crack, I drove over there. It took me a while to smoke the crack and build up my courage after hearing my sister be shot. I pulled up inside by the front doors around 4:30 a.m.. GEORGE and WAYNE were on the front porch and were shocked to see me there, because he had shot her. WAYNE said he was going to bed and went to the camper. I asked GEORGE what was going on and he told me I could go into the house and check on her, but don't wake her up. I forced him to give me some crack, 'cause of what he did to my sister and I left. About three in the afternoon, I went back to the house and she was still sleeping. We --- me, GEORGE, and the mechanic --- went to GEORGE's drug dealer's house. He left us in the van while he walked to wherever the house was. I could show you where we parked. It was near

33$^{rd}$ and Vasquez. He didn't want us to know where his drug dealer lived. GEORGE came back with an ounce of cocaine and we went back to the house. I went upstairs and woke her up. She stood up to go to the bathroom and she almost fell over. I didn't look at the wound. I kept asking her where he shot her and she was so fearful about him killing her, she would never tell me where. And then finally, after three or four weeks, she did eventually show me where it was. It was on the back of her head, down at the bottom of her hair. It looked like a hole the size of a dime. The scab was sticking up. She never said why she didn't go to the doctor's or hospital, except he had her locked up."

- WILL stated, "GEORGE was a good-hearted guy. He would give us all the drugs we wanted. But he was also scary. He was so happy at Thanksgiving. We made Thanksgiving dinner. Me, my grandma, WAYNE, GEORGE. I set the table. I didn't smoke crack that day."

- WILL stated that one day, GEORGE told SHARON and WILL that GEORGE had gone to his drug dealer's house and GEORGE had seen hand prints of blood on the washer and puddles of blood, so he left. WILL stated that GEORGE had a kilo of cocaine after he returned from his drug dealer's house. WILL stated, "We think GEORGE robbed the guy, maybe killed him."

- WILL stated that he thought somebody was shot in the bathroom at 1118 W. 41$^{st}$ Avenue. He stated that there was an imprint of a badge in blood on the floor. WILL stated, "Definitely something weird looking like that." He also stated that in front of the toilet is a black pipe with something stuffed in it. WILL stated that next to the black pipe is a hole through which you can see down into the crawlspace under the house. WILL stated, "I think there's a head in a plastic bag down there."

Attorney Work Product - Confidential

Jonathan Willett
U.S. / Jorge Castillo – Case 2004-112
Appellate Case: 11-1322    Document: 39-2    Date Filed: 02/01/2012    Page: 110
Interview with William Bateman
November 17, 2004
Page 11

- WILL stated that one day he heard GEORGE ask WAYNE where the fourty-four gun was. WILL stated that WAYNE told GEORGE he had hid it. WILL stated that GEORGE asked WAYNE if he had wrapped the gun in plastic or put it in a plastic bag and WAYNE told GEORGE that he had.

- WILL stated that GEORGE and SHARON began having trouble with each other. WILL stated that they were angry and would argue so badly that GEORGE would force SHARON to leave the house. WILL stated that SHARON would disappear for a couple of days in her van and nobody would know where she had gone.

- WILL stated that the night before the raid on the house, WAYNE stayed up all night in the motor home. WILL stated you could see the lights on in the motor home.

- WILL stated that the night before the raid on the house, the furniture in the living room was a bed, a moped scooter, and a white plastic lawn chair. He stated that there was not a couch in the living room the night before the raid.

- WILL stated that the night before the raid on the house, he and SHARON hung out in the living room, smoked crack, and stayed up all night. He stated that GEORGE went to sleep upstairs in the room that used to be WAYNE's room. WILL stated that SHARON went up to bed around 5 a.m. and lay down next to GEORGE, but she could not sleep, because she was so high on crack.

- WILL stated that in front of the two doors of the house, there is a PVC pipe sticking up with a rubber lid on it. WILL stated that GEORGE liked to hide stuff down the pipe. WILL stated that the day the house was raided, he noticed that the lid was not on the PVC pipe.

**Attorney Work Product - Confidential**

STATEMENT

- As a matter of fact George had sent Wayne out to deliver drugs during the afternoon on day of their arrest and Wayne had just returned (and received another bag of crack cocaine from George) only minutes before the SWAT team arrived and arrested them.

- George used the rubber gloves found in the kitchen, for packaging drugs so not to leave his fingerprints on the plastic packaging and also to avoid contaminating himself, which would cause him to have a positive UA test (which he often took for per terms of probation).

- Once George tried to strangle him (Bateman) with the rubber gloves on. George was outside when he noticed Bateman looking out the upstairs window. George became very angry and accused Bateman of spying on him to see where he was concealing the drugs and then grabbed him by his neck and strangled him.

- George also attempted to strangle Sharon at grandma's house once and he (Bateman) ran up to help stop him. He (Bateman) hit George over the back of the head as hard as he could to stop him. George would sometimes get angry for no good reason and became very violent.

- George sold everything from small to large quantities of heroin, crack cocaine and speed.

- On the time when George was arrested at the Hotel a year ago, he was able to beat the case against him because the police did not have a search warrant. Also Bateman learned that the police only found a small amount of drugs in that hotel room. George concealed the drugs by tying a string to the bag and concealing it in the pipes in the ceiling. George had more than a half an ounce of crack cocaine on that date at the hotel and he returned later to get the drugs back by breaking into the hotel room.

- Before arrest George had about two ounces of heroin, several ounces of crack cocaine and speed, which George concealed somewhere outside of the house.

- *8* Also about two weeks before the arrest at 1118 W. 41$^{st}$ Ave., George had three bags of cash on him. On one recent occasion George took Sharon to the bank with him to exchange money. Sharon should know where that bank is located. George took money to the bank earlier that day (before their arrest at 1118 W. 41$^{st}$ Ave).

- *9* The reason for this was because George feared police would get him with marked money.

- *10* He stayed overnight at the house on the night before they were arrested and slept downstairs behind the couch on the floor, because he was afraid of George.

*Paragraph*

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

\_\_\_\_\_/\_\_\_\_\_/\_\_\_\_\_
Date

_____
Time Statement Completed

_____
Signature of person making statement

SHARON BATEMAN - Direct

| | | |
|---|---|---|
| 1 | A | I was downstairs smoking crack. |
| 2 | Q | Where did you get that crack that you were smoking? |
| 3 | A | From Jorge. |
| 4 | Q | Were you smoking that crack with anyone else? |
| 5 | A | My brother. |
| 6 | Q | What was your brother's name again? |
| 7 | A | William Bateman. |
| 8 | Q | When the police came, what did you do? |
| 9 | A | I jumped up, and they went to the door so fast I got thrown |
| 10 | | on the floor downstairs. |
| 11 | Q | And did you observe your brother do anything that you |
| 12 | | recall? |
| 13 | A | I don't really recall. |
| 14 | Q | After the police came and kind of took control of the |
| 15 | | house, did you assist officers at all in recovering any type of |
| 16 | | evidence? |
| 17 | A | I tried to tell them where some was, but there wasn't any |
| 18 | | there. |
| 19 | Q | When you say "tell them," was there a specific detective |
| 20 | | you told? |
| 21 | A | I think it was the lady outside. I don't really remember. |
| 22 | | Someone outside. |
| 23 | Q | During this time, you mention that Mr. Jorge Castillo would |
| 24 | | hide his drugs because you would smoke them if you found them? |
| 25 | A | Right. |

*[handwritten top-left:]* This is an Invalid Document, the fact's Appear to the below.

Property Invoice # 680248   *Exhibit*

Gang Involvement: N

Property Released? NO (Y/N)

M=Motivated, R=Related, N=Not Related

Car Pound Control#

*[handwritten:]* page - of

OFFENSE: POSSESSION OF A CONTROLLED SUBSTANCE/POSSESSION WEAPON BY PREVIOUS OFFENDER

| | Name | Address | City, State, Zip | Phone |
|---|---|---|---|---|
| VICTIMS: | State of Colorado | | | |

SUSPECTS:
Date Name   Address (City, State, Zip)   DOB, Race, Sex, Height, Weight, Hair, Eyes   Booking #   DPD#
05/28/04 Dibble, Wayne, 1118 W. 41st Ave. Denver, CO. 80211, 4-19-55, W, Male, 5'11" 160 Brn. Brn.
#1401509, DPD #616450
05/28/04 Castillo, Jorge, 1118 W. 41st Ave. Denver, CO. 80211, 10-28-63 H, Male, 5'6", 180 Blk. Brn,
#1401491 DPD #587233

| Suspects filed on in Court: | District: X Susp.#1 & #2 | County: Susp.# | Juvenile: Susp.# | Other: Susp.# |
|---|---|---|---|---|
| ☐ Unfounded | ☐ Exceptionally Cleared | ☐ Inactive, Not Cleared | ☒ Cleared by Arrest | ☐ Warrant Issued |

| Investigator | Serial Number | Approved: |
|---|---|---|
| | | |

| Det. Daniel Rojas | 83026 | Supervisory Officer |
|---|---|---|

DETAILS: *[handwritten:]* This document is not Approved by Det. Rojas Supervisor, officers, This document dosen't have any bodys Signature

Investigation facts: *[handwritten:]* This document dosen't have a date of when was mad

On May 28, 2004, at approximately 8:35 PM., members of the Denver Police Department responded to 1118 41st Avenue to execute a narcotics search warrant. The search warrant was authored by Detective Daniel Rojas #83026, (hereafter referred to as Reporting Detective) and was signed by Judge Michael A. Martinez 05-24-04. The search warrant also named Jorge Castillo as person to be searched.

Surveillance:

During the previous 2 weeks before May 28, 2004, Reporting Detective conducted surveillance and observe tall white male (approximately 45 years old, brown hair and unshaven and later identified as **Wayne Dibb date of birth 4-19-55**) come out of the yard at 1118 W. 41st Avenue on numerous occasions and make cont with unknown parties on the sidewalk away from 1118 W. 41st Ave. At first Reporting Detective obser Dibble walking out to meet people near 41st and Kalamath St. and 40th and Jason St. to Kalamath St. T. during the week prior to May 28, 2004 (execution of search warrant) Dibble began using the bicycle to m parties a distance away from 1118 W. 41st Ave.

On May 28, 2004, at approximately 7:40 PM, Reporting Detective conducted surveillance at 1118 W. Avenue before entry at 1118 W. 41st Ave. Reporting Detective observed **Jorge Castillo, date of birth 10-28-** step out of 1118 W. 41st Ave. and stood outside for short period of time then returned to the house. Report Detective also observed activity consistent with drug dealing, for instance upon arrival Reporting Detect observed Dibble step out of the yard, via the north gate of the 6' privacy fence at 1118 W. 41st Ave. Dibble riding a bicycle and rode to the intersection of 40th and Lipan St. At 40th and Lipan St. Dibble met with two n parties who were standing on the corner. Dibble stopped and after a brief conversation with the two men Dib reached down into his socks (left leg) and appeared to retrieve something, and then made a hand-to-h exchange with one of the two men. After no more than a few seconds of conversation Dibble rode away in

00013

Property Invoice # 680248

Gang Involvement: **N**

Property Released?  NO  (Y/N)   ( 2 )

M=Motivated, R=Related, N=Not Related

Car Pound Control#

---

**OFFENSE: POSSESSION OF A CONTROLLED SUBSTANCE/POSSESSION WEAPON BY PREVIOUS OFFENDER**

---

|  | Name | Address | City, State, Zip | Phone |
|---|---|---|---|---|
| VICTIMS: | State of Colorado | | | |

---

|  | Date | Name | Address (City, State, Zip) | DOB, Race, Sex,  Height, Weight, Hair, Eyes | Booking # | DPD# |
|---|---|---|---|---|---|---|
| SUSPECTS: | 05/28/04 | Dibble, Wayne, 1118 W. 41st Ave. Denver, CO. 80211, 4-19-55, W, Male, 5'11" 160 Brn. Brn. #1401509, DPD #616450 | | | | |
| | 05/28/04 | Castillo, Jorge, 1118 W. 41st Ave. Denver, CO. 80211, 10-28-63 H, Male, 5'6", 180 Blk. Brn, #1401491 DPD #587233 | | | | |

| Suspects filed on in Court: | District: X Susp.#1 & #2 | County: Susp.# | Juvenile: Susp.# | Other: Susp.# |
|---|---|---|---|---|
| ☐ Unfounded | ☐ Exceptionally Cleared | ☐ Inactive, Not Cleared | ☒ Cleared by Arrest | ☐ Warrant Issued |

| Investigator | Serial Number | Approved: |
|---|---|---|
| Det. Daniel Rojas | 83026 | Supervisory Officer |

DETAILS:

<u>Investigation facts:</u>
On May 28, 2004, at approximately 8:35 PM., members of the Denver Police Department responded to 1118 W. 41st Avenue to execute a narcotics search warrant. The search warrant was authored by Detective Daniel E. Rojas #83026, (hereafter referred to as Reporting Detective) and was signed by Judge Michael A. Martinez on 05-24-04. The search warrant also named Jorge Castillo as person to be searched.

**Surveillance:**

During the previous 2 weeks before May 28, 2004, Reporting Detective conducted surveillance and observed Dibble come out of the yard at 1118 W. 41st Avenue on numerous occasions and make contact with unknown parties on the sidewalk away from 1118 W. 41st Ave. At first Reporting Detective observed Dibble walking out to meet people near 41st and Kalamath St. and 40th and Jason St. to Kalamath St. Then during the week prior to May 28, 2004 (execution of search warrant) Dibble began using the bicycle to meet parties a distance away from 1118 W. 41st Ave. During this time period neither Sharon, the yellow car nor William Bateman were observed at 1118 W. 41st Avenue.

On May 28, 2004, at approximately 7:40 PM, Reporting Detective conducted surveillance at 1118 W. 41st Avenue before entry at 1118 W. 41st Ave. Reporting Detective observed **Jorge Castillo, date of birth 10-28-63**, step out of 1118 W. 41st Ave. and stood outside for short period of time then returned to the house. Reporting Detective also observed activity consistent with drug dealing, for instance upon arrival Reporting Detective observed the party later identified as **Wayne Dibble, date of birth 4-19-55**, step out of the yard, via the north gate of the 6' privacy fence at 1118 W. 41st Ave. Dibble was riding a bicycle and rode to the intersection of 40th and Lipan St. At 40th and Lipan St. Dibble met with two male parties who were standing on the corner. Dibble stopped and after a brief conversation with the two men Dibble reached down into his socks (left leg) and appeared to retrieve something, and then made a hand-to-hand exchange with one of the two men. After no

000113

direction of 1118 W. 41st Avenue and the two men departed the area toward the south. Later Reporting Detective observed a white female, later identified as Sharon Bateman, date of birth 04-17-82, drive up in a yellow compact car and park the car in the back yard. A white male (Sharon's brother), later identified as William Bateman, date of birth 5-14-83 opened the back gate to let the yellow car into the yard. *Exhibit*

## METRO/SWAT ENTRY:

On 05-28-04 at approximately 8:35 PM. Metro/SWAT arrived at 1118 W. 41st Avenue. Upon approach to the front door Sgt. Robert Organ reports he observed Jorge Castillo attempting to enter the front door and then saw officers approaching and moved quickly to the rear of a van parked nearby. Castillo was secured without incident. It was felt that Castillo had alerted others in the residence to the presence of the officers. A second party nearby (Dibble) was in the yard, saw the officers and tried to flee behind the truck/camper but was also secured. Officers continued to the front door and knocked and announced several times before the door was breached and entrance was made. Both Sharon and William Bateman were contacted in the house.

## OCCUPANTS IDENTIFIED AND CLEARANCE CHECKS DONE WITH NCIC/CCIC:

After conducting routine ID checks on all four parties the following information was obtained: Wayne Dibble was wanted by Denver County Sheriff for FTA, Dangerous drugs OCA #03CR0421 and was placed under arrest. William Bateman was wanted by Jefferson County for a Burglary warrant and Sharon Bateman was wanted by Denver on a Bench warrant for DUR, case #04M02471. **Jorge Castillo was identified as a corrections client with the Probation Department for a 2003 drug conviction. Castillo has a second prior drug arrest in Colorado but case disposition is unclear.**

4) After taking Sharon Bateman out of the house, she asked to speak to Reporting Detective and made the following statement. Sharon Bateman told Reporting Detective she would show detectives where Jorge Castillo hid a kilo quantity of cocaine if Reporting Detective could help her with her warrant. Reporting Detective told Ms. Bateman that if she led detectives to the location of the drugs Reporting Detective would assist Bateman with her warrant but couldn't promise anything. Reporting Detective asked Bateman if there were any drugs or guns in the house. Bateman stated that Jorge was in possession of a bag of crack cocaine just minutes before police arrival and should still have the drugs on him. Reporting Detective asked how much crack was there in the bag? Ms. Bateman answered it was a lot, possibly as much as an ounce. Ms. Bateman stated that Jorge was not keeping any drugs in the house but instead he was hiding it in the yard and burying the larger quantity across the street under bushes. Reporting Detective asked "What about guns." **Ms. Bateman stated that Jorge kept gun under the bed in his bedroom upstairs.** Ms. Bateman admits that Jorge and Ms. Bateman share the bed when she stays at 1118 W. 41st Ave. but that she had not been at home much lately because of fights she had with Jorge. Ms. Bateman also informed that her brother (William Bateman) did not live at 1118 W. 41st but was only visiting. Reporting Detective pointed out to Ms. Bateman that the house had two bedrooms and asked if her brother or anyone else occupied the other bedroom. Ms. Bateman answered that the room was used for storage and was not occupied by anyone and that only she and Jorge stay in the house. Ms. Bateman admits that her brother does stay overnight occasionally but sleeps in the van out in the yard and Wayne stays in the camper also outside in the yard. Ms. Bateman led Reporting Detective to several different areas in the back yard and across the street under the bushes, where she stated Jorge had buried up to a Kilo of cocaine. Ms. Bateman relates that Jorge will take a shovel and go out in the night and dig a deep hole to hide the drugs in and then covers the hole up and spreads some leaves and branches or a rock over the spot so you can't tell it is there. Nothing was found though it was apparent that someone had recently dug the dirt up at the locations pointed out by Ms. Bateman.

5) After arrest of William Bateman he asked to speak to Reporting Detective and made the following statement. William Bateman asked for help with his warrant so he could get out of going to jail and in return he would tell Reporting Detective where Jorge hid some of the drugs. Reporting Detective informed William Bateman that his warrant was a very difficult issue but Reporting Detective would do best to help him if he could lead Reporting Detective to the location or locations where drugs are now stored. William Bateman agreed and took Reporting

000118

more than a few seconds of conversation Dibble moved away in the direction of 1118 W. 41st Avenue and the two men departed the area toward the south. Later Reporting Detective observed a white female, later identified as Sharon Bateman, date of birth 04-17-82, drive up in a yellow compact car and park the car in the back yard. A white male (Sharon's brother), later identified as **William Bateman, date of birth 5-14-83** opened the back gate to let the yellow car into the yard.

## METRO/SWAT ENTRY:

On 05-28-04 at approximately 8:35 PM. Metro/SWAT arrived at 1118 W. 41st Avenue. Upon approach to the front door Sgt. Robert Organ reports he observed Jorge Castillo attempting to enter the front door and then saw officers approaching and moved quickly to the rear of a van parked nearby. Castillo was secured without incident. It was felt that Castillo had alerted others in the residence to the presence of the officers. A second party nearby (Dibble) was in the yard, saw the officers and tried to flee behind the truck/camper but was also secured. Officers continued to the front door and knocked and announced several times before the door was breached and entrance was made. Both Sharon and William Bateman were contacted in the house.

## OCCUPANTS IDENTIFIED AND CLEARANCE CHECKS DONE WITH NCIC/CCIC:

After conducting routine ID checks on all four parties the following information was obtained: Wayne Dibble was wanted by Denver County Sheriff for FTA, Dangerous drugs OCA #03CR0421 and was placed under arrest. William Bateman was wanted by Jefferson County for a Burglary warrant and Sharon Bateman was wanted by Denver on a Bench warrant for DUR, case #04M02471. **Jorge Castillo was identified as a corrections client with the Probation Department for a 2003 drug conviction. Castillo has a second prior drug arrest in Colorado but case disposition is unclear.**

After taking Sharon Bateman out of the house, she asked to speak to Reporting Detective and made the following statement. Sharon Bateman told Reporting Detective she would show detectives where Jorge Castillo hid a kilo quantity of cocaine if Reporting Detective could help her with her warrant. Reporting Detective told Ms. Bateman that if she led detectives to the location of the drugs Reporting Detective would assist Bateman with her warrant but couldn't promise anything. Reporting Detective asked Bateman if there were any drugs or guns in the house. Bateman stated that Jorge was in possession of a bag of crack cocaine just minutes before police arrival and should still have the drugs on him. Bateman answered that Jorge was not keeping any drugs in the house but instead he was hiding it in the yard and burying the larger quantity across the street under the bushes. Reporting Detective asked "What about guns." **Ms. Bateman stated that Jorge kept a gun under the bed in his bedroom upstairs.** Ms. Bateman admits that Jorge and Ms. Bateman share the bed when she stays at 1118 W. 41st Ave. but that she had not been at home much lately because of fights she had with Jorge. Ms. Bateman also informed that her brother (William Bateman) did not live at 1118 W. 41st but was only visiting. Reporting Detective pointed out to Ms. Bateman that the house had two bedrooms and asked if her brother or anyone else occupied the other bedroom. Ms. Bateman answered that the room was used for storage and was not occupied by anyone. Only she and Jorge stay in the house. Ms. Bateman admits that her brother does stay overnight occasionally but sleeps in the van out in the yard and Wayne stays in the camper also outside in the yard.

After arrest of William Bateman he asked to speak to Reporting Detective and made the following statement. William Bateman asked for help with his warrant so he could get out of going to jail and in return he would tell Reporting Detective where Jorge hid the drugs. Reporting Detective informed William Bateman that his warrant was a very difficult issue but Reporting Detective would do best to help him. William Bateman took Reporting Detective around the yard at 1118 W. 41st Ave. and pointed out several locations where he stated he observed Jorge hide bags of drugs in the recent past. No drugs were found. **Bateman related that Jorge did not trust anyone and was very good at hiding his drugs.** He stated that Jorge was in possession of a bag of crack cocaine just minutes before Police arrival.

0001

Reporting Detective entered the residence after METRO/SWAT had secured the occupants. Reporting Detective took custody of suspect Jorge Castillo and conducted search of his person. Reporting Detective found Item #1, $1445.00 in U.S. currency (mostly small bills) from Castillo's pants pockets. Also found on Castillo were three new glass **crack pipes, item #2.** Reporting Detective inspected the contents of Castillo's wallet and copied same (at HQ) including a Wells Fargo Bank receipt for a deposit of $1600.00 made at 3:38 PM on 5-28-04 (account #5686678383). Reporting Detective placed Castillo's wallet in the DPD Property Bureau as Personal Property (item #13).

Upon entering the kitchen area Reporting Detective observed a box of Latex gloves on the kitchen table along with some drug packaging material. This was photographed and not recovered. Detective Robert Wilson #93003 recovered **item # 3, a Pocket-Tech digital scale** from on top of the refrigerator.

Found in the living room, on the stereo stand was **item #4, a grey digital scale,** found by Technician Alfonso Cervera #96008. Officers turned their attention to the upstairs north bedroom. Officer Brian Jeffers #99061 found **item #5, a loaded S&W 32cal. Revolver,** found under the bed and mattress. Item #6 were the four live 32cal. rounds removed from the gun and placed in evidence separately. **Item #7 was a small amount of marijuana** found by Officer Jeffers on a dresser.

Technician Cervera took custody of Wayne Dibble and after transporting to the District One station, conducted a custodial search. Technician Cervera found **2 bags of suspected crack cocaine** in Wayne Dibble's right front shorts pocket. This was placed in evidence as **item #8.** Later after Dibble was placed in holding cell #2, still at the District One Station, Officer William Hynes and paramedics were called to check Dibble and upon contact Dibble was found clutching a small amount of **suspected crack cocaine** and dropped it on the floor. Officer Hynes placed it in evidence as **item #9.**

Item #10 was a Kyocera cell phone with phone number 720-365-0400, belonging to Wayne Dibble.

Item #11 was a Kyocera cell phone with phone number 720-298-1416, belonging to Jorge Castillo.

Item #12 were documents which included a large mailing envelope from the Public Defender's Office and which had been mailed to Jorge Castillo at 1118 W. 41st Ave. Denver, CO. A piece of paper with handwritten business ledger style notes. A Notebook with several pages of handwritten business ledger notes.

### Information from landlord:

On May 29, 2004 Reporting Detective contacted Mark Pelz, the landlord of 1118 W. 41st Ave. and explained in brief the action taken by Police. Reporting Detective asked for information regarding the lease. Mr. Pelz stated that Jorge Castillo paid the rent and he was on the lease along with his girlfriend, Sharon. Mr. Pelz relates that he was aware that Jorge had invited Wayne to stay a short time after Jorge and Sharon moved in. Mr. Pelz states that he noticed Jorge had turned the property into a kind of a fortress but didn't think much of this at the time. Mr. Pelz informs that the back yard surrounding 1118 W. 41st Ave. is shared with another property he owns next door, which is 4059 Jason St. Mr. Pelz states that he keeps a Streamline trailer home there along with stacks of lumber, building supplies and other odds and ends. Reporting Detective asked for and received consent to search the back yard further. Nothing was found.

On June 1, 2004 at approximately 12:15 PM Reporting Detective returned an earlier phone message from Mr. Pelz. Mr. Pelz was concerned about his legal rights as landlord of this property and asked for reports needed for evicting Jorge and his friends. During the conversation Mr. Pelz stated that he "Jorge called him last night" (May 31, 2004) and that Jorge tried to tell Mr. Pelz that the police action was nothing more than racially motivated harassment and that the police did not find anything illegal on the property. Jorge further informed that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz states that **Jorge Castillo told him that "He was only keeping the gun for a friend."**

he was aware that Jorge had invited Wayne to stay a short time after Jorge and Sharon moved in. Mr. Pelz states that he noticed Jorge had turned the property into a kind of a fortress but didn't think much of this at the time. Mr. Pelz informs that the back yard surrounding 1118 W. 41st Ave. is shared with another property he owns next door, which is 4059 Jason St. Mr. Pelz states that he keeps a Streamline trailer home there along with stacks of lumber, building supplies and other odds and ends. Reporting Detective asked for and received consent to search the back yard further. Nothing was found.

On June 1, 2004 at approximately 12:15 PM Reporting Detective returned an earlier phone message from Mr. Pelz. Mr. Pelz was concerned about his legal rights as landlord of this property and asked for reports needed for evicting Jorge and his friends. During the conversation Mr. Pelz stated that he "Jorge called him last night" (May 31, 2004) and that Jorge tried to tell Mr. Pelz that the police action was nothing more than racially motivated harassment and that the police did not find anything illegal on the property. Mr. Pelz further related that Jorge stated that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz states that Jorge Castillo told him that "He was only keeping the gun for a friend."

On June 06, 2004, Denver Police Department Chemist Jennifer Kimmett completed a presumptive screening of the substances held under invoice #680248 and reported the following results:

Item #8- (The 2 bags containing numerous small rock like substance found in Dibble's pocket) tested positive for cocaine base, with a weight of 3.081 grams

Item #9- (The substance found by Officer Hynes) tested positive for cocaine base, with a weight of 0.105 grams.

On 05-30-04, Jorge Castillo was released from PADF on bond with a return court date of 06-14-04. Wayne Dibble is still in custody as of 06-02-04.

On June 2, 2004, this case was presented to the Denver District Attorney's office for acceptance of felony charges on Wayne Dibble for PCS and on Jorge Castillo for Possession of a weapon by previous offender. This Case will be carried as cleared by arrest.

I would like for you to look into, the situation pertaining to my arrest on 5-28-04. As you can see according to this document, my case was presented before the D.A. on 6-02-04 for acceptance of felony charges, after this date I don't know how long the D.A took to accept the charges and to file charges formally. As far as I know the government has 72 hours to charge a person formally after being detained. It is obvious here that more than 6 (six) days after my arrest and detention I still had not been formally charged. please investigat this situation and evaluate the results and give me your respons in this regard ASAP.

he was aware that Jorge had invited Wayne to stay a short time after Jorge and Sharon moved in. Mr. Pelz states that he noticed Jorge had turned the property into a sort of a fortress but didn't think much of this at the time. Mr. Pelz informs that the back yard surrounding 1118 W. 41st Ave is shared with another property he owns next door, which is 4059 Jason St. Mr. Pelz states that he keeps a Streamline trailer home there along with stacks of lumber, building supplies and other odds and ends. Reporting Detective asked for and received consent to search the back yard further. Nothing was found.

On June 1, 2004 at approximately 12:15 PM Reporting Detective returned an earlier phone message from Mr. Pelz. Mr. Pelz was concerned about his legal rights as landlord of this property and asked for reports needed for evicting Jorge and his friends. During the conversation Mr. Pelz stated that he "Jorge called him last night" (May 31, 2004) and that Jorge tried to tell Mr. Pelz that the police action was nothing more than racially motivated harassment and that the police did not find anything illegal on the property. Mr. Pelz further related that Jorge stated that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz states that Jorge Castillo told him that "He was only keeping the gun for a friend."

On June 06, 2004, Denver Police Department Chemist Jennifer Kimmett completed a presumptive screening of the substances held under invoice #680248 and reported the following results:

Item #8- (The 2 bags containing numerous small rock like substance found in Dibble's pocket) tested positive for cocaine base, with a weight of 3.081 grams

Item #9- (The substance found by Officer Hynes) tested positive for cocaine base, with a weight of 0.105 grams.

On 05-30-04, Jorge Castillo was released from PADF on bond with a return court date of 06-14-04. Wayne Dibble is still in custody as of 06-02-04.

On June 2, 2004, this case was presented to the Denver District Attorney's office for acceptance of felony charges on Wayne Dibble for PCS and on Jorge Castillo for Possession of a weapon by previous offender. This Case will be carried as cleared by arrest.

000186

40

1    Q    Did you go ahead and drive that vehicle for a

2  period of time?

3    A    Yes, I did.

4    Q    Did a day come when you were stopped by state

5  investigators or state authorities and was the car

6  searched after you were stopped?

7    A    Yes, it was.

8    Q    When they did that, did they discover a

9  quantity of illegal drugs?

10    A    Yes, they did.

11    Q    Can you tell us what they found?

12    A    Methamphetamine.

13    Q    Do you know how much?

14    A    I'm not sure.  They have exactly how many

15  grams on my discovery.  But they found a whole bunch of

16  methamphetamine in the trunk of the car.

17    Q    Whose methamphetamine was that?

18    A    Jorge Castillo's.

19    Q    And with regard to that, have you been

20  prosecuted in state court for that?

21    A    No.  I pled guilty to a plea bargain, but it

22  wasn't my dope.

23    Q    Did you -- were you aware that it was there?

24    A    I was aware that it was missing from the

25  people that he knew, but I didn't know that it was

1    actually, in fact, in the car.

2        Q    So besides yourself and Mr. Jorge Castillo, in

3    your judgment, did anybody else have access to that car?

4    Could that have been Wayne Dibble's methamphetamine, for

5    example or . . .

6        A    No.  No.

7        Q    So is Mr. Jorge Castillo the only person, in

8    your judgment, who could be responsible for the

9    methamphetamine that was in the car?

10       A    Yes.

11       Q    How long had he been using that car?

12       A    That car was at the house when they raided it,

13   and he was using it ever since the house had got raided.

14   He was picked up two days before driving that car.  He

15   got picked up and the car was left with me.  And I got

16   picked up two days after he had got picked up.

17       Q    So have you actually pled guilty based on that

18   methamphetamine in the trunk?

19       A    Yes, I did.

20       Q    And are you waiting to be sentenced in Adams

21   County District Court?

22       A    Yes, I am.

23       MR. TILL:  Can we go off the record just for a

24   couple of minutes here.

25       VIDEOGRAPHER:  The time is 9:59.  We're going

92

1    your arrest?

2         A    Yes.

3         Q    And when -- what was it doing underneath the

4    mattress if he carries it with him for protection?

5         A    It was not nighttime.

6         Q    Does he carry it with him just for protection

7    from the other guys who have guns in the neighborhood?

8         A    From the other -- the other customers that

9    come by -- certain customers that come around, he would

10   have the gun on him for that reason.

11        Q    Tell me about this car that you were arrested

12   in for meth possession.  Do you -- do you do meth?

13        A    No, I didn't.

14        Q    Have you ever?

15        A    No, I don't.

16        Q    You've never done it before?

17        A    I tried it; I don't like it.

18        Q    So you've tried it, but you don't like it?

19        A    Yeah.

20        Q    How about heroin?  Have you done heroin

21   before?

22        A    No, I haven't.

23        Q    And other drugs?

24        A    No.

25        Q    Okay.  The car was at the house; is that



1    right?

2         A    The car was at the house when it got raided

3    or . . .

4         Q    Yeah.  I assume the car was there; is that

5    right?

6         A    Yes, it was.  The car was at my grandmother's

7    house, and we were one block away from my grandmother's

8    house when Jorge got arrested to come into federal

9    custody.

10        Q    So it was at your grandmother's house?

11        A    Yes, it was.

12        Q    And what was it doing there?

13        A    He was driving it, and I was sleeping in it.

14        Q    And were you driving it also?

15        A    Not when Jorge was there.

16        Q    But when he wasn't around, would you drive it?

17        A    After he went to jail, yeah.

18        Q    What kind of car is it?

19        A    It was a Ford.  A blue one.

20        Q    And so why were you pulled over in this car?

21        A    I don't know.  Suspected -- I think they

22    suspected that I had drugs.  I'm not really sure.

23        Q    Do you know the date?

24        A    July 2nd, 2004.

25        Q    How do you remember that?

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

oF- 2004        Sharon

94

1    A    That's the day my life ended.

2    Q    Why is that?

3    A    Because that's the day I got a drug charge

4  that wasn't mine.  That's the day I've been incarcerated

5  since.

6    Q    And so you've pled guilty to possessing these

7  drugs?

8    A    Yes, I have.

9    Q    And why did you plead guilty to it if it

10  wasn't your drugs?

11    A    Why did I plead guilty?  Because they

12  weren't -- how am I going to fight something that was in

13  my possession in my car that I was in control of?  It's

14  hard to fight something like that, so I just pled guilty.

15    Q    Okay.  And what were you thinking during the

16  years before this that you were constantly in possession

17  of crack cocaine?  That you weren't going to get

18  arrested?

19    A    But I wasn't in large quantities of crack

20  cocaine.  It was small quantities that I used for my own

21  personal use.

22    Q    Did you ever sell drugs?

23    A    Only to make more money so I could support my

24  own habit.

25    Q    So you've sol -- so you're a drug dealer too;

001146

## AFFIDAVIT IN SUPPORT OF WARRANTLESS ARREST

I Manuel J. Aragon, a peace officer, being duly sworn says that there is probable cause for the warrantless arrest of the above-named defendant for the charge(s) stated above, arising out of the incidents occurring at Ogden & Corona Street Denver, Colorado, Adams County, Colorado on July 2, 2004 , 1642 hours, and that the following facts are true and correct to the best of my knowledge, information and belief and support the arrest of the defendant.

Bateman, Sharon Ann DOB 04-17-82

On 07-02-04 at 1642 hours, Your Affiant was at the corner of Sheldon Street and Corona Street. Your Affiant saw a blue Ford Tempo at the stop sign going north on Corona Street. Your Affiant identified the driver of the vehicle as Sharon Bateman. Your Affiant had prior knowledge of a warrant for her arrest out of Adams County Court for Failure to Appear on a traffic offense. As Sharon Bateman turned west on Sheldon Street, Your Affiant did a traffic stop at Ogden and Sheldon Street. Your Affiant approached the vehicle and asked the driver Sharon Bateman for a driver's license, registration and Insurance. Sharon Bateman did not have the requested documents and was asked to exit the vehicle. Sharon Bateman advised your Affiant that her name was Linda Bateman with a date of birth of 12-20-77. Your Affiant asked how old Sharon Bateman was at which time she attempted to flee on foot. Your Affiant grabbed Sharon Bateman and placed her in handcuffs and seated her in the back seat of the patrol car. Your Affiant noticed a blue car pull along side of the traffic stop and an older female get out of the car. At that time Sharon Bateman said, "That's my Grandma". Your Affiant asked the older female, identified as Eileen Bateman, if she was the grandma and she said, "Yes". Your Affiant asked Eileen Bateman if her granddaughter was Linda or Sharon. Eileen Bateman said her name was, "Sharon". Your Affiant advised Sharon that she was under arrest. While doing a inventory search prior to towing the vehicle, Your Affiant discovered a Black weight scale under the front passenger seat of the vehicle. Your Affiant also discovered a six-inch metal pipe with a burnt scouring pad in the end of the pipe. Your Affiant asked Sharon Bateman if she had any drugs on her person. Sharon Bateman said, "Come on Officer, give me a break". At that time Sharon Bateman handed me a baggie containing a white powdery substance that tested presumptive positive for methamphetamine and weighed 80.75 grams. Your Affiant transported Sharon Bateman to the Adams County Substation for processing, and to the Adams County Detention Facility.

Your Affiant believes probable cause exists for the warrant less arrest of Sharon Bateman for 18-18-405 Unlawful Possession with Intent to Distribute of a Controlled Substance Schedule II, 18-18-405 Unlawful Possession of a Controlled Substance Schedule II.

Affiant's Signature

Subscribed and sworn to before me this _02_ day of _July_, _2004_.

Notary Public

Probable Cause for Warrantless Arrest is ☐ Found    ☐ Not Found

Expires

_____
Judge

Court Info & Affidavit

Form J256 CV (07/01)

Page 1 of 1

# Continuation/Supplemental Sheet

| | | | Original Case Report # 04-9264 |
|---|---|---|---|
| Initial Offense Classification Possession with intent to distribute schedule II | | Victim State of Colorado | Date Original Report 07-02-04    Date This Report 07-02-04 |

| Code | Name (Last, First, Middle) | | Sex | Race | Date of Birth | Social Security # | X-Day |
|---|---|---|---|---|---|---|---|
| | Residence | | City | | Zip | Telephone | |
| | Business | | Occupation | | | Bus. Telephone | |

| Property | | A Currency | B Jewelry | C Clothing | D Vehicle/Local | E Office Equip. | F Radio, TV, Cameras | G Firearm | H Household Goods | I Consuma bles | J Livestock | K Misc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stolen | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| | Recovered | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |

## If property itemization, use the following format:

| Item # | Quantity | Brand Name | Property Description | Serial # | Stolen | Rec | UCR Type |
|---|---|---|---|---|---|---|---|

(A) Lost / Stolen / Recovered Property;
RECOVERED PROPERTY:

1)  1  Unknown  White Crystal like Substance gross weight 81.88 grams  None  Recovered Value $ Unknown
2)  9  Unknown  Paper, Scale, Pipe, ID, Baggies, Scouring Pad, Baking Soda Box  None  Recovered Value $ Unknown
Box with white powdery substance, Hair from Wig

(B) Additional Witnesses / Victims; None

(C) Officer's Observation's;

On 06-30-04 at 0955 hours. I saw a Blue Ford Tempo Bearing Colorado Temporary 616816B. I noticed the vehicle pull in front of a residence on Sheldon and Dawson and the driver identified as Gorge Castillo DOB 10-28-63 get out of the vehicle and approach the front door. I then noticed that Gorge Castillo walked away from the vehicle north on Dawson. I contacted Gorge Castillo and found him to have an active warrant for drug possession with intent to distribute and felon in possession of a firearm. I also contacted a female asleep on the front passenger side of the vehicle. The female identified herself as Linda Bateman DOB 12-20-77. Linda Bateman did not have hair and had a brown wig next to her. I cleared Linda Bateman and was notified by ADCOM that there was no wants or warrants for her arrest. Linda Bateman was released on scene and walked home. I transported Gorge Castillo to the Adams County Detention Facility.

On 07-02-04 at 1500 hours, Denver Police Detective Rojas who was inquiring about the arrest of Gorge Castillo contacted me. Detective Rojas advised that Gorge Castillo was in the company of Sharon Bateman. Detective Rojas described Sharon Bateman as a white female, five feet two, one hundred too one hundred fifteen pounds with a shaved head and green eyes. Detective Rojas informed me that there were warrants for her arrest for traffic offense and drug possession. I cleared Sharon Bateman through ADCOM and found three active warrants for her arrest. I obtained a last know address of 8621 Corona Street in Denver which is her grandmother's house and attempted to contact her.

On 07-02-04 at 1642 hours, I was at the corner of Sheldon Street and Corona Street. I saw a Blue Ford Tempo bearing Colorado Temporary 616816B at the stop sign. I noticed that the driver of the vehicle did not have any hair. I also recognized her as the female that was sleeping on the passenger side of the vehicle on 06-30-04. I identified the driver of the vehicle as Sharon Bateman. I had prior knowledge of warrants for her arrest. As Sharon Bateman turned west on Sheldon Street, I initiated a traffic stop at Ogden and Sheldon Street. I approached the vehicle and asked the driver Sharon Bateman for a driver's license, registration and Insurance. Sharon Bateman did not have the requested documents and was asked to exit the vehicle. Sharon Bateman advised me that her name was Linda Bateman with a date of birth of 12-20-77. I told Sharon Bateman I knew her real name at which time she began to cry and act hysterical. Sharon Bateman continued to tell me her name was Linda. I asked Sharon Bateman how old she was at which time she attempted to flee on foot. I grabbed Sharon Bateman before she got away and placed her in handcuffs. I then seated her in the back seat of the patrol car and seat belted her in. I noticed a blue car pull along side me and an older female get out of the car. At that time Sharon Bateman said, "That's my Grandma". I asked the older female, identified as Eileen Bateman, if she was the grandma and she said, "Yes". I then asked Eileen Bateman if her granddaughter was Linda or Sharon Bateman. Eileen Bateman said,"Sharon". I advised Sharon that she was under arrest. While doing an inventory search prior to towing the vehicle, I found a black weight scale under the front passenger seat of the vehicle. I also found a copper colored scouring pad on the front floorboard of the passenger side of the vehicle which is commonly used as a filter when doing methamphetamine. I found a six-inch metal pipe with a burnt scouring pad in the end of the pipe in the center console ashtray below the radio. I looked in the trunk of the vehicle and found a large quantity of plastic Baggies and a box containing a white powdery substance. Inside the box, I noticed another box of baking soda. I asked Sharon Bateman if she had any drugs on her person. Sharon Bateman began to cry and said, "Come on Officer, give me a break". At that time Sharon Bateman removed a plastic baggie containing a white crystal substance and handed it to me. I asked her what was in the bag and Sharon Bateman said, "Meth". I obtained a Narcotic Identification Kit and tested the white crystal substance. The crystal substance tested presumptive positive for methamphetamine. I then transported Sharon Bateman to the Adams County Substation for processing.

While in route to the Substation, I advised Sharon Bateman of her Miranda Rights. Sharon Bateman advised me that she understood her rights. Sharon Bateman told me that there are more Baggies of "Meth" that she would give me if I would give her a break. Sharon Bateman told me that the baggie that she gave me contained four ounces of "Meth". While on scene at the Substation, I weighed the white crystal substance. I zeroed the scale and hit print. I then placed the baggie containing the white crystal substance on the scale. The gross weight of the baggie containing the white crystal substance was 81.88 grams. I then printed that out. I zeroed out the scale and placed an empty baggie of the same size. I then placed the baggie containing the white crystal substance back onto the scale to get the net weight. The net weight was 80.75. Photographs of the recovered items were taken and then booked into evidence at the Adams County Substation. Sharon Bateman was later transported to the Adams County Detention Facility. Above Board Towing towed the vehicle for proof of ownership. Records was notified.

| Deputy's Signature Aragon, MJ | ID # 01-23 | Supervisor's Initials & Date  JC  7-3-04 | Page 2 of 3 |
|---|---|---|---|

Form 3346 CV (03/91)

Denver Police Department
## STATEMENT

| NAME (LAST, FIRST, MIDDLE INITIAL) | | MAKING STATEMENT IS: |
|---|---|---|
| DiGiacomo, Bonnie 98028 | | ☒ OFFICER ☐ WITNESS ☐ PERSON ADVISED |

| RESIDENCE STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | SOCIAL SECURITY NO. | | DATE OF BIRTH/SERIAL NO. |
|---|---|---|---|---|

| BUSINESS STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|
| 1331 CHEROKEE STREET | DENVER | DENVER | CO | 80204 |

| OFFICER TAKING STATEMENT | SERIAL NO. | DATE | TIME |
|---|---|---|---|

| CONCERNING AN INCIDENT AT | LOCATION WHERE STATEMENT TAKEN |
|---|---|
| 1118 W 41 AVE | 1331 CHEROKEE STREET |

On May 28th, 2004, while working as Z82, I covered the 90's (Narcotic) Team on the execution of a search warrant. I waited until Metro cleared the house then entered. I went into the living room and contacted a white female, later identified as Sharon Bateman (04-17-82). I stayed in the living room until it was determined that Bateman had warrants. I then walked Bateman outside towards my car to transport her to jail. At that time she said she wanted to talk to Detective Rojas outside of the house.

Detective Rojas came outside to speak to Bateman. Bateman related that Jorge (referring to Jorge Castillo 10-28-63) had crack on him right before the police arrived. Bateman related Jorge had larger amounts of crack that he buries deep in the ground. She did not know exactly where but said it was either in the back yard or in the bushes across the street. Rojas asked Bateman if Jorge had a gun. Bateman said that Jorge kept his gun under the bed in his bedroom. I then transported Bateman to jail on her warrants.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

05/03/04
_____
Date

1700
_____
Time Statement Completed

_____ 98028
Signature of person making statement

000019

Denver Police Department
# STATEMENT

| | |
|---|---|
| NAME (LAST, FIRST, MIDDLE INITIAL) HYNES, WM | MAKING STATEMENT IS: ☒ OFFICER ☐ WITNESS ☐ PERSON ADVISED |

| RESIDENCE STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE 7209130400 | SOCIAL SECURITY NO. | DATE OF BIRTH/SERIAL NO. 01025 |
|---|---|---|---|

| BUSINESS STREET ADDRESS DIST 1 | CITY DENVER | COUNTY DENVER | STATE CO | ZIP CODE 80211 |
|---|---|---|---|---|

| OFFICER TAKING STATEMENT | SERIAL NO. | DATE 5/29/04 | TIME 1210  0010 |
|---|---|---|---|

| CONCERNING AN INCIDENT AT DIST1 CELL#2 | LOCATION WHERE STATEMENT TAKEN DIST1 |
|---|---|

I was clerking on the above date, when I called the abulance  because the party Wayne Dibble 04/19/55 was complaining of chest pain.  When the paramedic was checking him out, Mr Dibble through a small white substance onto the ground.  I picked it up, and it is believed to be (suspected) Crack/cocaine.   Mr. Dibble was orginally arrested for PCS, so I will just include this in the arrest packet GD851515, and the suspected crack coacaine will be placed into property, by Ofc Ruiz car 114a.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief.  I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

05 / 29 / 04
Date

0020
Time Statement Completed

_William Hynes_
Signature of person making statement

000022

Appellate Case: 11-1322    Document: 39-2    Date Filed: 02/01/2012    Page: 129

Denver Police Department

# STATEMENT

| NAME (LAST, FIRST, MIDDLE INITIAL) | | | MAKING STATEMENT IS | | |
|---|---|---|---|---|---|
| WILSON, ROBERT, MITCH | | | X OFFICER ☐ WITNESS ☐ PERSON ADVISED | | |

| RESIDENCE STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

| RESIDENCE PHONE | BUSINESS PHONE 720-913-6060 | SOCIAL SECURITY NO. | | DATE OF BIRTH/SERIAL NO. 93003 |
|---|---|---|---|---|

| BUSINESS STREET ADDRESS 1331 Cherokee Street | CITY Denver | COUNTY Denver | STATE CO | ZIP CODE 80204 |
|---|---|---|---|---|

| OFFICER TAKING STATEMENT | SERIAL NO. | DATE 6/3/04 | TIME 4:57 PM |
|---|---|---|---|

| CONCERNING AN INCIDENT AT 1118 W. 41ST AVE | LOCATION WHERE STATEMENT TAKEN 1331 CHEROKEE ST. |
|---|---|

On May 28, 2004, R/D assisted the night narcotics enforcement team with a search warrant at 1118 W 41st Ave. After SWAT had made entry and secured the residence R/D entered and began searching. During the search R/D recovered a digital scale from on top of the refrigerator. R/D also searched the upstairs, which consisted of two rooms. The south room appeared to be a small storage area and nothing was recovered from the room. During a search of the north room, which had one bed, located against the northwest wall, I observed Officer Jeffers lift the mattress and recover a .32 caliber revolver.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

6 3 04
Date

5:00 P.m
Time Statement Completed

e.m. wilson 93003
Signature of person making statement


Denver Police Department

# STATEMENT

| NAME (LAST, FIRST, MIDDLE INITIAL) | | | MAKING STATEMENT IS: | | |
|---|---|---|---|---|---|
| CERVERA, ALFONSO JR. | | | X OFFICER ☐ WITNESS ☐ PERSON ADVISED | | |
| RESIDENCE STREET ADDRESS | CITY | | COUNTY | STATE | ZIP CODE |
| DISTRICT ONE | | | | | |
| RESIDENCE PHONE | BUSINESS PHONE | | SOCIAL SECURITY NO. | | DATE OF BIRTH/SERIAL NO. |
| | 720-913-0455 | | | | 96008 |
| BUSINESS STREET ADDRESS | CITY | | COUNTY | STATE | ZIP CODE |
| 1311 West 46th Avenue | Denver | | Denver | CO | 80211 |
| OFFICER TAKING STATEMENT | SERIAL NO. | | DATE | | TIME |
| CERVERA | 96008 | | 5/28/04 | | 10:29 PM |
| CONCERNING AN INCIDENT AT | | | LOCATION WHERE STATEMENT TAKEN | | |
| 1118 WEST 41ST AVE | | | 1311 WEST 46TH AVE | | |

9:40 PM

On 5/28/04, at about 2140 hours R/O A. Cervera 96008, while working car 1156 with Officer B. Jeffers – 99-61 responded to assist Narcotics Bureau detectives with the execution of a search warrant for narcotics at 1118 West 41 St ave. Upon arrival R/O assisted in securing the premises and took watched over detained residents. R/O Cervera saw a gray digital scale located in a basket in the living room and secured it and handed it over to Detective Sherry Duran. A warrant check was run on all parties and subject Wayne Dibble 4/19/55 was advised to be wanted for a burglary warrant by the clearance channel. R/O Cervera and Jeffers transported Dibble and William Bateman, dob 5/14/83 to District One Station for warrant processing. Upon arrival at District One and during inventory and booking procedure R/O Cervera located two small plastic baggies containing multiple rocks of suspected crack cocaine in Dibble's right front shorts pocket. R/O Cervera secured the evidence and prepared felony PCS paperwork. Dibble was also charged with PCS. Evidence was submitted to property bureau.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

5 28 04
_____
Date

2230
_____
Time Statement Completed

_____
Signature of person making statement

000018

Denver Police Department
## STATEMENT

Paragraph (1)

Upon arrival of the SWAT officers (at 1118 W. 41st Ave.) he (Bateman) ran upstairs to George's bedroom because he had a bag of marijuana on him and he then tossed that marijuana down. The officers found that same bag. The marijuana was a big concern of his because he (Bateman) is on Probation and he would have been violated if found with marijuana.

Paragraph (2)

He (Bateman) has never seen any guns in the house and did not know there was a gun under the mattress. He has never seen any guns in George's house or cars. End of statement.

In officer Jeffers, Brian T Statement Says that he located a baggy that Contained a Small amount Of Suspected marijuana behind the dresser on the north wall. upstairs Room.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/_____/_____
Date

_____
Time Statement Completed

_____ 83026
Signature of person making statement

**H. ELLIS ARMISTEAD & ASSOCIATES, INC.**
**LEGAL INVESTIGATORS**
1127 Auraria Parkway, Suite 201-B, Denver, Colorado 80204
303-825-2373 ♦ 303-825-2374 Facsimile
www.coloradoinvestigators.com

## INVESTIGATIVE REPORT

| | |
|---|---|
| **TO:** | Jeff Edelman |
| **PREPARED BY:** | Creseda Riccardi |
| **CASE:** | Edelman / Costillo - Case No. 2004-112 |
| **DATE:** | August 12, 2004 |
| **SUBJECT:** | Interview with Mark Pelz and Photographs of Property |

On August 12, 2004, I met Mark PELZ (hereinafter referred to as PELZ) at 1118 W. 41st Avenue, Denver, Colorado so that I could photograph the contents of the rooms. PELZ is the owner and landlord of this property, which he rented to Jorge COSTILLO (hereinafter referred to as COSTILLO). His cellular telephone number is 303/916-7890.

The following is a summary of the interview:

- PELZ stated that he appreciated the Denver Nuisance Abatement laws because they had enabled him to evict Jorge COSTILLO. He said that without the laws, COSTILLO would have been able to continue to rent the property for another six months.

- PELZ stated that COSTILLO and Sharon BATEMAN (hereinafter referred to as SHARON) had thoroughly convinced him that they were "lovebirds and this was going to be their love nest. They were really going to fix this place up, they said."

- PELZ stated that because the property is sub-standard, he has typically rented it to people one step above homeless. He stated that COSTILLO had

**Attorney Work Product - Confidential**

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz and Photographs of Property
Date: August 12, 2004
Page 2   87

---

convinced PELZ that renting the house to COSTILLO would really help COSTILLO turn his life around.   PELZ said he felt foolish and duped by COSTILLO.

1. • PELZ stated that his interactions with COSTILLO have cost him a great deal of money.

2. • PELZ stated that very shortly after renting the house to COSTILLO and SHARON, more and more people began living there.  PELZ stated that there were vans parking in the compound parking area with people living in them. PELZ stated that he had explained to COSTILLO that, according to their contractual agreement on the lease, there were only supposed to be two people living on the property.  PELZ stated that COSTILLO disregarded their conversation and continued to have many people staying on the property.

3. • PELZ stated that even though he was concerned for his property and the damage that they were doing to it (PELZ pointed out various things smashed and destroyed within the house that they did), he quit visiting the property because there were so many people around that were a negative element that he did not feel comfortable or safe.

4. • PELZ stated that his interactions with SHARON and her brother William BATEMAN (hereinafter referred to as WILLIAM) gave him "the creeps".  PELZ stated, "And the grandmother [Eileen BATEMAN, SHARON and WILLIAM's grandmother], have you met her?  My God, that whole family gives me the creeps."

5. • PELZ stated that he had thought SHARON was in her late forties and that he was shocked when he found out she was in her early twenties.  He stated that

**Attorney Work Product - Confidential**

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz and Photographs of Property
Date: August 12, 2004
Page 3

he could never understand what she got out of her relationship with COSTILLO.

1-
- PELZ stated after the night the police searched the property, COSTILLO arranged for all of his possessions to be removed from the house.  PELZ stated that COSTILLO was "like a king with an army --- he never did anything himself, he just ordered it done."

2-
- PELZ stated that the mattress on the floor in the second floor north bedroom was left behind by COSTILLO's associates.  Other than the mattress, the house is devoid of furniture and personal possessions.

- A floor plan, including the location of the remaining mattress, and directional orientation may be found in Attachment A.

- Photographs of the property may be found in Attachment B.

Creseda Riccardi

Reviewed by

Edelman/costillo/interviewwithmarkpelz.doc

Attorney Work Product - Confidential

## H. ELLIS ARMISTEAD & ASSOCIATES, INC.
### LEGAL INVESTIGATORS
1127 Auraria Parkway, Suite 201-B, Denver, Colorado 80204
303-825-2373 ♦ 303-825-2374 Facsimile
www.coloradoinvestigators.com

### INVESTIGATIVE REPORT

| | |
|---|---|
| **TO:** | **Jeff Edelman** |
| **PREPARED BY:** | **Creseda Riccardi** |
| **CASE:** | **Edelman / Costillo - Case No. 2004-112** |
| **DATE:** | **August 17, 2004** |
| **SUBJECT:** | **Attempt to Contact** |

On August 17, 2004, I contacted Mark PELZ (hereinafter referred to as PELZ), the owner and landlord of 1118 W. 41st Avenue, Denver, CO, by telephone. His cellular telephone number is 303/916-7890.

The following is a summary of the interview:

- When questioned about the sleeping arrangements of Jorge COSTILLO (hereinafter referred to as COSTILLO) and Sharon BATEMAN at the property PELZ rented to them, PELZ stated, "I never really saw anything. I have no knowledge of who slept with whom, where."

- PELZ stated that before COSTILLO and BATEMAN had paid a deposit, he found them illegally on his property one night. Because the utilities had not yet been turned on, PELZ stated that they had candles everywhere. He stated that they seemed to be sleeping on the floor in the living room but they were not fully or officially moved in and he did not go upstairs so he could not be sure. He stated that they were "camping" there until the lease agreements were completed. PELZ stated that he told them it was illegal to do what they were doing.

### Attorney Work Product - Confidential

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz Supplement
Date: August 17, 2004
Page 2

- PELZ stated that he went over to the house a couple of times to do electrical work. He stated, "I really wasn't in there very much. I became less and less comfortable there."

- PELZ stated that he did know there was a mattress upstairs.

- PELZ stated that two or three days before the drug bust he had gone to see COSTILLO to tell COSTILLO that PELZ's son would be staying at the house on Jason Street, which is adjacent to 1118 W. 41st and surrounded by the same fence. PELZ stated that he stood in the kitchen and was uncomfortable with the amount of people that were coming and going. He stated he does not recall seeing a bed in the living room at that time.

- PELZ stated that the Monday or Tuesday following the drug bust, he went to the property to evict COSTILLO and BATEMAN. PELZ stated that COSTILLO invited PELZ into the house and then PELZ had to wait while COSTILLO spoke to someone. PELZ stated, "Jorge [COSTILLO] was sitting in the living room on a couch, holding court. I got the feeling he was conducting an important conversation and I was supposed to wait."

- PELZ stated that there was no bed in the living room at that time.

- Other than these few memories, PELZ reiterated that he was unfamiliar with the arrangement of furniture or who slept where in the house.

_____
Creseda Riccardi

_____
Reviewed by

Edelman/costillo/interviewwithmarkpelzsupplement.doc

**Attorney Work Product - Confidential**

he was aware that Jorge had invited Wayne to stay a short time after Jorge and Sharon moved in. Mr. Pelz states that he noticed Jorge had turned the property into a kind of a fortress but didn't think much of this at the time. Mr. Pelz informs that the back yard surrounding 1118 W. 41st Ave is shared with another property he owns next door, which is 4059 Jason St. Mr. Pelz states that he keeps a Streamline trailer home there along with stacks of lumber, building supplies and other odds and ends. Reporting Detective asked for and received consent to search the back yard further. Nothing was found.

On June 1, 2004 at approximately 12:15 PM Reporting Detective returned an earlier phone message from Mr. Pelz. Mr. Pelz was concerned about his legal rights as landlord of this property and asked for reports needed for evicting Jorge and his friends. During the conversation Mr. Pelz stated that he "Jorge called him last night" (May 31, 2004) and that Jorge tried to tell Mr. Pelz that the police action was nothing more than racially motivated harassment and that the police did not find anything illegal on the property. Mr. Pelz further related that Jorge stated that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz states that **Jorge Castillo told him that "He was only keeping the gun for a friend."**

On June 06, 2004, Denver Police Department Chemist Jennifer Kimmett completed a presumptive screening of the substances held under invoice #680248 and reported the following results:

Item #8- (The 2 bags containing numerous small rock like substance found in Dibble's pocket) tested positive for cocaine base, with a weight of 3.081 grams

Item #9- (The substance found by Officer Hynes) tested positive for cocaine base, with a weight of 0.105 grams.

On 05-30-04, Jorge Castillo was released from PADF on bond with a return court date of 06-14-04. Wayne Dibble is still in custody as of 06-02-04.

On June 2, 2004, this case was presented to the Denver District Attorney's office for acceptance of felony charges on Wayne Dibble for PCS and on Jorge Castillo for Possession of a weapon by previous offender. This Case will be carried as cleared by arrest.

000185

I, **Wayne Dibble** , state that

I reside at

I have known Jorge Castillo since April 2003. Looking at the governments exhibits I have not seen exhibit 1 before, it is a picture of a revolver. I have not seen any firearm on Castillo's property at any time. I moved into a camper that was on Jorge's property at 1118 W 41st Avenue, Denver CO 80211 in November 2003 and lived there until May 2004. While I lived there I worked for Jorge painting cars and doing autobody work. I also delivered and sold crack cocaine for Jorge. I knew it was crack cocaine because I was a user. Jorge hired me to work on cars and paid me. It came up in conversation that I was a crack user. Cocaine comes in a rock form. Baking soda, water, and cocaine in ratio 3 parts coke, 1 part baking soda, adding water. Cook it on a stove or any kind of flame until it becomes oil then let it cool then it becomes a rock. The oil goes to the top and when it dries, it goes to the bottom. There is no waste. I used cocaine hundreds of times between 2002

I have read the foregoing statement consisting of ___5___ pages, each of which I have signed. I fully understand this statement and I declare, certify, verify and/or state under penalty of perjury that the foregoing is true and correct. I made the corrections shown and placed my initials opposite each. I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it. Executed on **March 23, 2005**

SIGNATURE OF AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS **23rd**
DAY OF **March** , **2005**
AT **Rush's office - Denver**
SIGNATURE **Carrie DiPirro ATF SA3180**
TITLE **Special Agent ATF**

WITNESS SIGNATURE **Daniel E. Rojas DPD. 83026**
TITLE

ATF F 5000.1 (12-83)

001318

to 2004, smoking an 8-ball at a time by using
a glass or metal pipe with a brillow(copper) inside.
Then I dropped in the crack and smoked it. I
cooked crack for personal use hundreds of time. I
liked smoking crack better than snorting cocaine, which
I started snorting cocaine in 2001 when my wife
left me. The crack pipes can be bought in any
convenience store or gas station as glass tubes with
flowers in it. I don't know of any other use for
those glass pipes that are sold with the roses in them.
I sold crack for Jorge. I usually took my bike
(bicycle). He always directed me and told me
where to go. I also had my own customers. They
would call me on my phone. The phones were bought
in the cricket store so on Auraria campus. Jorge
on Colfax
asked me to put the phones in my name, but Jorge gave
me the money to pay the bills on my phone and Jorge's.
Jorge cooked and packaged his own crack. Sometimes
I helped him package it this way which was to
put it in a little baggie, put after weighing it,
twist the bag closed then burned it to seal it. He
charged people different rates. Some customers got
better prices. They were packaged in 8-balls and
½ an 8 ball, called a teener. An 8-ball usually
sold for $100.00 for regular customers. The largest
I delivered for Jorge was ½ oz of crack for

SIGNATURE OF AFFIANT

DATE
3/23/05

ATF F 5000.2 (6-74)

001319

$300 - $350.00. I never knew his customers. Jorge would tell me where to go to sell to his customers who I would recognize. Sometimes Jorge told me to "front" the crack to his customers who would pay later. I also collected money from his customers without giving them crack. I would then give all the money back to Jorge and he would pay me what he wanted for my delivery services. Sometimes he paid me in crack instead of cash. The crack high is a good feeling of euphoria — like drinking 3-4 beers. I never saw Jorge hide his drugs. I have a suspicion he did not keep his stash in his house, but outside somewhere because he left the house to get the crack. Jorge always gave me sealed bags of crack to sell, never loose crack to sell on my own. I sold from $300-$800 a day for Jorge 7 days a week, I don't know how much he sold from his house by himself. I don't know where Jorge got his cocaine. I saw ounces at a time. Jorge cooked crack whenever he needed to, anytime. When Jorge was in jail he told me where the crack was in the van inside the gas tank receptacle area. There was about 5 ounces of crack. Between me, Sharon and Billy and their friends, it took us about 3 weeks to smoke it. Jorge was arrested at his house @ March 2004. Jorge told me where the crack was so I could sell it to pay bills and

SIGNATURE OF AFFIANT: Wayne Dougherty

DATE: 3/23/05

ATF F 5000.2 (6-74)

001320

save the profits to give him the money. Jorge blamed me for smoking it and wanted me to pay him back and work it off. It was packaged in 8-balls. About Sept. 2003 Back to the exhibits, exhibit 2 is a picture of crack pipes glass pipes with roses in them. I have used them for smoking crack. Exhibit 3 is a picture of a scale that looks like a scale Jorge used to weigh crack in his house. Exhibit 4 I do not recognize. Exhibit 5 is a picture of the house in front of the house where Jorge lived. Exhibit 6 is a picture of Jorge's house and the motor home I lived in that was on his property at 1118 W 41st Avenue. Exhibit 7 is a picture of Jorge's house and the house in front of his Exhibit 8 is a picture closer zoom of Exhibit 7. Exhibit 9 looks like an areiel view of the neighborhood where Jorge's house was. Exhibit 10 is a picture of Jorge Castillo. Exhibit 11 is a photo of me. Exhibit 12 looks like some substance in a plastic bag. Exhibit 12(b) looks like crack cocaine packaged the way Jorge packs it. It was the crack that was in my pocket when I was arrested and Jorge gave it to me. Exhibit 15 looks like something in a plastic bag. It was a crack rock that was in my hand when I was in the jail cell when I was arrested. It is a $20.00 rock that I would get a couple hits off. Exhibit 19 is a photo of Sharon Bateman. She is bald because she

| SIGNATURE OF AFFIANT | DATE |
|---|---|
|  | 3/23/05 |

ATF F 5000.2 (6-74)

001321

DEPARTMENT OF THE TREASURY – BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
Appellate Case: 11-1322     Document: 39-2     Date Filed: 02/01/2012     Page: 142

**AFFIDAVIT**
(CONTINUATION SHEET)

PAGE ___5___ OF ___5___ PAGES

was burning her hair with a lighter. I don't know why she did that. Exhibit 18 is a photo of Billy Bateman. I saw Jorge give and sell crack to Billy and Sharon. Billy also did some yard work for Jorge to get free drugs. Looking at other photos, page 20 is not my writing and it is not my property. Page 21 is not my book. Page 22 is part my writing on the bottom. It was a notebook binder Jorge had in his house. Sometimes I wrote in it if someone owed Jorge money for drugs. I would put the person's initials and the amount owed Jorge. It would be when I fronted the crack. Page 23 I do not recognize. Page 24 I do not recognize. When we smoked the 5 oz. of crack when Jorge was in jail, I also sold some for Jorge. I gave the money to Sharon from the sales, because Sharon was his girlfriend. I originally met Jorge when I was staying at the Rosedale Motel. We started talking about cars, and car repairs and our conversation later lead to me making money by selling crack for Jorge. Back to exhibit 12B, Jorge give it to me to sell to one customer, he told me I would know who it was when I got there, but I was arrested first. Back to exhibit 19, Sharon burned her hair because she thought there were bugs crawling in her hair – that's what she said. I never had any halucinations like Sharon did from the addiction to crack. Jorge treated Sharon good and sometimes bad. He would sometimes threaten to cut off her drug supply.

SIGNATURE OF AFFIANT

DATE 3/23/05

ATF F 5000.2 (6-74)

001322

1   ever pay any rent?

2        A    No.  But what was George's was mine.

3        Q    That's because you were sleeping with him?

4        A    That's because we had a child together.

5        Q    Mr. Castillo?

6        A    Yeah.

7        Q    And that's while you were doing crack?

8        A    No.

9        Q    When did you have a child together that you

10   weren't doing crack?

11       A    I quit for a period of time when I was in

12   Mexico.  That's the baby I was pregnant with.  I had a

13   relationship with him and he went to jail and I ended up

14   being pregnant.

15       Q    And you weren't smoking crack during that

16   time?

17       A    No, I was not.

18       Q    What period of time was that, ma'am?

19       A    From -- I had her September 7th of 2000 --

20   2002, I think.  Yeah.  When I was pregnant with her I

21   didn't smoke crack.

22       Q    So when you went down to Mexico -- you

23   indicated George kept you in the house.  How come he

24   didn't keep you there that time?

25       A    George was in jail.  George was in jail when I

001138

```
 1   was pregnant.  My daughter was already in custody with

 2   Social Services when he kept me locked up in the house.

 3        Q    Why was that?

 4        A    Because he didn't want me going out finding

 5   crack cocaine on my own.

 6        Q    Why was your daughter in jail -- I mean, why

 7   was your daughter already in Social Services' custody?

 8        A    Because my godmother called Social Services

 9   and gave my children to Social Services.

10        Q    Why?

11        A    Because I didn't have a home.  George was in

12   jail, and I hadn't -- I was living in a hotel.

13        Q    And you were doing drugs?

14        A    Yes, I was.

15        Q    Okay.  All right.  I want to draw your

16   attention to Government's Exhibit 12.  And what's

17   depicted on this exhibit?

18        A    The bags of crack cocaine.

19        Q    And have you seen this actual crack before --

20   this actual crack?

21        A    This one?

22        Q    Yeah.

23        A    No.

24        Q    Do you know anything about where this crack

25   came from?
```

Sharon Clims geting the Grait from Wayne

88

```
 1      A    Jorge's.

 2      Q    So you know it came from Jorge?

 3      A    Yes, I do.

 4      Q    How do you know that?

 5      A    Because he had some before.  This came from

 6  Wayne.  Jorge gave it to Wayne.

 7      Q    How do know that this came from Wayne?  Who

 8  told you?

 9      A    Wayne got busted with it.

10      Q    How do you know?

11      A    Because Wayne gave me some before the cops

12  raided the house.

13      Q    How do you know this is the crack Wayne got

14  busted with?

15      A    Because that's how Wayne packaged it.

16      Q    Okay.  So this is the way Wayne packages his

17  crack?

18      A    Yes.

19      Q    And Wayne gave you some crack before you got

20  arrested; is that right?

21      A    Yes.

22      Q    So at the time you made these statements about

23  these kilos of crack on the property you were high on

24  crack; is that correct?

25      A    Yes, I was.
```

1   Q   Did you ever have opportunity to see him hide drugs?

2   A   Yeah, I did.

3   Q   Where would he hide them?

4   A   In the ground.

5   Q   If you happened to see him hide them, what would you do?

6   A   I would take them.

7   Q   On this particular night, May 28th, 2004, did you assist

8 officers in locating the handgun you had seen Mr. Castillo

9 trade for crack cocaine?

10   A   Yes, I did.

11   Q   What did you do in order to assist with that?

12   A   I just told them there's a weapon underneath the bed

13 upstairs.

14   Q   During your time at this residence from November 2003 up

15 through April 2004 and even going into May 2004, did you sell

16 cocaine at this residence?

17   A   Yeah.

18   Q   Sometimes?

19   A   Yeah.  Sometimes.

20   Q   How often?

21   A   Whenever Jorge or Wayne wasn't around and I had a little

22 bit to make a little bit of cash, I would sell it.

23   Q   And how often would you see Jorge sell crack cocaine?

24   A   Daily.

25   Q   I want to talk briefly about your history.  You have a

Page 65

1  him?
2      A    Sometimes.  Sometimes he'd go to work and
3  leave me at the shop with a -- a woman or something and
4  I'd do things, and then I'd go back to work when I was
5  done.
6      Q    Okay.  And -- and when you -- when you say
7  he'd leave you there, are we talking about with a
8  prostitute?
9      A    Uh-huh.
10     Q    Is that a ye -- I'm sorry.  You have to answer
11  yes or no.
12     A    Yeah.  Yes, sir.
13     Q    Okay.  And -- and was he making you do all
14  these things or this was --
15     A    No, I wanted it.
16     Q    -- the kind of lifestyle that you enjoyed
17  leading?
18     A    Yeah.  I hadn't -- I hadn't had a woman for a
19  few years so I was enjoying all the women that were
20  coming around.
21     Q    Okay.  So tell me about your history of drug
22  use.  Have you -- have you been using drugs for a long
23  time?
24     A    Not really.  Basically, I've been having jobs
25  off and on.  Not really using much drugs.  I -- when I

Page 66

1  used cocaine, it was for about a three-, four-, maybe
2  five-month period of time.  And I really didn't use it
3  that much because I was unemployed, so I couldn't afford
4  it that much.  So when I did use it, I'd try and work for
5  it for free or something, if I could.
6      Q    So when -- are we talking about this last
7  year, then, that you're using a lot of crack?
8      A    Kind of, yeah.
9      Q    And -- and before that?
10     A    No.  I had never really had any people that
11  sold it or know where to get it or didn't even really
12  know about it.
13     Q    Okay.  And how about your sister?
14     A    She -- she --
15     Q    She knows -- she knows where to get it, right?
16     A    I'm not sure.  She had a lot of boyfriends
17  that got incarcerated for dealing drugs.  Undercover cops
18  like Daniel Rojas has busted a few of her boyfriends.
19  And she -- more than -- more of the time than any Sharon
20  would be away from my grandma's house and I wouldn't know
21  where to find her or what she was up to.
22     Q    So how many boyfriends would you say she's had
23  that have been busted for crack?
24     A    Just three.
25     Q    And what are their names?

Page 67

1      A    George Castillo, and then Oscar Perez Garcia,
2  and then the other Oscar guy.  I don't know -- I don't
3  know this guy's last name.  His name was Oscar.  I think
4  he got busted with a kilo of cocaine or something.  I'm
5  not sure.
6      Q    And -- and it's your understanding that Rojas
7  has -- that Detective Rojas has investigated and
8  arrested --
9      A    He got them incarcerated.
10     Q    -- all these boyfriends?
11     A    Yeah.  Because they were bad guys.  They
12  were -- deserved to go to jail.
13     Q    And does your -- does your sister -- I mean --
14  and I don't mean this in a bad way -- but does she have
15  some kind of relationship with Detective Rojas?
16     A    No, sir.
17     Q    Okay.  But -- but she's known him for a long
18  time because he's arrested a lot of her boyfriends?
19     A    Yeah.  He's raided a lot of their motel rooms
20  and stuff and took a lot of drugs off the streets, which
21  is good.
22     Q    Have you or your sister ever had any
23  psychological issues?
24     A    No, sir.
25     Q    You indicated that at one point you felt like

Page 68

1  committing suicide.  Have you ever seen someone for some
2  psychological issues relating to that?
3      A    What point did I indicate that?
4      Q    What's that?
5      A    I said, "What point did I indicate that?"
6      Q    I -- I -- I said in the past you've indicated
7  that you, you know, were wanting to commit suicide.  I
8  think when you were direct-testifying you said, When I
9  smoked heroin, it made me want to commit suicide --
10     A    Yeah, I --
11     Q    -- so I stopped.
12     A    Yeah.  I took a knife and slashed my arm right
13  there (indicated).  I didn't try and kill myself, but
14  that's when I knew it was time to give up the drugs.
15     Q    Okay.  So have you ever seen anybody about
16  those issues?
17     A    Yeah, in prison.
18     Q    Okay.
19     A    I speak -- I spoke to the psychologist daily.
20     Q    All right.  And how about your sister?
21     A    She's not suicidal.  She's -- she was going
22  through a lot of, like, depression issues because of
23  being bald and having to wear wigs and stuff.
24         And now her hair's growing --
25     Q    I'm sorry.  Say that last part.

### H. ELLIS ARMISTEAD & ASSOCIATES, INC.
### LEGAL INVESTIGATORS
1127 Auraria Parkway, Suite 201-B, Denver, Colorado 80204
303-825-2373 ♦ 303-825-2374 Facsimile
www.coloradoinvestigators.com

## INVESTIGATIVE REPORT

| | |
|---|---|
| TO: | Jonathan Willett |
| PREPARED BY: | Creseda Riccardi |
| CASE: | U.S. / Jorge Castillo - Case No. 2004-112 |
| DATE: | November 17, 2004 |
| SUBJECT: | Interview with William Bateman |

On October 19 and 20, 2004, I interviewed William BATEMAN (hereinafter referred to as WILL) at the Federal Detention Center. The address for the FDC is 9595 W. Quincy Avenue, Littleton, Colorado. The telephone number is 303/985-1566.

The following is a summary of the interview:

- WILL stated that he had been placed on suicide watch and asked me to contact his lawyer, Mark Rubenstein, to help WILL get off of suicide watch. WILL stated that the last time he was in jail, he was sexually molested by another prisoner and had made a statement to the jail management that he would be suicidal if it ever happened to him again. WILL stated, "Of course, I didn't mean I would really be suicidal. It was just something I said."

- WILL stated that a few days ago, he had noticed that the fly on his boxer shorts was in the back. WILL stated that his cellmate had pointed out to WILL, while they were in the showers, that WILL's boxer shorts were on backwards. WILL stated that, although he had no recollection of being sexually molested by his cellmate, he believes that his cellmate wanted WILL to believe that he had been molested. WILL stated that as a result of this

**Attorney Work Product - Confidential**

Jonathan Willett
Appellate Case: 11-1322    Document: 39    Date Filed: 02/01/2012    Page: 149

U.S. / Jorge Castillo – Case 2004-112    Exhibit ___ *of Castillo's Affidavit*
Interview with William Bateman    Date: _____    *- page.*
November 17, 2004
Page 2

---

- incident at FDC, in combination with his earlier statement that he would be "suicidal if it ever happened again", FDC management had placed him in a cell all by himself, completely naked except for a restraining jacket. WILL stated that he did not want to be on suicide watch anymore.

- WILL stated his sister, Sharon BATEMAN (hereinafter referred to as SHARON) had been romantically involved with George CASTILLO (hereinafter referred to as GEORGE) for three to four years.

- WILL stated he had stayed frequently with SHARON and GEORGE during the time that SHARON and GEORGE lived together at 1118 W. 41st Avenue in Denver, Colorado.

- WILL stated that when the police raided the house on 41st Avenue, he had two warrants out for his arrest and SHARON had five warrants out for her arrest. WILL stated that these outstanding warrants were why "the government put us in jail even though we didn't do nothing wrong. Man, this is day 61 in jail and I didn't do nothing wrong."

- WILL stated, "I looked up Immunity 6001 to 6003. I've got immunity, man. There's no reason for me to lie."

- WILL stated, "Being a crack fiend, I totally hung out there [1118 W. 41st Avenue]. I'd clean for him [GEORGE], mowed his yard, watch the house, organize his wood 'cause he'd give me free drugs. He'd bitch us out, me and my sister, 'cause we'd kill a sack [of crack cocaine]. He would hide his eight balls and ounces on him. He'd have a huge sack with eight balls and ounces. My sister got so good at picking them off him while he was sleeping and we'd just get high."

**Attorney Work Product - Confidential**

U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 3

---

- WILL stated that when SHARON and GEORGE first moved into 1118 W. 41st Avenue, the three of them worked very hard on fixing the place up. WILL stated, "We fixed that place up with George's drug money. They kept me prisoner. They made me stay at their house for two weeks and I just worked on the house. They paid me with drugs. Kept me high. It was great."

- WILL stated, "He [GEORGE] would have 90 different people over there hammering and doing things for him. He'd have a huge barbeque."

- WILL stated that before they laid down square tiles in the kitchen, there were large squares of plywood screwed down on the kitchen floor very smoothly. WILL stated, "One day, just before we tiled it, all the plywood squares were tilted like George had lifted them up and rescrewed them."

- WILL stated that Wayne DIBBLE (hereinafter referred to as WAYNE) stayed at the house with them, too. WILL drew a diagram of the layout of the upstairs of the house with the initial sleeping arrangements detailed (see Figure 1). WILL stated that since everyone was always high from cocaine-related drugs, often they would not sleep at all during the night; therefore, who slept where changed frequently.

**Attorney Work Product - Confidential**

Exhibit# 1- oF-8- Exhibits have
17 - Pages oF Government Documents as
Exhibits., And 6- Pages oF hand
Writing Report by me ISmael, A. G.
~~~~~ as Display of Contradictions of Sharon and
William Bateman False testimonies and or
Statements that are not Sustained with any
~~~~~ Physical Material Factual evidence,

You Can See them in all oF this 8 —
Exhibits.

This Exhibits From Exhibit # 1- to Exhibit
#8 have 152- Pages oF hand writing Reports
and Government Documents togeder.

Index of False witnesses of this
Case-04-Cr-00285-

Exhibit # 1-of-8, Page 1-of-6.
Index "
Display of contradictions of Sharon and William Bateman. False testimonies
and or statements that are not Precedent nor sustained
with any material Physical evidence, and State and Federal fal-
se statements of Government officials as follows. Statement 1

Q While you were at that residence, did you
have the opportunity to see where Mr. Castillo
kept his drugs?
A he hid it outside. He always changed his
hiding spot. The only Person that ever seen
where he kept it was wayne Dibble because
I observed wayne Dibble Steal—Mr. Castillo
told me it was 18 ounces of Crack. Whether
it was Cocaine or Crack rocked up—-he told
me that when he was in Denver County Jail,
Mr. Castillo. He told me that Wayne Dibble Stole
18 ounces and I went over there, and Mr. Dibble
had a bunch of Crack and he was giving me Crack balls and smoking
them with me and getting high. While Mr. Castillo was still in Jail,
wayne Dibble was selling it and making money, buying Prostitutes,
and just partying.

Please see in
Page 163-line 21 to
25, Page 164 line 1 to
8, statements of
William Bateman
on my trial of
the 9 month of
2010, days 27-
28 and 29.

Will stated that GEORGE told wayne where to find
a small amount of drugs, which WAYNE was sup-
posed to sell and give the money from the sale to
GEORGE. Will stated that WAYNE found a large
amount of drugs—-the small amount GEORGE
had directed WAYNE to as well and additional
ten ounces which GEORGE had not told WAYNE
about. WILL stated, "AFTer GEORGE got out, I
asked why he was so Pissed at WAYNE and he explained that
WAYNE had ruined —

statement 2.
Please review
Jonathan willett
interview with william
Bateman on 11-17-04,
page 7, read Circle
# 5 and 6.

Page 163
164
7—
3-Pages
95 Exhibits

Page 1-of, 5.

WILLIAM BATEMAN - Direct

1    *A*   Mr. Castillo.

2    *Q*   I'm sorry. I cut you off. Did you see people come to the

3    home in order to buy crack cocaine?

4    *A*   Numerous people.

5    *Q*   Did you buy crack cocaine from anybody other than Wayne

6    Dibble? You mentioned Mr. Dibble.

7    *A*   Yeah. Mr. Castillo. A lot of times some of them would

8    come there and want to smoke, too. He didn't like people

9    smoking there. Sometimes he would let them take a hit there.

10    Besides me, my sister and Wayne Dibble, George didn't like

11    people smoking there while he was selling them and working,

12    which was usually all day all the time. He would usually let

13    them take a hit or take them out of there. All the time he was

14    trying to get rid of them. He didn't want them sitting there

15    and getting high. He wanted them buying their stuff and

16    leaving. That's how he would like to run his operation.

17    *Q*   Did you ever sell crack cocaine while at that residence?

18    *A*   Maybe two or three times. People would come over and they

19    would give me the money, and I would go to Mr. Castillo and buy

20    it and hand it to them and they would leave.

21    *Q*   While you were at that residence, did you have the

22    opportunity to see where Mr. Castillo kept his drugs?

23    *A*   He hid it outside. He always changed his hiding spot. The

24    only person that ever seen where he kept it was Wayne Dibble

25    because I observed Wayne Dibble steal -- Mr. Castillo told me

1  it was 18 ounces of crack. Whether it was cocaine or crack

2  rocked up -- he told me that when he was in Denver County Jail,

3  Mr. Castillo. He told me that Wayne Dibble stole 18 ounces and

4  I went over there, and Mr. Dibble had a bunch of crack and he

5  was giving me crack balls and smoking them with me and getting

6  high. While Mr. Castillo was still in jail, Wayne Dibble was

7  selling it and making money, buying prostitutes, and just

8  partying.

9  Q   Now, you mention that Mr. Castillo would hide his drugs.

10  Would he be hiding them from anybody in particular?

11  A   Me and my sister.

12  Q   Are you aware why he would hide them from you and your

13  sister?

14  A   Because we'd smoke it all. Anytime we'd get ahold of it,

15  we'd smoke it all.

16  Q   Did you ever try to find his drugs?

17  A   No. I didn't know where they were at. I remember I was

18  raking the yard at one time, 1118, doing yard work, and I found

19  a 20 rock. It was in a black trash bag. I found it while I

20  was raking, and I went in the house later and smoked it. I

21  didn't smoke it in front of him. While he was still in the

22  house, I went upstairs and smoked it.

23  Q   While you were living at the residence between late 2003

24  and 2004 at 1118 West 41st Avenue, do you have an opinion as to

25  whether the crack that was being sold by Mr. Castillo to you

Jonathan Willett
Appellate Case: 11-1322    Document: 39-2    Date Filed: 02/01/2012    Page: 155    (14)
U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 7

- WILL stated that there were two beds up in "WAYNE's room" (see Figure 1) at one time. WILL also stated that GEORGE had a bed downstairs in the living room, too. WILL stated that 3-4 weeks before the raid, SHARON and GEORGE were sleeping in the living room on a box springs and mattress.

- WILL stated that GEORGE hid the drugs which he was going to sell all over the property. WILL stated GEORGE would bury his drugs in the ground or hide them in a pile of rubble on the property or hide them in secret places in the house. WILL stated, "Check out a pile of bricks. WAYNE loved to hide drugs there."

- WILL stated that GEORGE would keep "two to three ziplock sacks of money taped to his stomach." WILL stated that the neighbor had told WILL that he saw GEORGE with a sack of money.

- WILL stated that at one point GEORGE had been in jail for about one month. WILL stated that he had been in the same room with WAYNE when WAYNE accepted a collect call from GEORGE in jail. WILL stated he was not on the phone so he does not know exactly what was said, but from listening to WAYNE's end of the conversation, WILL stated it sounded like GEORGE wanted WAYNE to keep the house at 1118 W. 41st Avenue open and continue GEORGE's drug business. WILL stated that GEORGE told WAYNE where to find a small amount of drugs, which WAYNE was supposed to sell and give the money from the sale to GEORGE. WILL stated that WAYNE found a large amount of drugs --- the small amount GEORGE had directed WAYNE to as well as an additional ten ounces which GEORGE had not told WAYNE about. WILL stated that WAYNE sold all of the drugs without giving GEORGE any of the proceeds. WILL stated, "After GEORGE got out, I asked why he was so pissed at WAYNE and he explained that WAYNE had ruined

Exhibit # 1 -OF- 8.    Page 2-OF-16.

(Page 8, 1, 25, are 3-Pages as Exhibits)

statement 3.

Please review Jonathan Willett interview with William Bateman on 11-17, 2004 Page 8 the First line that is circle.

him. All his (GEORGE'S) money was invested in that eleven ounces.

I, Ismael Arenas aske you to see how Mr. Bateman change his false statement From 11 ounces to 18.

George did not Pay Wayne Dibbles bond because George believed Wayne had stolen a quantity OF Crack Cocaine (approximately 11 ounces) when George was incarcerated on a Prior occasion.

statement 4.

review 1 Page of Det. Rojas Daniel Report Dated 8-23, 2004, read Paragraph # 4 that is circle.

Q Have you actually witnessed with your own eyes Mr. Castillo ever going into the yard to get drugs and coming--

A NO.

Q Never?

(See Mr. Bateman Contradictions in this statement # 5. Also Pay-attention to Sta ment 6 where Mr. Bateman claims that I hide the drugs on me.)

A NO.

Q But you have seen Mr. Dibble disappear into the yard and come back with drugs?

A Yeah. And the same with George. I've seen him go outside and come back with drugs too.

statement 5.

review Mr. Bateman 11-30, 2004 Deposition on page 25 in it Find Page 87 line 11-to 20 and line 23-to 25, and Page 88 line 1-and 2, and line 13-to 15.

Q Okay. Now, when you First were arrested by the detectives, you indicated that you were willing to speak with them about where Mr. Castillo keeps drugs in order to keep yourself out of Jail; is that right?

A yea. I didn't want to go to Jail that night.

Q So you--

A I was--I was Just trying to get out of Jail that night.

him. All his [GEORGE's] money was invested in that eleven ounces. He kicked WAYNE out for a while."

- WILL stated that he was afraid to tell the Alcohol, Tobacco, and Firearms agent and the Denver narcotics policeman the truth about how many guns GEORGE had, but now that WILL had immunity he would tell the truth about GEORGE's guns. WILL stated GEORGE had five or six different handguns. WILL stated, "Sometimes he [GEORGE] would brag and show them off to me."

- WILL stated that one night he went downstairs to the kitchen and he found GEORGE practicing pulling a gun from his pocket and pointing it at the exterior door in the kitchen. WILL stated that this frightened him. WILL stated, "That night I had to sleep by him. I crawled behind the couch because I was afraid of him."

- WILL stated that he knows about guns, because his grandfather was in World War II and had numerous guns. WILL stated that his grandmother's house has bullet holes all over it because he has shot off guns inside her house so many times.

- WILL stated that SHARON does not know about guns. He stated, "She never really messed with them." WILL also stated that SHARON never possessed a gun. He stated, "GEORGE would always have guns, one or two at a time, but he'd keep changing them." WILL stated that WAYNE and GEORGE kept the guns in the motor home.

- WILL stated, "He [GEORGE] had a chainsaw he'd keep right by the door the SWAT team kicked in." (see Figure 2) WILL stated, "One day it looked

**Attorney Work Product - Confidential**

*11 ounces*

## STATEMENT

| (LAST, FIRST, MIDDLE INITIAL) | | MAKING STATEMENT IS | | |
|---|---|---|---|---|
| ROJAS, DANIEL | | X OFFICER ☐ WITNESS ☐ PERSON ADVISED | | |

| RESIDENCE STREET ADDRESS | | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE 720-913-6060 | SOCIAL SECURITY NO. | DATE OF BIRTH SERIAL NO. 83026 |
|---|---|---|---|

| BUSINESS STREET ADDRESS 1331 Cherokee Street | CITY Denver | COUNTY Denver | STATE CO | ZIP CODE 80204 |
|---|---|---|---|---|

| OFFICER TAKING STATEMENT | SERIAL NO | DATE 08-23-04 | TIME 8:00 PM |
|---|---|---|---|

| CONCERNING AN INCIDENT AT 1118 W. 41ST St. | LOCATION WHERE STATEMENT TAKEN HQ |
|---|---|

On August 23, 2004, Reporting Detective and ATF Special Agent Cari Depiro responded to the Adams County jail for prisoner transport duty. William Joseph Bateman was transported to the Federal Court Building and turned over to U. S. Marshals custody. During the transport Bateman expressed his desire to relate certain information to us. Bateman made a number of unsolicited statements before Agent Depiro interrupted him and asked me to read Bateman the Miranda advisement, with an ATF form. After reading Bateman the advisement, Bateman agreed to waive rights and speak to us without an attorney. Bateman related the following information, that:

- He met Jorge Castillo (hereafter referred to as George) approximately 1 year ago through his sister.

- On the day that SWAT officers arrived at George's house, George had thrown a bag of crack cocaine down as they approached and that police never found this bag.

- George paid his and Sharon's bail. When George, Sharon and he were released from jail, George went back to the place in the yard where he was arrested and began searching for the bag of crack cocaine and told him that he was looking for the crack the police missed. George found the bag of crack cocaine among some weeds.

- George did not pay Wayne Dibbles' bond because George believed Wayne had stolen a quantity of crack cocaine (approximately 11 ounces) from George, when George was incarcerated on a prior occasion.

- Wayne had been working for George since long before he (Bateman) had known George and that George employed Wayne to deliver drugs for him. Wayne rode a bike to deliver drugs.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/_____/_____
Date

_____
Time Stat

_____
Signature of person making statement

001582

*Contradictions of William Bateman*
*Deposition of 2004. 4-Pages in Page 25.*

Page 85

1  Q  And --
2  A  $2,000.
3  Q  Okay.  And when did she tell you about this?
4  A  She called me in the afternoon and told me
5  that her and George had went to the bank.  Went in there
6  with maybe hundred-dollar bills and came out with
7  twenties or however they did it, you know.  I'm not sure
8  exactly what the denominations were of the money.
9       But they went in there and exchanged the bills
10 so that way if somebody came in their house with marked
11 money and bought drugs from Mr. Castillo, the -- the
12 money that they had now was not money that could have had
13 highlighters on it or any kind of marks.
14  Q  So is it your understanding that she was
15 helping Mr. Castillo and Mr. Biddle (sic) --
16  A  Dibble.
17  Q  -- essentially clean this money up?
18  A  Yeah.  She was -- not helping them clean it
19 up; she was just with them.
20  Q  But they -- she was living there; is that
21 right?
22  A  Yeah.
23  Q  And she was getting --
24  A  Sometimes she -- right before the time where
25 they got raided, like I said, she wasn't even -- she

Page 86

1  would sleep out in the van in the yard.  She wouldn't
2  even go in the house sometimes.  I'd come over there and
3  find her sleeping in the van.
4  Q  Okay.  And -- but she was getting money for
5  free by living there?  Was she paying any rent?
6  A  I don't know.
7  Q  All right.  Have you ever seen Wayne Biddle --
8  A  Dibble.
9  Q  Dibble, I'm sorry.  I -- sell drugs?
10  A  Yeah.
11  Q  How often?
12  A  Less than Mr. Castillo.  They both had their
13 own cell phones and they made a lot of money.
14       When George went to jail and he found the
15 11 ounces of George's --
16  Q  Yeah.
17  A  -- he did sell a lot of drugs and had a lot of
18 money.
19  Q  And it's -- you heard from Mr. Dibble at that
20 time that that 11 ounces was Mr. Castillo's life savings?
21  A  No.  I heard that from George.  George told me
22 when he got out of jail.  I asked him -- because I was
23 kind of worried about it.  I told him what I had seen
24 Mr. Dibble have of his drugs and I asked him how much it
25 was.

Page 87

1       And I just let George -- let Mr. Castillo know
2  that Mr. Dibble threatened to kill me if I told George
3  what Wayne had showed me.
4  Q  So Wayne, actually, of all the people that
5  you've actually seen go into the yard and get drugs, is
6  Wayne the only person you've actually ever seen do that?
7  A  I didn't see him because he shut the door in
8  the camper and I stayed in there and he just came back
9  with the drugs.  I don't know where he got it from in the
10 yard.
11  Q  Have you actually witnessed with your own eyes
12 Mr. Castillo ever going into the yard to get drugs and
13 coming --
14  A  No.
15  Q  Never?
16  A  No.
17  Q  But you have seen Mr. Dibble disappear into
18 the yard and come back with drugs?
19  A  Yeah.  And the same with George.  I've seen
20 him go outside and come back with drugs too.  Sometimes
21 he would walk away from the house even, like, maybe a
22 block, two blocks, who knows, you know, but . . .
23  Q  Okay.  Now, when you first were arrested by
24 the detectives, you indicated that you were willing to
25 speak with them about where Mr. Castillo keeps drugs in

Page 88

1  order to keep yourself out of jail; is that right?
2  A  Yeah.  I didn't want to go to jail that night.
3  I told them I thought I might be able to help them find
4  where the drugs were, and they brought me back to the
5  yard, which I was unable to help them find anything so it
6  was a waste of their time.
7  Q  So what did you do?  What did you do when you
8  were helping them trying to find drugs?
9  A  Mr. Castillo was in the house, and I walked
10 around the backyard and just looked around and showed
11 them the spots where I thought it might be.  And we
12 didn't recover nothing, so I got put in jail.
13  Q  So you --
14  A  I -- I was just trying to get out of jail that
15 night.
16  Q  And you've --
17  A  I was -- and I -- you know, had seen George
18 messing around outside by vehicles, so I just showed them
19 where I'd seen him messing around.  They didn't recover
20 nothing.  So they just told me I was wasting their time
21 and they took me back to jail.
22  Q  You indicated that you missed a court date in
23 Golden because you were in custody; is that right?
24  A  Uh-huh.
25  Q  What is this explanation about your house

Exhibit #1-of-8.    Page 3-of-6.

About George. He would hide his eight balls and ounces on him. He'd have a huge sack with eight balls and ounces.

Will stated, "I looked up immunity 6001 to 6003. I've got immunity, man. There's no reason for me to lie."

Q  who's "we"?

A  Me and George Castillo would get in his vehicle and drive to Vasquez Street. He would leave me in the car, walk away from the car and go to his dealer's house and come back approximately 10 to 15 minutes later, and he would have an ounce of cocaine, sometimes 2 ounces of cocaine, depending how much he purchased at the time.

Sharon/BATEMAN said CASTILLO sold crack, methamphetamine (meth), and cocaine. He sold in ounce quantities. He sold an ounce of crack for six hundred fifty ($650.00) dollars US currency, and ounce of cocaine for six hundred ($600.00) dollars, US currency, and she was unsure how much the meth was sold for. BATEMAN stated CASTILLO had four (4) to five (5) kilos at a time.

Q  What was the largest quantity of cocaine you saw Mr. Castillo, or George, make during that time?

A  A few kilos.

Q  When you say "a few kilos," about how many?

A  I think about three or four.

(Page 2, 161, 2, 115 - are 4-pages as Exhibits)

---

Statement 6

review paragraph 6-of Page 2-of Jonathan Willett interview with William Bateman of 11-17, 2004. also review paragraph 5- which is circle.

Statement-7.

review page 161 of Mr. Bateman testimony of my 9, 27-28-29, 2010 trial date, line 9- to 15 that are circle.

Statement-8.

review the Bureau of Alco Tobacco and Firearms Report of investigation. Report # 6, Page 2, with case # 785025-04-0051, Paragraph 5-that's circle.

Statement-9.

review Page 115 line 21 to 25 of Sharon Bateman testimony of 9, month 27-28 and 29 day of 2010 trial date.

Jonathan Willett
U.S. v. Jorge Castillo   Case 2004-1122
Interview with William Bateman
November 17, 2004
Page 2

*Exhibit # ___ of Castillo's Affidavit*
*Date _____   -page (12)*

• incident at FDC, in combination with his earlier statement that he would be "suicidal if it ever happened again", FDC management had placed him in a cell all by himself, completely naked except for a restraining jacket. WILL stated that he did not want to be on suicide watch anymore.

• WILL stated his sister, Sharon BATEMAN (hereinafter referred to as SHARON) had been romantically involved with George CASTILLO (hereinafter referred to as GEORGE) for three to four years.

• WILL stated he had stayed frequently with SHARON and GEORGE during the time that SHARON and GEORGE lived together at 1118 W. 41st Avenue in Denver, Colorado.

• WILL stated that when the police raided the house on 41st Avenue, he had two warrants out for his arrest and SHARON had five warrants out for her arrest. WILL stated that these outstanding warrants were why "the government put us in jail even though we didn't do nothing wrong. Man, this is day 61 in jail and I didn't do nothing wrong."

5. • WILL stated, "I looked up Immunity 6001 to 6003. I've got immunity, man. There's no reason for me to lie."

6. → • WILL stated, "Being a crack fiend, I totally hung out there [1118 W. 41st Avenue]. I'd clean for him [GEORGE], mowed his yard, watch the house, organize his wood 'cause he'd give me free drugs. He'd bitch us out, me and my sister, 'cause we'd kill a sack [of crack cocaine]. He would hide his eight balls and ounces on him. He'd have a huge sack with eight balls and ounces. My sister got so good at picking them off him while he was sleeping and we'd just get high."

**Attorney Work Product - Confidential**

*hideing Places of Drugs*

WILLIAM BATEMAN - Direct

1   go buy more ounces of cocaine.

2   Q   And did you ever accompany Mr. Castillo when he went to

3   reup?

4   A   Yes, I would.

5   Q   If you could describe to the Court what would take place at

6   that time.

7   A   We would get in his vehicle and drive out to Vasquez

8   Street.

9   Q   Who's "we"?

10  A   Me and George Castillo would get in his vehicle and drive

11  to Vasquez Street.  He would leave me in the car, walk away

12  from the car and go to his dealer's house and come back

13  approximately 10 to 15 minutes later, and he would have an

14  ounce of cocaine, sometimes 2 ounces of cocaine, depending how

15  much he purchased at the time.  Then we would go back to his

16  house and rock it up.

17  Q   When you say "go back to the house and rock it up," what do

18  you mean by, "rock it up"?

19  A   He would take a coffeepot and put the cocaine in there and

20  put baking soda and water and use a blue blow dryer that had a

21  flame on it and heat up the coffeepot and shake it around, and

22  it -- the water would kind of boil, and the cocaine would turn

23  into huge rocks.

24  Q   Did you personally observe Mr. Castillo doing this?

25  A   Yes.

Appellate Case: 11-1322   Document: 59-2   Date Filed: 02/01/2012   Page: 163

| ADDRESSED TO:<br>Special Agent in Charge<br>Phoenix Field Division | MONITORED INVESTIGATION INFORMATION:<br>Phoenix Field Division<br>FY-04<br>Report 006 |
|---|---|

TITLE OF INVESTIGATION:
CASTILLO, Jorge

| CASE NUMBER:<br>785025-04-0051 | REPORT NUMBER:<br>6 |
|---|---|

house, and a bullet ricocheted off a wall and entered the back of her neck at the bottom of her skull. She did not seek medical treatment. She says the bullet is still in her head.

3   BATEMAN stated CASTILLO carried the gun with him daily. He cleaned it with alcohol and a cloth to wipe his fingerprints off, while wearing gloves. She saw CASTILLO hide the gun under the mattress at night.

4.   BATEMAN said one of CASTILLO's drug customers came to their residence to buy crack with an AK-47 rifle. She recognized the gun because she said she knows guns. After that night, Castillo told BATEMAN he was going to get a gun for self-protection while he was selling his dope. That is when he traded drugs for the gun. He always carried his gun when he was dealing drugs from the house.

5.   BATEMAN said CASTILLO sold crack, methamphetamine (meth), and cocaine. He sold in ounce quantities. He sold an ounce of crack for six hundred fifty (650.00) dollars US currency, and an ounce of cocaine for six hundred ($600.00) dollars US currency, and she was unsure how much the meth was sold for. BATEMAN stated CASTILLO had four (4) to five (5) kilos at a time.

Attachments:
Copy of BATEMAN's fingerprints, photographs, and R-84
Copy of Removal of ATF Wanted Person from NCIC

1    A    I don't remember.

2    Q    Do you recall what Mr. Castillo would use the scale for?

3    A    To weigh out different weights, for different quantities,

4    different prices.

5    Q    And then you mentioned after he would weigh it out, what

6    would he do with it?

7    A    He would put it in a baggie and seal it.

8    Q    And after putting it in a baggie and sealing it, what was

9    the common practice of the drug trade at his residence?

10   A    Can you repeat your question.

11   Q    After he sealed it in different weights and different

12   packages, what would he do with it?  When I say "he," I mean

13   Jorge Castillo, the man you knew as Jorge Castillo.

14   A    He would hide it from me and sell it later on.  He would

15   package it all at one time and then hide it for sales later on

16   whenever somebody came.

17   Q    And are you familiar with why he would hide it from you?

18   A    Because I would take it.

19   Q    Why would you take it?

20   A    For my own personal use.

21   Q    What was the largest quantity of cocaine you saw

22   Mr. Castillo, or George, make during that time?

23   A    A few kilos.

24   Q    When you say "a few kilos," about how many?

25   A    I think about three or four.

Exhibit # 1 of 8.   Page 4 of 6.

SHARON stated that JORGE would cook into crack in the house. She stated he would Put a Kilo of cocaine in a coffeepot with some baking soda and water, then he would use a heat gun to heat the mixture, until it was glob.

Statement-10.

review Jeff Edelman Investigative Report: Interview with Sharon Bateman on 9-30, 2004 Page 3-Paragraph 2-that is Circle.

Q (By Mr. Willett). How much -- how much Crack would be yielded by the coffee Pot manufacturing technique?
A One or two ounces at one time.
Q of crack?
A of Crack.
Q Can you tell us if, based on your observations, what -- what is the largest single quantity of crack cocaine that you saw Jorge Castillo in possession of between the period of time, say, November of 2003 and June of 2004?
A Four to Five Kilos at one time.
Q Okay. Can --
A He had four or Five of them as they referred to them -- him and wayne. They were usually the ones that dealt with it. I was -- I just was there.
Q And can you estimate the month or the time when you -- you saw him with the Kilos of cocaine?
A About the month of June -- May, around May.
Q Okay. And did you show the various detectives, including Rojas, places around the property where you Knew drugs were buried?
A Yes, I did.
Q And how much -- how much drugs were buried there?
A Four to Five Kilos.
Q And when you went around with the detectives to Find the drugs, what did you Find?
A George had moved them.
Q So you didn't Find any drugs?
A No, I did not.
Q And did George -- you were there when the bust happened; was there time For anybody to move drugs?
A Not when they came, but he must have hid it within the Past

Statement-11.

Review the 11-30, 2004 Deposition of Ms. Bateman, Read Page 96, line 18 to 23, and page 25 line 2 to 6, and 9, and 13 to 16, and 20 to 22, and page 72 line 20 to 25, and Page 73 line 1 to 13, and Page 75, line 1 to 22.

( Page 3, 96, 25, 72, 73, 75 are 6-pages as Exhibits )

Appellate Case: 11-1322     Document: 39-2     Date Filed: 02/01/2012     Page: 166
Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 3

---

- SHARON stated her brother, William BATEMAN (hereinafter referred to as WILLIAM) would sometimes stay overnight at the house.  She stated that sometimes WILLIAM would sleep downstairs on a small mattress in the living room.  She stated that sometimes WILLIAM would sleep on the floor in the second room upstairs.  She stated that sometimes WILLIAM would sleep in the camper with DIBBLE.

- SHARON stated that JORGE would cook cocaine into crack in the house.  She stated he would put a kilo of cocaine in a coffeepot with some baking soda and water, then he would use a heat gun to heat the mixture, until it was glob.  She stated then they would let it cool and harden and break it up into little pieces.

- SHARON stated JORGE had four or five digital scales, some small and some large, which he used to weigh the drugs.

- SHARON stated that there was a school nearby but she did not know the name of it.

- SHARON stated that JORGE would strangle her.  She stated she believed that cooking the cocaine to crack affected JORGE's brain.  She stated sometimes WILLIAM would come over to stay at their house with her, because she was afraid of JORGE.

- SHARON stated she found out JORGE had a gun for the first time when he pointed it at her.  She stated, "It was a twenty-five caliber revolver.  I'm not sure where it came from."  She stated, "He pointed it at me, so I threw it away.  Well, I took the pin out, so it was useless, and he threw it away."

**Attorney Work Product - Confidential**



1      Q     And how did they do that?  How does that go
2  with the coffee pot?

3      A     With the heat gun?

4      Q     Yeah.  Describe it for me in detail how that
5  works.

6      A     Okay.  You take the coffee pot; you take the
7  cocaine and you pour it into the coffee pot.  You take
8  water and you pour it into the coffee pot.  You take
9  baking soda and you pour it into the coffee pot.  You
10 take the heat gun, you apply it underneath the coffee pot
11 and you apply heat until it turns into an oil spot.  Then
12 you throw ice and water on top and it hardens.

13     Q     Have you done that before, as well?

14     A     Yes, I have.

15           MR. WILLETT:  Just make sure I got everything.
16 Okay.  That's it.  No further questions.  Wait.  Maybe
17 one more.

18     Q     (By Mr. Willett)  How much -- how much crack
19 would be yielded by the coffee pot manufacturing
20 technique?

21     A     One or two ounces at one time.

22     Q     Of crack?

23     A     Of crack.

24     Q     Okay.  So how big is the coffee pot?

25     A     Just a regular-size coffee pot.

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014  (720) 449-0329 FAX (720) 449-0334

001148



1    A    Yes, I am.

2    Q    Can you tell us if, based on your

3    observations, what -- what is the largest single quantity

4    of crack cocaine that you saw Jorge Castillo in

5    possession of between the period of time, say, November

6    of 2003 and June of 2004?

7                   MR. WILLETT:  Objection.  Relevance.

8    Q    (By Mr. Till)  You may answer.

9    A    Four to five kilos at one time.

10   Q    And with regard to a kilo, can you tell us

11   what that means to you?  What is a kilo?

12   A    A kilo -- it was big.  I don't know.

13   Q    Okay.  Can --

14   A    He had four or five of them as they referred

15   to them -- him and Wayne.  They were usually the ones

16   that dealt with it.  I was -- I just was there.

17   Q    And where did you see him with these kilos of

18   cocaine?

19   A    In my house.

20   Q    And can you estimate the month or the time

21   when you -- you saw him with the kilos of cocaine?

22   A    About the month of June -- May, around May.

23   Q    Did you talk to him about the kilos of

24   cocaine?

25   A    Yeah.

```
 1    didn't think you would --

 2         A    No, I didn't.

 3         Q    Yeah.

 4         A    Okay.

 5         Q    And you asked him at that time if he could do

 6    anything about your warrant; is that right?

 7         A    Yes, I did.

 8         Q    And so you were trying to orchestrate some

 9    kind of deal for your cooperation?

10         A    Yes, I did.

11         Q    And he said he would help you?

12         A    No, I didn't get no help.  I . . .

13         Q    But you spoke thinking he was going to help

14    you; is that right?

15         A    No.  I spoke because I wanted to speak.

16         Q    Okay.  And at that time you indicated that you

17    would tell Detective Rojas where a gun was hidden in the

18    house and also where drugs were buried; is that right?

19         A    Yes.  And I did that on my own free will.

20         Q    Okay.  And did you show the various

21    detectives, including Rojas, places around the property

22    where you knew drugs were buried?

23         A    Yes, I did.

24         Q    And how much -- how much drugs were buried

25    there?
```

1 A Four to five kilos.

2 Q And when you went around with the detectives

3 to find the drugs, what did you find?

4 A George had moved them.

5 Q So you didn't find any drugs?

6 A No, I did not.

7 Q And did George -- you were there when the bust

8 happened; was there time for anybody to move drugs?

9 A Not when they came, but he must have hid it

10 within the past couple of days because he had buried it

11 there a couple of days --

12 Q How --

13 A -- prior to the raid.

14 Q Okay.  How long had you lived in that house?

15 A Since November.

16 Q And so that would be November of 2003?

17 A Uh-huh.

18 Q And that's a yes, ma'am?

19 A Yes.

20 Q Okay.  And is it true, ma'am, that you were

21 intimately involved with Mr. Castillo?

22 A Yes, it is.

23 Q So you had a sexual relationship with him?

24 A Yes, I did.

25 Q And you were boyfriend and girlfriend with



1        Q      And when you would steal drugs, how -- how
2    would you find them?  How would you know where the drugs
3    were?
4        A      I would watch George hide them.
5        Q      And what about Wayne Dibble?  What did he have
6    to do with any of this?
7        A      Wayne hid them too.
8        Q      And so you knew all the hiding places; is that
9    right?
10       A      No, I did not.  Wayne Dibble did.
11       Q      Okay.  So if you watched George hide them, did
12   you watch Wayne hide them too?
13       A      Yes, I did.
14       Q      So you knew a lot of the hiding places?
15       A      I knew a few.  Only the ones in the yard.
16       Q      And when you went to go show the police where
17   these four to five kilos of drugs were, they weren't
18   there; is that right?
19       A      No, they were not.
20       Q      And, in fact, there were no drugs in the house
21   when it was searched; is that correct?
22       A      No, there was not.
23       Q      Now, have you ever met this other lady at the
24   table here?
25       A      No, I have not.

001127

Exhibit #1 - of - 8. Page 6 - of - 6.

Q Hold on, without telling me what other people said -- or, I mean, I don't know you know that. How do you know what George said to wayne on the phone.

A Because I drove him back to George's house, 1118 and --

Q And wayne told you something?

A No. we went to the compex and he grabbed an ounce of cocaine out of there that George had told him where it was at. This was to help post George's bond, but instead we just sat there and got high, pretty much.

Q And so Mr. Dibble got the cocaine out of somewhere in the RV?

A The motor home, yeah.

Q And then --

A It was in the -- some -- one of the -- either the motor cover or something or in the door. Somewhere in the front cab of the motor home.

Q And without assuming anything, did you actually hear the -- Mr. Castillo speaking to Mr. Dibble on the phone?

A No. I just heard wayne say that he told me where it's at and let's go get it.

Q So wayne is telling you that?

A yeah. So we hopped in the car after Mr. Castillo called from jail and went to George's house again and found it.

statement 12.

Review Page 31 - in it Find Page 109 to 112, in Page 110, Read line 1 to 10 and 19 to 25, and in page 111 read line 3 to 11.

I, Ismael Arenas ask you to notice that Mr. Bateman statement #1 of this Exhibit #1, and statement 2 - 3 - 4 - and 12, Mr. Bateman is refering to one same event, which you can see in this 5 - statements Mr. Bateman contradictions and unprecedent storys. I affirm that this statements are fiction storys of Mr. Bateman under the fact that I was not a drug delear and I did not possessed any of the illegal items that Mr. Bateman is accussing me of.

( Page 31, is one page as Exhibit )

Page 109

1   you guys would smoke; is that fair to say?
2   A   No.  He wouldn't -- he wouldn't just keep
3   handing us crack and crack, you know.  He would tell us
4   you know, No more; and we'd have to deal with it.
5   Q   And that was hard --
6   A   Yeah.
7   Q   -- when there was no more?
8   A   When we was addicted.
9   Q   Okay.  Have you ever cooked up some crack in
10  the coffee pot?
11  A   Never.
12  Q   Has --
13  A   Because I -- I never had ounces.  If I ever
14  had a little bit of cocaine, I would cook it in a spoon.
15  Small amounts, like maybe $10 worth of cocaine or
16  something.
17  Q   Okay.  And have you seen Wayne Dibble do that?
18  A   Uh-huh.
19  Q   And that's a yes?
20  A   Yes.
21  Q   How many -- how many times have you seen that?
22  A   I witnessed Wayne Dibble cook up an ounce of
23  cocaine when George went to jail.  George gave him a
24  phone call and -- when he was in jail -- a collect phone
25  call -- and told Mr. Dibble to --

Page 110

1   Q   Hold on.  Without telling me what other people
2   said -- or, I mean, I don't know how you know that.  How
3   do you know what George said to Wayne on the phone?
4   A   Because I drove him back to George's house,
5   1118 and --
6   Q   And Wayne told you something?
7   A   No.  We went to the camper and he grabbed an
8   ounce of cocaine out of there that George had told him
9   where it was at.  This was to help post George's bond,
10  but instead we just sat there and got high, pretty much.
11  Q   And --
12  A   I went and picked George's van up.  It had
13  broke down off the side of the highway and -- with the
14  tow truck, brought it home, paid the tow truck driver,
15  and then Mr. Dibble gave me a little bit of cocaine for
16  doing that, because he was just sitting there playing
17  with the cocaine at the house while I left to go get the
18  van on the highway that was broke down.
19  Q   And so Mr. Dibble got the cocaine out of
20  somewhere in the RV?
21  A   The motor home, yeah.
22  Q   And then --
23  A   It was in the -- some -- one of the -- either
24  the motor cover or something or in the door.  Somewhere
25  in the front cab of the motor home.

Page 111

1   Q   Right.  And did you --
2   A   In the side where you sit to drive.
3   Q   And without assuming anything, did you
4   actually hear the -- Mr. Castillo speaking to Mr. Dibble
5   on the phone?
6   A   No.  I just heard Wayne say that He told me
7   where it's at and let's go get it.
8   Q   So Wayne is telling you that?
9   A   Yeah.  So we hopped in the car after
10  Mr. Castillo called from jail and went to George's house
11  again and found it.
12  Q   Now, you have never -- on the night that your
13  sister was allegedly shot, you didn't mend the wound for
14  her, did you?
15  A   No.  No.
16  Q   So if she's saying that, is she mistaken?
17  A   She's saying that I mended the wound?
18  A   Uh-huh.
19  A   No.  I didn't touch the wound.  I only -- the
20  day that, like I said, the day when I came back in the
21  afternoon -- about three o'clock in the afternoon --
22  that's the only time I touched her when she stood up and
23  almost fell.  But I didn't clean no wound or nothing.
24  Q   So where's she getting that from?
25  A   From being shot, she might be imagining it.

Page 112

1   I'm not sure.
2   Q   Has your -- does your -- in your past, has
3   your sister frequently imagined things that weren't true?
4   A   No.
5   Q   Never?
6   A   Just thinking that bugs were in her head after
7   she got shot and burning her hair, you know.
8   Q   Uh-huh.  And is it your -- do you know whether
9   that stuff about having bugs in her hair and burning her
10  hair, whether that has to do with being shot or consuming
11  so much crack?
12  A   It has to be with doing shot -- being shot.
13  Because she -- before she would smoke the same amount of
14  crack and never think that kind of stuff.  But once she
15  was shot, then she kind of lost a few brain cells, I
16  think, and went a little bit crazy.
17  But since she's not been smoking crack and
18  incarcerated, she's looking a lot better.  You know, her
19  hair's growing back, she's not burning it.  And hopefully
20  she's making better decisions on her part.
21  MR. WILLETT:  All right.  Let me just make
22  sure that's all the questions I have.  I think it is, but
23  hold on one sec.
24  (A discussion was held off the record between
25  Mr. Willett and Mr. Castillo.)

Exhibit # 2 - of 8 - Exhibits have
8 - Pages of Government Documents as
Exhibits, and 3 - Pages of hand
Writing Report by me Ismael, A. G.

Exhibit #2-of-8.       Page 1-of-3.

Q. (By Ms. Eskesen) Ms. Bateman, going back to your Provided testimony in this case, that's when you were in Custody. You actually Provided testimony under a grant of immunity; is that Correct?

A Yes, I did.

Q Do you understand what that grant of immunity meant?

A That even if I talk about me doing illegal things, I will not be Prosecuted for that.

Q And the reason that you gave the deposition was so that you Could get out of Custody?

A Yes, it is.

I, Ismael Arenas G. believe that Sharon and William Bateman where manipulated to falsely testify, me by the Government, under the fact affirm it above by Ms. Sharon and below.

After taking Sharon Bateman out of the house, she asked to speak to Reporting Detective and made the following statement. Sharon Bateman told Reporting Detective she would show detective where Jorge Castillo hid a Kilo of Cocaine if Reporting Detective Could help her with her warrant. Reporting Detective told Ms. Bateman that if she led detectives to the location of the drugs Reported Detective would assist Bateman with her warrant but Could't Promise anything.

page 133, 127, 2-are 3-pages as Exhibits

Statement 1.
Review Page 133 of Sharon Bateman Statement of the month 9-days 27-28 and 29, of 2010 Trial Date, Line 10-to-17.

statement 2.
Review Page 127 of Sharon Bateman Statement of the month 9-days 27-28 and 29, of 2010 Trial Date, Line 3-to 5.

statement 3.
Review the Det. Rojas Daniel #83026, statement Report, with Property Invoice #680248 and Case #200424372 undated and without signature of any-boby, See Paragraph #4 and #5-that are Circle in Page #2.

1   Q   Did you see him distribute those narcotics to others?

2   A   Yes, I did.

3   Q   And did you see Wayne Dibble with cash?

4   A   Yes, I did.

5   Q   Did you know if Wayne Dibble had a bank account?

6   A   I have no clue.

7           MS. ESKESEN:  May I have one moment, Your Honor?

8           THE COURT:  Counsel, you may.  Thank you.

9           (Pause in proceedings.)

10  Q   (By Ms. Eskesen) Ms. Bateman, going back to your provided

11  testimony in this case, that's when you were in custody.  You

12  actually provided testimony under a grant of immunity; is that

13  correct?

14  A   Yes, I did.

15  Q   Do you understand what that grant of immunity meant?

16  A   That even if I talk about me doing illegal things, I will

17  not be prosecuted for that.

18  Q   Okay.  And you have, in fact, not been prosecuted for any

19  of your activities in connection with 1118 West 41st Avenue?

20  A   No, I haven't.

21          MS. ESKESEN:  Nothing further, Your Honor.

22          THE COURT:  Very well.  Redirect examination by the

23  Government, Mr. Phillips?

24          MR. PHILLIPS:  Thank you, Your Honor.

25          THE COURT:  You're welcome.

 1 | material witness in connection with this case; is that right?

 2 | A   Yes, it is.

 3 | Q   And the reason that you gave the deposition was so that you

 4 | could get out of custody?

 5 | A   Yes, it is.

 6 | Q   When you gave that deposition, you had an attorney that was

 7 | representing you, correct?

 8 | A   Yes, I did.

 9 | Q   And so you had an opportunity to speak with that attorney

10 | and clarify any questions about the procedures; is that right?

11 | A   Yes, I did.

12 | Q   And going back to May 28th, '04, when you were at 1118

13 | West 41st Avenue, you were there after having moved out of

14 | that residence; is that right?

15 | A   Yes, it was.

16 | Q   You had moved out sometime within the month or two months

17 | before then; is that a good amount of time -- is that correct?

18 | A   Yes, it is.

19 | Q   The reason you moved out was because you and Mr. Castillo

20 | weren't getting along?

21 | A   Right.

22 | Q   You had been in a relationship with him for a few years,

23 | and things were not going as well as they were at the beginning

24 | of the relationship; is that a fair statement about it?

25 | A   Yes, it is.

more than a few seconds of conversation Dibble rode away in the direction of 1118 W. 41st Avenue and the two men departed the area toward the south. Later Reporting Detective observed a white female, later identified as **Sharon Bateman, date of birth 04-17-82**, drive up in a yellow compact car and park the car in the back yard. A white male (Sharon's brother), later identified as **William Bateman, date of birth 5-14-83** opened the back gate to let the yellow car into the yard.

## METRO/SWAT ENTRY:

On 05-28-04 at approximately 8:35 PM. Metro/SWAT arrived at 1118 W. 41st Avenue. Upon approach to the front door Sgt. Robert Organ reports he observed Jorge Castillo attempting to enter the front door and then saw officers approaching and moved quickly to the rear of a van parked nearby. Castillo was secured without incident. It was felt that Castillo had alerted others in the residence to the presence of the officers. A second party nearby (Dibble) was in the yard, saw the officers and tried to flee behind the truck/camper but was also secured. Officers continued to the front door and knocked and announced several times before the door was breached and entrance was made. Both Sharon and William Bateman were contacted in the house.

## OCCUPANTS IDENTIFIED AND CLEARANCE CHECKS DONE WITH NCIC/CCIC:

After conducting routine ID checks on all four parties the following information was obtained: Wayne Dibble was wanted by Denver County Sheriff for FTA, Dangerous drugs OCA #03CR0421 and was placed under arrest. William Bateman was wanted by Jefferson County for a Burglary warrant and Sharon Bateman was wanted by Denver on a Bench warrant for DUR, case #04M02471. **Jorge Castillo was identified as a corrections client with the Probation Department for a 2003 drug conviction. Castillo has a second prior drug arrest in Colorado but case disposition is unclear.**

After taking Sharon Bateman out of the house, she asked to speak to Reporting Detective and made the following statement. Sharon Bateman told Reporting Detective she would show detectives where Jorge Castillo hid a kilo quantity of cocaine if Reporting Detective could help her with her warrant. Reporting Detective told Ms. Bateman that if she led detectives to the location of the drugs Reporting Detective would assist Bateman with her warrant but couldn't promise anything. Reporting Detective asked Bateman if there were any drugs or guns in the house. Bateman stated that Jorge was in possession of a bag of crack cocaine just minutes before police arrival and should still have the drugs on him. Bateman answered that Jorge was not keeping any drugs in the house but instead he was hiding it in the yard and burying the larger quantity across the street under bushes. Reporting Detective asked "What about guns." **Ms. Bateman stated that Jorge kept a gun under the bed in his bedroom upstairs.** Ms. Bateman admits that Jorge and Ms. Bateman share the bed when she stays at 1118 W. 41st Ave. but that she had not been at home much lately because of fights she had with Jorge. Ms. Bateman also informed that her brother (William Bateman) did not live at 1118 W. 41st but was only visiting. Reporting Detective pointed out to Ms. Bateman that the house had two bedrooms and asked if her brother or anyone else occupied the other bedroom. Ms. Bateman answered that the room was used for storage and was not occupied by anyone. Only she and Jorge stay in the house. Ms. Bateman admits that her brother does stay overnight occasionally but sleeps in the van out in the yard and Wayne stays in the camper also outside in the yard.

After arrest of William Bateman he asked to speak to Reporting Detective and made the following statement: William Bateman asked for help with his warrant so he could get out of going to jail and in return he would tell Reporting Detective where Jorge hid the drugs. Reporting Detective informed William Bateman that his warrant was a very difficult issue but Reporting Detective would do best to help him. William Bateman took Reporting Detective around the yard at 1118 W. 41st Ave. and pointed out several locations where he stated he observed Jorge hide bags of drugs in the recent past. No drugs were found. **Bateman related that Jorge did not trust anyone and was very good at hiding his drugs.** He stated that Jorge was in possession of a bag of crack cocaine just minutes before Police arrival.

Exhibit #2-of-8.    Page 2-of-3. statement 4.

After arrest of William Bateman he asked to speak to Reporting Detective and made the following statement: William Bateman asked for help with his warrant so he could get out of going to Jail and in return he would tell Reporting Detective where Jorge hid the drugs. Reporting Detective informed william Bateman that his warrant was a very difficult issue but Reportive Detective would do best to help him.

Review the Det. Rojas, Daniel #8306, Statement Report with Property Invoice #680246 and case #200424377, undated and without signature of any-body, See Paragraph #5 that is Circle. Page #2.

statement 5.

Q You provided information so that you could get some help with your own situation?
A Yes, I did, but I didn't give them any useful information.

Review Page 129, Line 20 to 22 that is Circle, statement of Sharon Bateman on my Trial of the 9-month, days 27-28 and 29 of 2010.

statement 6.

Q After the police came and kind of took control of the house, did you assist officers at all in recovering any type of evidence?
A I tried to tell them where some was, but there wasn't any there.
Q When you say "tell them," was there a specific detective you told?
A I think it was the lady outside. I don't really remember. Someone outside.

Review Page 122, Line 14-to-22 that is Circle, statement of Sharon Bateman on my Trial of the 9-month, days 27-28 and 29 of 2010.

I, Ismael Arenas ask you to compare statement #6 with statement #3 of Page 1. Which show you that Ms. Bateman in trial, deny that she spoke to officer Bonnie and Det. Rojas in this regard. all this 7 statements as well shows that the Batemans disregard my innocents and care only about their situation.

(Page 2, 129, 122 are 3-pages as Exhibits)

direction of 1118 W. 41st Avenue and the two men departed the area toward the south later Reporting Detective observed a white female, later identified as **Sharon Bateman**, date of birth 04-17-82, drive up in a yellow compact car and park the car in the back yard. A white male (Sharon's brother), later identified as **William Bateman**, date of birth 5-14-83 opened the back gate to let the yellow car into the yard.

## METRO/SWAT ENTRY:

On 05-28-04 at approximately 8:35 PM. Metro/SWAT arrived at 1118 W. 41st Avenue. Upon approach to the front door Sgt. Robert Organ reports he observed Jorge Castillo attempting to enter the front door and then saw officers approaching and moved quickly to the rear of a van parked nearby. Castillo was secured without incident. It was felt that Castillo had alerted others in the residence to the presence of the officers. A second party nearby (Dibble) was in the yard, saw the officers and tried to flee behind the truck/camper but was also secured. Officers continued to the front door and knocked and announced several times before the door was breached and entrance was made. Both Sharon and William Bateman were contacted in the house. *Det. pojas here he claims that 2 parties were contacted in the house and on his summies report he claims that*

## OCCUPANTS IDENTIFIED AND CLEARANCE CHECKS DONE WITH NCIC/CCIC:

After conducting routine ID checks on all four parties the following information was obtained: Wayne Dibble was wanted by Denver County Sheriff for FTA, Dangerous drugs OCA #03CR0421 and was placed under arrest. William Bateman was wanted by Jefferson County for a Burglary warrant and Sharon Bateman was wanted by Denver on a Bench warrant for DUR, case #04M02471. **Jorge Castillo was identified as a corrections client with the Probation Department for a 2003 drug conviction. Castillo has a second prior drug arrest in Colorado but case disposition is unclear.**

After taking Sharon Bateman out of the house, she asked to speak to Reporting Detective and made the following statement. Sharon Bateman told Reporting Detective she would show detectives where Jorge Castillo hid a kilo quantity of cocaine if Reporting Detective could help her with her warrant. Reporting Detective told Ms. Bateman that if she led detectives to the location of the drugs Reporting Detective would assist Bateman with her warrant but couldn't promise anything. Reporting Detective asked Bateman if there were any drugs or guns in the house. Bateman stated that Jorge was in possession of a bag of crack cocaine just minutes before police arrival and should still have the drugs on him. Reporting Detective asked how much crack was there in the bag? Ms. Bateman answered it was a lot, possibly as much as an ounce. Ms. Bateman stated that Jorge was not keeping any drugs in the house but instead was hiding it in the yard and burying the larger quantity across the street under bushes. Reporting Detective asked "What about guns." **Ms. Bateman stated that Jorge kept a gun under the bed in his bedroom upstairs.** Ms. Bateman admits that Jorge and Ms. Bateman share the bed when she stays at 1118 W. 41st Ave. but that she had not been at home much lately because of fights she had with Jorge. Ms. Bateman also informed that her brother (William Bateman) did not live at 1118 W. 41st but was only visiting. Reporting Detective pointed out to Ms. Bateman that the house had two bedrooms and asked if her brother or anyone else occupied the other bedroom. Ms. Bateman answered that the room was used for storage and was not occupied by anyone and that only she and Jorge stay in the house. Ms. Bateman admits that her brother does stay overnight occasionally but sleeps in the van out in the yard and Wayne stays in the camper also outside in the yard. Ms. Bateman led Reporting Detective to several different areas in the back yard and across the street under the bushes, where she stated Jorge had buried up to a Kilo of cocaine. Ms. Bateman relates that Jorge will take a shovel and go out in the night and dig a deep hole to hide the drugs in and then covers the hole up and spreads some leaves and branches or a rock over the spot so you can't tell it is there. Nothing was found though it was apparent that someone had recently dug the dirt up at the locations pointed out by Ms. Bateman.

After arrest of William Bateman he asked to speak to Reporting Detective and made the following statement. William Bateman asked for help with his warrant so he could get out of going to jail and in return he would tell Reporting Detective where Jorge hid some of the drugs. Reporting Detective informed William Bateman that his warrant was a very difficult issue but Reporting Detective would do best to help him if he could lead Reporting Detective to the location or locations where drugs are now stored. William Bateman agreed and took Reporting

*all parties were contacted outside in the yard.*

*paragraph-5*

Appellate Case: 17-1322    Document: 39-2    Date Filed: 02/02/2018    Page: 13

SHARON BATEMAN - Cross

1    A    Right.

2    Q    And you were scared?

3    A    Yeah.

4    Q    Scared for yourself?

5    A    Myself, my brother, George, everyone.

6    Q    Scared for your brother as well.  And once the officers

7    came and took you into custody, you used that as an opportunity

8    to ask the officers to help you out; is that correct?

9    A    Yes, I did.

10   Q    That you, in fact, had warrants, and you were wanted on

11   those warrants; is that right?

12   A    Yes, I was.

13   Q    And you were trying to get some help with those warrants?

14   A    Yes, I was.

15   Q    And you knew that providing information to the officers

16   would help you with those warrants?

17   A    Yes, I did.

18   Q    And that's, in fact, what you did?

19   A    Yes, I did.

20   Q    You provided information so that you could get some help

21   with your own situation?

22   A    Yes, I did, but I didn't give them any useful information.

23   Q    And, in fact, the information you gave them about drugs

24   being on the property, there were none?  When I say, "the

25   property," I'm referring to outside property, outside the

SHARON BATEMAN - Direct

| | | |
|---|---|---|
| 1 | A | I was downstairs smoking crack. |
| 2 | Q | Where did you get that crack that you were smoking? |
| 3 | A | From Jorge. |
| 4 | Q | Were you smoking that crack with anyone else? |
| 5 | A | My brother. |
| 6 | Q | What was your brother's name again? |
| 7 | A | William Bateman. |
| 8 | Q | When the police came, what did you do? |
| 9 | A | I jumped up, and they went to the door so fast I got thrown |
| 10 | | on the floor downstairs. |
| 11 | Q | And did you observe your brother do anything that you |
| 12 | | recall? |
| 13 | A | I don't really recall. |
| 14 | Q | After the police came and kind of took control of the |
| 15 | | house, did you assist officers at all in recovering any type of |
| 16 | | evidence? |
| 17 | A | I tried to tell them where some was, but there wasn't any |
| 18 | | there. |
| 19 | Q | When you say "tell them," was there a specific detective |
| 20 | | you told? |
| 21 | A | I think it was the lady outside. I don't really remember. |
| 22 | | Someone outside. |
| 23 | Q | During this time, you mention that Mr. Jorge Castillo would |
| 24 | | hide his drugs because you would smoke them if you found them? |
| 25 | A | Right. |

EXhibit #2-oF-8. Page 3-oF-3.

I then walked Bateman outside towards my car to transport her to Jail. At that time she said she wanted to talk to Detective Rojas outside oF the house.
Detective Rojas Came outside to speak to Bateman. Bateman related that Jorge (referring to Jorge Castillo 10-28-63) had Crack on him right beFore the police arrived. Bateman related Jorge had larger amounts of Crack that he buries deep in the ground.

Q And they were still living together?
A Yeah.
Q And was it - is it Fair to say that at one point in time they were in love?
A Were what?
Q Were in love?
A Yeah in the beginning, yeah.
Q And that relationship, I guess, went on the skids?
A Is that a good way of saying that?
A I don't know the deFinition of that-- that expression. Okay. There relationship started to fall on hard times?
A yeah, Fall apart?   Q yeah.   A yeah. with that?. A yes.
Q And was there a lot of anger associated with that?
A And is it Fair to say that your sister is anger with Mr. Castillo now?
A All, I can stay on that is today she said she cried when she seen him.
That's all she told me. So I don't know.
Q Okay. And are you aware whether or not Mr. Castillo would encourage your sister to try and stop doing Crack?   Q To stop?. A Uh huh.
A yeah. He encouraged us both to.   Q to stop?. A Uh huh.
Q And I guess that was a yes?. A yes. He encouraged us both to.
Q And is one of the reasons why their relationship may be Fell apart,
based upon what you observed, is because he wanted her to stop
doing crack and she would not?.   A I'm not sure why the
relationship Fell apart.   I, Ismael, Arenas, aFFirm that my reason of
Sharon and I separation, was because I asked her to stop indoing what she was
doing wrong and illegal, and after I asked her for so many times the same
thing   I Pack all her property that she had in the house and Put
it out side of the house, she was gone For days
when she came back I asked her to go away.

statement 7.
Review Denver 2004 Police Department statement Report oF officer DiGiacomo, Bonnie # 98028, 1-Page Report, read the # 1-Circle paragraphs.

statement 8.
Review page 29, in it Find Page 101 to 104, in page 101 read Line 3 to 25, and of Page 102 read Line 1 to 11.

Page

Denver Police Department
# STATEMENT

| NAME (LAST, FIRST, MIDDLE INITIAL): DiGiacomo, Bonnie 98028 | | MAKING STATEMENT IS: ☒ OFFICER ☐ WITNESS ☐ PERSON ADVISED |
|---|---|---|

| RESIDENCE STREET ADDRESS | CITY | COUNTY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

| RESIDENCE PHONE | BUSINESS PHONE | SOCIAL SECURITY NO. | DATE OF BIRTH/SERIAL NO. |
|---|---|---|---|
| | | | |

| BUSINESS STREET ADDRESS 1331 CHEROKEE STREET | CITY DENVER | COUNTY DENVER | STATE CO | ZIP CODE 80204 |
|---|---|---|---|---|

| OFFICER TAKING STATEMENT | SERIAL NO. | DATE | TIME |
|---|---|---|---|
| | | | |

| CONCERNING AN INCIDENT AT 1118 W 41 Ave | LOCATION WHERE STATEMENT TAKEN 1331 CHEROKEE STREET |
|---|---|

On May 28th, 2004, while working as Z82, I covered the 90's (Narcotic) Team on the execution of a search warrant. I waited until Metro cleared the house then entered. I went into the living room and contacted a white female, later identified as Sharon Bateman (04-17-82). I stayed in the living room until it was determined that Bateman had warrants. I then walked Bateman outside towards my car to transport her to jail. At that time she said she wanted to talk to Detective Rojas outside of the house.

**#1**

Detective Rojas came outside to speak to Bateman. Bateman related that Jorge (referring to Jorge Castillo 10-28-63) had crack on him right before the police arrived. Bateman related Jorge had larger amounts of crack that he buries deep in the ground. She did not know exactly where but said it was either in the back yard or in the bushes across the street. Rojas asked Bateman if Jorge had a gun. Bateman said that Jorge kept his gun under the bed in his bedroom. I then transported Bateman to jail on her warrants.

**#2**

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

06-03-04
Date

1700
Time Statement Completed

Signature of person making statement    98028

Page 101

```
 1     Q    And they were still living together?
 2     A    Yeah.
 3     Q    And was it -- is it fair to say that at one
 4  point in time they were in love?
 5     A    Were what?
 6     Q    Were in love?
 7     A    Yeah.  At the beginning, yeah.
 8     Q    And that relationship, I guess, went on the
 9  skids?  Is that a good way of saying that?
10     A    I don't know the definition of that --
11     Q    That expression.  Okay.  The relationship
12  started to fall on hard times?
13     A    Yeah, fall apart?
14     Q    Yeah.
15     A    Yeah.
16     Q    And was there a lot of anger associated with
17  that?
18     A    Yes.
19     Q    And is it fair to say that your sister is
20  angry with Mr. Castillo now?
21     A    All I can stay on that is today she said she
22  cried when she seen him.  That's all she told me.  So I
23  don't know.
24     Q    Okay.  And are you aware whether or not
25  Mr. Castillo would encourage your sister to try and stop
```

Page 102

```
 1  doing crack?
 2     A    Yeah.  He encouraged us both to.
 3     Q    To stop?
 4     A    Uh-huh.
 5     Q    And I guess that was a yes?
 6     A    Yes.  He encouraged us both to.
 7     Q    And is one of the reasons why their
 8  relationship maybe fell apart, based upon what you
 9  observed, is because he wanted her to stop doing crack
10  and she would not?
11     A    I'm not sure why the relationship fell apart,
12  other than they both had other people they were seeing.
13     Q    All right.  Would she get angry when she
14  wouldn't have crack?  You said she was grumpy when she
15  was straight?
16     A    Uh-huh.
17     Q    So -- so that's a yes?
18     A    Yes.
19     Q    Sorry, I have to --
20     A    Yes.  She was grumpy when she was straight.
21     Q    Okay.  Thank you.  And so if she didn't get
22  the drugs that she needed to be happy, would she be angry
23  with anyone in particular?
24     A    No.  I think it was just that after being shot
25  she went through a lot of pain daily just from, you know,
```

Page 103

```
 1  just from being hurt.
 2     Q    And did she ever see a doctor?
 3     A    Never.
 4     Q    Why not?
 5     A    She never told me why.  The only reason I
 6  concluded was I -- it could be true and it could be
 7  false, but I think maybe he may have made a threat to her
 8  that if she went to the police or told anyone that he
 9  might harm her again, which -- that's why I think it took
10  her a month before she told me that she was shot.
11     Q    Okay.  And with regard to that threat comment,
12  is that speculation on your part?
13     A    Sure.
14     Q    Okay.  You don't --
15     A    I don't know if it's true or not.  That's just
16  what I think --
17     Q    Okay.
18     A    -- just from observing everything from every
19  day.
20     Q    Okay.  And -- but she was able to go to Mexico
21  to visit Al?  What was --
22     A    Alberto?
23     Q    Yeah.
24     A    Yeah.  That was before she got shot.
25     Q    Okay.  And was she -- she was able to get out
```

Page 104

```
 1  of the house to do other things; is that right?
 2     A    Sometimes.
 3     Q    And she was able to see other men while she
 4  was still living there, wasn't she?
 5     A    Yeah.  And that's where the argument came in
 6  between her and him.  He would have lots of girl clients
 7  that he would be talking to and it would make him or --
 8  it would make her mad at him, and then she'd be seeing
 9  other men so he would be mad at her.
10     Q    So is it fair to say that their intimate
11  relationship ended badly?  Is that a fair statement?
12     A    Yeah.
13     Q    I want to talk to you a little bit about when
14  the arrest was made by the SWAT team.  Did -- you
15  indicated you were in the house at the time?
16     A    Yeah.
17     Q    And did the police knock on the door before
18  they came in?
19     A    They -- from what I heard from upstairs, they
20  yelled, Open the door, open the door, which I was already
21  upstairs trying to discard my bag of marijuana.  It was
22  maybe a gram or two; it was very small.
23     I heard them just yelling, Open the door.  And
24  luckily my sister didn't, because if she would have went
25  anywhere near the door -- when they kicked it open, it
```

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

EXhibit # 3 - oF 8 - Exhibits have
6 - Pages oF Government Documents as
EXhibits, and 3 - pages oFhand
writing Report by me Ismael, A.G.

(Page 18, 154, 165 are 3-pages as Exhibits)

Exhibit #3-of-8.          Page 1-of-3.

And right when I got released, friends and family was offering me drugs and I refused all the drugs, because in my heart I'd rather say no to drugs and be free on the streets. And that's what road I took.

Q  Okay. But at some point in time you became addicted to crack; is that right?

A  Yes, sir.

Q  And that was later?

A  About three years later.

Q  And how did that happen?

A  I tried it -- I tried it once and liked it. So every maybe week or two weeks when I had a little money, I'd waste my money on it and -- You know.

Q  And when was that in relation to when you met Mr. Castillo?

A  It was right -- once I met Mr. Castillo was when I first got introduced to it.

Q  And who introduced you to it? Your sister?

A  No.

Q  Who?

A  Mr. Castillo. He sold it to us.

Q  When you first met Mr. Castillo in the, I guess, mid-summer to fall area of 2003, were you smoking at that time?

A  Yes.

Q  How much crack were you smoking at that time?

A  As much as I could get ahold of, whatever I could get ahold of. Usually between maybe $80 to $150 a day.

A  Oh, yeah. I'm sure it was crack because even before Mr. Castillo came around I smoked crack before he came around. I was a heavy drug user, and I knew what it was.

Ismael Arenas aske you to notice in this page 1- how Mr. Bateman claims that the dint use to do drugs after he met me, that I was the one that introduced him to drugs, that I sold it to them, but before friends and family use to offered to him for free and he didn't whant them, and he also claims being a heavy drug user from way before me. met me.

statement 1.
Review paragraphs of Page 18 in it find Page 57 and 58 of Mr. William Bateman Deposition of 11-30-2004, Read Line 7 to 25, and Page 58 Line 1 and 2, and line 13 to 25. All the lines that are able to read are circled.

statement 2.
Review Page 154 of Mr. William Bateman statement on my trial date 9-month of 2010 Days- 27-28 and 29 Read line 14 to 19 that are circled.

statement 3.
Review Page 165 of Mr. William Bateman statement on my trial date 9-month of 2010 Days- 27-28 and 29. Read line 2 to 4 that are circled.

Page 57

1　　　　Because I -- when I -- when they said they was
2　going to -- I spent 86 days in custody in Jefferson
3　County and they released me on a -- I think it was a
4　$50,000 PR bond, they told me that -- a week after I got
5　released I was going to take a urinalysis to determine
6　whether I get five years' DOC or five years' probation.
7　　　　And right when I got released, friends and
8　family was offering me drugs and I refused all the drugs,
9　because in my heart I'd rather say no to drugs and be
10　free on the streets. And that's what road I took.
11　　Q.  Okay. But at some point in time you became
12　addicted to crack; is that right?
13　　A.  Yes, sir.
14　　Q.  And that was later?
15　　A.  About three years later.
16　　Q.  And how did that happen?
17　　A.  I tried it -- I tried it once and liked it.
18　So every maybe week or two weeks when I had a little
19　money, I'd waste my money on it and -- you know.
20　　Q.  And when was that in relation to when you met
21　Mr. Castillo?
22　　A.  It was right -- once I met Mr. Castillo was
23　when I first got introduced to it.
24　　Q.  And who introduced you to it? Your sister?
25　　A.  No.

Page 58

1　　Q.  Who?
2　　A.  Mr. Castillo. He sold it to us.
3　　Q.  Okay. So -- so what you're saying is -- is
4　that -- was your sister using crack at that time?
5　　A.  Yeah, I think she was.
6　　Q.  Okay. And -- and you essentially went to
7　Mr. Castillo. How did you meet him?
8　　A.  He came to our house.
9　　Q.  Okay. And he brought some crack there for you
10　to smoke?
11　　A.  No. He just brought some there. I was asking
12　him for a ride. I was going to go to Denver and try and
13　find some --
14　　Q.  Right.
15　　A.  -- and he happened to -- it was the week after
16　we -- he had came with speed to my grandma's house and we
17　told him that we didn't do that. So he said that a week
18　later he'd come back and that's when I had $20. And when
19　I was asking him for a ride somehow it came out in the
20　conversation that he had crack. So I just told him to
21　come in the house, bring his crack and let me try a
22　little bit, which he did. And then I bought some from
23　him.
24　　Q.  Okay. So it's your -- your decision to try
25　the crack; is that right?

Page 59

1　　A.  Uh-huh.
2　　Q.  Okay. And I guess I'm a little unclear on
3　something else. You indicated in your direct testimony
4　that Mr. Castillo was -- was a nice guy who would try and
5　get you to not do drugs. Can -- can you explain that
6　discrepancy for me?
7　　A.  The reason he didn't want me to do drugs, he
8　stated to me was if I didn't do drugs, then he thought
9　that I would be more reliable to help him sell and not be
10　tempted to use the drugs and waste the profit.
11　　Q.  And so he wasn't being the nice guy according
12　to what you just said; is that right, or was he? Which
13　is it?
14　　A.  Yeah. He was being a nice guy for saying no
15　to me to get me off it, which he helped me get off it.
16　　Q.  Okay. Now, where were -- how old are you?
17　　A.  Twenty-one.
18　　Q.  And where were you raised?
19　　A.  I spent about six months of my life when I was
20　about ten years old in Post Falls, Idaho, with my mother.
21　And then the rest of my life I spent here in Colorado
22　with my grandmother in Thornton, Colorado.
23　　Q.  Okay. So your mom and dad don't live here?
24　　A.  My dad's deceased --
25　　Q.  Okay.

Page 60

1　　A.  -- and my mom lives in Idaho.
2　　Q.  And how many sisters do you have?
3　　A.  Three.
4　　Q.  And where do they live?
5　　A.  One lives in Cheyenne, Wyoming; and one lives
6　in Aurora, Colorado; and the other one is incarcerated
7　with me right now. So she lives in Clear Creek County
8　Detention Facility.
9　　Q.  Okay. And what are the names of your other
10　sisters, not Sharon?
11　　A.  Linda and Cindy.
12　　Q.  Bateman?
13　　A.  Yes.
14　　Q.  Okay. How -- how do you -- have you -- what
15　did you do in preparation for today's deposition?
16　　A.  Nothing. Just -- I've been looking forward to
17　it because I've been incarcerated as a material witness.
18　And the last two -- the one on October 18th was canceled,
19　the deposition for that date was canceled; and then the
20　one for November 5th was canceled, so --
21　　Q.  Yeah.
22　　A.  -- I've just been looking forward to get this
23　out of the way.
24　　Q.  So have you met with anyone to talk about this
25　case before today?

1 | to make money.

2 | Q   Now, you mention when you first met him he had meth, but

3 | you said you didn't do meth?

4 | A   Yes, sir.

5 | Q   Did you do other drugs?

6 | A   I've done meth before.  I just don't like the high.  I've

7 | done heroin before a bunch.  That, I got suicidal on.  I've

8 | done marijuana, alcohol, and mushrooms.  I've never shot up

9 | drugs in my life.  All I would ever do is smoke them or snort

10 | them.

11 | Q   Do you have a drug of choice that is your favorite drug?

12 | A   Crack.  I used to like.  That used to be my favorite drug

13 | of choice.

14 | Q   When you first met Mr. Castillo in the, I guess, mid-summer

15 | to fall area of 2003, were you smoking crack at that time?

16 | A   Yes.

17 | Q   How much crack were you smoking at that time?

18 | A   As much as I could get ahold of, whatever I could get ahold

19 | of.  Usually between maybe $80 to $150 a day.

20 | Q   How much crack will $80 to $150 a day buy?  How much would

21 | $80 to $100 of crack buy back in 2003?

22 | A   An 8-ball.  3.5 grams.

23 | Q   Are you familiar with the high or the effects that crack

24 | cocaine has on your body?

25 | A   Yeah.

WILLIAM BATEMAN - Direct

1  and other people was, in fact, crack cocaine?

2  A   Oh, yeah.  I'm sure it was crack because even before

3  Mr. Castillo came around I smoked crack before he came around.

4  I was a heavy drug user, and I knew what it was.

5          *MR. PHILLIPS:*  If I may have one moment, Your Honor.

6          *THE COURT:*  You may.  Thank you.

7          (Pause in proceedings.)

8  Q   (By Mr. Phillips) I want to talk to you briefly about the

9  day that the police came and raided the residence at 1118 West

10 41st Avenue.  I believe you referred to it when the SWAT came

11 in?

12 A   Uh-huh, yes, sir.

13 Q   Do you recall that day?

14 A   Yeah.

15 Q   It was it May 28th, 2004?

16 A   I'm not sure of the date.  They arrested us all.  They

17 kicked the door in and arrested us all and raided the house.

18 They tore the house apart and took a large sum of money off

19 Mr. Castillo.

20 Q   Did you observe them taking money?

21 A   Yeah.

22 Q   On that date, had you smoked crack that day?

23 A   All day.

24 Q   About how much crack had you smoked that day?

25 A   Probably two 8-balls because it was already late in the

Exhibit # 3-of-8.        page 2-of-3.        statement 4.

Q what was your relationship with George prior to moving in with him and Sharon?

A How I first met him was he came to my grandma's house. Our relationship was just starting out. He first came to my grandma's house, and he had a friend with him, and I met him, and we sat out front of my grandma's house and talked. He had told me that he had meth, which I explained to him that me and my sister don't do meth. I told him to come back with some coke or something. He had a half ounce of meth, and I helped him sell that. He sold that to some of my friends.

He got approximately $600 to $700 cash for that, and for that, in return, he bought me some crack through one of my dealers.

Q How about with regard to methamphetamine? did Mr. Castillo actually show you the speed or just tell you about it?

A He just told me about it. I had seen little amounts of it.

Q In the house?

A Yeah, when—when I first met Mr. Castillo he came to my grandma's house and he was showing my sister and me some speed that he had. And my sister told him that me and her didn't do speed, and that if he wanted to make her happy, he would come back with some cocaine. And about a week later he did come back with cocaine, and I bought some from him—some crack.

Q From Mr. Castillo?

A Yes. Just a 20—nothing big.

Review Page 153 of Mr. William Bateman statement on my trial Date 9-month of 2010 Days-27-28-and 29. Read line 7-to-16 that are circled and line 21-to-23 that are circled.

statement 5.

Review page 14 in it find page 42- in regard Mr. William Bateman deposition of 11-30-2004 in page 42, read line 6- to 14.

(Page 153, 14-are 2-pages as Exhibits)

WILLIAM BATEMAN - Direct

1   Q   Let me take you back before moving into the residence at

2   1118 West 41st Avenue.  You mentioned you knew George before

3   that?

4   A   Uh-huh.

5   Q   Is that a yes?

6   A   Yes, sir.

7   Q   What was your relationship with George prior to moving in

8   with him and Sharon?

9   A   How I first met him was he came to my grandma's house.  Our

10   relationship was just starting out.  He first came to my

11   grandma's house, and he had a friend with him, and I met him,

12   and we sat out front of my grandma's house and talked.  He had

13   told me that he had meth, which I explained to him that me and

14   my sister don't do meth.  I told him to come back with some

15   coke or something.  He had a half ounce of meth, and I helped

16   him sell that.  He sold that to some of my friends.  The first

17   person was Roger Cadell (phonetic).  He bought most of the half

18   ounce.

19        The person that bought the remaining amount of

20   methamphetamines was a girl I knew by the name of Brittany.

21   She bought the last 8-ball.  He got approximately $600 to $700

22   cash for that, and for that, in return, he bought me some crack

23   through one of my dealers.  After that, later on that night, he

24   went through another dealer my sister knew and spent the rest

25   of that money to get crack so he could start selling his crack

*Mr. Bateman said when he first met George*

Page 41

1    A    Yes, sir.
2    Q    Have you ever used methamphetamine?
3    A    Once. But I almost died from it.
4    Q    You say George Castillo showed you some heroin
5  in the kitchen?
6    A    Uh-huh.
7    Q    What did it look like? Was it black-tar
8  heroin or . . .
9    A    Yes. It was black-tar heroin.
10    Q    Okay.
11        MR. WILLETT: Objection to leading the
12  witness.
13        THE WITNESS: It was -- yeah.
14    Q    (By Mr. Till) What does black-tar heroin look
15  like?
16    A    It looks like a black, dark red color. It's
17  kind of -- if -- what I know about it from my own
18  personal use from, you know, if you let it go -- if you
19  leave it out in the car and the windows are up and it's
20  90 degrees, it will turn to liquid and you'll ruin your
21  whole supply. So it melts very easily.
22        It's just like methamphetamine, too, if you
23  leave that in the sun or something, like, in a car with
24  the windows up, it will melt and you'll lose everything
25    Q    How about with regard to methamphetamine? Did

Page 42

1  Mr. Castillo actually show you the speed or just tell you
2  about it?
3    A    He just told me about it. I had seen little
4  amounts of it.
5    Q    In the house?
6    A    Yeah. When -- when I first met Mr. Castillo
7  he came to my grandma's house and he was showing my
8  sister and me some speed that he had. And my sister told
9  him that me and her didn't do speed; and that if he
10  wanted to make her happy, he would come back with some
11  cocaine. And about a week later he did come back with
12  cocaine, and I bought some from him -- some crack.
13    Q    From Mr. Castillo?
14    A    Yes. Just a 20 -- nothing big.
15    Q    Skipping down a little bit on that page, it
16  says before the arrest of George Castillo, he had a
17  certain quantity of drugs on him.
18        How do you know -- or first of all: Did you
19  say this? Did you tell the detective that before his
20  arrest on May 28th George had about 2 ounces of heroin
21  and that kind of thing? It's about four paragraphs up
22  from the bottom of the page -- of page 2 of Exhibit 29.
23    A    Okay. I see it.
24    Q    And the first three words are, "Before arrest
25  George."

Page 43

1    A    Yeah, I see it. I told them that he had
2  heroin. Yeah. I ain't exactly sure just by about --
3  exactly how many ounces it could have been. Or it could
4  have been less than an ounce, you know, but I told him I
5  had seen heroin with Mr. Castillo.
6    Q    Okay. And with regard to the pieces of
7  heroin, can you describe them in terms of their size?
8  Were they dime-size? Quarter-size?
9    A    They was like about that big (indicated).
10  It's like --
11    Q    A little bit bigger than a quarter? A half-
12  dollar?
13    A    Like the size of a 50 -- like a half-dollar
14  bill or whatever.
15    Q    Okay. And that would have been a piece of
16  heroin that size?
17    A    Uh-huh. In a plastic baggy.
18    Q    Did you ever see any weapons -- any firearms
19  at 1118 West 41st?
20    A    No, sir. The only weapon that I heard about
21  there was when --
22        MR. WILLETT: Objection. Hearsay.
23        THE WITNESS: -- Mr. Castillo was in jail.
24  Mr. Dibble stated that he had George's gun. He never
25  showed it to me, but he told me that he had found it and

Page 44

1  he had it.
2    Q    (By Mr. Till) Were you aware of any incident
3  where your sister was injured with a firearm?
4    A    Yes, sir.
5    Q    Can you tell us about that.
6    A    I got a -- I was sitting in my grandmother's
7  house in Thornton, Colorado -- it was about twelve
8  o'clock midnight -- and I got a call from my sister and
9  she stated to me that she was afraid for her life. She
10  was locked in the house, and she was afraid that George
11  was going to hurt her. And she was on her cell phone.
12        And I talked to her for about five minutes.
13  She worried me just for her to give me a call like that.
14  And then about five minutes into the phone call,
15  Mr. Castillo came in the room. So what I'm assuming from
16  being on the phone was that she was upstairs and he was
17  downstairs.
18        He came upstairs and told her to get off the
19  phone. After telling her to get off the phone, he
20  grabbed the cell phone out of her hand not realizing that
21  it wasn't hung up. And for about two minutes I heard
22  them screaming back and forth at each other.
23        And then I heard a gunshot and right before
24  the gunshot my sister was screaming at the top of her
25  lungs. I couldn't clearly hear what she was saying. But

Exhibit # 3-OF 8.          Page 3-OF-3.          Statement 6.

Q I want to take you when you Started living-- you mention you assisted Mr. Castillo in selling the meth he had?
A uh-huh. I brought him the Customers, people I Knew that would buy that stuff.
Q In exchange For that, you received Crack Cocaine?
A yeah. Money to buy it.

Reviw Page 155 OF Mr. william Bate- man Statement on my my Trial date 9-month OF 2010 Days-27-28-and 29. Read line 1 to 6- that are Circled.

I, Ismael Arenas whant you to notice statemen 4 and 5 of Page 2-OF this Exhibit # 3, how Mr. Bateman Falsely affirms 3-times the same event that never existed in my life and how he Contradicted himself in his estate-ment, 4-5-and 6. trying to talk about his Fiction story in regard this Fiction event, as you can notice in statemen 4, he Said that he told me to come back with coke or something; then in statemen 5- he said that his Sister told me that if I want to make her happy to come back with some Cocaine; and statement 6- he said that I gavi him money to buy it, and statemen 4-he said that in return I bought him some Crack through one of his dealers; and in statement 5-he said that I came back A week later with Cocaine and he bought same From me. all this statement's 4-5-and 6 he is refering about the same False event.

(Page 155- one-page as Exhibits)

WILLIAM BATEMAN - Direct

```
 1    Q   I want to take you when you started living -- you mention
 2    you assisted Mr. Castillo in selling the meth he had?
 3    A   Uh-huh.  I brought him the customers, people I knew that
 4    would buy that stuff.
 5    Q   In exchange for that, you received crack cocaine?
 6    A   Yeah.  Money to buy it.  He gave me a ride to where I could
 7    buy it because he didn't have it at that time.
 8    Q   I want to take you to November 2003.  Is that about when
 9    you started to live at the house, or when did you start living
10    at the house at 1118 West 41st Avenue?
11    A   Probably a month after they got it.  It took about a month,
12    but once they got settled, I moved in there.  All three, me,
13    Sharon, and George all slept in the bedroom upstairs with the
14    door that shut.  Sharon and George slept on one side of the
15    room, and I slept on the other side of the room.
16    Q   So fair to say that was late 2003, or early 2004?
17    A   Yeah.
18    Q   When you were staying at 1118 West 41st Avenue with
19    Mr. Castillo, Sharon Bateman, your sister, and a man named
20    Wayne Dibble, did you have a job?
21    A   No, sir.
22    Q   Did Sharon have a job you're aware of?
23    A   No, she didn't.  The only thing she did do is part-time she
24    did work at a hairstyling place.
25    Q   How often did she work there, to your knowledge?
```

Exhibit# 4-oF 8 - Exhibits have
2 - Pages oF Government Documents
as Exhibits, and 1-page oF hand
writing Report by me Ismael, A.G.

(page 24, 125 are 2 pages as Exhibits)

EXHIBIT # 4 - OF - 8.        page 1 - OF - 1. Statement 1.

Q Okay. But I'm wondering, in here -- in all this -- all this statements you've made, you have not attributed your sister as the source for any information that you've provided. Is she the source of some of the information?
A The source -- she's the one that gave me the information of how she got shot and where.
Q Right.
A She gave me the information that they took the money to the bank and exchanged it.
Q And how -- did she tell you how she knew that?
A She went with him.
Q Okay. And did she tell you when that was?
A The day they got raided.

→ Review page 24 - in it Fin Page 81 - to 84, in Page 84 - read line 9 - to - 22. This lines are circle, this statements are in regard William Bateman Deposition of 11-30, 2004.

Statement 2.

Q Would he ever do anything, in particular, with that money? I guess, did you ever accompany him anywhere with the money?
A We went out to eat and stuff. Like, I didn't go anywhere to go purchase drugs with him.
Q Do you know where he kept his money?
A No. He wouldn't let me know that 'either.
Q Did you ever accompany him to any banks or anything of that nature?
A Not that I recall.

→ Review Page 125 of Sharon, Bateman Statement on the 9 month of 2010 Days 27-28-29, Read line 12 to 20 are circled.

(I, Ismael A. remember tha Mr. Bateman during my trial on the 9 month and days 27-28 and 29 of 2010 stated the same false statement about me taking money to banks to be exchange.)

I, Ismael Arenas aske that you see the contradiction of Statement 1 and 2, where Mr. William Falsely affirms that Sharon inform him that her and I took money to th banks to be exchange, and when Ms. Bateman was aske in 4 different ways she said, not that I recall, as you see that dosen't make sense Mr. william claim that her and I went to the Bank to exchange money on 5-28-2004 when being a remarkable day for her to recall. And as well I, Ismael Arenas affirm that on 5-28-04 the Batemans weren't at 1118 W 51 Ave. at no time during that day int'll about 5-minutes before the Metro/SWAT arrived in othere words, that day the Metro/Swat came to the house right after the Batemans arrived, like 5 minutes after the Batemans.

Page 81

1  it, it was already shaved off, so she was just burning
2  her scalp more than anything.
3      Q   And she was actually taking a lighter to her
4  own head?
5      A   Yeah.
6      Q   All right. And how shortly after this alleged
7  shooting incident had you been in the house?
8      A   That day, because I left at 3:30, 4:00 in the
9  morning. And then I came back at 3:00 in the afternoon.
10     Q   Did you see any blood anywhere?
11     A   The upstairs wall looked like somebody took
12  red spray paint and kind of spray-painted on the wall.
13     Q   So was it -- was it spray paint?
14     A   I don't know. I --
15     Q   Okay.
16     A   It was kind of spotted red. I don't know.
17     Q   Has your sister ever told you that George
18  actually shot her in a car? Did she ever mention that to
19  you?
20     A   No.
21     Q   And you --
22     A   She never said that he shot her in the car.
23  She said in the house.
24     Q   And when's the most -- when did you most
25  recently speak with her?

Page 82

1      A   Today.
2      Q   Today you spoke with her?
3      A   Uh-huh.
4      Q   Did you talk to her about this incident?
5      A   No.
6      Q   Okay.
7      A   We -- I already --
8      Q   Just said hi?
9      A   No. We -- I was more worried about her
10  because she had a heart attack. I was just talking to
11  her seeing how she was doing when I talked with.
12     Q   When did she have a heart attack?
13     A   When she was in a halfway house. She stopped
14  breathing for five minutes and they had to call an
15  ambulance for her and a fire truck and take her to the
16  hospital.
17     Q   Okay. And have you ever ascertained what
18  caused that?
19     A   No, sir. She's -- she don't know either. She
20  just stopped breathing and had a heart attack when she
21  went to bed in the halfway house.
22     Q   Okay. Your -- your sister had a child when
23  she was very young; is that correct?
24     A   Yeah. At the age of 14, I think.
25     Q   Do you know how that came about? Were you

Page 83

1  friendly with her at the time?
2      A   Yeah. She had a baby boy. And she got
3  pregnant by someone named Alberto.
4      Q   Oh, is that Mr. Trini?
5      A   No.
6      Q   No. Who's -- who's Alberto? Do you know his
7  last name?
8      A   Chivero (phonetic).
9      Q   Okay. And -- and what was the nature -- what
10  was that relationship like? Did he use drugs with her?
11     A   No. He abused her and ended up going to jail.
12  And then they gave him a PR bond and he fleed to Mexico
13  after he beat her up.
14     Q   Okay. And is that the person that she went to
15  go visit last year?
16     A   In Mexico?
17     Q   Yes.
18     A   Yeah. With their house out there.
19     Q   So she's still friendly with this guy that
20  abused her?
21     A   Not now. She was friendly with him. She went
22  and visited the house and then she came back here and
23  that's when she came back with her -- or followed --
24  she -- came back out three weeks after her and that's
25  when he abused her. He beat her up and ended up going to

Page 84

1  jail. They gave him a PR bond and then he ran on it.
2      Q   Okay. Mr. Bateman, can you -- you've given a
3  lot of information here. Can you discriminate between
4  what's information that you saw yourself and what's
5  information you got from your sister?
6      A   Any -- anything I seen I can tell you I seen.
7  And anything that was told to me, I can tell you it was
8  told to me, if you have questions about it.
9      Q   Okay. But I'm wondering, in here -- in all
10  this -- all these statements you've made, you have not
11  attributed your sister as the source for any information
12  that you've provided. Is she the source of some of the
13  information?
14     A   The source -- she's the one that gave me the
15  information of how she got shot and where.
16     Q   Right.
17     A   She gave me the information that they took the
18  money to the bank and exchanged it.
19     Q   And how -- did she tell you how she knew that?
20     A   She went with him.
21     Q   Okay. And did she tell you when that was?
22     A   The day they got raided.
23     Q   Okay. And so how much money was she talking
24  about?
25     A   Maybe two grand, she said.

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

Bank Money Contradictions

1   Q   (By Mr. Phillips) You mentioned earlier in your testimony

2   that you saw Wayne Dibble sell crack cocaine from that

3   location; is that correct?

4   A   Yes, I did.

5   Q   Did you ever see what Wayne did with the money after his

6   sales?

7   A   Give it to George.

8   Q   And did you ever accompany George during the time of

9   November 2003 through May of 2004 -- did you ever see

10   Mr. Castillo with large amounts of money?

11   A   Yes, I did.

12   Q   Would he ever do anything, in particular, with that money?

13   I guess, did you ever accompany him anywhere with the money?

14   A   We went out to eat and stuff.  Like, I didn't go anywhere

15   to go purchase drugs with him.

16   Q   Do you know where he kept his money?

17   A   No.  He wouldn't let me know that either.

18   Q   Did you ever accompany him to any banks or anything of that

19   nature?

20   A   Not that I recall.

21           MR. PHILLIPS:  Nothing further.  Thank you, Your

22   Honor.

23           THE COURT:  Very well.

24           MS. ESKESEN:  May I have one moment, Your Honor?

25           THE COURT:  You may.  Thank you, Counsel.

*Bank money Contradictions* (handwritten annotation)

Exhibit # 5 - of - 8 - Exhibits have
29 - pages of Government Documents
as Exhibits, and 11 - Pages of
hand writing Report by me Ismael, A. G.

(page 78, 22 are 2-pages as Exhibits)

# Exhibit # 5 - OF - 8.

## page 1 - OF - 11. statemen 1.

Q So essentially what you understand is: you
testify, you won't be prosecuted for anything
arising from living in this house and whatever went
on there?

A uh - huh.

Q is that a yes, also? I'm sorry--

A yes. I'm sorry.

Q And at the time that the arrest was made,
which bed was made? which bed was ready
for sleeping?

A Both of them, I think. I don't remember. I did not use the
bed.

Q Why not?

A Because I didn't need to sleep.

Q And was there--did--what was--who used the small bedroom?

A Nobody. It was a storage area.

Q And who slept downstairs?

A Somtimes George would.

statement 2.

Review page 78
OF 11-30, 2004
Sharon Bateman
Deposition. Read
line 1-to-6, and
line 12-to-22 -
which are circled.

Review page 22
in it find page 73-
to 76 in regard Mr.
william Bateman
Deposition OF 11-
30, 2004, Read of
Page 73, line 5 and
16, and 13-to 18,
page 74, line 19-to
25, and page 75,
line 1-to 5.

Q And-- okay. Talk to me a little bit about--
the layout of the house.

Q And--and where would Mr. Castillo sleep?

A Towards the time period when the house got raided,
he'd usually sleep on the bed in the living room
downstairs by the heater.

Q Right. So at the time of the raid your sister slep
upstairs, isn't that 'right?

A yes, ser, it's true also that during--over the course
Q And--and it's true also that during--over the course
of the past year at--all the time you've spent at the
house on 41st Avenue, you've never seen any guns there,
is that right?

A No, sir.

Q And the only time you've heard--you'v heard some discussion about
guns and that came mostly From Mr. Dibble?

A yes, sir.

78

```
 1      Q    So essentially what you understand is:  you
 2  testify, you won't be prosecuted for anything arising
 3  from living in this house and whatever went on there?
 4      A    Uh-huh.
 5      Q    Is that a yes, also?  I'm sorry --
 6      A    Yes.  I'm sorry.
 7      Q    -- I'm sorry to have to keep having you do
 8  that.  It's just better for the record.
 9           Okay.  So there are two bedrooms upstairs in
10  this house?
11      A    Yes, there is.
12      Q    And at the time that the arrest was made,
13  which bed was made?  Which bed was ready for sleeping?
14      A    Both of them, I think.  I don't remember.  I
15  did not use the bed.
16      Q    Why not?
17      A    Because I didn't need to sleep.
18      Q    And was there -- did -- what was -- who used
19  the small bedroom?
20      A    Nobody.  It was a storage area.
21      Q    And who slept downstairs?
22      A    Sometimes George would.
23      Q    And who used the big bedroom?
24      A    Me and George.
25      Q    Now, when you moved in with George, you were
```

001130

Page 73

1  in bed, and all the business would go to Wayne Dibble in
2  the camper, because Wayne would have a certain amount,
3  you know, I don't know how much, but he'd have enough to
4  supply the people that came over through the night.
5      Q   And -- okay.  Talk to me a little bit about
6  the layout of the house.
7      A   Okay.
8      Q   There -- there -- are there a couple of
9  bedrooms upstairs?
10     A   No.  There's just two.
11     Q   And there's, like a living area downstairs?
12     A   Living room with the heater right there.
13     Q   And -- and where would Mr. Castillo sleep?
14     A   Towards the time period when the house got
15  raided, he'd usually sleep on the bed in the living room
16  downstairs by the heater.
17     Q   Okay.  And who would sleep upstairs?
18     A   My sister, usually.
19     Q   Okay.  And your sister indicated at one point
20  that you and she -- or she actually -- let me re --
21  rephrase that -- that she is acquainted with guns through
22  your grandfather; is that correct?
23     A   Yeah.  She may -- he taught us how to shoot BB
24  guns in the backyard when we was little kids.
25     Q   Right.

Page 74

1      A   We used to shoot at cardboard boxes.  He would
2  teach us how to aim and stuff.
3      Q   Okay.  So do you like guns?
4      A   I like them, but I'm not allowed to possess
5  them because I'm convicted of a felony.
6      Q   Right.
7      A   So I just stay away from them.
8      Q   Okay.  And you're not allowed to smoke crack
9  either; is that right?
10     A   Yeah.  I don't want to.  I don't choose to
11  now.  It's ruined my life; my sister's life; and
12  Mr. Castillo's life, not because he smoked but because he
13  sold it, got us all in this mess because we all was there
14  when it got raided.
15     Q   So at the time of the raid -- oh, I'm sorry.
16  I spoke over you.
17     A   I was saying we was all at his house when it
18  got raided, and we're all paying for it now.
19     Q   Right.  So at the time of the raid your sister
20  slept upstairs; isn't that right?
21     A   Yes, sir.
22     Q   And -- and it's true also that during -- over
23  the course of the past year at -- all the times you've
24  spent at the house on 41st Avenue, you've never seen any
25  guns there; is that right?

Page 75

1      A   No, sir.
2      Q   And the only time you've heard -- you've heard
3  some discussion about guns and that came mostly from
4  Mr. Dibble?
5      A   Yes, sir.
6      Q   Tell me a little bit about this time when --
7  well, actually let me ask you this preliminary question:
8  When you are smoking a large amount of crack, what's it
9  do to your mind?
10     A   It -- it makes me horny.  I'm sorry.  But I
11  just like to call the girls that I know that are, like,
12  21 years old and hang out with them, and, you know, maybe
13  a lap dance from them or something.  But it just
14  stimulates me kind of like it does other men like the
15  drug Viagra or something or maybe the drug ecstasy.  It's
16  kind of like that to me.  You know, just makes me
17  horny --
18     Q   Okay.
19     A   -- that's the only reason I mess with it.
20     Q   And how about your ability to -- I mean,
21  doesn't it distort your perception of things?
22     A   No.  I -- I could --
23     Q   No?
24     A   -- drive a car at a hundred miles an hour and
25  not wreck it.

Page 76

1      Q   Right.  You indicated that, that you like to
2  drive while you're high on crack; is that right?
3      A   I don't like to.  I just have to sometimes.
4      Q   But, yeah, so you -- so in order to drive
5  safely, in your view, sometimes you need a hit of crack;
6  is that right?
7      A   Yeah, if I've been up for days.  Right --
8  right in the time period when his house got raided, I had
9  been up for a few days and it was the first time I was
10  driving on the highway where I almost actually fell
11  asleep.  So that's why I decided to get off the drugs,
12  because I'd never felt like that before, where I -- I was
13  actually almost dozing off driving down I-25 going south.
14  So --
15     Q   Okay.
16     A   -- it was pretty weird.
17     Q   So this time when your sister -- when your
18  sister -- did your sister tell you that she had been shot
19  in the neck?  How did you figure that out?
20     A   Because I kept questioning her about it, what
21  happened that night.  And she -- for the first two or
22  three weeks she refused to tell me what happened.
23     Q   Right.
24     A   And, then, finally about three to four weeks
25  after she had been shot, she finally told me what had

Exhibit # 5 - OF, 8.        Page 2 - of, 11. statement 3.

Q On this particular night, May 28th, 2004, did you
assist officers in locating the handgun you seen Mr.
Castillo trade For Crack cocaine?
A yes, I did
Q what did you do in order to assist with that?
A I just told them there's a weapon underneath
the bed upstairs.

Review page 123
of 9,27,28,29, 2010
Sharon Bateman
trial days, Read
line 7- to 13.
statement 4.

A It would have violated my probation. And
that's the only reason I ran upstairs.
A -- it just scared me. So I went upstairs away from
them instead of running towards them.
Q And so, yeah -- I guess -- maybe I'll ask that question
again: why didn't you flush your drugs down the toilet?
A I never thought of it.
Q So there was enough time for you to think of it; is
that right?
A There was enough. yeah, there was, but I
didn't think of it --
Q okay.

Review Page 27, in it
Find Page 94, read line
4 and 5 that are circle,
they are in regard
william Bateman de-
Position of 11-30, 2040,
and Page 30-in it Find
Page 106, Read line
5 - to -17. Also Review
Page #2 of Det. Rojas state-
ment signed by Rojas.
It was
statement 5.

A -- Which I wasn't worried about marijuana anyways
nothing serious.
WILL stated that he was afraid to tell the Alcohol,
Tabacco, and Firearms agent and the Denver nar-
cotics policeman the truth about how many guns
GEORGE had, but now that WILL had immunity he
would tell the truth about GEORGE'S guns. WILL
stated GEORGE had Five or six different handguns.
WILL stated, Sometimes he (GEORGE) would brag and show them
off to me." WILL stated that he knows about guns, because his
grandfather was in world war II and had numerous
guns, WILL stated that his grandmother's house has
bullet holes all over it because he has shot off guns
inside her house so many times.
WILL stated that SHARON does not know about guns. He stated, "She never really
messed with them." WILL also stated that SHARON never possessed a gun.
He stated, "GEORGE would always have guns, one or two at a time, but
he'd keep changing them." WILL stated that WAYNE and GEORGE kept the
guns in the motor home.

Review Page 8 - of
Jonathan willett Inter-
view with william -
Bateman of 11-17,
2004, paragraph #
1 - and 3 - and 4 -
that are circled.
this Report is
identify with Case
# as u.s./Jorge
Castillo - Case 2004 -
1112.

(Page 123, 27, 3, 8 - are 4-Pages as Exhibits.)

1   Q  Did you ever have opportunity to see him hide drugs?

2   A  Yeah, I did.

3   Q  Where would he hide them?

4   A  In the ground.

5   Q  If you happened to see him hide them, what would you do?

6   A  I would take them.

7   Q  On this particular night, May 28th, 2004, did you assist

8  officers in locating the handgun you had seen Mr. Castillo

9  trade for crack cocaine?

10   A  Yes, I did.

11   Q  What did you do in order to assist with that?

12   A  I just told them there's a weapon underneath the bed

13  upstairs.

14   Q  During your time at this residence from November 2003 up

15  through April 2004 and even going into May 2004, did you sell

16  cocaine at this residence?

17   A  Yeah.

18   Q  Sometimes?

19   A  Yeah.  Sometimes.

20   Q  How often?

21   A  Whenever Jorge or Wayne wasn't around and I had a little

22  bit to make a little bit of cash, I would sell it.

23   Q  And how often would you see Jorge sell crack cocaine?

24   A  Daily.

25   Q  I want to talk briefly about your history.  You have a

Page 93

```
 1      A   -- just for the change of settings and being
 2   away from my cat that was at grandma's house. And I just
 3   went home where I felt safe with my grandma.
 4      Q   Mr. Bateman, how do -- do you know that there
 5   was a gun found in the house?
 6      A   Yes, sir.
 7      Q   How do you know that?
 8      A   That night when we were -- me; my sister,
 9   Sharon Bateman; and George Castillo was all three sitting
10   on the bed that was downstairs in the living room. Wayne
11   Dibble was sitting on a white lawn chair because he got
12   thrown in a pile of bricks and he was beat up pretty bad.
13   And he said he -- I don't know why they set him there,
14   but they let him sit in front of me, Sharon, and George.
15      And I heard the SWAT team come downstairs and
16   I think it was Detective Rojas, too, and they stated that
17   they found a gun upstairs. And they asked my sister
18   whose gun it was, and she told them that it was George's.
19      Q   How do we know it wasn't Wayne's? How do we
20   know that?
21      A   I don't know. It's -- Wayne could have put it
22   in George's house. That could be the case. You know, I
23   honestly don't know.
24      I -- I -- I stated to Detective Rojas the only
25   reason I went upstairs was to ditch the little joint of
```

Page 94

```
 1   marijuana that I had to get it off my person, to throw it
 2   upstairs --
 3      Q   And that was --
 4      A   It would have violated my probation. And
 5   that's the only reason I ran upstairs. If I would have
 6   known there was a gun up there I would have rather been
 7   caught with weed than running near a gun that could have
 8   got me in trouble.
 9      Q   Right. Was -- I was going to ask: Was
10   that -- you ditched the marijuana in the same room the
11   gun was found in, right?
12      A   Exactly. I had no clue that it was up there.
13      Q   And okay. And speaking of guns, is it true
14   that you have fired off guns inside your grandma's house
15   before?
16      A   Sure.
17      Q   Okay. And is it also true that you think
18   Mexican guys can be really crazy?
19      A   Not all of them. Some of them are nice.
20      I stole two car stereos from the guy that was
21   Oscar Perez Garcia or Chucky, the guy that was the
22   Mexican Mafia --
23      Q   Yeah.
24      A   -- that Detective Daniel Rojas busted. And he
25   held me in the bathtub with a gun to my head and was
```

Page 95

```
 1   ready to shoot me. And I don't know why he didn't. So I
 2   don't really judge Mexicans; I just don't mess with them.
 3      Q   Okay. And is it also true that you were
 4   regularly smoking crack in your grandma's house?
 5      A   No. I'd go outside and not regularly either.
 6   Just -- once my grandma and dad died -- when my dad first
 7   passed away about a year ago, that's the only thing I did
 8   to deal with losing my father.
 9      Jefferson County, they gave me a $50,000 PR
10   bond because my dad was in the hospital dying. Three
11   days after I had been out on the PR bond -- right after I
12   got out of jail, I went to the hospital and seen my dad.
13   Three days later he passed away, and I got an insurance
14   policy settlement, and I wasted most of it on drugs just
15   for the stress that I was going through.
16      Q   Okay.
17      A   And he's been gone for a while now, and I
18   don't find that way of relieving my stress no more. It's
19   just -- it's ruined my life more than anything, wasted
20   money --
21      Q   Sure.
22      A   -- and I got better things to do with my life
23   than get high now.
24      Q   So is your grandma still alive?
25      A   Yeah. She's old and she should be -- you
```

Page 96

```
 1   know, not living that much longer. That's why I'd like
 2   to be home with her. She's 73 years old. Her house is
 3   pretty dirty now since I've been gone 103 days. I was
 4   living there, keeping it clean, fixing her meals and
 5   stuff, driving her to the grocery store, driving her to
 6   her church to get food. She gets the food bank. I'd
 7   drive her there sometimes.
 8      She really needs help. She's -- her kids are
 9   going to put her in a nursing home if she don't get some
10   help soon. And so I'd like to get home just to help her
11   and to clean up my house and straighten up my life. I --
12   you know, it's just a mess.
13      Q   You've previously indicated that you think
14   there might be a head in a plastic bag in the Castillo
15   house.
16      A   Maybe.
17      Q   What -- what is all that about?
18      A   I was higher than a motherfucker. I got to
19   say that. But I looked down a hole in the bathroom and
20   it's like there's a black pipe sticking up, and then
21   there's a little hole next to it. And I shined a really
22   bright flashlight down there, and I thought I seen a
23   plastic bag down there that kind of looked like a head.
24   And also on the kitch -- or the bathroom
25   floor, it looked like there was a print of a police badge
```

# STATEMENT

Paragraph (1)

Upon arrival of the SWAT officers (at 1118 W. 41st Ave.) he (Bateman) ran upstairs to George's bedroom because he had a bag of marijuana on him and he then tossed that marijuana down. The officers found that same bag. (The marijuana was a big concern of his because he (Bateman) is on Probation and he would have been violated if found with marijuana.

Paragraph (2)

He (Bateman) has never seen any guns in the house and did not know there was a gun under the mattress. He has never seen any guns in George's house or cars. End of statement.

In officer Jeffers, Brian T Statement Says that he located a baggy that Contained a Small amount OF Suspected marijuana behind the dresser on the north wall. upstairs Room.

I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.

_____/_____/_____
Date

Time Statement Completed

Signature of person making statement

*Exhibit Date* ~~F Castillo's affidavit~~ *- Page. (15)*

Appellate Case: 11-1322   Document: 39   Date Filed: 02/01/2012   Page: 208

him. All his [GEORGE's] money was invested in that eleven ounces. He kicked WAYNE out for a while."

*(1) Paragraph*

• WILL stated that he was afraid to tell the Alcohol, Tobacco, and Firearms agent and the Denver narcotics policeman the truth about how many guns GEORGE had, but now that WILL had immunity he would tell the truth about GEORGE's guns. WILL stated GEORGE had five or six different handguns. WILL stated, "Sometimes he [GEORGE] would brag and show them off to me."

*(2) Paragraph*

• WILL stated that one night he went downstairs to the kitchen and he found GEORGE practicing pulling a gun from his pocket and pointing it at the exterior door in the kitchen. WILL stated that this frightened him. WILL stated, "That night I had to sleep by him. I crawled behind the couch because I was afraid of him."

*(3) Paragraph*

• WILL stated that he knows about guns, because his grandfather was in World War II and had numerous guns. WILL stated that his grandmother's house has bullet holes all over it because he has shot off guns inside her house so many times.

*(4) Paragraph*

• WILL stated that SHARON does not know about guns. He stated, "She never really messed with them." WILL also stated that SHARON never possessed a gun. He stated, "GEORGE would always have guns, one or two at a time, but he'd keep changing them." WILL stated that WAYNE and GEORGE kept the guns in the motor home.

*(5)*

• WILL stated, "He [GEORGE] had a chainsaw he'd keep right by the door the SWAT team kicked in." (see Figure 2) WILL stated, "One day it looked

**Attorney Work Product - Confidential**

(page 4, 2, 177 — are 3 - pages as Exhibits)

Exhibit # 5 - of, 8.        Page 3 - of - 11.        statement 6.

SHARON stated that her grandfather had been a hunter, so she had learned about guns from him. She stated, "He had rifles and thirty-aught-sixes and handguns."

Upon arrival of the SWAT officers (at 1118 W. 41st Ave.) he (Bateman) ran upstairs to Georg's bedroom because he had a bag of marijuana on him and he then tossed that marijuana down. The officers found that same bag. The marijuana was a big concern of his because he (Bateman) is on probation and he would have been violated if found with marijuana. He (Bateman) has never seen any guns in the house and did not know there was a gun under the mattress. He has never seen any guns in George's house or cars. End of statement.

I, Ismael Arenas hope that you will notice how Det. Rojas testify in the statement 7 - above, defending Mr. Bateman, Mr. Rojas is being a witness for Mr. Bateman without him, Mr. Rojas knowing the true fact of Mr. Bateman event, of that particular time that Mr. Bateman raning up-stairs on 5-28-2004; unless that Mr. Rojas had sanded the Bateman's to set me up with the gun, which I also — believe that this can be the case too, because I know the following fact and I affirm that the Bateman's weren't at 1118 41 st Ave. at no time that Date: 5-28, 2004, the Bateman's came to the house for the first time on that specific day about 5-minute before the metro/SWAT arrived at 1118 W. 41st Avenue. I also don't believe that the officers found — the — illegal items listed in the return and inventory report, unless the Bateman's bring those items into the house in agreement with Det. Rojas, or an their own; And notice that the Bateman's where the only one's that were in the house when officers arrived, Also no photographs where taken - inside of the house" by the officers at no time — inside of the house" of the illegal items listed in the return and inventory report.

Q. And then you ran upstairs to go pitch drugs you had on you; is that correct?
A. yeah, It was less than a gram of marijuana.

Review Page 4 of Jeff Edelman U.S./castillo - case 2004-112. Investigative Report: Interview with Sharon Bateman, Read paragraph # 1

statement 7.
Review page 2 of Denver Police Depart-ment, Statement of Det. Daniel Rojas, undated Document, Read paragraph # 1 - and 2. Rojas state-ment.

Review page 177 statement of Mr. William Batement in trial date 9, 27-28 and 29 of 2010, Read line 6 - to 8 that are circled.↑

statement 8.

Appellate Case: 11-1322    Document: 39-2    Date Filed: 02/01/2012    Page: 210

*Paragraph #1*

- SHARON stated that her grandfather had been a hunter, so she had learned about guns from him. She stated, "He had rifles and thirty-aught-sixes and handguns."

- SHARON stated JORGE obtained his second gun from Shawn (LNU) and Adam (LNU), who gave the gun to JORGE in exchange for an eightball. She stated the gun was a "thirty-two revolver". She stated, "I tried to steal it but never really handled it."

- SHARON stated JORGE was paranoid and slept with a gun for protection. She stated sometimes JORGE would stick the gun between the mattress and the box springs. She stated sometimes JORGE would sleep in the living room.

- SHARON stated that sometime before April 17th, JORGE shot her with the first gun, "the twenty-five caliber revolver". She stated, "I took an ounce of crack from him and he wanted it back. I was talking on the phone to WILLIAM and threw the phone and jumped in the car. I took the car. I was leaving, was flooring it in reverse. He [JORGE] shot the gun three times. I heard three shots. A bullet hit me in the back of the neck. It's still there. I think it ricocheted. It's still in my head." SHARON stated that she did not go to the hospital for treatment, because she was high when this occurred. She stated that the wound bled a lot and burned. She stated she went to her grandmother's house and WILLIAM treated the wound while she was at her grandmother's house. SHARON allowed me to examine the back of her neck. I was unable to detect any scar or indication that a bullet entered her neck recently.

*Sharon's wound*

- SHARON stated her birthday is on April 17th. She stated that her relationship with JORGE began deteriorating in early April and she was moving her

# STATEMENT

**Paragraph (1)**

- Upon arrival of the SWAT officers (at 1118 W. 41st Ave.) he (Bateman) ran upstairs to George's bedroom because he had a bag of marijuana on him and he then tossed that marijuana down. The officers found that same bag. The marijuana was a big concern of his because he (Bateman) is on Probation and he would have been violated if found with marijuana.

**Paragraph (2)**

- He (Bateman) has never seen any guns in the house and did not know there was a gun under the mattress. He has never seen any guns in George's house or cars. End of statement.

In officer Jeffers, Brian T Statement says that he located a baggy that contained a small amount of suspected marijuana behind the dresser on the north wall, upstairs room.

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/_____/_____
Date

_____
Time Statement Completed

_____  83026
Signature of person making statement

1 | police or SWAT team yelling, "search warrant." They kept

2 | repeating themselves.

3 | Q   Okay.  I'm going to stop you there.  If you could answer my

4 | questions.  When they came, you were first downstairs, correct?

5 | A   Yeah.

6 | Q   And then you ran upstairs to go pitch drugs you had on you;

7 | is that correct?

8 | A   Yeah.  It was less than a gram of marijuana.

9 | Q   But you had drugs on you that you were pitching?

10 | A   Yeah.

11 | Q   You actually pitched that upstairs in the bedroom?

12 | A   Yeah.

13 | Q   That's where the officers ultimately found you in the

14 | house; is that right?

15 | A   Yes.

16 | Q   That was after they had done something downstairs with

17 | whomever was downstairs; is that right?

18 | A   Whomever was downstairs was my sister.

19 | MS. ESKESEN:  Your Honor, may I have one moment?

20 | THE COURT:  Counsel, you may.  Thank you.

21 | (Pause in proceedings.)

22 | Q   (By Ms. Eskesen) Mr. Bateman, your willingness to talk to

23 | the officers after the raid and between the raid and now was in

24 | order to help yourself, correct?

25 | A   Correct.

Exhibit # 5 - OF_ 8.                    Page 4 - OF - 11.

Q you actually Pitched that upstairs in the bedroom?
A yeah.
Q That's where the Officers ultimately found you in the house; is that righ?
A yes.

SHARON stated that durin the police search of the house, Detective Rojas told her he found a gun. SHARON stated, "He asked me if JORGE had a gun. I said, "yeah. I knew where he kept it." Review this unsolicited statement, Regarding a Prior inciden with Detective Rojas, SHORON stated, "He [ROJAS] caught my Friend with a lot of crack. I was there with a lot of pipes and spoons, So I told him (ROJAS) I was a crack-head so he would think they were all mine and wouldn't bust me for distribution, only paraphernalia." SHARON stated ROJAS was taking her back to her hotel room when she told him she never intended to quit smoking crack. SHARON stated she said this to ROJAS, because she was high.

I, Ismael Arenas believe that this statements above #20 of MS. Sharon B. and Det. Rojas statement that is wroten in Page 3 of Exhibit #5 displays A numbers of suspicions about Mr. Rojas protecting — Mr. Bateman: And MS. Batemant affirming that she got caught with a lot crack and Pipes and, high with illegal drugs and wasn't arrested, instead of being arrested or taken to A Hospital to be rehabilitated Det. Rojas tooke her to her hotel room; This 3-statements shows conspiracy amount them against me in this case; At the same time shows that Det. Rojas was abusing MS. Bateman civil and Constitutional rights in a different ways.

PELZ Stated that the monday or Tuesday following the drug bust, that there was no bed in the living room at that time.

(Page ~~5~~ 5+2-are 2-Pages as Exhibits)

Statement 9.
In Continuation of page 177, Read line 11-to-15

Statement 10.
Review Jeff Edelman U.S./Castillo-Case 2004-112 Investigative Report: Interview with Sharon Bateman 9-30, 2004 Page 5, Read Paragraph 5- and 6 that are Circled.

Statement 11.
Veview Jeff Edelman Edelman/Castillo+Case 2004-112 Interview with Mark Pelz Supplewer Date 8-17, 2004 Page 2. Read Para-graph 4 and 5.

Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 5

---

belongings out of the house just before her birthday.  She said they were
fighting often.  SHARON stated, "I found him in our bed with whores.  I walked
in and he was in my bed with whores [crying].  I love him, but it's over.  My
life's been going downhill since I met him."

- SHARON stated that on her birthday, she went to jail for "theft by receiving".
  She stated the charges were dropped down to "theft by trade secrets".  She
  stated that JORGE bonded her out and she moved back in with her
  grandmother.

- SHARON stated that up until JORGE's arrest on May 28th, she would
  continue to return to the house to clean because JORGE would not clean the
  house.

- SHARON stated that on May 28th, "I was harassing JORGE, trying to get him
  to give me some crack.  He gave me almost an eightball and I smoked it all
  by the time the police came."

- SHARON stated that during the police search of the house, Detective Rojas
  told her he found a gun.  SHARON stated, "He asked me if JORGE had a
  gun.  I said, 'yeah'.  I knew where he kept it."

- Regarding a prior incident with Detective Rojas, SHARON stated, "He
  [ROJAS] caught my friend with a lot of crack.  I was there with a lot of pipes
  and spoons, so I told him [ROJAS] I was a crackhead so he would think they
  were all mine and wouldn't bust me for distribution, only paraphernalia."
  SHARON stated ROJAS was taking her back to her hotel room when she told
  him she never intended to quit smoking crack.  SHARON stated she said this
  to ROJAS, because she was high.

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz Supplement
Date: August 17, 2004
Page 2

- PELZ stated that he went over to the house a couple of times to do electrical work. He stated, "I really wasn't in there very much. I became less and less comfortable there."

- PELZ stated that he did know there was a mattress upstairs.

- PELZ stated that two or three days before the drug bust he had gone to see COSTILLO to tell COSTILLO that PELZ's son would be staying at the house on Jason Street, which is adjacent to 1118 W. 41st and surrounded by the same fence. PELZ stated that he stood in the kitchen and was uncomfortable with the amount of people that were coming and going. He stated he does not recall seeing a bed in the living room at that time.

- PELZ stated that the Monday or Tuesday following the drug bust, he went to the property to evict COSTILLO and BATEMAN. PELZ stated that COSTILLO invited PELZ into the house and then PELZ had to wait while COSTILLO spoke to someone. PELZ stated, "Jorge [COSTILLO] was sitting in the living room on a couch, holding court. I got the feeling he was conducting an important conversation and I was supposed to wait."

- PELZ stated that there was no bed in the living room at that time.

- Other than these few memories, PELZ reiterated that he was unfamiliar with the arrangement of furniture or who slept where in the house.

Creseda Riccardi

Reviewed by

Edelman/costillo/interviewwithmarkpelzsupplement.doc

**Attorney Work Product - Confidential**

Exhibit # 5-of-8.          Page 5-of,11.     Statement 12.

WILL stated that the night before the raid on the house, the furniture in the living room was a bed, a moped scooter, and a wite plastic lawn chair. He stated that there was not a couch in the living room the night before the raid.

WILL stated that 3-4 weeks before the raid, SHARON and GEORGE were sleeping in the living room on a box spring and mattress.

~ This statement is from Sharon Bateman "
BATEMAN said one of CASTILLO's drug customers came to their residence to buy crack with an AK-47 rifle. She recognized the gun because she said she knows guns.

I, Ismael Arenas affirm that the only bed that was being use sence I evicted Ms. Bateman was the one in the living room downstairs, which I evicted Ms. Bateman about + 2-months before the raid of 5-28-04. Also notice how the Batemans contradicted each other about knowing guns in statement 13, 5 and 6. Also notice how Ms. Bateman in statement 1 can't answer precedent the questions in regard which bed was made, on 5-28-04 and about who slipt downstairs, she admitted that I am the one that slipt downstairs in statement 2-affirms that at the time of the raid I sleep on the bed that was in the living room, Mr. Bateman also affirms that at that time of the raid Ms. Bateman sleep upstairs on the bed where the gun was supposedly found. And I, Ismael Arenas affirm that Ms. and Mr. Bateman both of them in some of this are lying, because any of them doring the time of the raid stay at 1118 41st ave. over night nor for more then A hour, Sharon B. use to go to see me like ones a week, some time every 2-weeks by her self, some times with william B. Just to asked me for help, with money, which eventhough she was not longer my official grillfriend I was still helping her because I was still careing for her, like I still do up to this date, but sence I evicted her they never stay at 1118 41st ave. fore more then A hour.

Statement 12.
Review Jonathan willet U.S./Jorge Castillo-case 2004-112 Interview with william Bateman 11-17, 2004, Page 11. Paragraph 4.

Statement 13.
Review Jonathan willett U.S./Jorge Castillo-Case 2004-112 Interview with william Bateman 11-17, 2004. Page 16 Paragraph 1. through

Statement 14.
Review the Bureau of Alco Tobacco and Firearms Report of investigation #4, with case# 785025-04-0051, Report Number 6, page 2- Paragraph 4.

Page 11, 7, 2- are 3-pages as Exhibits

U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 11

---

- WILL stated that one day he heard GEORGE ask WAYNE where the fourty-four gun was. WILL stated that WAYNE told GEORGE he had hid it. WILL stated that GEORGE asked WAYNE if he had wrapped the gun in plastic or put it in a plastic bag and WAYNE told GEORGE that he had.

- WILL stated that GEORGE and SHARON began having trouble with each other. WILL stated that they were angry and would argue so badly that GEORGE would force SHARON to leave the house. WILL stated that SHARON would disappear for a couple of days in her van and nobody would know where she had gone.

- WILL stated that the night before the raid on the house, WAYNE stayed up all night in the motor home. WILL stated you could see the lights on in the motor home.

- WILL stated that the night before the raid on the house, the furniture in the living room was a bed, a moped scooter, and a white plastic lawn chair. He stated that there was not a couch in the living room the night before the raid.

- WILL stated that the night before the raid on the house, he and SHARON hung out in the living room, smoked crack, and stayed up all night. He stated that GEORGE went to sleep upstairs in the room that used to be WAYNE's room. WILL stated that SHARON went up to bed around 5 a.m. and lay down next to GEORGE, but she could not sleep, because she was so high on crack.

- WILL stated that in front of the two doors of the house, there is a PVC pipe sticking up with a rubber lid on it. WILL stated that GEORGE liked to hide stuff down the pipe. WILL stated that the day the house was raided, he noticed that the lid was not on the PVC pipe.

**Attorney Work Product - Confidential**

Jonathan Willett
U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 7

- WILL stated that there were two beds up in "WAYNE's room" (see Figure 1) at one time. WILL also stated that GEORGE had a bed downstairs in the living room, too. WILL stated that 3-4 weeks before the raid, SHARON and GEORGE were sleeping in the living room on a box springs and mattress.

- WILL stated that GEORGE hid the drugs which he was going to sell all over the property. WILL stated GEORGE would bury his drugs in the ground or hide them in a pile of rubble on the property or hide them in secret places in the house. WILL stated, "Check out a pile of bricks. WAYNE loved to hide drugs there."

- WILL stated that GEORGE would keep "two to three ziplock sacks of money taped to his stomach." WILL stated that the neighbor had told WILL that he saw GEORGE with a sack of money.

- WILL stated that at one point GEORGE had been in jail for about one month. WILL stated that he had been in the same room with WAYNE when WAYNE accepted a collect call from GEORGE in jail. WILL stated he was not on the phone so he does not know exactly what was said, but from listening to WAYNE's end of the conversation, WILL stated it sounded like GEORGE wanted WAYNE to keep the house at 1118 W. 41st Avenue open and continue GEORGE's drug business. WILL stated that GEORGE told WAYNE where to find a small amount of drugs, which WAYNE was supposed to sell and give the money from the sale to GEORGE. WILL stated that WAYNE found a large amount of drugs --- the small amount GEORGE had directed WAYNE to as well as an additional ten ounces which GEORGE had not told WAYNE about. WILL stated that WAYNE sold all of the drugs without giving GEORGE any of the proceeds. WILL stated, "After GEORGE got out, I asked why he was so pissed at WAYNE and he explained that WAYNE had ruined

**Attorney Work Product - Confidential**

| ADDRESSED TO:<br>Special Agent in Charge<br>Phoenix Field Division | MONITORED INVESTIGATION INFORMATION:<br>Phoenix Field Division<br>FY-04<br>Report 006 |
|---|---|

| TITLE OF INVESTIGATION:<br>CASTILLO, Jorge | |
|---|---|

| CASE NUMBER:<br>785025-04-0051 | REPORT NUMBER:<br>6 |
|---|---|

house, and a bullet ricocheted off a wall and entered the back of her neck at the bottom of her skull. She did not seek medical treatment. She says the bullet is still in her head.

3　BATEMAN stated CASTILLO carried the gun with him daily. He cleaned it with alcohol and a cloth to wipe his fingerprints off, while wearing gloves. She saw CASTILLO hide the gun under the mattress at night.

4.　BATEMAN said one of CASTILLO's drug customers came to their residence to buy crack with an AK-47 rifle. She recognized the gun because she said she knows guns. After that night, Castillo told BATEMAN he was going to get a gun for self-protection while he was selling his dope. That is when he traded drugs for the gun. He always carried his gun when he was dealing drugs from the house.

5.　BATEMAN said CASTILLO sold crack, methamphetamine (meth), and cocaine. He sold in ounce quantities. He sold an ounce of crack for six hundred fifty (650.00) dollars US currency; an ounce of cocaine for six hundred ($600.00) dollars US currency, and she was unsure how much the meth was sold for. BATEMAN stated CASTILLO had four (4) to five (5) kilos at a time.

Attachments:
Copy of BATEMAN's fingerprints, photographs, and R-84
Copy of Removal of ATF Wanted Person from NCIC

(1-one Page and Page 10, 8, 9- are 4-pages as Exhibits)

Exhibit # 5- OF- 8.    Page 6- of- 11.

statement 15.

"Mr. Bateman Claims that"
He stayed overnight at the house on the night
before they were arrested and slipt downstairs
behind the Couch on the Floor. because he was
afraid of George.

Review A page
signed by Det.
Daniel Rojas, with
Det. Rojas State-
ment. is an undated
statement. Read
paragraph # 10
about Mr. Bateman
statement.

I, Ismael Arenas aske you to Notice that
Mr. Bateman in statement 12 he claims
that the night before the raid the furniture
in the living room was a bed. He stated that
there was not a Couch in the living room the
night before the raid. but in his statement 15 above this my state-
ment, he, Mr. Bateman Claims that the night before the raid he
slipt downstairs behind A Couch on the Floor; And I, Ismael A
affirms that the only downstairs room that he Can referred to
is the living room, because in the downstairs the living room,
is the only room where you can fit that kind of furniture,
because the kitchen room and the bathroom, are, to small to set that kind
of furniture in them, and that house, only has in the downstairs A living-
Room, and A kitchen Room, and A bath Room.
        Ismael A. ask you to notice how Mr. Bateman Continuo
insulting and slandering me with hate with his false accusations.

statement 16.
Review Jonathan
willet U.S./ Jorge
Castillo -Case 2004
112 Interview with
William Bateman
11- 17, 2004 Page 10
Paragraphs 2- to 5.

WILL Stated, "GEORGE was a good-hearted guy. He
would give us all the drugs we wanted. But he was
also scary. WILL Stated that one day, GEORGE told
SHARON and WILL that GEORGE had gone to his drug
deale's house and GEORGE had seen hand Prints of
blood on the washer and puddles of blood, so he left.
WILL Stated that GEORGE had a kilo of cocaine after
he returned from his drug dealer's house, WILL
Stated, "We think GEORGE robbed the guy, maybe killed him."
    WILL Stated that he thought somebody was shot in the bathroom at the
1118  W. 41 st. Avenue. He stated that there was an imprint of badge in
blood on the floor. "I think there's a head in a plastic bag down there."
    WILL Stated,

statement 17.
Review Jonathan
willet U.S./ Jorge
Castillo -Case 2004-112
Interview with william
Bateman 11-17, 2004,
Page 8, Paragraph 5,
and Page 9, Paragraph 1 and
2.

    WILL Stated, "He (GEORGE) had a chainsaw he'd
keep right by the door the SWAT team kicked in" bloody,
(see Figure 2) WILL Stated, "One day it looked bloody,
like a red oil was on it, instead of sawdust. Then it
was scary.

Exhibit #5-of-8. Page 7-of-11.

of Statement 17.
Continuation of
Page 8, Paragraph 5,
and Page 9, Paragraph
1 and 2.

disappeared. I looked for it. It was gone. I think
he killed somebody. That guy was scary."
   WILL stated, "You know those Mexican guys
can be crazy. They'll do anything."
   WILL stated that GEORGE shot SHARON in
the back of the head. She was screaming so loud I couldn't hear
what she was saying. Then I heard gunshots --- just one gunshot.
Them immediately afterward, she was quiet.

WILL stated, "We fixed that place up with George's
drug money. They kept me prisoner. They made
me stay at their house for two weeks and I just worked
on the house. They paid me with drugs, kept me high."
   WILL stated, "He (GEORGE) would have 90
different people over there hammering and doing
things for him. He'd have a huge barbeque."

statement 18.
Review Jonathan Will-
ett U.S./Jorge Casti-
llo -2004-112 Inter-
view with William
Bateman 11-17,2004
page 3, Paragraph 1
and 2.

I, Ismael Arenas ask you to notice as how Mr.
Pelz and Mr. Bateman ways of insults and
slandered me with hate with their false accusations are similar then Det.
Daniel Rojas ways of slandered me; you also will notice that Det.
Rojas and the Batemans and Mr. Pelz, had been contacted each
other before Det. Rojas frabricate his fiction, affidavit for search,
warrant dated 5-24,2004, You will notice all of this facts as folows.

statement 19.
Review Jeff Edelman
/Castillo-case 2004-
112 Interview with
Mark Pelz Date:8-
12,2004, page 3,
Paragraph 1

PELZ stated after the night the police
searched the property, COSTILLO arranged for all
of his possessions to be removed from the house.
PELZ stated COSTILLO was "like a King with an
army --- he never did anything himself, he just
ordered it done."

I, Ismael A. ask. you to compare this statement
19-with statement 18.

statement 20.
Review Investigative
Report. OF H. ELLIS
ARMISTEAD & ASSOCIAT-
ES, INC. LEGAL INVES-
TIGATORS. To: Jeff
Edelman/Castillo-Case
No. 2004-112, 8-17,2004
page 1, Read the circle
Paragraph 2.

PELZ stated that before CASTILLO and BATEMAN
had paid a deposit, he found them illegally on his
property one night. Because the utilities had not yet
been turned on, he told them it was illegal to do
   PELZ stated what they were doing.

(Page 3,3, 1 -are 3-pages as Exhibits)

## STATEMENT

- As a matter of fact George had sent Wayne out to deliver drugs during the afternoon on day of their arrest and Wayne had just returned (and received another bag of crack cocaine from George) only minutes before the SWAT team arrived and arrested them.

- George used the rubber gloves found in the kitchen, for packaging drugs so not to leave his fingerprints on the plastic packaging and also to avoid contaminating himself, which would cause him to have a positive UA test (which he often took for per terms of probation).

- Once George tried to strangle him (Bateman) with the rubber gloves on. George was outside when he noticed Bateman looking out the upstairs window. George became very angry and accused Bateman of spying on him to see where he was concealing the drugs and then grabbed him by his neck and strangled him.

- George also attempted to strangle Sharon at grandma's house once and he (Bateman) ran up to help stop him. He (Bateman) hit George over the back of the head as hard as he could to stop him. George would sometimes get angry for no good reason and became very violent.

- George sold everything from small to large quantities of heroin, crack cocaine and speed.

- On the time when George was arrested at the Hotel a year ago, he was able to beat the case against him because the police did not have a search warrant. Also Bateman learned that the police only found a small amount of drugs in that hotel room. George concealed the drugs by tying a string to the bag and concealing it in the pipes in the ceiling. George had more than a half an ounce of crack cocaine on that date at the hotel and he returned later to get the drugs back by breaking into the hotel room.

- Before arrest George had about two ounces of heroin, several ounces of crack cocaine and speed, which George concealed somewhere outside of the house.

- **8** Also about two weeks before the arrest at 1118 W. 41st Ave., George had three bags of cash on him. On one recent occasion George took Sharon to the bank with him to exchange money. Sharon should know where that bank is located. George took money to the bank earlier that day (before their arrest at 1118 W. 41st Ave).

- **9** The reason for this was because George feared police would get him with marked money.

- **10** He stayed overnight at the house on the night before they were arrested and slept downstairs behind the couch on the floor, because he was afraid of George.

*Paragraph*

*I have read the foregoing statement and the facts contained therein are true to the best of my knowledge and belief. I do not maintain that it contains all of the facts or details of the incident, but only those facts about which I have been asked.*

_____/____/_____
Date

_____
Time Statement Completed

_____
Signature of person making statement

001583

33rd and Vasquez. He didn't want us to know where his drug dealer lived. GEORGE came back with an ounce of cocaine and we went back to the house. I went upstairs and woke her up. She stood up to go to the bathroom and she almost fell over. I didn't look at the wound. I kept asking her where he shot her and she was so fearful about him killing her, she would never tell me where. And then finally, after three or four weeks, she did eventually show me where it was. It was on the back of her head, down at the bottom of her hair. It looked like a hole the size of a dime. The scab was sticking up. She never said why she didn't go to the doctor's or hospital, except he had her locked up."

2
Paragraph

- WILL stated, "GEORGE was a good-hearted guy. He would give us all the drugs we wanted. But he was also scary. He was so happy at Thanksgiving. We made Thanksgiving dinner. Me, my grandma, WAYNE, GEORGE. I set the table. I didn't smoke crack that day."

3

- WILL stated that one day, GEORGE told SHARON and WILL that GEORGE had gone to his drug dealer's house and GEORGE had seen hand prints of blood on the washer and puddles of blood, so he left. WILL stated that GEORGE had a kilo of cocaine after he returned from his drug dealer's house. WILL stated, "We think GEORGE robbed the guy, maybe killed him."

4

- WILL stated that he thought somebody was shot in the bathroom at 1118 W. 41st Avenue. He stated that there was an imprint of a badge in blood on the floor. WILL stated, "Definitely something weird looking like that." He also stated that in front of the toilet is a black pipe with something stuffed in it. WILL stated that next to the black pipe is a hole through which you can see down into the crawlspace under the house. WILL stated, "I think there's a

5
head in a plastic bag down there."

Attorney Work Product - Confidential

him. All his [GEORGE's] money was invested in that eleven ounces. He kicked WAYNE out for a while."

- WILL stated that he was afraid to tell the Alcohol, Tobacco, and Firearms agent and the Denver narcotics policeman the truth about how many guns GEORGE had, but now that WILL had immunity he would tell the truth about GEORGE's guns. WILL stated GEORGE had five or six different handguns. WILL stated, "Sometimes he [GEORGE] would brag and show them off to me."

- WILL stated that one night he went downstairs to the kitchen and he found GEORGE practicing pulling a gun from his pocket and pointing it at the exterior door in the kitchen. WILL stated that this frightened him. WILL stated, "That night I had to sleep by him. I crawled behind the couch because I was afraid of him."

- WILL stated that he knows about guns, because his grandfather was in World War II and had numerous guns. WILL stated that his grandmother's house has bullet holes all over it because he has shot off guns inside her house so many times.

- WILL stated that SHARON does not know about guns. He stated, "She never really messed with them." WILL also stated that SHARON never possessed a gun. He stated, "GEORGE would always have guns, one or two at a time, but he'd keep changing them." WILL stated that WAYNE and GEORGE kept the guns in the motor home.

- WILL stated, "He [GEORGE] had a chainsaw he'd keep right by the door the SWAT team kicked in." (see Figure 2) WILL stated, "One day it looked

**Attorney Work Product - Confidential**

bloody, like a red oil was on it, instead of sawdust. Then it disappeared. I looked for it. It was gone. I think he killed somebody. That guy was scary."

- WILL stated that even though GEORGE would give WILL free drugs, WILL was very frightened of GEORGE. WILL stated, "You know those Mexican guys can be crazy. They'll do anything."

- WILL stated that GEORGE shot SHARON in the back of the head. WILL stated, "I got a call from my sister on her cell phone, 11:30 or 12 at night. She was whispering at me, 'cause George was nearby. We talked five minutes then George grabbed the cell phone out of her hand. It was still on so I heard them yelling at each other. She was screaming so loud I couldn't hear what she was saying. Then I heard gunshots --- just one gunshot. Then, immediately afterward, she was quiet. I couldn't hear her. I called back. George answered. I asked him what that loud popping sound was and he said it was the door slamming because my sister had left."

- WILL stated, "I was at my grandma's house, so I wrote her a note. 'I think George shot SHARON.' I was fearing for my sister's life. After I smoked the rest of the crack, I drove over there. It took me a while to smoke the crack and build up my courage after hearing my sister be shot. I pulled up inside by the front doors around 4:30 a.m. GEORGE and WAYNE were on the front porch and were shocked to see me there, because he had shot her. WAYNE said he was going to bed and went to the camper. I asked GEORGE what was going on and he told me I could go into the house and check on her, but don't' wake her up. I forced him to give me some crack, 'cause of what he did to my sister and I left. About three in the afternoon, I went back to the house and she was still sleeping. We --- me, GEORGE, and the mechanic --- went to GEORGE's drug dealer's house. He left us in the van while he walked to wherever the house was. I could show you where we parked. It was near

*Paragraph 3*

**Attorney Work Product - Confidential**

U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 3

_____

- WILL stated that when SHARON and GEORGE first moved into 1118 W. 41st Avenue, the three of them worked very hard on fixing the place up. WILL stated, "We fixed that place up with George's drug money. They kept me prisoner. They made me stay at their house for two weeks and I just worked on the house. They paid me with drugs. Kept me high. It was great."

*1 —*

- WILL stated, "He [GEORGE] would have 90 different people over there hammering and doing things for him. He'd have a huge barbeque."

*2 —*

- WILL stated that before they laid down square tiles in the kitchen, there were large squares of plywood screwed down on the kitchen floor very smoothly. WILL stated, "One day, just before we tiled it, all the plywood squares were tilted like George had lifted them up and rescrewed them."

- WILL stated that Wayne DIBBLE (hereinafter referred to as WAYNE) stayed at the house with them, too. WILL drew a diagram of the layout of the upstairs of the house with the initial sleeping arrangements detailed (see Figure 1). WILL stated that since everyone was always high from cocaine-related drugs, often they would not sleep at all during the night; therefore, who slept where changed frequently.

**Attorney Work Product - Confidential**

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz and Photographs of Property
Date: August 12, 2004
Page 3

he could never understand what she got out of her relationship with COSTILLO.

1- • PELZ stated after the night the police searched the property, COSTILLO arranged for all of his possessions to be removed from the house. PELZ stated that COSTILLO was "like a king with an army --- he never did anything himself, he just ordered it done."

2- • PELZ stated that the mattress on the floor in the second floor north bedroom was left behind by COSTILLO's associates. Other than the mattress, the house is devoid of furniture and personal possessions.

• A floor plan, including the location of the remaining mattress, and directional orientation may be found in Attachment A.

• Photographs of the property may be found in Attachment B.

Creseda Riccardi

Reviewed by

Edelman/costillo/interviewwithmarkpelz.doc

Attorney Work Product – Confidential

**H. ELLIS ARMISTEAD & ASSOCIATES, INC.**
**LEGAL INVESTIGATORS**
1127 Auraria Parkway, Suite 201-B, Denver, Colorado 80204
303-825-2373 ♦ 303-825-2374 Facsimile
www.coloradoinvestigators.com

### INVESTIGATIVE REPORT

---

| | |
|---|---|
| **TO:** | **Jeff Edelman** |
| **PREPARED BY:** | **Creseda Riccardi** |
| **CASE:** | **Edelman / Costillo - Case No. 2004-112** |
| **DATE:** | **August 17, 2004** |
| **SUBJECT:** | **Attempt to Contact** |

---

On August 17, 2004, I contacted Mark PELZ (hereinafter referred to as PELZ), the owner and landlord of 1118 W. 41st Avenue, Denver, CO, by telephone. His cellular telephone number is 303/916-7890.

The following is a summary of the interview:

- When questioned about the sleeping arrangements of Jorge COSTILLO (hereinafter referred to as COSTILLO) and Sharon BATEMAN at the property PELZ rented to them, PELZ stated, "I never really saw anything. I have no knowledge of who slept with whom, where."

- PELZ stated that before COSTILLO and BATEMAN had paid a deposit, he found them illegally on his property one night. Because the utilities had not yet been turned on, PELZ stated that they had candles everywhere. He stated that they seemed to be sleeping on the floor in the living room but they were not fully or officially moved in and he did not go upstairs so he could not be sure. He stated that they were "camping" there until the lease agreements were completed. PELZ stated that he told them it was illegal to do what they were doing.

**Attorney Work Product - Confidential**

Exhibit # 5-OF, 8.    Page 8-OF-11.

statement 21.
Continuation of Investigative Report of H. ELLIS ARMISTEAD & ASSOCIATES, INC. LEGAL INVESTIGATORS. Dated 8-17, 2004, Page 2, paragraphs 1-3- and 4, and 6.

1.- PELZ stated that he went over to the house a couple of times to do electrical work. He stated, "I really wasn't in there very much. I became less and less comfortable there."

2.- PELZ stated that two or three days before the drug bust he had gone to see CASTILLO to tell CASTILLO that PELZ's son would be staying at the house on Jason Street, which is adjacent to 1118 W. 41st and surrounded by the same fence. PELZ stated that he stood in the kitchen and was uncomfortable with the amount of people that were coming and going.

3.- PELZ stated that the Monday or Tuesday following the drug bust, he went to the property to evict CASTILLO and BATEMAN. PELZ stated that CASTILLO invited PELZ into the house and then PELZ had to wait while CASTILLO spoke to someone. PELZ stated, "Jorge (CASTILLO) was sitting in the living room on a couch, holding court. I got the feeling he was conducting an important conversation and I was supposed to wait."

PELZ stated that there was no bed in the living room at that time.

statement 22.
Review H. ELLIS ARMISTEAD & ASSOCIATES, INC. LEGAL INVESTIGATORS. To Jeff delman/Castillo - Case No. 2004-112, 8-12, 2004, interview with Mark Pelz. page 1, paragraph 1 -to- 3. and page 2, paragraph 1-to-5. and page 3, paragraph 1 and 2.

1.- PELZ stated that he appreciated the Denver Nuisance Abatement laws because they had enabled him to evict Jorge COSTILLO. He said that without the laws, CASTILLO would have been able to continue to rent the property for another six months.

2.- PELZ stated that CASTILLO and Sharon Bateman had thoroughly convinced him that they were "lovebirds and this was going to be their love nest. They were really going to fix this place up, they said."

3.- PELZ stated that because the property is sub-standard, he has typically rented it to people one step above homeless. He stated that CASTILLO had convinced PELZ that renting the house to CASTILLO would really help CASTILLO turn his life around. PELZ said he felt foolish and duped by CASTILLO.

1.- PELZ stated that his interactions with CASTILLO have cost him a great deal of money.

(page 2, 1, 2, 3 = are 4-pages as Exhibits)

Exhibit # 5 - of - 8.    Page 9 - of - 11.

continuation of statement 22. of 3-pages document dated 8-12, 2004 in regard Mr. PELZ statement.

2. - PELZ stated that very shortly after renting the house to CASTILLO and SHARON, more and more people began living there, PELZ stated that there were vans parking in the compound parking area with people living in them. PELZ stated that CASTILLO disregarded their conversation and continued to have many people staying on the property.

3. - PELZ stated that even though he was concerned for his property and the damage that they were doing to it (PELZ pointed out various things smashed and destroyed within the house that they did). he quit visiting the property because there were so many people around that were a negative element that he did not feel comfortable or safe.

4. - PELZ stated that his interactions with SHARON and her brother William BATEMAN gave him "the creeps." PELZ stated, "And the grandmother [Eileen BATEMAN, SHARON and WILLIAM's grandmother], have you met her? My God, that whole family gives me the creeps."

5. - PELZ stated that he had thought SHARON was in her late forties, and that he was shocked when he found out she was in her early twenties. He stated that he could never understand what she got out of her relationship with CASTILLO.

1. - PELZ stated after the night the police searched the property, CASTILLO arranged for all of his possessions to be removed from the house. PELZ stated that CASTILLO was "like a king with an army --- he never did anything himself, he just ordered it done."

2. - PELZ stated that the mattress on the floor in the second floor north bedroom was left behind by CASTILLO's associates. Other than the mattress, the house is devoid of furniture and personal possessions.

On May 24, 2004, Affiant dialed the number on the sign in the window of 4059 Jason St. and spoke to a male, who identified himself as Mark Pelz, owner of the property.

Statement 23. Review Det. Daniel Rojas Affidavit for Search warrant Dated 5-24, 2004 Page-5, Paragraph 1. with Det. Rojas Statement.

(page 5 - one page as Exhibit)

8-17-04; 12:13PM;                                        :3                        #  3/  3

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz Supplement
Date: August 17, 2004
Page 2

- PELZ stated that he went over to the house a couple of times to do electrical work. He stated, "I really wasn't in there very much. I became less and less comfortable there."

- PELZ stated that he did know there was a mattress upstairs.

- PELZ stated that two or three days before the drug bust he had gone to see COSTILLO to tell COSTILLO that PELZ's son would be staying at the house on Jason Street, which is adjacent to 1118 W. 41$^{st}$ and surrounded by the same fence. PELZ stated that he stood in the kitchen and was uncomfortable with the amount of people that were coming and going. He stated he does not recall seeing a bed in the living room at that time.

- PELZ stated that the Monday or Tuesday following the drug bust, he went to the property to evict COSTILLO and BATEMAN. PELZ stated that COSTILLO invited PELZ into the house and then PELZ had to wait while COSTILLO spoke to someone. PELZ stated, "Jorge [COSTILLO] was sitting in the living room on a couch, holding court. I got the feeling he was conducting an important conversation and I was supposed to wait."

- PELZ stated that there was no bed in the living room at that time.

- Other than these few memories, PELZ reiterated that he was unfamiliar with the arrangement of furniture or who slept where in the house.

Creseda Riccardi

Reviewed by

Edelman/costillo/interviewwithmarkpelzsupplement.doc

**Attorney Work Product - Confidential**

## H. ELLIS ARMISTEAD & ASSOCIATES, INC.
### LEGAL INVESTIGATORS
1127 Auraria Parkway, Suite 201-B, Denver, Colorado 80204
303-825-2373 ♦ 303-825-2374 Facsimile
www.coloradoinvestigators.com

## INVESTIGATIVE REPORT

---

| | |
|---|---|
| **TO:** | Jeff Edelman |
| **PREPARED BY:** | Creseda Riccardi |
| **CASE:** | Edelman / Costillo - Case No. 2004-112 |
| **DATE:** | August 12, 2004 |
| **SUBJECT:** | Interview with Mark Pelz and Photographs of Property |

---

*8-12-04*

On August 12, 2004, I met Mark PELZ (hereinafter referred to as PELZ) at 1118 W. 41st Avenue, Denver, Colorado so that I could photograph the contents of the rooms. PELZ is the owner and landlord of this property, which he rented to Jorge COSTILLO (hereinafter referred to as COSTILLO). His cellular telephone number is 303/916-7890.

The following is a summary of the interview:

1. • PELZ stated that he appreciated the Denver Nuisance Abatement laws because they had enabled him to evict Jorge COSTILLO. He said that without the laws, COSTILLO would have been able to continue to rent the property for another six months.

2. • PELZ stated that COSTILLO and Sharon BATEMAN (hereinafter referred to as SHARON) had thoroughly convinced him that they were "lovebirds and this was going to be their love nest. They were really going to fix this place up, they said."

3. • PELZ stated that because the property is sub-standard, he has typically rented it to people one step above homeless. He stated that COSTILLO had

**Attorney Work Product - Confidential**

Jeff Edelman
Edelman / Costillo – Case 2004-112
Interview with Mark Pelz and Photographs of Property
Date: August 12, 2004
Page 2

___

convinced PELZ that renting the house to COSTILLO would really help COSTILLO turn his life around. PELZ said he felt foolish and duped by COSTILLO.

1 — • PELZ stated that his interactions with COSTILLO have cost him a great deal of money.

2 — • PELZ stated that very shortly after renting the house to COSTILLO and SHARON, more and more people began living there. PELZ stated that there were vans parking in the compound parking area with people living in them. PELZ stated that he had explained to COSTILLO that, according to their contractual agreement on the lease, there were only supposed to be two people living on the property. PELZ stated that COSTILLO disregarded their conversation and continued to have many people staying on the property.

3 — • PELZ stated that even though he was concerned for his property and the damage that they were doing to it (PELZ pointed out various things smashed and destroyed within the house that they did), he quit visiting the property because there were so many people around that were a negative element that he did not feel comfortable or safe.

4 — • PELZ stated that his interactions with SHARON and her brother William BATEMAN (hereinafter referred to as WILLIAM) gave him "the creeps". PELZ stated, "And the grandmother [Eileen BATEMAN, SHARON and WILLIAM's grandmother], have you met her? My God, that whole family gives me the creeps."

5 — • PELZ stated that he had thought SHARON was in her late forties and that he was shocked when he found out she was in her early twenties. He stated that

**Attorney Work Product - Confidential**

U.S. / Jorge Castillo – Case 2004-112
Interview with William Bateman
November 17, 2004
Page 3

- WILL stated that when SHARON and GEORGE first moved into 1118 W. 41st Avenue, the three of them worked very hard on fixing the place up. WILL stated, "We fixed that place up with George's drug money. They kept me prisoner. They made me stay at their house for two weeks and I just worked on the house. They paid me with drugs. Kept me high. It was great."

- WILL stated, "He [GEORGE] would have 90 different people over there hammering and doing things for him. He'd have a huge barbeque."

- WILL stated that before they laid down square tiles in the kitchen, there were large squares of plywood screwed down on the kitchen floor very smoothly. WILL stated, "One day, just before we tiled it, all the plywood squares were tilted like George had lifted them up and rescrewed them."

- WILL stated that Wayne DIBBLE (hereinafter referred to as WAYNE) stayed at the house with them, too. WILL drew a diagram of the layout of the upstairs of the house with the initial sleeping arrangements detailed (see Figure 1). WILL stated that since everyone was always high from cocaine-related drugs, often they would not sleep at all during the night; therefore, who slept where changed frequently.

**Attorney Work Product - Confidential**

On May 24, 2004, Affiant dialed the number on the sign in the window of 4059 Jason St. and spoke to a male, who identified himself as Mark Pelz, owner of the property. Mr. Pelz informed that he was renting 4059 Jason St. and that it is now vacant. Mr. Pelz also informed that the home behind 4059 Jason St. (identified as 1118 W. 41st Ave.) was also his property but it was already rented to someone. Mr. Pelz states that the back yard between 4059 Jason St. is a common area for both houses and is to be shared by occupants of both houses when they are both occupied.

Based on the Aforementioned information contained in this affidavit your Affiant respectfully requests that a search warrant be granted for the address of 1118 West 41st Ave., a white two story house, with a 6' privacy fence around the property, located on the south side of 41st Avenue, between Kalamath St. and Jason St. with no visible numbers on the dwelling, and for the curtilage: For Jorge Castillo, date of birth 10-28-63, described as a Hispanic male approximately 5'6" tall, 180 pounds in weight, long black hair and brown eyes.

_Daniel E. Rojas 83026_
Signature of Affiant

Subscribed under oath before me on this 24th day of May, 2004 at 4420 in the City and County of Denver, CO

READ & APPROVED BY
D.D.A. L. LEVINE, #21939.

05/24/04, 1621 Hours

_Signature of Judge_

MICHAEL A. MARTINEZ
Printed Name of Judge

(page 4, 20, 5 - are 3 - pages as Exhibits)

Exhibit # 5 - OF - 8.    page 10 - OF - 11.

Mr. Pelz Further related that Jorge stated that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz stated that Jorge Castillo told him that "He was only Keeping the gun for a Friend."

Q So when -- are we talking about this last year, then, that you're using a lot of Crack?
A Kind of, yeah.
Q And -- and before that?
A No. I had never really had any people that Sold it or Know where to get it or didn't even really Know about it.
Q Okay. And how about your Sister?
A She -- she --
Q She Knows -- she Knows where to get it, right?
A I'm not sure. She had a lot of boyfriends that got incarcerated for dealing drugs. Undercover cops like Daniel Rojas has busted a Few of her boyfriends.
Q And does your -- does your sister -- I mean -- and I don't mean this in a bad way -- but does she have Som kind of relationship with Detective Rojas?
A No, sir.
Q Okay. But -- but she's Known him for a long time because he's arrested a lot of her boyfriends?
A Yeah. He's raided a lot of their motel rooms
Q And -- and it's your understanding that Rojas has -- has investigated and arrested --
A He got them incarcerated.
Q -- all these boyfriends?
A Yeah. Because they were bad guys.

incident with Detective Rojas, SHARON stated, "He (Rojas) Caught my friend with a lot of Crack. I was there with a lot of pipes and spoons, SHARON stated ROJAS was taking her back to her hotel room when she told him she never intended to quit smoking Crack.

I, Ismael Arenas ask you to Notice that Statement 23 - To - 26 of page 9 - and 10, shows the fact that Det. Rojas had Contacted Ms. Bateman and Mr. Pelz before he made his false-

statement 24.
Review Supplementary Report case number 200424372 Property Invoice # 680248, unsigned Report of Det. Daniel Rojas 83026, and is undated too. Read the paragraph that is Circled in page 4 - OF - 4.

statement 25.
Review page 20, in it Find page 66 and 67, with statements of Mr. Bateman's deposition of 11-30, 2004, Read what is Circled of page 66 and 67. --that Detective Rojas

statement 26.
Review Jeff Edelman U.S./Castillo - Case 2004-112 Investigative Report: Interview with Sharon Bateman 9-30, 2004, page 5, paragraph 6.

Exhibit #5-of-8.   Page 11-of-11.

Fiction Affidavit to request for the unlawful Search warrant dated 5-24, 2004, and more likely that Mr. Rojas advised Mr. Pelz to make up the statement #24 of Page 10 to get rid of me from his property, as you can tell that on all the statements of this Exhibit #5 of the Bateman's and Mr. Pelz and Det. Rojas shows that they are discriminating me by slandering with hate against me with their fabricated Fiction statement, please Notice that on 2004 the status of my real identity was not Clear, not because was my free will of hide my truth identity but because was a necessity to hide it in order to surviv without being discover by the government that I was illegal in this Country, Det. Rojas knew that my identity was not Clear and is what he use to Push his unlawful attack and use caucasians to ramover my civil rights. I, Ismael Arenas affirm that in fact Mr. Pelz give Mr. Dibble permission in his own will to reside in his property under Mr. Pelz condition to help to remodel Mr. Pelz house at that time Mr. Pelz was incharge of the Motorhome as well and let Mr. wayne Dibble reside in the motorhome, please Review my Addendum to petition complaint dated 10-19, 2010 that I sended to court to be file and review, this document will give you more details in regard Mr. Pelz Misconduct.
The issue that I am pointing out to you that Mr. Pelz is falsely accussing me as you can see his slandering statements on statement 19 to 26 of this Exhibit #5 as well Mr. Pelz accussess me of haveing People staying on the property in the vans that where parked on his property, Mr. Pelz has no evidence to prove that his accusations are true. I, Ismael Arenas affirm that Mr. Pelz had lie in regard all the wrong doings that he had accusse me of.

he was aware that Jorge had invited Wayne to stay a short time after Jorge and Sharon moved in. Mr. Pelz states that he noticed Jorge had turned the property into a kind of a fortress but didn't think much of this at the time. Mr. Pelz informs that the back yard surrounding 1118 W. 41st Ave is shared with another property he owns next door, which is 4059 Jason St. Mr. Pelz states that he keeps a Streamline trailer home there along with stacks of lumber, building supplies and other odds and ends. Reporting Detective asked for and received consent to search the back yard further. Nothing was found.

On June 1, 2004 at approximately 12:15 PM Reporting Detective returned an earlier phone message from Mr. Pelz. Mr. Pelz was concerned about his legal rights as landlord of this property and asked for reports needed for evicting Jorge and his friends. During the conversation Mr. Pelz stated that he "Jorge called him last night" (May 31, 2004) and that Jorge tried to tell Mr. Pelz that the police action was nothing more than racially motivated harassment and that the police did not find anything illegal on the property. Mr. Pelz further related that Jorge stated that he would be suing the Denver Police Department. On the subject of the loaded handgun Mr. Pelz states that **Jorge Castillo told him that "He was only keeping the gun for a friend."**

On June 06, 2004, Denver Police Department Chemist Jennifer Kimmett completed a presumptive screening of the substances held under invoice #680248 and reported the following results:

Item #8- (The 2 bags containing numerous small rock like substance found in Dibble's pocket) tested positive for cocaine base, with a weight of 3.081 grams

Item #9- (The substance found by Officer Hynes) tested positive for cocaine base, with a weight of 0.105 grams.

On 05-30-04, Jorge Castillo was released from PADF on bond with a return court date of 06-14-04. Wayne Dibble is still in custody as of 06-02-04.

On June 2, 2004, this case was presented to the Denver District Attorney's office for acceptance of felony charges on Wayne Dibble for PCS and on Jorge Castillo for Possession of a weapon by previous offender. This Case will be carried as cleared by arrest.

Appellate Case: 11-1323    Document: 882    Date Filed: 02/01/2012    Page: 238

000195

Page 65

1    him?
2        A    Sometimes. Sometimes he'd go to work and
3    leave me at the shop with a -- woman or something and
4    I'd do things, and then I'd go back to work when I was
5    done.
6        Q    Okay. And -- and when you -- when you say
7    he'd leave you there, are we talking about with a
8    prostitute?
9        A    Uh-huh.
10       Q    Is that a ye -- I'm sorry. You have to answer
11   yes or no.
12       A    Yeah. Yes, sir.
13       Q    Okay. And -- and was he making you do all
14   these things or this was --
15       A    No, I wanted it.
16       Q    -- the kind of lifestyle that you enjoyed
17   leading?
18       A    Yeah. I hadn't -- I hadn't had a woman for a
19   few years so I was enjoying all the women that were
20   coming around.
21       Q    Okay. So tell me about your history of drug
22   use. Have you -- have you been using drugs for a long
23   time?
24       A    Not really. Basically, I've been having jobs
25   off and on. Not really using much drugs. I -- when I

Page 66

1    used cocaine, it was for about a three-, four-, maybe
2    five-month period of time. And I really didn't use it
3    that much because I was unemployed, so I couldn't afford
4    it that much. So when I did use it, I'd try and work for
5    it for free or something, if I could.
6        Q    So when -- are we talking about this last
7    year, then, that you're using a lot of crack?
8        A    Kind of, yeah.
9        Q    And -- and before that?
10       A    No. I had never really had any people that
11   sold it or know where to get it or didn't even really
12   know about it.
13       Q    Okay. And how about your sister?
14       A    She -- she --
15       Q    She knows -- she knows where to get it, right?
16       A    I'm not sure. She had a lot of boyfriends
17   that got incarcerated for dealing drugs. Undercover cops
18   like Daniel Rojas has busted a few of her boyfriends.
19   And she -- more than -- more of the time than any Sharon
20   would be away from my grandma's house and I wouldn't know
21   where to find her or what she was up to.
22       Q    So how many boyfriends would you say she's had
23   that have been busted for crack?
24       A    Just three.
25       Q    And what are their names?

Page 67

1        A    George Castillo, and then Oscar Perez Garcia,
2    and then the other Oscar guy. I don't know -- I don't
3    know this guy's last name. His name was Oscar. I think
4    he got busted with a kilo of cocaine or something. I'm
5    not sure.
6        Q    And -- and it's your understanding that Rojas
7    has -- that Detective Rojas has investigated and
8    arrested --
9        A    He got them incarcerated.
10       Q    -- all these boyfriends?
11       A    Yeah. Because they were bad guys. They
12   were -- deserved to go to jail.
13       Q    And does your -- does your sister -- I mean
14   and I don't mean this in a bad way -- but does she have
15   some kind of relationship with Detective Rojas?
16       A    No, sir.
17       Q    Okay. But -- but she's known him for a long
18   time because he's arrested a lot of her boyfriends?
19       A    Yeah. He's raided a lot of their motel rooms
20   and stuff and took a lot of drugs off the streets, which
21   is good.
22       Q    Have you or your sister ever had any
23   psychological issues?
24       A    No, sir.
25       Q    You indicated that at one point you felt like

Page 68

1    committing suicide. Have you ever seen someone for some
2    psychological issues relating to that?
3        A    What point did I indicate that?
4        Q    What's that?
5        A    I said, "What point did I indicate that?"
6        Q    I -- I -- I said in the past you've indicated
7    that you, you know, were wanting to commit suicide. I
8    think when you were direct-testifying you said; When I
9    smoked heroin, it made me want to commit suicide --
10       A    Yeah, I --
11       Q    -- so I stopped.
12       A    Yeah. I took a knife and slashed my arm right
13   there (indicated). I didn't try and kill myself, but
14   that's when I knew it was time to give up the drugs.
15       Q    Okay. So have you ever seen anybody about
16   those issues?
17       A    Yeah, in prison.
18       Q    Okay.
19       A    I speak -- I spoke to the psychologist daily.
20       Q    All right. And how about your sister?
21       A    She's not suicidal. She's -- she was going
22   through a lot of, like, depression issues because of
23   being bald and having to wear wigs and stuff.
24            And now her hair's growing --
25       Q    I'm sorry. Say that last part.

Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 5

---

belongings out of the house just before her birthday.  She said they were fighting often.  SHARON stated, "I found him in our bed with whores.  I walked in and he was in my bed with whores [crying].  I love him, but it's over.  My life's been going downhill since I met him."

SHARON stated that on her birthday, she went to jail for "theft by receiving".  She stated the charges were dropped down to "theft by trade secrets".  She stated that JORGE bonded her out and she moved back in with her grandmother.

SHARON stated that up until JORGE's arrest on May 28th, she would continue to return to the house to clean because JORGE would not clean the house.

SHARON stated that on May 28th, "I was harassing JORGE, trying to get him to give me some crack.  He gave me almost an eightball and I smoked it all by the time the police came."

SHARON stated that during the police search of the house, Detective Rojas told her he found a gun.  SHARON stated, "He asked me if JORGE had a gun.  I said, 'yeah'.  I knew where he kept it."

Regarding a prior incident with Detective Rojas, SHARON stated, "He [ROJAS] caught my friend with a lot of crack.  I was there with a lot of pipes and spoons, so I told him [ROJAS] I was a crackhead so he would think they were all mine and wouldn't bust me for distribution, only paraphernalia."  SHARON stated ROJAS was taking her back to her hotel room when she told him she never intended to quit smoking crack.  SHARON stated she said this to ROJAS, because she was high.

*Paragraphs 5 and 6*

Attorney Work Product - Confidential

Exhibit # 6 - oF - 8 - Exhibits have
9 — Pages oF Government Documents as
Exhibits, and 3 - pages oF hand
Writing Report by me Ismael, A. Go

(page 39, 40, 41, 6 of are 5 pages as Exhibits)

Exhibit # 6 -OF- 8.          page 1- OF -3. statement 1.

Q And when that-- when that happened-- after
Mr. Castillo was arrested, did you have occasion to
come into custody of a motor vehicle-- I think it
might have been a car or a truck-- that Mr. Castillo
had been using?
A   Yes, I did,
Q  Did you go ahead and drive that vehicle for
a period of time?
A  Yes, I did.
Q  Can you tell us what they found?
A  Methamphetamine.
Q  Do you know how much?
A  I'm not sure. They have, exactly how many
grams on my discovery. But they found a whole
bunch of methamphetamine in the trunk of the
car.
Q  whose methamphetamine was that?
A  Jorge Castillo's.
Q  did you-- were you aware that it was there?
A  I was aware that it was missing from the people that he knew,
but I didn't know that it was actually, in fact, in the car.
Q  So is Mr. Jorge Castillo the only person, in your judgment, who
could be responsible for the methamphetamine that was in the car?
A   yes.
He got picked up and the car was left with me. And I got picked up
two days after he had got picked up.

After May 28th when JORGE went to Jail,
SHARON stated, "I was driving his car. Well, the
car's in SPARKY's name. I lied and said I was my
sister, LINDA. So I took the car. A day later, I
backed into a trash can and went back and opened
the trunk. Not me, I wasn't driving. Some friends
were driving. I gave most of the drugs to Sparky.
There was still four ounces of drugs I didn't know about. I got
stopped by the (Adams County) police.

Your Affiant advised Sharon that she was under
arrest. While doing a inventory search prior to towing
the vehicle, your Affiant discovered a Black weight

Review page 39-
of Sharon Bateman
deposition on 11-
30, 2004, Read line
20-to- 25. and page
40, line 1-to-3 and
line 11-to-18-and
23-to-25. and page
41, line 1, and line
7-to-10, and 15-
and 16.

statement 2.
Review Jeff Edelman
U.S/ Castillo- case
2004-112 Investigati-
ve Report: Interview
with Sharon Bateman
9-30-2004, page 6
First Paragraph that
is circled.

statement 3.
Review Affidavit of
Officer Manuel T. Aragon
is Notify by A Notary
public on 7-2, 2004,
Read what is circled, in
regard Ms. Bateman.

1    I believe would be Polaroid photographs.  You might have

2    to take it out of the document protector to see both

3    pages.

4         A    (The witness complied.)

5         Q    Okay.  Have you had a chance to look at it,

6    ma'am?

7         A    Yes, I see it.

8         Q    Looking at the -- the object depicted in the

9    photographs there, have you ever seen an item like that

10   before?

11        A    Yes, I have.

12        Q    And where and when did you see it outside of

13   these pictures?

14        A    Under my mattress.

15        Q    And whose weapon was that?

16        A    Jorge Castillo's.

17        Q    Ma'am, at a certain point in time, was

18   Mr. Castillo arrested and taken into federal custody?

19        A    Yeah.

20        Q    And when that -- when that happened -- after

21   Mr. Castillo was arrested, did you have occasion to come

22   into custody of a motor vehicle -- I think it might have

23   been a car or a truck -- that Mr. Castillo had been

24   using?

25        A    Yes, I did.

40

```
1        Q    Did you go ahead and drive that vehicle for a
2   period of time?
3        A    Yes, I did.
4        Q    Did a day come when you were stopped by state
5   investigators or state authorities and was the car
6   searched after you were stopped?
7        A    Yes, it was.
8        Q    When they did that, did they discover a
9   quantity of illegal drugs?
10       A    Yes, they did.
11       Q    Can you tell us what they found?
12       A    Methamphetamine.
13       Q    Do you know how much?
14       A    I'm not sure.  They have exactly how many
15  grams on my discovery.  But they found a whole bunch of
16  methamphetamine in the trunk of the car.
17       Q    Whose methamphetamine was that?
18       A    Jorge Castillo's.
19       Q    And with regard to that, have you been
20  prosecuted in state court for that?
21       A    No.  I pled guilty to a plea bargain, but it
22  wasn't my dope.
23       Q    Did you -- were you aware that it was there?
24       A    I was aware that it was missing from the
25  people that he knew, but I didn't know that it was
```

001092

1    actually, in fact, in the car.

2         Q    So besides yourself and Mr. Jorge Castillo, in

3    your judgment, did anybody else have access to that car?

4    Could that have been Wayne Dibble's methamphetamine, for

5    example or . . .

6         A    No.  No.

7         Q    So is Mr. Jorge Castillo the only person, in

8    your judgment, who could be responsible for the

9    methamphetamine that was in the car?

10        A    Yes.

11        Q    How long had he been using that car?

12        A    That car was at the house when they raided it,

13   and he was using it ever since the house had got raided.

14   He was picked up two days before driving that car.  He

15   got picked up and the car was left with me.  And I got

16   picked up two days after he had got picked up.

17        Q    So have you actually pled guilty based on that

18   methamphetamine in the trunk?

19        A    Yes, I did.

20        Q    And are you waiting to be sentenced in Adams

21   County District Court?

22        A    Yes, I am.

23             MR. TILL:  Can we go off the record just for a

24   couple of minutes here.

25             VIDEOGRAPHER:  The time is 9:59.  We're going

001093

U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 6

---

- After May 28th, when JORGE went to jail, SHARON stated, "I was driving his car.  Well, the car's in SPARKY's name.  I lied and said I was my sister, LINDA.  So I took the car.  A day later, I backed into a trash can and went back and opened the trunk.  Not me, I wasn't driving, some friends were driving.  I gave most of the drugs to Sparky.  There was still four ounces of drugs I didn't know about.  I got stopped by the [Adams County] police.  I pleaded guilty.  I pled down to Felony 3.  The Adams County P.D.'s going to try to get me into a half way house."

- When asked, SHARON stated that Detective ROJAS has not contacted her at all regarding this matter.

- When asked, SHARON stated that Detective ROJAS has not promised to help WILLIAM at all.

- SHARON stated that WILLIAM is in the Federal Detention Center.

- SHARON stated that DIBBLE is running from the law.

- SHARON stated that she wants to get out of jail so she can get into a treatment plan and get her children back.  She stated she has three children and they are Christian (aged eight), Alberto (aged five), and Jade (aged two).  When asked if all of the children were from the same father she said, "Yeah".

_Creseda Riccardi_

_____
**Reviewed by**

Edelman/costillo/interviewwithsharonbateman.doc

---

**Attorney Work Product - Confidential**

## AFFIDAVIT IN SUPPORT OF WARRANTLESS ARREST

I Manuel J. Aragon, a peace officer, being duly sworn says that there is probable cause for the warrantless arrest of the above-named defendant for the charge(s) stated above, arising out of the incidents occurring at Ogden & Corona Street Denver, Colorado, Adams County, Colorado on July 2, 2004 , 1642 hours, and that the following facts are true and correct to the best of my knowledge, information and belief and support the arrest of the defendant.

Bateman, Sharon Ann DOB 04-17-82

On 07-02-04 at 1642 hours, Your Affiant was at the corner of Sheldon Street and Corona Street. Your Affiant saw a blue Ford Tempo at the stop sign going north on Corona Street. Your Affiant identified the driver of the vehicle as Sharon Bateman. Your Affiant had prior knowledge of a warrant for her arrest out of Adams County Court for Failure to Appear on a traffic offense. As Sharon Bateman turned west on Sheldon Street, Your Affiant did a traffic stop at Ogden and Sheldon Street. Your Affiant approached the vehicle and asked the driver Sharon Bateman for a driver's license, registration and Insurance. Sharon Bateman did not have the requested documents and was asked to exit the vehicle. Sharon Bateman advised your Affiant that her name was Linda Bateman with a date of birth of 12-20-77. Your Affiant asked how old Sharon Bateman was at which time she attempted to flee on foot. Your Affiant grabbed Sharon Bateman and placed her in handcuffs and seated her in the back seat of the patrol car. Your Affiant noticed a blue car pull along side of the traffic stop and an older female got out of the car. At that time Sharon Bateman said, "That's my Grandma". Your Affiant asked the older female, identified as Eileen Bateman, if she was the grandma and she said, "Yes". Your Affiant asked Eileen Bateman if her granddaughter was Linda or Sharon. Eileen Bateman said her name was, "Sharon". Your Affiant advised Sharon that she was under arrest. While doing a inventory search prior to towing the vehicle, Your Affiant discovered a Black weight scale under the front passenger seat of the vehicle. Your Affiant also discovered a six-inch metal pipe with a burnt scouring pad in the end of the pipe. Your Affiant asked Sharon Bateman if she had any drugs on her person. Sharon Bateman said, "Come on Officer, give me a break". At that time Sharon Bateman handed me a baggie containing a white powdery substance that tested presumptive positive for methamphetamine and weighed 80.75 grams. Your Affiant transported Sharon Bateman to the Adams County Substation for processing, and to the Adams County Detention Facility.

Your Affiant believes probable cause exists for the warrant less arrest of Sharon Bateman for 18-18-405 Unlawful Possession with Intent to Distribute of a Controlled Substance Schedule II, 18-18-405 Unlawful Possession of a Controlled Substance Schedule II.

Affiant's Signature

Subscribed and sworn to before me this _02_ day of _July_ , _2004_ .

Notary Public    My Comm. Expires Oct. 22, 20

[Notary seal: ROBERT D. MAELE NOTARY PUBLIC STATE OF COLORADO]

Expires _____

Probable Cause for Warrantless Arrest is ☐ Found    ☐ Not Found

Judge _____

# Continuation/Supplemental Sheet

| Initial Offense Classification | | | | | | | | | 04-9264 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Possession with intent to distribute shedule II | | | Victim State of Colorado | | | | | | | | | |
| Code | Name (Last, First, Middle) | | | Sex | Race | Date of Birth | | Social Security # | | | Date Original Report 07-02-04 | Date This Report 07-02-04 |
| | Residence | | | | City | | Zip | | Telephone | | | X-Day |
| | Business | | | Occupation | | | | Bus. Telephone | | | | |

| Property | | Property | A Currency | B Jewelry | C Clothing | D Vehicle Local | E Office Equip. | F Radio, TV, Cameras | G Firearms | H Household Goods | I Consumables | J Livestock | K Misc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Stolen | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| | | Recovered | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |

## If property itemization, use the following format:

| Item # | Quantity | Brand Name | Property Description | Serial # | Stolen | Rec | UCR Type |
|---|---|---|---|---|---|---|---|

(A) Lost / Stolen / Recovered Property;
RECOVERED PROPERTY:
1)   1   Unknown    White Crystal like Substance gross weight 81.88 grams    None    Recovered Value $ Unknown
2)   9   Unknown    Paper, Scale, Pipe, ID, Baggies, Scouring Pad, Baking Soda Box   None   Recovered Value $ Unknown
                    Box with white powdery substance, Hair from Wig

(B) Additional Witnesses / Victims; None

(C) Officer's Observation's;

On 06-30-04 at 0955 hours, I saw a Blue Ford Tempo Bearing Colorado Temporary 616816B. I noticed the vehicle pull in front of a residences on Sheldon and Dawson and the driver Identified as Gorge Castillo DOB 10-28-63 get out of the vehicle and approach the front door. I then noticed that Gorge Castillo walked away from the vehicle north on Dawson. I contacted Gorge Castillo and found him to have an active warrant for drug possession with intent to distribute and felon in possession of a vehicle. I also contacted a female asleep on the front passenger side of the vehicle. The female identified herself as Linda Bateman DOB 12-20-77. Linda Bateman had no hair and had a brown wig next to her. I cleared Linda Bateman and was notified by ADCOM that there was no wants or warrants for her arrest. Linda Bateman was released on scene and walked home. I transported Gorge Castillo to the Adams County Detention Facility.

On 07-02-04 at 1300 hours, Denver Police Detective Rojas who was inquiring about the arrest of Gorge Castillo contacted me. Detective Rojas advised me that Gorge Castillo was in the company of Sharon Bateman. Detective Rojas described Sharon Bateman as a white female, five feet two, one hundred too one hundred fifteen pounds with a shaved head and green eyes. Detective Rojas advised me that there were warrants for her arrest for traffic offense and drug possession. I cleared Sharon Bateman through ADCOM and found three active warrants for her arrest. I obtained a last know address of 8621 Corona Street in Denver which is her grandmother's house and attempted to contact her.

On 07-02-04 at 1642 hours, I was at the corner of Sheldon Street and Corona Street. I saw a blue Ford Tempo bearing Colorado Temporary 616816B at the stop sign. I noticed that the driver of the vehicle did not have any hair. I also recognized her as the female that was sleeping on the passenger side of the vehicle on 06-30-04. I identified the driver of the vehicle as Sharon Bateman. I had prior knowledge of warrants for her arrest. As Sharon Bateman turned west on Sheldon Street, I initiated a traffic stop at Ogden and Sheldon Street. I approached the vehicle and asked the driver Sharon Bateman for a driver's license, registration and Insurance. Sharon Bateman did not have the requested documents and was asked to exit the vehicle. Sharon Bateman advised me that her name was Linda Bateman with a date of birth of 12-20-77. I told Sharon Bateman I knew her real name at which time she began to cry and act hysterical. Sharon Bateman continued to tell me her name was Linda. I asked Sharon Bateman how old she was at which time she attempted to flee on foot. I grabbed Sharon Bateman before she got away and placed her in handcuffs. I then seated her in the back seat of the patrol car and seat belted her in. I noticed a blue car pull along side me and an older female get out of the car. At that time Sharon Bateman said, "That's my Grandma". I asked the older female, identified as Eileen Bateman, if she was the grandma and she said, "Yes". I then asked Eileen Bateman if her granddaughter was Linda or Sharon Bateman. Eileen Bateman said, "Sharon". I advised Sharon that she was under arrest. While doing an inventory search prior to towing the vehicle I found a black weight scale under the front passenger seat of the vehicle. I also found a copper colored scouring pad on the front floorboard of the passenger side of the vehicle which is commonly used as a filter when doing methamphetamine. I found a six inch metal pipe with a burnt scouring pad in the end of the pipe in the center console ashtray below the radio. I looked in the trunk of the vehicle and found a large quantity of plastic Baggies and a box containing a white powdery substance inside the box. I noticed another box of baking soda. I asked Sharon Bateman if she had any drugs on her person. Sharon Bateman began to cry and said, "Come on Officer, give me a break". At that time Sharon Bateman removed a plastic baggie containing a white crystal substance and handed it to me. I asked her what was in the bag and Sharon Bateman said, "Meth". I obtained a Narcotic Identification Kit and tested the white crystal substance. The crystal substance tested presumptive positive for methamphetamine.

While in route to the Substation, I advised Sharon Bateman of her Miranda Rights. Sharon Bateman advised me that she understood her rights. Sharon Bateman told me that there are more Baggies of "Meth" that she would give me if I would give her a break. Sharon Bateman told me that the baggie that she gave me contained four ounces of "Meth". While on scene at the Substation, I weighed the white crystal substance. I zeroed the scale and hit print. I then placed the baggie containing the white crystal substance on the scale. The gross weight of the baggie containing the white crystal substance was 81.88 grams. I then printed that out. I zeroed out the scale and placed an empty baggie of the same size. I then placed the baggie containing the white crystal substance back onto to scale to get the net weight. The net weight was 80.75. Photographs of the recovered items were taken and then booked into evidence at the Adams County Substation. Sharon Bateman was later transported to the Adams County Detention Facility. Above Beard Towing towed the vehicle for proof of ownership. Records was notified.

| Deputy's Signature Aragon, MJ | ID # 01-23 | Supervisor's Initials & Date  JC 7-3-04 | Page 2 of 2 |
|---|---|---|---|

Form 2346 CV (03/91)

EXhibit# 6-of-8.     Page 2-of-3.

Scale under the Front Passenger Seat of the vehicle.
Your Affiant also discovered a six-inch metal
Pipe with a burnt scouring pad in the end
of the Pipe. Your Affiant asked Sharon Bateman
if she had any drugs on her person. Sharon

Bateman said, "Come on Officer, give me a break". At that time
Sharon Bateman handed me a baggie containing a white powdery
substance that tested presumptive Positive For methamphetamine
and weighed 80.75 grams. Your Affiant transported Sharon Bateman

**statement 4.**
Continuation of Officer
Manuel J. Aragon state-
ment, Affidavit dated
7-2, 2004.

Q Yeah. I assume the car was there; is that right?
A yes, it was. The car was at my grandmother's
house, and we were one block away From my grand-
mother's house when Jorge got arrested to come
into Federal Coustody.
Q So it was at your grandmother's house?
A yes, it was.
Q And what was it doing there?
A He was driveng it, and I was sleeping in it.
Q But when he wasn't around, would you drive it?
A After he went to Jail, yeah.
Q And So why were you pulled over in this car?
A I don't know. Suspected-- I think they suspected that I had drugs.
A I'm not really sure.
Q Do you know the date?
A July 2nd, 2004.

**statement 5.**
Review Page 93, line
4-to-13, and
16 and 17, and 20-
to 24, of 11-30,
2004 of Sharon
Bateman Deposition,
also Review Page 94,
line 1-to 5.

**statement 6.**
Review A Report of
Officer Manuel J. Aragon
title Continuation
Supplemental Sheet,
with Original Case Rep-
ort #04-9264,
Dated 7-2, 2004
in regard Gorge
Castillo arrest of 6-
30, 2004, page #2.

On 06-30-04 at 0955 hours. I saw a Blue Ford Tempo-
Bearing Colorado Temporary 616816B. I noticed the vehicle
pull in front of a residence on Sheldon and Dawson and
the driver Identified as Gorge Castillo DOB 10-28-63 get
out of the vehicle and approach the front door. I then
noticed that Gorge Castillo walked away from the
vehicle north on Dawson. I contacted Gorge Castillo and
Found him to have an active warrant for drug Possession
with intent to distribute and Felo in possession of a
Firearm. I also contacted a female asleep on the front passenger side of the vihi-
cle. The Female identified herself as Linda Bateman DOB 11-20-77 Linda Bateman had no hair
and had a brown wig next to her. I cleared Linda Bateman and was notified by ADCOM that
and was notified by ADCOM that

page 93,94,2-are 3-pages of Exhibits

Exhibit # 6-of-8.    Page 3-of-3.

statement 7.

Continuation of officer Manuel J. Aragon statement of his Report/title Continuation/Supplemental Sheet, Dated 7-2, 2004 Page#2

there was no wants or warrants for her arrest. Linda Bateman was released on scene and walked home. I transported Gorge Castillo to the Adams Detention facility.

I, Ismael Arenas aske you to notice in statement 1 of Exhibit#6, page 1 line 15-to 16, were Ms. Bateman is refering the statement about me and her, she stated, "He got picked up and the car was left with me. And I got picked up two days after he had got picked up." Also see statement 2-where Sharon said. "I lied and said I was my sister, LINDA. So I took the car. This statements are in reference of the date 6-30, 2004 about when I was areste by this same officer Aragon of Adams County. I, Ismael Arenas affirm that officer Manuel Aragon also lie about, Ms. Bateman walking home after he arrested me. I affirm that Mr. Aragon give to Ms. Bateman the key of the car in front of me and told her to take the car. then Ms. Bateman took off in the car before officer took me away. Also when Sharon was still sleeping in the car officer Aragon asked me for her name I told him that her name is Sharon Bateman about 3-times. So officer Aragon is lying in this too by claiming that he let her go because she just said that her name was Linda. Also notice that officer Aragon stoped me unlawfully without any probable cause, he pulled up next to me and asked me for my name while I was walking on the sidewalk, then he said he was going to hold me until he checks to see if I was lying or not, he did not charge me with the commission of any crime yet he handcuffed me and ordered me to sit in the back seat of his Police car. Please notice in his own reports that he doesn't show nor affirms probable cause for him to stoped me while I was walking on the sidewalk. Also Notice how Sharon contradicted Mr. Aragon statements in regard her having the drugs on her person, and accusing me that were mine and that she didn't knew that were in the car. I, Ismael Arenas believe that under this facts above Mr. Aragon was allieded with Det. Rozas before he even saw me on this date 6-30, 2004 and he knew who Sharon was and who I was before he even stoped me.



```
1   right?

2       A    The car was at the house when it got raided

3   or . . .

4       Q    Yeah.  I assume the car was there; is that

5   right?

6       A    Yes, it was.  The car was at my grandmother's

7   house, and we were one block away from my grandmother's

8   house when Jorge got arrested to come into federal

9   custody.

10      Q    So it was at your grandmother's house?

11      A    Yes, it was.

12      Q    And what was it doing there?

13      A    He was driving it, and I was sleeping in it.

14      Q    And were you driving it also?

15      A    Not when Jorge was there.

16      Q    But when he wasn't around, would you drive it?

17      A    After he went to jail, yeah.

18      Q    What kind of car is it?

19      A    It was a Ford.  A blue one.

20      Q    And so why were you pulled over in this car?

21      A    I don't know.  Suspected -- I think they

22  suspected that I had drugs.  I'm not really sure.

23      Q    Do you know the date?

24      A    July 2nd, 2004.

25      Q    How do you remember that?
```

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

oF- 2004        Sharon

94

```
 1        A    That's the day my life ended.

 2        Q    Why is that?

 3        A    Because that's the day I got a drug charge

 4   that wasn't mine.  That's the day I've been incarcerated

 5   since.

 6        Q    And so you've pled guilty to possessing these

 7   drugs?

 8        A    Yes, I have.

 9        Q    And why did you plead guilty to it if it

10   wasn't your drugs?

11        A    Why did I plead guilty?  Because they

12   weren't -- how am I going to fight something that was in

13   my possession in my car that I was in control of?  It's

14   hard to fight something like that, so I just pled guilty.

15        Q    Okay.  And what were you thinking during the

16   years before this that you were constantly in possession

17   of crack cocaine?  That you weren't going to get

18   arrested?

19        A    But I wasn't in large quantities of crack

20   cocaine.  It was small quantities that I used for my own

21   personal use.

22        Q    Did you ever sell drugs?

23        A    Only to make more money so I could support my

24   own habit.

25        Q    So you've sol -- so you're a drug dealer too;
```

# Continuation/Supplemental Sheet

| Initial Offense Classification<br>Possession with intent to distribute shedule II | | | | | Original Case Report #<br>04-9264 |
|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) State of Colorado<br>Victim: | Sex | Race | Date of Birth | Date Original Report 07-02-04   Date This Report 07-02-04 |
| | Residence | City | | Zip | Social Security # |
| | Business | Occupation | | Telephone | Bus. Telephone   X-Day |

| Property | Property | A Currency | B Jewelry | C Clothing | D Vehicle /Local | E Office Equip | F Radio TV Camera | G Firearms | H Houshold Goods | I Consumables | J Livestock | K Misc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stolen | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| | Recovered | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |

## If property itemization, use the following format:

| Item # | Quantity | Brand Name | Property Description | Serial | Stolen | Rec | UCR Type |
|---|---|---|---|---|---|---|---|

(A) Lost / Stolen / Recovered Property;
RECOVERED PROPERTY:
1) 1 — Unknown — White Crystal like Substance gross weight 81.88 grams — None — Recovered Value $ Unknown
2) 9 — Unknown — Paper, Scale, Pipe, ID, Baggies, Scouring Pad, Baking Soda Box, Box with white powdery substance, Hair from Wig — None — Recovered Value $ Unknown

(B) Additional Witnesses / Victims; None

(C) Officer's Observation's;

On 06-30-04 at 0955 hours, I saw a Blue Ford Tempo Bearing Colorado Temporary 616816B. I noticed the vehicle pull in front of a residence on Sheldon and Dawson and the driver identified as Gorge Castillo DOB 10-28-63 get out of the vehicle and approach the front door. I then noticed that Gorge Castillo walked away from the vehicle north on Dawson. I contacted Gorge Castillo and found him to have an active warrant for drug possession with intent to distribute and felon in possession of a firearm. I also contacted a female asleep on the front passenger side of the vehicle. The female identified herself as Linda Bateman DOB 12-20-77. Linda Bateman had no hair and had a brown wig next to her. I cleared Linda Bateman and was notified by ADCOM that there was no wants or warrants for her arrest. Linda Bateman was released on scene and walked home. I transported Gorge Castillo to the Adams County Detention Facility.

On 07-02-04 at 1300 hours, Denver Police Detective Rojas who was inquiring about the arrest of Gorge Castillo contacted me. Detective Rojas advised that Gorge Castillo was in the company of Sharon Bateman. Detective Rojas described Sharon Bateman as a white female, five feet two, one hundred too one hundred fifteen pounds with a shaved head and green eyes. Detective Rojas informed me that there were warrants for her arrest. As Sharon Bateman through ADCOM and found three active warrants for her arrest. I obtained a last know address of 8621 Corona Street in Denver which is her grandmother's house and attempted to contact her.

On 07-02-04 at 1642 hours, I was at the corner of Sheldon Street and Corona Street. I saw a blue Ford Tempo bearing Colorado Temporary 616816B at the stop sign. I noticed that the driver of the vehicle did not have any hair. I also recognized her as the female that was sleeping on the passenger side of the vehicle on 06-30-04. I identified the driver of the vehicle as Sharon Bateman. I had prior knowledge of warrants for her arrest. I initiated a traffic stop at Ogden and Sheldon Street. I approached the vehicle and asked the driver Sharon Bateman for a driver's license, registration and insurance. Sharon Bateman did not have the requested documents and was asked to exit the vehicle. Sharon Bateman advised me that her name was Linda Bateman with a date of birth of 12-20-77. I told Sharon Bateman I knew her real name at which time she began to cry and act hysterical. Sharon Bateman continued to tell me her name was Linda. I asked Sharon Bateman how old she was at which time she attempted to flee on foot. I grabbed Sharon Bateman before she got away and placed her in handcuffs. I then seated her in the back seat of the patrol car and seat belted her in. I noticed a blue car pull along side me and an older female get out of the car. At that time Sharon Bateman said, "That's my Grandma". I asked the older female, identified as Eileen Bateman, if she was the grandma and she said, "Yes". I then asked Eileen Bateman if her granddaughter was Linda or Sharon Bateman. Eileen Bateman said, "Sharon". I advised Sharon that she was under arrest. While doing an inventory search prior to towing the vehicle, I found a black weight scale under the front passenger seat of the vehicle. I also found a copper colored scouring pad on the front floorboard of the passenger side of the vehicle which is commonly used as a filter when doing methamphetamine. I found a six-inch metal pipe with a burnt scouring pad in the end of the pipe in the center console ashtray below the radio. I looked in the trunk of the vehicle and found a large quantity of plastic Baggies and a box containing a white powdery substance. Inside the box, I noticed another box of baking soda. I asked Sharon Bateman if she had any drugs on her person. Sharon Bateman began to cry and said, "Come on Officer, give me a break". At that time Sharon Bateman removed a plastic baggie containing a white crystal substance and handed it to me. I asked her what was in the bag and Sharon Bateman said, "Meth". I obtained a Narcotic Identification Kit and tested the white crystal substance. The crystal substance tested presumptive positive for methamphetamine. I then transported Sharon Bateman to the Adams County Substation for processing.

While in route to the Substation, I advised Sharon Bateman of her Miranda Rights. Sharon Bateman advised me that she understood her rights. Sharon Bateman told me that there are more Baggies of "Meth" that she would give me if I would give her a break. While on scene at the Substation, I weighed the white crystal substance. Sharon Bateman told me that the baggie that she gave me contained four ounces of "Meth". On scene at the Substation, I weighed the white crystal substance. I zeroed the scale and hit print. I then placed the baggie containing the white crystal substance on the scale. The gross weight of the baggie containing the white crystal substance was 81.88 grams. I then printed that out. I zeroed out the scale and placed an empty baggie of the same size. I then placed the baggie containing the white crystal substance back onto the scale to get the net weight. The net weight was 80.75. Photographs of the recovered items were taken and then booked into evidence at the Adams County Substation. Sharon Bateman was later transported to the Adams County Detention Facility. Above Board Towing towed the vehicle for proof of ownership. Records was notified.

| Deputy's Signature<br>Aragon, MJ | ID # 01-23 | Supervisor's Initials & Date | Page of 2 2 |
|---|---|---|---|

Form 2346 CV (02/91)

EXhibit# 7-oF-8-Exhibits have
32 — Pages oFGovernment Documents as
Exhibits, and 8-Pages oF hand
Writing RePort by me Ismael, A- G.

EXhibit # 7-OF-8.        Page 1-OF-8.

Q Now, you have never-- on the night that your sister was allegedly shot, you didn't mend the wound For her, did you?

A NO. NO.

Q So if She's saying that, is she mistaken?

A She's saying that I mended the wound?

Q uh-huh.

A NO. I didn't touch the wound. I only-- the day that, like I said, the day when I came back in the afternoon--about three o'clock in the afternoo--that's the only time I touched her when she stood up and almost Fell. But I didn't clean no wound or nothing.

Q So where's she getting that From?

A From being shot, She might be imagining it. I'm not sure.

Statement #1
Review Page 31-in it Find Page 109 - to 112, in Page 111 and 112 Read Line 12 -to -25 and line 1-of 112 page, in regard William Bateman Deposition OF 11-30, 2004.

"SHAPON stated that She did not go to the hospital for treatment, because she was high when this occurred. She stated that the wound bled a lot and burned. She stated She went to her grandmother's house and WILLIAM treated the wound while she was at her grandmother's house.

Statement #2
Review Jeff Edelman U.S./Castillo-case 2004-112 Investigative Report: Interview with Sharon Bateman 9-30-2004 Page 4. Read what is Circled oF Paragraph 4.

A --there's a circle on the back of her neck about the size of--a little bit bigger than a dime. And it kind of looked like a volcano coming out oF her skin. That's what the skin melted looked like. And--

Q OKay.

A --I--like I was saying I picked at it with tweezers, because she said that it hurt. And I seen little metal Fibers coming out of it like thin strands of metal, like, that looked like hairs, but they was metal.

Q And you saw it when you where picking her neck with tweezers. That was on the night she was--said she-- or supposedly shot; is that right?

A NO, sir. That was, like Four weeks later.

Statement #3
Review page 23 in it Find Page 77 to -80-in Page 77, line 6 -to 18 that are Circled I will like you to read, This Statements are in regard Mr. Bateman Deposition OF 11-30, 2004.

(Page 31, 4, 23- are 3-Pages as Exhibits)

Appellate Case: 11-1390  Document: 01 2  Date Filed:  Page: 256

Page 109

1   you guys would smoke; is that fair to say?
2       A   No.  He wouldn't -- he wouldn't just keep
3   handing us crack and crack, you know.  He would tell us
4   you know, No more; and we'd have to deal with it.
5       Q   And that was hard --
6       A   Yeah.
7       Q   -- when there was no more?
8       A   When we was addicted.
9       Q   Okay.  Have you ever cooked up some crack in
10  the coffee pot?
11      A   Never.
12      Q   Has --
13      A   Because I -- I never had ounces.  If I ever
14  had a little bit of cocaine, I would cook it in a spoon.
15  Small amounts, like maybe $10 worth of cocaine or
16  something.
17      Q   Okay.  And have you seen Wayne Dibble do that?
18      A   Uh-huh.
19      Q   And that's a yes?
20      A   Yes.
21      Q   How many -- how many times have you seen that?
22      A   I witnessed Wayne Dibble cook up an ounce of
23  cocaine when George went to jail.  George gave him a
24  phone call and -- when he was in jail -- a collect phone
25  call -- and told Mr. Dibble to --

Page 110

1       Q   Hold on.  Without telling me what other people
2   said -- or, I mean, I don't know how you know that.  How
3   do you know what George said to Wayne on the phone?
4       A   Because I drove him back to George's house,
5   1118 and --
6       Q   And Wayne told you something?
7       A   No.  We went to the camper and he grabbed an
8   ounce of cocaine out of there that George had told him
9   where it was at.  This was to help post George's bond,
10  but instead we just sat there and got high, pretty much.
11      Q   And --
12      A   I went and picked George's van up.  It had
13  broke down off the side of the highway and -- with the
14  tow truck, brought it home, paid the tow truck driver,
15  and then Mr. Dibble gave me a little bit of cocaine for
16  doing that, because he was just sitting there playing
17  with the cocaine at the house while I left to go get the
18  van on the highway that was broke down.
19      Q   And so Mr. Dibble got the cocaine out of
20  somewhere in the RV?
21      A   The motor home, yeah.
22      Q   And then --
23      A   It was in the -- some -- one of the -- either
24  the motor cover or something or in the door.  Somewhere
25  in the front cab of the motor home.

Page 111

1       Q   Right.  And did you --
2       A   In the side where you sit to drive.
3       Q   And without assuming anything, did you
4   actually hear the -- Mr. Castillo speaking to Mr. Dibble
5   on the phone?
6       A   No.  I just heard Wayne say that He told me
7   where it's at and let's go get it.
8       Q   So Wayne is telling you that?
9       A   Yeah.  So we hopped in the car after
10  Mr. Castillo called from jail and went to George's house
11  again and found it.
12      Q   Now, you have never -- on the night that your
13  sister was allegedly shot, you didn't mend the wound for
14  her, did you?
15      A   No.  No.
16      Q   So if she's saying that, is she mistaken?
17      A   She's saying that I mended the wound?
18      Q   Uh-huh.
19      A   No.  I didn't touch the wound.  I only -- the
20  day that, like I said, the day when I came back in the
21  afternoon -- about three o'clock in the afternoon --
22  that's the only time I touched her when she stood up and
23  almost fell.  But I didn't clean no wound or nothing.
24      Q   So where's she getting that from?
25      A   From being shot, she might be imagining it.

Page 112

1   I'm not sure.
2       Q   Has your -- does your -- in your past, has
3   your sister frequently imagined things that weren't true?
4       A   No.
5       Q   Never?
6       A   Just thinking that bugs were in her head after
7   she got shot and burning her hair, you know.
8       Q   Uh-huh.  And is it your -- do you know whether
9   that stuff about having bugs in her hair and burning her
10  hair, whether that has to do with being shot or consuming
11  so much crack?
12      A   It has to be with doing shot -- being shot.
13  Because she -- before she would smoke the same amount of
14  crack and never think that kind of stuff.  But once she
15  was shot, then she kind of lost a few brain cells, I
16  think, and went a little bit crazy.
17      But since she's not been smoking crack and
18  incarcerated, she's looking a lot better.  You know, her
19  hair's growing back, she's not burning it.  And hopefully
20  she's making better decisions on her part.
21      MR. WILLETT:  All right.  Let me just make
22  sure that's all the questions I have.  I think it is, but
23  hold on one sec.
24      (A discussion was held off the record between
25  Mr. Willett and Mr. Castillo.)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Appellate Case: 11-1322    Document: 33-2    Date Filed: 02/01/2012    Page: 257

- SHARON stated that her grandfather had been a hunter, so she had learned about guns from him. She stated, "He had rifles and thirty-aught-sixes and handguns."

- SHARON stated JORGE obtained his second gun from Shawn (LNU) and Adam (LNU), who gave the gun to JORGE in exchange for an eightball. She stated the gun was a "thirty-two revolver". She stated, "I tried to steal it but never really handled it."

- SHARON stated JORGE was paranoid and slept with a gun for protection. She stated sometimes JORGE would stick the gun between the mattress and the box springs. She stated sometimes JORGE would sleep in the living room.

- SHARON stated that sometime before April 17th, JORGE shot her with the first gun, "the twenty-five caliber revolver". She stated, "I took an ounce of crack from him and he wanted it back. I was talking on the phone to WILLIAM and threw the phone and jumped in the car. I took the car. I was leaving, was flooring it in reverse. He [JORGE] shot the gun three times. I heard three shots. A bullet hit me in the back of the neck. It's still there. I think it ricocheted. It's still in my head." SHARON stated that she did not go to the hospital for treatment, because she was high when this occurred. She stated that the wound bled a lot and burned. She stated she went to her grandmother's house and WILLIAM treated the wound while she was at her grandmother's house. SHARON allowed me to examine the back of her neck. I was unable to detect any scar or indication that a bullet entered her neck recently.

*(handwritten left margin: Paragraph 4)*

*(handwritten right margin: Sharon's wound?)*

- SHARON stated her birthday is on April 17th. She stated that her relationship with JORGE began deteriorating in early April and she was moving her

Attorney Work Product - Confidential

Page 77

1  happened. She told me, He shot me. And then about a
2  week later after that she told me -- she showed me where,
3  and I seen the scar on the back of her neck where the
4  line goes down like where your spine is --
5      Q   Yeah.
6      A   -- there's a circle on the back of her neck
7  about the size of -- a little bit bigger than a dime.
8  And it kind of looked like a volcano coming out of her
9  skin. That's what the skin melted looked like. And --
10     Q   Okay.
11     A   -- I -- like I was saying I picked at it with
12 tweezers because she said that it hurt. And I seen
13 little metal fibers coming out of it like thin strands of
14 metal, like, that looked like hairs, but they was metal.
15     Q   And you saw it when you were picking her neck
16 with tweezers. That was on the night she was -- said
17 she -- or supposedly shot; is that right?
18     A   No, sir. That was, like, four weeks later.
19 It was, like, a month later.
20     Q   But you saw her on the night she was
21 supposedly shot?
22     A   No, sir.
23     Q   You did not?
24     A   I was afraid to go in the house.
25     Q   Okay. Let me -- let me ask you about that:

Page 78

1  You indicated when -- she had called you at your
2  grandmother's house; is that right?
3      A   Uh-huh.
4      Q   And you were nervous about what was going on,
5  so you stole your grandmother's car; is that right?
6      A   Uh-huh.
7      Q   Is that a yes? I'm sorry.
8      A   Yes, sir.
9      Q   Okay. Thank you.
10          And -- and then, having stole your
11 grandmother's car, you went over to the house; is that
12 correct?
13     A   Yes, sir.
14     Q   And you went inside the house; is that right?
15     A   No, sir.
16     Q   You didn't go inside the house?
17     A   I stood on the porch and talked to George and
18 Mr. Dibble. And then we -- two minutes after I arrived
19 there, Mr. Dibble went to the motor home which was parked
20 on the property.
21     Q   Right.
22     A   And then I just talked to George for maybe ten
23 minutes.
24     Q   Okay.
25     A   And he indicated to me that I could go in the

Page 79

1  house if I wanted to, but Just don't wake my sister up,
2  which I refused to. I told him, No, it's okay, I'm sure
3  she's all right. And --
4      Q   Why were you sure she was all right?
5      A   I wasn't sure --
6      Q   Okay.
7      A   -- but I was just afraid to go in the house
8  that I might get hurt. The time that I did go in the
9  house the day that she got shot was later that night in
10 the afternoon when I came back when I had to catch her
11 when she got up out of the bed.
12     Q   Now, why did you indicate in your direct
13 testimony that when you went over to her house -- to the
14 house, her hair was singed?
15     A   I didn't say her -- I don't think I said that
16 her hair was singed. I said that she burns her hair with
17 a lighter after she had been shot. She would think that
18 there was bugs in her hair and she would burn it with the
19 lighter. And it would make her house smell like a skunk,
20 like, when she burned her hair, that's what the smell
21 would smell like. And it bothered me and George. We'd
22 tell her to quit doing it, and . . .
23     Q   I'm a little confused. And I guess I need to
24 ask you questions to resolve that, if that's okay,
25     A   That's fine.

Page 80

1      Q   Your sister indicated to you or -- that she
2  had burned her own hair with a lighter? Or is that
3  something that she did that you've seen her do?
4      A   Yeah. We witnessed it.
5      Q   And when did you witness it?
6      A   When she would sit at her house. She would
7  just think that there's bugs in her hair so she would
8  burn it. And she kind of -- I don't know, might have had
9  brain damage or something for thinking that.
10         But since she's been released, now, I asked
11 here like what -- today I asked her if she's been burning
12 her hair and she said no.
13     Q   So how often --
14     A   So she lost that from going away from the
15 drugs and her hair growing back. She don't feel like
16 there's bugs in there no more, at least.
17     Q   So would she burn her hair when she was using
18 crack cocaine?
19     A   Yeah.
20     Q   And was that a common occurrence?
21     A   Yeah.
22     Q   And does that help explain for you maybe why
23 her hair was so short, because she was actually burning
24 it herself?
25     A   Yeah, but it was all -- when she was burning

Exhibit # 7-of-8.        Page 2-of-8.      Statement#4.

Review Page 120 of MS. Bateman statemen in triat date 9, 27-28-29-of 2010, Read line 13 and 14.

Q  did you ever see, after that date, Mr. Castillo with a gun?
A  Yes, I did. He Carried it daily.

Q  And when you indicated with regard to the -- what weapon had you actually seen Mr. Caseas--Castillo Possess? was it the weapon that was found on the date of your arrest?
A  Yes.
Q  And when--what was it doing underneath the mattress if he Carries it with him For protection?
A  It was not nighttime.

Statement 5.
Review Page 91 of MS. Bateman Deposition of 11-30-2004, Read line 23-to-25, and Page 92, read line 1-to-5.

Q  -- your neck. Is the bullet Still in there?
A  Yes, it is.
Q  And where were you treated for this injury?
A  I was not treated.
Q  Were you Concerned that the bullet's near your spinal Cord?
A  yes, I was.
Q  And you didn't go to the hospital?
A  No, I didn't.
Q  Is it Possible you dreamed this up?
A  NO. It's not possible.
Q  Ma'am. in relation to--to this statement, have you had a chance to read it

Statement 6.
Review Page 69 of MS. Bateman Deposition of 11-30, 2004, Read line 1-to-13. and Page 36, Read line 14-to-25, and Page 37, read line 1-to-3.

A  yes, I did.
Q  looking, at it today, is there anything on it that you think is attributed to you that is not accurate? that -- of the Car. And
A  Just the part when the bullet recocheted off the Car. And it wasn't right after he bought it, it was a couple of days after. And it was in the Car.
Q  Ma'am, with regard to the acquisition of the Firearm that was used when the shot was Fired, according to your statement it was received From a person: Shawn, last name unknown, and Adam, last name unknown. Do you know these two men?
A  yes, I do.

Page 120, 91, 92, 69, 36, 37, -are 6-pages as Exhibits

1  bathroom in the kitchen, and I saw them show him the gun.  He

2  looked at it and checked it out, made sure everything was okay,

3  and then he gave them, I don't know how much, crack cocaine for

4  the gun.

5  Q  And was it common practice for Jorge -- let me ask you

6  this.  When George or Jorge needed something in order to

7  purchase, did he always use cash to purchase it?

8  A  Not always.

9  Q  If he didn't use cash, what type of currency would he use?

10 A  Drugs.

11 Q  What type of drugs?

12 A  Cocaine, heroin, meth.

13 Q  Did you ever see, after that date, Mr. Castillo with a gun?

14 A  Yes, I did.  He carried it daily.

15 Q  And did he do anything in particular when he did carry it

16 daily, or --

17 A  He wore gloves with it.  Like, when he carried it, he would

18 put a towel around it and keep it with him for protection.

19 Q  How do you know he would keep it for protection?

20 A  Because I lived there when he purchased the gun, and it

21 wasn't a safe, I would say, occupation being a drug dealer.

22 Q  Did he ever share with you personally through statements of

23 his own why he had the gun?

24 A  For protection.

25 Q  And that's something he told you?

*[handwritten annotation]* Read Page 91- and 92- of MS. Bateman Deposition of 11-30, 04 in regard this lines 13- and 14, Read line 23 to-25, and 2- to-5- of Page 91- and 92.

1    A    I'm not sure.  I've seen many bags like that.

2    Q    Drawing your attention back to Exhibit 12, did

3 Wayne put these notes on this bag -- these notes -- these

4 black notes?

5    A    I don't know.

6    Q    Do you know who put -- is that the way he

7 packages it with those black notes?

8    A    I don't know.  I never bought it.  I always

9 got it for free.

10    Q    Why's that?

11    A    Because George gave it to me.

12    Q    It had nothing to do with you being in an

13 intimate relationship with him?

14    A    Yes, it did.

15    Q    So can you tell me the date or the month that

16 you were shot in the back of your neck by Jorge Castillo?

17    A    The date?

18    Q    The month.  I -- I assumed you couldn't tell

19 me a date so try -- go for a month.

20    A    April.

21    Q    Is that '04?

22    A    Yeah.

23    Q    And when you indicated with regard to the --

24 what weapon had you actually seen Mr. Caseas -- Castillo

25 possess?  Was it the weapon that was found on the date of

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

1    your arrest?

2        A    Yes.

3        Q    And when -- what was it doing underneath the

4    mattress if he carries it with him for protection?

5        A    It was not nighttime.

6        Q    Does he carry it with him just for protection

7    from the other guys who have guns in the neighborhood?

8        A    From the other -- the other customers that

9    come by -- certain customers that come around, he would

10   have the gun on him for that reason.

11       Q    Tell me about this car that you were arrested

12   in for meth possession.  Do you -- do you do meth?

13       A    No, I didn't.

14       Q    Have you ever?

15       A    No, I don't.

16       Q    You've never done it before?

17       A    I tried it; I don't like it.

18       Q    So you've tried it, but you don't like it?

19       A    Yeah.

20       Q    How about heroin?  Have you done heroin

21   before?

22       A    No, I haven't.

23       Q    And other drugs?

24       A    No.

25       Q    Okay.  The car was at the house; is that

001144

```
 1        Q    -- your neck.  Is the bullet still in there?

 2        A    Yes, it is.

 3        Q    And where were you treated for this injury?

 4        A    I was not treated.

 5        Q    Okay.  Did you bleed?

 6        A    Yes, I did.

 7        Q    Were you concerned that the bullet's near your

 8   spinal cord?

 9        A    Yes, I was.

10        Q    And you didn't go to the hospital?

11        A    No, I didn't.

12        Q    Is it possible you dreamed this up?

13        A    No.  It's not possible.

14        Q    Okay.  Would you show the -- and I -- can I

15   ask the videographer to zoom in on her neck, please.

16   Will you show us your neck again where the bullet went

17   in.

18        A    (The witness complied.)

19             I can't point it out exactly.  It's right in

20   between here.

21        Q    Okay.

22        A    And there's a scar.

23        Q    All right.  Thank you, ma'am.

24             When the police stormed in the house -- when

25   they -- when the arrest occurred, where were you?
```

1    guns, AK-47s and stuff, and so he decided to get a weapon

2    for protection.

3        Q    And with regard to protection, was his

4    protection in any way involved with the possession and

5    distribution of the heroin, methamphetamine, and crack

6    cocaine?

7        A    Yes, it was.

8        Q    Can you go ahead and take a look at what's

9    marked, I believe, as Exhibit 27. And I think it's in a

10   document protector. So maybe you can take that out and

11   read it.

12       A    (Reviewed document.)

13            Yeah. I'm done.

14       Q    Ma'am, in relation to -- to this statement,

15   have you had a chance to read it?

16       A    Yes, I did.

17       Q    Looking at it today, is there anything on it

18   that you think is attributed to you that is not accurate?

19   That --

20       A    Just the part when the bullet ricocheted off

21   of the car. And it wasn't right after he bought it; it

22   was a couple of days after. And it was in the car.

23       Q    Ma'am, with regard to the acquisition of the

24   firearm that was used when the shot was fired, according

25   to your statement it was received from a person: Shawn,

001088

1    last name unknown, and Adam, last name unknown.  Do you

2    know these two men?

3         A    Yes, I do.

4         Q    And can you basically tell us were you there

5    when the weapon was acquired by Mr. Castillo?

6         A    Yes, I was.

7         Q    And can you tell us basically how it went

8    down?  What happened?  What was said?

9         A    I was outside and they went inside with George

10   in the kitchen area.  And he gave them like an 8-ball or

11   two 8-balls, I'm not exactly how much crack cocaine for

12   it, but he gave them some crack and he got the gun.

13        Q    Were you an eyewitness to that or did . . .

14        A    Wayne Dibble was next to him.  He was always

15   next to George at things like that.  I wasn't next to him

16   at things -- at times like that.

17        Q    Okay.  How did you learn what happened?

18        A    Because -- I kind of, you know, looked through

19   the window, and I investigate, because I didn't -- I

20   didn't like what was going on in the house at that point

21   in time.  I was getting scared there.

22        Q    So based on looking through the window and

23   what you observed, you saw an exchange of crack cocaine

24   for a weapon?

25        A    Yes, I did.

page 91,92,67,68,99 — are 5-pages as Exhibits

Exhibit # 7-of-8.          Page 3-of-8.      Statement# 7.

Q  So can you tell me the date or the month that you were shot in the back of your neck by Jorge Castillo?

A  The date?

Q  The month. I--I assumed you could't tell me a date so try-- go for a month.

A  April.

Q  Is that '04?

A  Yeah.

Q  And when you indicated with regard to the-- what weapon had you actually seen Mr. Caseas -- Castillo possese? was it the weapon that was found on the date of your arrest?

A  Yes.

Q  And when--what was it doing underneath the mattress if he carries it with him for protection?

A  it was not nighttime.

Q  Who did--when were you actually struck with the bullet in your neck?

A  When I stole the dope from George.

Q  And do you recall what date that was at all?

A  No, I don't.

Q  A month?

A  Days are flying. A month ago? No, it was a long time.

Q  I mean, can you tell me a month that this occurred in?

A  May. I don't know.

Q  Are you guessing?

A  Yes. I don't remember.

Q  I just have a couple of follow-up issues. What time of day was that arrest? when did that occur?

A  The raid?

Q  Yes.

A  like seven or eight at night.

Review page 91 of Ms. Bateman Deposition of 11 30, 2004, Read line 15-to-25, and page 92, line 1-to-5, and page 67, line 23-to-25, Page 68, line 1-to-10, and page 99, line 10-to-15.

I Ismael Arenas, G. as George Castillo affirm that on 5-28, 2004 when officers arrive at 1118 41st Ave. was about 9:00 PM at night, I affirm that I was not a drug dealer and at no time posses any illegal drugs, and at no time had a gun nor posses one. I never give illegal drugs to any of the Batemans and to nobody.

1     A     I'm not sure.  I've seen many bags like that.

2     Q     Drawing your attention back to Exhibit 12, did

3  Wayne put these notes on this bag -- these notes -- these

4  black notes?

5     A     I don't know.

6     Q     Do you know who put -- is that the way he

7  packages it with those black notes?

8     A     I don't know.  I never bought it.  I always

9  got it for free.

10     Q     Why's that?

11     A     Because George gave it to me.

12     Q     It had nothing to do with you being in an

13  intimate relationship with him?

14     A     Yes, it did.

15     Q     So can you tell me the date or the month that

16  you were shot in the back of your neck by Jorge Castillo?

17     A     The date?

18     Q     The month.  I -- I assumed you couldn't tell

19  me a date so try -- go for a month.

20     A     April.

21     Q     Is that '04?

22     A     Yeah.

23     Q     And when you indicated with regard to the --

24  what weapon had you actually seen Mr. Caseas -- Castillo

25  possess?  Was it the weapon that was found on the date of

001143

1    your arrest?

2         A    Yes.

3         Q    And when -- what was it doing underneath the

4    mattress if he carries it with him for protection?

5         A    It was not nighttime.

6         Q    Does he carry it with him just for protection

7    from the other guys who have guns in the neighborhood?

8         A    From the other -- the other customers that

9    come by -- certain customers that come around, he would

10   have the gun on him for that reason.

11        Q    Tell me about this car that you were arrested

12   in for meth possession.  Do you -- do you do meth?

13        A    No, I didn't.

14        Q    Have you ever?

15        A    No, I don't.

16        Q    You've never done it before?

17        A    I tried it; I don't like it.

18        Q    So you've tried it, but you don't like it?

19        A    Yeah.

20        Q    How about heroin?  Have you done heroin

21   before?

22        A    No, I haven't.

23        Q    And other drugs?

24        A    No.

25        Q    Okay.  The car was at the house; is that

001144

1    A    Yes.

2    Q    And that's not the time that the bullet struck

3  you in the neck?

4    A    No.

5    Q    Now, why did you tell police that at one point

6  in time, the gun was fired off in the house and

7  ricocheted and struck you in the neck?  Why -- how did

8  that mis -- you've indicated in your direct testimony

9  that that was a mistake?

10    A    Yes, that was.

11    Q    And how did that occur?  How did that mistake

12  get written down?

13    A    Because I -- I misstated it on my own.

14  Because I -- when I was talking about it I was nervous.

15  But it happened when I was in my car.

16    Q    Okay.  So that wasn't a problem with Detective

17  Rojas writing --

18    A    No.  That was mine -- that was my problem.

19    Q    Okay.  And could it have something to do with

20  you being high all the time you were in that house?

21    A    No, because I wasn't high at the time I made

22  that statement.

23    Q    When did -- when were you actually struck with

24  the bullet in your neck?

25    A    When I stole the dope from George.

1    Q    And do you recall what date that was at all?

2    A    No, I don't.

3    Q    A month?

4    A    Days are flying.  A month ago?  No, it was a

5  long time.

6    Q    I mean, can you tell me a month that this

7  occurred in?

8    A    May.  I don't know.

9    Q    Are you guessing?

10   A    Yes.  I don't remember.  The months seemed to

11  be all together at that point in time when I was drugged

12  out.

13   Q    Okay.

14   A    I was up for three to four days on end.

15   Q    So --

16   A    He kept me high all the time.

17   Q    And can you show -- show us where the bullet

18  struck you?

19   A    Right here in the back of my neck.

20   Q    Okay.  Can you -- would you be so kind as to

21  turn around and lift up your hair, please.

22   A    (The witness complied.)

23        Right here (indicated).

24   Q    And it went in --

25   A    My neck.

001120

1    Q    Full uniforms?

2    A    Yes.

3    Q    Okay.  Did you have any doubt that they were

4    the police?

5    A    Oh, no.  I knew that they were the police.

6         MR. TILL:  Okay.  I don't have any other

7    questions.

8                        EXAMINATION

9    BY MR. WILLETT:

10    Q    I just have a couple of follow-up issues.

11         What time of day was that arrest?  When did

12    that occur?

13    A    The raid?

14    Q    Yes.

15    A    Like seven or eight at night.

16    Q    Okay.  And assuming you are going to be

17    released, where are you going to be?

18    A    I don't feel that that information is

19    important at this time.

20    Q    Okay.  Well --

21    A    I mean, I could let the -- I could let the

22    district attorney know, but as far as in front of Jorge

23    Castillo, I think that information is not available.

24    Q    Okay.  That's fine.  I won't press that, but

25    do you promise to be here for the trial?

(page 3, 1 and 2 1, 2 are pages as Exhibits)

EXhibit # 4 - OF - 8.    Page 4 - OF - 8.    statement # 8 -

Review Page 3 OF Jeff Edelman U.S./Castillo Case 2004-112 Investigative Report: Interview with Sharon Bateman 9-30, 2004, Read Paragraph 6. and A letter of Jeff Edelman dated 9-29-2004, Read Paragraph 3. of page 1 and 2 which is circled.

SHARON stated she found out JORGE had a gun for the first time when he pointed it at her. She stated, "It was a twenty-five caliber revolver. I'm not sure where it came from." She stated, "He pointed it at me, so I threw it away. Well I took the Pin out, so it was useless, and he threw it away."

Also eclosed is a September 23, 2004 cover letter from Mr. Till's legal assistant with discovery pages 155 through 171. Please direct your attention of particular interest to page 165, Paragraph 2, in which MS. Bateman is being interviewed by Special Agent of the ATF, Agent Carrie DiPirro, in which MS. Bateman claims that Mr. Castillo Purchased a .22 revolver From Adam LNU, in exchange for two (2) 8-balls. Mr. Castillo then used the gun right away in the house and a bullet ricocheted off the wall and entered the back of her neck at the bottom of skull. MS. Bateman Claims that she did not seek medical treatment and still has the bullet lodged in her head. MS. Bateman also claims to "know guns" So please Pin her down with regards to the different caliber of the gun under the mattress and the one used to wound her since the discovery shows two different caliber guns.

statement # 9 -

Review Department of the treasury Bureau of Alcohol Tobacco and Firearms, Report of Investigation, Report Number 6, with case Number: 785025-04-0051, submitted by Carrie DiPirro on 8-20, 2004, Read Page 1 and 2, Paragraph 2.

SA DiPirro advised. BATEMAN of her statement of Rights from a card in her wallet. BATEMAN stated She understood her rights. BATEMAN told SA DiPirro she wanted to waive her rights. She stated she was outside CASTILLO's residence when Shawn LNU and Adam LNU brough a 25 caliber revolver to their house to trade For two (2) 8-balls of illegal drugs. She added CASTILLO used the gun right away in the house, and a bullet ricocheted off a wall and entered the back of her neck at the bottom of her skull. She did not seek medical treatment. She says the bullet is still in her head.

I, Ismael Arenas G. as George Castillo aske you to review statement # 8 the letter of Mr. Edelman dated 9-29-04 see the name of Adam LNU and on statement 9 see again the name of Adam LNU and Shawn LNU, and on statement 10 - she reference as Sean and Adam, and on statement 11-she claims not known their last names and said that I exchanged guns A numerous of times, and that I didn't. that they just presented to me as show.

Jeff Edelman
U.S. / Costillo – Case 2004-112
Investigative Report:  Interview with Sharon Bateman
September 30, 2004
Page 3

- SHARON stated her brother, William BATEMAN (hereinafter referred to as WILLIAM) would sometimes stay overnight at the house.  She stated that sometimes WILLIAM would sleep downstairs on a small mattress in the living room.  She stated that sometimes WILLIAM would sleep on the floor in the second room upstairs.  She stated that sometimes WILLIAM would sleep in the camper with DIBBLE.

- SHARON stated that JORGE would cook cocaine into crack in the house.  She stated he would put a kilo of cocaine in a coffeepot with some baking soda and water, then he would use a heat gun to heat the mixture, until it was glob.  She stated then they would let it cool and harden and break it up into little pieces.

- SHARON stated JORGE had four or five digital scales, some small and some large, which he used to weigh the drugs.

- SHARON stated that there was a school nearby but she did not know the name of it.

- SHARON stated that JORGE would strangle her.  She stated she believed that cooking the cocaine to crack affected JORGE's brain.  She stated sometimes WILLIAM would come over to stay at their house with her, because she was afraid of JORGE.

- SHARON stated she found out JORGE had a gun for the first time when he pointed it at her.  She stated, "It was a twenty-five caliber revolver.  I'm not sure where it came from."  She stated, "He pointed it at me, so I threw it away.  Well, I took the pin out, so it was useless, and he threw it away."



# Jeffrey R. Edelman, P.C.
### Law Offices

18801 East Mainstreet, Suite 290
Parker, Colorado 80134
Telephone (720) 851-8440
Facsimile (720) 851-5874
e-mail: jredel@earthlink.net

Jeffrey R. Edelman, Attorney
Mindy Greenwald, J.D.
  email: MGreenwald@jeffreyredelmanpc.com
Julie M. Mesaros, Paralegal
  email: JMesaros@jeffreyredelmanpc.com

Nitzie Pabon-Ba, Paralegal
  email: NPabon-Ba@jeffreyredelmanpc.com
Cindy Nowell, Paralegal
  email: CNowell@jeffreyredelmanpc.com

September 29, 2004

**<u>Via Facsimile [303-825-2374] & Regular Mail</u>**

Ms. Creseda Riccardi
H. Ellis Armistead & Associates, Inc.
802 East 19th Avenue
Denver, Colorado 80218

     **Re:**    **United States of America v. Jorge Castillo**
              **Case No. 04-CR-282-D**

Dear Creseda:

     I would like to update you in matters in the above-referenced case. Mr. Castillo asked me to file a motion to withdraw because, amongst other reasons, he claims that I was not looking out for his best interests and did not visit him sufficiently enough in order to obtain adequate information to help prepare a defense and file the appropriate motions. At the hearing on September 28, 2004, which was also the date of the rearraignment on the superceding indictment, a copy of which you should have already received, Magistrate Judge Schlatter gave Mr. Castillo an opportunity to either represent himself or keep me as his attorney. Mr. Castillo chose to keep me as his attorney.

     In addition, prior to the hearing, I met with Mr. Castillo and presented to him the enclosed Plea Agreement and Statement of Facts Relevant to Sentencing, which was rejected by Mr. Castillo once again as was a prior plea agreement.

     Also enclosed is a September 23, 2004 cover letter from Mr. Till's legal assistant with discovery pages 155 through 171. Please direct your attention of particular interest to page 165, paragraph 2, in which Ms. Bateman is being interviewed by Special Agent of the ATF, Agent Carrie DiPirro, in which Ms. Bateman claims that Mr. Castillo purchased a .22 revolver from Adam LNU in exchange for two (2) 8-balls. Mr. Castillo then used the gun right away in the house and a bullet ricocheted off the wall and entered the back of her neck at the bottom of skull. Ms. Bateman claims that she did not seek medical treatment and still has the bullet

Ms. Creseda Riccardi
H. Ellis Armistead & Associates, Inc..
September 29, 2004
Page 2

lodged in her head. This seems to me to be quite unbelievable. Perhaps, during an interview she will show you a scar on the back of her neck, if one exists. We may want to consider strategically whether or not to get the back of her head x-rayed, because if it in fact shows a bullet, it might not show the age of the bullet wound and that would substantiate her story, but not when it occurred. The lack of a scar or any evidence of a bullet might be more positively used against Ms. Bateman when she testifies on cross-examination. Ms. Bateman also claims to "know guns" so please pin her down with regards to the different caliber of the gun under the mattress and the one used to wound her since the discovery shows two different caliber guns.

Also enclosed is a non-bates stamped statement from Daniel Rojas, consisting of three (3) pages, and dated August 23, 2004 in which Rojas and DiPirro both heard alleged unsolicited statements from William Bateman, while he was being transported to the Federal Court Building, on the same date. I wanted you to have this additional discovery and also be updated on matters.

It is my understanding that an Order was issued granting the government's request to have the compelled testimony of Sharon and William Bateman. The Court has not ruled upon a motion ordering the depositions, but they will probably be scheduled shortly, at which time, Mr. Castillo has a right to be present. The depositions, when they take place, should be preceded by an interview with you and both of the Bateman's who appear to have consented to your interview. At that time, you may have an opportunity to question Ms. Bateman more about this bullet wound and examine the back of her neck for a scar. I probably will request that a video deposition be completed after your report back to me subsequent to your interview with Sharon and William and advise me whether or not there is any evidence of an entry wound, bullet or scar from a bullet entering the back of her neck.

As of this date, a trial has not yet been scheduled, however, the pre-trial conference and motions hearing is currently scheduled for November 15, 2004 at 9:00 a.m. I would like to be present at the Batemans' interviews. Thank you.

Sincerely,

Jeffrey R. Edelman

JRE/jm
Enclosures

cc:    Jorge Castillo

# REPORT OF INVESTIGATION

| ADDRESSED TO: | |
|---|---|
| Special Agent in Charge<br>Phoenix Field Division | Phoenix Field Division<br>FY-04<br>Report 006 |

**TITLE OF INVESTIGATION:**
CASTILLO, Jorge

| CASE NUMBER: | REPORT NUMBER: |
|---|---|
| 785025-04-0051 | 6 |

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)* | SUBMITTED BY *(Title and Office)* | SUBMITTED BY *(Date)* |
|---|---|---|
| Carrie DiPirro | Special Agent, Denver I Field Office | 08/20/2004 |
| REVIEWED BY *(Name)* | REVIEWED BY *(Title and Office)* | REVIEWED BY *(Date)* |
| James Deir | Acting Resident Agent in Charge, Denver I Field Office | |
| APPROVED BY *(Name)* | APPROVED BY *(Title and Office)* | APPROVED BY *(Date)* |
| Lester D. Martz | Special Agent in Charge, Phoenix Field Division | |

**DESCRIPTION OF ACTIVITY:**

Arrest of Sharon BATEMAN

**SYNOPSIS:**

On August 20, 2004, Special Agents (SA's) Carrie DiPirro and James Kennedy arrested Sharon BATEMAN who was being held on ATF Material Witness Warrant at the Adams County Detention Center.

**NARRATIVE:**

1. On August 20, 2004, SA's Carrie DiPirro and James Kennedy arrested Sharon BATEMAN without incident at 8:30 AM. She was being held on ATF Material Witness Warrant at the Adams County Detention Center. Adams County, Colorado (CO). BATEMAN was previously contacted by the Adams County Sheriff's Office and was arrested on State drug charges. On August 19, Trini Atencio posted bond for her. Before she bonded out, Adams County saw the ATF warrant. SA DiPirro was notified the evening of August 19th of her pending release by the Adams County Detention Center, and the ATF Communications Center. BATEMAN was subsequently held overnight with the ATF hold.

2. SA DiPirro advised BATEMAN of her Statement of Rights from a card in her wallet. BATEMAN stated she understood her rights. BATEMAN told SA DiPirro she wanted to waive her rights. She stated she was outside CASTILLO's residence when Shawn LNU and Adam LNU brought a .25 caliber revolver to their house to trade for two (2) 8-balls of illegal drugs. She added CASTILLO used the gun right away in the

ATF EF 3120.2 (5-98)                                                   0 0 0 1 6 5

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF INVESTIGATION   Page 2 pgs

| | |
|---|---|
| ADDRESSED TO:<br>Special Agent in Charge<br>Phoenix Field Division | MONITORED INVESTIGATION INFORMATION:<br>Phoenix Field Division<br>FY-04<br>Report 006 |
| TITLE OF INVESTIGATION:<br>CASTILLO, Jorge | *Page of Exhibit # Date* |
| CASE NUMBER:<br>785025-04-0051 | REPORT NUMBER:<br>6 |

*Paragraph*

(2) house, and a bullet ricocheted off a wall and entered the back of her neck at the bottom of her skull. She did not seek medical treatment. She says the bullet is still in her head.

3.) BATEMAN stated CASTILLO carried the gun with him daily. He cleaned it with alcohol and a cloth to wipe his fingerprints off, while wearing gloves. She saw CASTILLO hide the gun under the mattress at night.

4.) BATEMAN said one of CASTILLO's drug customers came to their residence to buy crack with an AK-47 rifle. She recognized the gun because she said she knows guns. After that night, Castillo told BATEMAN he was going to get a gun for self-protection while he was selling his dope. That is when he traded drugs for the gun. He always carried his gun when he was dealing drugs from the house.

5.) BATEMAN said CASTILLO sold crack, methamphetamine (meth), and cocaine. He sold in ounce quantities. He sold an ounce of crack for six hundred fifty (650.00) dollars US currency; an ounce of cocaine for six hundred ($600.00) dollars US currency, and she was unsure how much the meth was sold for. BATEMAN stated CASTILLO had four (4) to five (5) kilos at a time.

Attachments:
Copy of BATEMAN's fingerprints, photographs, and R-84
Copy of Removal of ATF Wanted Person from NCIC

000166

EXhibit# 7-oF-8.        page 5-oF-8.

Statement# 10.
Review Page 119 oF
9, 27-28-29-oF 2010
trial days Statement
oF Ms. Batement,
Read line 1- to 16.

Q You say he bought it, meaning George, From
one of this Customers. Can you describe to us
what you observed when the gun was Purchased.
A He gave them some Crack Cocaine For the
gun.
Q who's "he"?
A George.
Q Do you recall specifically who he Purchased the gun From For
Crack cocaine?
A Yes, I do.
Q Who was that?
A Sean and Adam.
Q How are you Familiar with Sean and Adam?
A They were one oF his customers.
Q Had you seen them beFore they actually exchanged the
gun For cocaine?
A Oh, yeah. Numerous times.

Statement# 11.

Review Page 65 oF
Ms. Bateman 11-30-
2004 Deposition
Statement, Read line
5-to-12, and line 15-
and 16, and 19- to-
25, and Page 66,
line 1-to-3, 10-to-
20, 24 and 25, Page
67, line 1-to-4.

Q But what you're saying is is that Shawn
and Adam on numerous occasions gave Mr.
Castillo guns.
A They didn't give them to him. They Presented
them and showed them to George.
Q So just For show?
A Yeah. And George didn't buy them.
Q And do you know Shawn and Adam's last
names?
A No, I don't.
Q Are their real names Shawn and Adam?
A Yes, they are.
Q Okay. you indicated that aFter Mr. Castillo received this gun, he Fired it
oFF inside the house.
A Yes, he did.
Q And it ricocheted and hit you--the bullet?
A No. That wasn't the true statement.
Q Okay. well let's--let's talk about how he Fired it in the house.
A He Fired it in the house. And, yeah, it--it went oFF in the house. But
when it ricocheted, it ricocheted in my Car and hit me in the back oF
my head.

Page 119, 65, 66, 67- are 4-Pages as Exhibits

1  Q  You say he bought it, meaning George, from one of his

2  customers.  Can you describe to us what you observed when the

3  gun was purchased.

4  A  He gave them some crack cocaine for the gun.

5  Q  Who's "he"?

6  A  George.

7  Q  Do you recall specifically who he purchased the gun from

8  for crack cocaine?

9  A  Yes, I do.

10  Q  Who was that?

11  A  Sean and Adam.

12  Q  How are you familiar with Sean and Adam?

13  A  They were one of his customers.

14  Q  Had you seen them before they actually exchanged the gun

15  for cocaine?

16  A  Oh, yeah.  Numerous times.

17  Q  When would you see them?

18  A  When they would come to purchase cocaine from George.

19  Q  Did you actually see them purchase cocaine from George?

20  A  Yes, I would.

21  Q  And on the particular day you saw the purchase of the

22  weapon you've described, could you describe to the Court what

23  you observed on that particular day.

24  A  I looked through the windows and -- Sean and Adam are

25  pretty big guys and George was little.  It was right by the

| | | |
|---|---|---|
| 1 | A | Three or four. |
| 2 | Q | Is there a reason why you haven't really |
| 3 | | talked to the detectives about this? |
| 4 | A | Because he didn't purchase them. |
| 5 | Q | But what you're saying is is that Shawn and |
| 6 | | Adam on numerous occasions gave Mr. Castillo guns. |
| 7 | A | They didn't give them to him.  They presented |
| 8 | | them and showed them to George. |
| 9 | Q | So just for show? |
| 10 | A | Yeah.  And George didn't buy them. |
| 11 | Q | And do you know Shawn and Adam's last names? |
| 12 | A | No, I don't. |
| 13 | Q | Do you know -- how do you know them? |
| 14 | A | Just because they were clients of George's. |
| 15 | Q | Are their real names Shawn and Adam? |
| 16 | A | Yes, they are. |
| 17 | Q | How do you know that? |
| 18 | A | That's what they use. |
| 19 | Q | Okay.  You indicated that after Mr. Castillo |
| 20 | | received this gun, he fired if off inside the house. |
| 21 | A | Yes, he did. |
| 22 | Q | And it ricocheted and hit you -- the bullet? |
| 23 | A | No.  That wasn't the true statement. |
| 24 | Q | Okay.  Well let's -- let's talk about how he |
| 25 | | fired it in the house. |

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

66

```
1      A      He fired it in the house.  And, yeah, it -- it

2   went off in the house.  But when it ricocheted, it

3   ricocheted in my car and hit me in the back of my head.

4      Q      Okay.  Let's talk about the firing the gun in

5   the house first.  That -- that occurred when Shawn and

6   Adam were there?

7      A      No.

8      Q      It occurred when?

9      A      When they were gone and when he was mad at me.

10     Q      And how many rounds did he fire off in the

11  house?

12     A      He only fired two shots.

13     Q      And where -- what room in the house did that

14  occur in?

15     A      Upstairs.

16     Q      In which room upstairs?

17     A      The bedroom.

18     Q      There are two bedrooms upstairs; is that

19  right?

20     A      The large bedroom.

21     Q      Are you familiar with which bedroom is the

22  north and which one's the south upstairs?

23     A      No.

24     Q      So in the large bedroom upstairs a gun was

25  fired off and ricocheted off the walls?
```

001118

1       A       Yes.

2       Q       And that's not the time that the bullet struck

3   you in the neck?

4       A       No.

5       Q       Now, why did you tell police that at one point

6   in time, the gun was fired off in the house and

7   ricocheted and struck you in the neck?  Why -- how did

8   that mis -- you've indicated in your direct testimony

9   that that was a mistake?

10      A       Yes, that was.

11      Q       And how did that occur?  How did that mistake

12  get written down?

13      A       Because I -- I misstated it on my own.

14  Because I -- when I was talking about it I was nervous.

15  But it happened when I was in my car.

16      Q       Okay.  So that wasn't a problem with Detective

17  Rojas writing --

18      A       No.  That was mine -- that was my problem.

19      Q       Okay.  And could it have something to do with

20  you being high all the time you were in that house?

21      A       No, because I wasn't high at the time I made

22  that statement.

23      Q       When did -- when were you actually struck with

24  the bullet in your neck?

25      A       When I stole the dope from George.

Exhibit # 7-of-8.   Page 6-of-8.

Q   And how many rounds did he Fire of in the house?
A   He only Fired two shots.
Q   And how many rounds did he Fire off in the house?
A   He only Fired two shots.
Q   And where -- what room in the house did that occur in?
A   Upstairs.
Q   In which room upstairs?
A   The bedroom
Q   There are two bedrooms upstairs; is that right?
A   The large bedroom.

"Mr. Bateman Said: "She was screaming so loud I couldn't hear what she was saying. Then I heard gunshots -- Just one gunshot. Then immediately afterward, she was quiet.

Q   (By Mr. Till) And at the time that he shot -- what -- where were you located? (on page 3 - she claim that happen on April and on may)
A   I was in my Car.
Q   And approximately when did this happen?
A   I don't remember exactly. It was in between March and May, in between there sometime.

Q   So in the large bedroom upstairs a gun was Fired off and ricocheted off the walls?
A   Yes.
Q   And that's not the time that the bullet struck you in the neck?
A   No.
Q   You had lived with other individuals that had been arrested for drugs?
A   Yes, I did.
Q   Now, you were actually outside when you described this incident with a gun being traded for drugs, Correct? you were outside of the house?
A   I believe so.

page 9, 34, 66, 67, 130 - are 5-pages as Exhibits

Statement 12.
Continuation of Statement - in regard Ms. Bateman Deposition statement of 11-30, 04, Read page 66, line 10 to 20,

Statement 13.
Review Jonathan Willet U.S./Jorge Castillo - Case 2004-112 Interview with William Bateman November 17, 2004 - Page 9, Paragraph 2 - Read what is Circled.

Statement 14.
Continuation of statement - in regard Ms. Bateman Deposition D 11-30, 2004 Page 34, line 20 to -25.

Statement 15.
Continuation of Ms. Batement Statement of her Deposition of 11-30, 04 Page 66, line 24 and 25, and page 67, line 1-to-4.

Statement 16
Review Page 130 of Ms. Batemen Trial Statements of 9, 27-28-29, of 2010, line 22-

Jonathan Willett
Appellate Case: Willett 322    Document: 39-2    Date Filed: 02/01/20 E Castillo's
U.S. / Jorge Castillo – Case 2004-112    Exhibit # ONE    (16)
Interview with William Bateman    Date -
November 17, 2004
Page 9    Page.

bloody, like a red oil was on it, instead of sawdust. Then it disappeared. I looked for it. It was gone. I think he killed somebody. That guy was scary."

1 - • WILL stated that even though GEORGE would give WILL free drugs, WILL was very frightened of GEORGE. WILL stated, "You know those Mexican guys can be crazy. They'll do anything."

2 - • WILL stated that GEORGE shot SHARON in the back of the head. WILL stated, "I got a call from my sister on her cell phone, 11:30 or 12 at night. She was whispering at me, 'cause George was nearby. We talked five minutes then George grabbed the cell phone out of her hand. It was still on so I heard them yelling at each other. She was screaming so loud I couldn't hear what she was saying. Then I heard gunshots --- just one gunshot. Then immediately afterward, she was quiet. I couldn't hear her. I called back. George answered. I asked him what that loud popping sound was and he said it was the door slamming because my sister had left."

*Paragraph of 2 -*

*Paragraph 3*

• WILL stated, "I was at my grandma's house, so I wrote her a note. 'I think George shot SHARON.' I was fearing for my sister's life. After I smoked the rest of the crack, I drove over there. It took me a while to smoke the crack and build up my courage after hearing my sister be shot. I pulled up inside by the front doors around 4:30 a.m.. GEORGE and WAYNE were on the front porch and were shocked to see me there, because he had shot her. WAYNE said he was going to bed and went to the camper. I asked GEORGE what was going on and he told me I could go into the house and check on her, but don't' wake her up. I forced him to give me some crack, 'cause of what he did to my sister and I left. About three in the afternoon, I went back to the house and she was still sleeping. We --- me, GEORGE, and the mechanic --- went to GEORGE's drug dealer's house. He left us in the van while he walked to wherever the house was. I could show you where we parked. It was near

**Attorney Work Product - Confidential**

1      Q    And when did you do that?

2      A    April.

3      Q    Of 2004?

4      A    March or April --

5      Q    Of 2004?

6      A    -- of 2004.

7      Q    And where did that take place?

8      A    At 1118 West 41st.

9      Q    So this haircut, would it be fair to say, was

10   a form of punishment or something?

11     A    Yes, it was.

12     Q    Around that incident, did Mr. Castillo make

13   any other gestures or -- or threats with regards to that

14   incident?

15          MR. WILLETT:  Objection.  Relevance.

16          THE WITNESS:  Yes.  George got mad at me one

17   night when I was outside and he shot at me, and the

18   bullet ricocheted off of the car and it entered the back

19   of my head.

20     Q    (By Mr. Till)  And at the time that he shot --

21   what -- where were you located?

22     A    I was in my car.

23     Q    And approximately when did this happen?

24     A    I don't remember exactly.  It was in between

25   March and May, in between there sometime.  Right around

001086

1      A      He fired it in the house.  And, yeah, it -- it

2   went off in the house.  But when it ricocheted, it

3   ricocheted in my car and hit me in the back of my head.

4      Q      Okay.  Let's talk about the firing the gun in

5   the house first.  That -- that occurred when Shawn and

6   Adam were there?

7      A      No.

8      Q      It occurred when?

9      A      When they were gone and when he was mad at me.

10     Q      And how many rounds did he fire off in the

11  house?

12     A      He only fired two shots.

13     Q      And where -- what room in the house did that

14  occur in?

15     A      Upstairs.

16     Q      In which room upstairs?

17     A      The bedroom.

18     Q      There are two bedrooms upstairs; is that

19  right?

20     A      The large bedroom.

21     Q      Are you familiar with which bedroom is the

22  north and which one's the south upstairs?

23     A      No.

24     Q      So in the large bedroom upstairs a gun was

25  fired off and ricocheted off the walls?

```
 1        A    Yes.

 2        Q    And that's not the time that the bullet struck

 3   you in the neck?

 4        A    No.

 5        Q    Now, why did you tell police that at one point

 6   in time, the gun was fired off in the house and

 7   ricocheted and struck you in the neck?  Why -- how did

 8   that mis -- you've indicated in your direct testimony

 9   that that was a mistake?

10        A    Yes, that was.

11        Q    And how did that occur?  How did that mistake

12   get written down?

13        A    Because I -- I misstated it on my own.

14   Because I -- when I was talking about it I was nervous.

15   But it happened when I was in my car.

16        Q    Okay.  So that wasn't a problem with Detective

17   Rojas writing --

18        A    No.  That was mine -- that was my problem.

19        Q    Okay.  And could it have something to do with

20   you being high all the time you were in that house?

21        A    No, because I wasn't high at the time I made

22   that statement.

23        Q    When did -- when were you actually struck with

24   the bullet in your neck?

25        A    When I stole the dope from George.
```

1  house.

2  A   Yes.

3  Q   Did you go with them and point out places?

4  A   I don't remember.  I think I sat there and told them the

5  area.

6  Q   Did you watch what they were doing?

7  A   Yes.

8  Q   You saw that they did not find anything?

9  A   Right.

10  Q   Did you have an opportunity to speak with anybody else,

11  meaning your brother and Wayne Dibble, while this was going on?

12  A   No.  They had us separated around the house.

13  Q   And being arrested for narcotics wasn't something that was

14  new to you on May 28th, 2004, correct?

15  A   I didn't have no drug charges prior to that.  I had

16  paraphernalia charges because I had a personal habit.  All the

17  warrants I had were for traffic.  They were not for drugs.

18  Q   Okay.  But you had, in fact, been involved in the world of

19  drugs for some time before residing at 1118 West 41st Avenue

20  with Mr. Castillo?

21  A   I would say maybe three years.

22  Q   You had lived with other individuals that had been arrested

23  for drugs?

24  A   Yes, I did.

25  Q   Now, you were actually outside when you described this

EXhibit # 7-of-8,    Page 7-of-8.

Q And we talked on direct and also cross about the gun trade you saw Jorge do, trading the gun for crack cocaine. Now, you were outside; is that correct?

A Yes, I was.

And I stood there and talked to George and I stated to him that I had been up for three or four days and that I didn't feel that I could drive the car back to my grandmother's house without smoking some crack cocaine. So I asked him would he give me something before I went home, which he did. And I sat there in his yard and took a hit of it, and then I drove home.

Q Did you see any evidence that your sister had been injured? Any blood or anything like that?

A No, sir. I didn't ask her at that point. And I asked her what happened. She refused to tell me until about a month later. She finally told me what happened. She got up enough courage to tell me what had happened and show me the spot on the back of her head where she had been shot.

And after she had been shot, she would burn her hair with a lighter and telling me that there was bugs in her hair. And she would tell Mr. Castillo the same thing.

And I used tweezers and picked the back or -- picked at the back of her head like where the hair was. And I pulled out what looked like hair fibers but they was, like, steel splinters they looked like instead of hair. It was, like, little fragments of steel that I pulled out. But it was nothing like a bullet.

I honest to god to this day still think there's a bullet in there. I don't know if you guys ever took an X-ray or not. I told them about this a while back, but I asked them to take an X-ray so that way it would kind of prove that this had taken place.

Will stated, "I was at my grandma's house so I wrote her a note. I think George shot SHARON." I was fearing for my sister's life. After I smoked the rest of the crack, I drove over there. it took me a while to smoke the crack and build up my

(Page 131, 134, 15, 9 - are 4-pages as Exhibits)

---

Statement 17.
to 25, and page 131, line 1-to 3, and page 134, line 15-to-18, and 21-to-23 of Ms. Bateman statement

Statement 18

Review page 15, in it find page 45-to 48, in page 46 read line 9-to-15 which is circled, and page 47 read line 22-to-25, and page 48, read line 1-to-20, which are circled. This statement is of William Bateman Deposition of 11-30, 2004

Statement 19

Review Jonathan Willett U.S./Jorge Castillo-Case 2004-112 interview with William Bateman 11-17-2004, page 9.

EXhibit # 7- OF- 8.          Page 8- OF- 8.

Statement OF 19.

Courage after hearing my Sister be Shat. I pulled up inside by the Front doors around 4:30 a.m. GEORGE and WAYNE were on the Front porch and were shocked to see me there, because he had Shot her. WAYNE Said he was going to bed and went to the camper. I asked GEORGE what was going on and he told me I could go into the house and check on her, but don't wake her up, I Force him to give me Some Crack, `cause of what he did to my sister and I left. About three in the afternoon, I went back to the house and she was still sleeping.

Continuation OF Mr. Bateman Statement OF 11-17,04, page 9, Paragraph 3, that is Circled.

Q  And did you ever tell her to go See a doctor?
A  No. Because she never --- it took her a month to even tell me that she had been Shot.

Statement 20.

Review Page 32, in it Find Page 113 to- 116, in Page 113, Line 5-to-10, Read what is Circled

one Page as Exhibit.
Page 32

is is OF Mr. Bateman Deposition OF 11-30,04

1  incident with a gun being traded for drugs, correct?  You were

2  outside of the house?

3  A   I believe so.

4  Q   And this trade allegedly occurred inside the house,

5  correct?

6  A   Yes, it did.

7  Q   So you weren't privy to what was being said?

8  A   No.

9  Q   Now, you also sold drugs from the residence at 1118 West

10  41st Avenue?

11  A   Yes, I did.

12  Q   You did that so that you could earn some money for

13  yourself?

14  A   Correct.

15  Q   You weren't working anywhere else?

16  A   No, I wasn't.

17  Q   And you were also sharing drugs with your brother; is that

18  correct?

19  A   Yes, I was.

20  Q   And he also wasn't working?

21  A   No, he wasn't.

22  Q   And you indicated as far as your leaving the house and

23  going back to your grandmother's, that not only was it because

24  of your relationship with Mr. Castillo kind of going down, but

25  things were going on at the house, you described it?

1          **REDIRECT EXAMINATION**

2     *BY MR. PHILLIPS:*

3     Q   You just mentioned during cross-examination that between

4     November of 2003 and May of 2004 at the residence we've been

5     talking about, 1118 West 41st Avenue, that you sold some drugs

6     while you were there, correct?

7     A   Yes, I did.

8     Q   When you sold those drugs, who did you get those drugs from

9     in order to sell them?

10    A   Jorge Castillo.

11    Q   Now, you mentioned that you were willing to assist officers

12    in order to help you with the warrants that you had at the

13    time.   What were those warrants for?

14    A   Traffic.

15    Q   And we talked on direct and also cross about the gun trade

16    you saw Jorge do, trading the gun for crack cocaine.   Now, you

17    were outside; is that correct?

18    A   Yes, I was.

19    Q   What allowed you to observe the transaction you described

20    to the Court in your direct examination?

21    A   There was windows all the way around that area.   There was

22    a window in the bathroom.   They were standing right in front of

23    it.   There was a window -- through the doors there was two

24    windows, and there was windows on the other side of the house.

25    Q   Were you, in fact, looking through the windows and observed

Page 45

1  immediately after the gunshot I heard her voice, like,
2  stop completely. And then the phone hung up. And I
3  called back and Mr. Castillo said that my sister had
4  left.
5        And I asked him what the noise was over the
6  phone. He stated to me that it was just a door slamming.
7  And I told him, No, George, I think it was a gunshot.
8  Then he hung up the phone. I tried to call back and the
9  cell phone was shut off.
10       So about -- about an hour later I took my
11  grandmother's car. I stoled it. I wrote her a note and
12  told her that I thought that my sister had been shot and
13  I was going to investigate it. And I told her if she
14  wanted to report the car stolen to go ahead, you know. I
15  told her exactly where I was going and what was going on.
16       And I went to Mr. Castillo's house. I arrived
17  there about maybe 2:30, 3:00 -- maybe 4:00 in the
18  morning. When I got there Mr. Castillo and Mr. Dibble
19  were both standing on the porch. I pulled the car in the
20  backyard and it lit up the front porch and they were
21  standing there.
22       And their faces were -- they was shocked to
23  see me there that early. And I told them I was there to
24  see my sister. Mr. Castillo said that I could go in the
25  house and check on my sister if I wanted to. He said

Page 46

1  that -- he said the only thing is just don't wake her up,
2  which I feared going in the house because I didn't know
3  if they'd shot her and maybe she was dead; if I went in
4  the house if maybe they would try and kill me too.
5        So I just talked to Mr. Castillo and
6  Mr. Dibble. And after about two minutes of being on the
7  porch, Mr. Dibble, Wayne, went back to the motor home
8  parked there in the yard.
9        And I stood there and talked to George and I
10  stated to him that I had been up for three or four days
11  and that I didn't feel that I could drive the car back to
12  my grandmother's house without smoking some crack
13  cocaine. So I asked him would he give me something
14  before I went home, which he did. And I sat there in his
15  yard and took a hit of it, and then I drove home.
16       And later that day I came back. It was from,
17  like, five in the morning -- four in the morning when I
18  left there. I came back about three o'clock in the
19  afternoon, because I wanted more drugs and I wanted to
20  come work for him. And Mr. Castillo wanted to go see his
21  supplier that lived off of Vasquez Street, somewhere
22  around Vasquez Street.
23       I never knew where the house was because he
24  never showed me. But I went with him there a few times
25  and waited in the car. So me and this guy that was

Page 47

1  George's mechanic went with him in the van. And me and
2  the mechanic waited in the van, and George went to his
3  supplier's house.
4        He came back, like, 20 minutes later and we
5  left. We went back to his house. And then the mechanic
6  asked Mr. Castillo if he could have a line of cocaine.
7  And George gave him one. And then I asked him if I could
8  have one, and I did a line.
9        Then we did some work in his kitchen on the
10  vent for the stove. And I snuck upstairs and woke my
11  sister up. And when she stood up to get out of bed, she
12  fell over. I had to catch her.
13       And then I really scared me. I had to help
14  her walk down the circle staircase because I was afraid
15  that she was going to fall down. She didn't have enough
16  energy. And right away she started -- when she got
17  downstairs she started yelling at George to give her
18  something to help her wake up, which she was asking for
19  crack.
20       And that's pretty much everything that
21  happened that day.
22   Q  Did you see any evidence that your sister had
23  been injured? Any blood or anything like that?
24   A  No, sir. I didn't ask her at that point. And
25  I asked her what happened. She refused to tell me until

Page 48

1  about a month later. She finally told me what happened.
2  She got up enough courage to tell me what had happened
3  and show me the spot on the back of her head where she
4  had been shot.
5        And after she had been shot, she would burn
6  her hair with a lighter and telling me that there was
7  bugs in her hair. And she would tell Mr. Castillo the
8  same thing.
9        And I used tweezers and picked the back or --
10  picked at the back of her head like where the hair was.
11  And I pulled out what looked like a -- it looked like
12  hair fibers but they was, like, steel splinters they
13  looked like instead of hair. It was, like, little
14  fragments of steel that I pulled out. But it was nothing
15  like a bullet.
16       I honest to god to this day still think
17  there's a bullet in there. I don't know if you guys ever
18  took an x-ray or not. I told them about this a while
19  back, but I asked them to take an x-ray so that way it
20  would kind of prove that this had taken place.
21       And if they shaved the hair on the back of her
22  neck, I'm sure they'd see a scar there still or
23  something, because the hair covers it up now that she's
24  got hair.
25   Q  Okay. Sir, in August, were you taken into

bloody, like a red oil was on it, instead of sawdust. Then it disappeared. I looked for it. It was gone. I think he killed somebody. That guy was scary."

- WILL stated that even though GEORGE would give WILL free drugs, WILL was very frightened of GEORGE. WILL stated, "You know those Mexican guys can be crazy. They'll do anything."

- WILL stated that GEORGE shot SHARON in the back of the head. WILL stated, "I got a call from my sister on her cell phone, 11:30 or 12 at night. She was whispering at me, 'cause George was nearby. We talked five minutes then George grabbed the cell phone out of her hand. It was still on so I heard them yelling at each other. She was screaming so loud I couldn't hear what she was saying. Then I heard gunshots --- just one gunshot. Then immediately afterward, she was quiet. I couldn't hear her. I called back. George answered. I asked him what that loud popping sound was and he said it was the door slamming because my sister had left."

- WILL stated, "I was at my grandma's house, so I wrote her a note. 'I think George shot SHARON.' I was fearing for my sister's life. After I smoked the rest of the crack, I drove over there. It took me a while to smoke the crack and build up my courage after hearing my sister be shot. I pulled up inside by the front doors around 4:30 a.m. GEORGE and WAYNE were on the front porch and were shocked to see me there, because he had shot her. WAYNE said he was going to bed and went to the camper. I asked GEORGE what was going on and he told me I could go into the house and check on her, but don't wake her up. I forced him to give me some crack, 'cause of what he did to my sister and I left. About three in the afternoon, I went back to the house and she was still sleeping. We --- me, GEORGE, and the mechanic --- went to GEORGE's drug dealer's house. He left us in the van while he walked to wherever the house was. I could show you where we parked. It was near

Page 113

1    Q    (By Mr. Willett) One more question: Did you
2    ever -- you were concerned about your sister after she
3    was shot; is that right?
4    A    Yeah. Real concerned.
5    Q    And did you ever tell her to go see a doctor?
6    A    No. Because she never -- it took her a month
7    to even tell me that she had been shot. I just heard the
8    gunshot over the phone and heard her screaming in the
9    background. That's how I assumed that she had been shot,
10   was hearing that over the phone.
11       And then George, when I talked to him on the
12   phone -- I called back before he shut the cell phone
13   off -- he told me that she had left the house and just
14   slammed the door and that I heard a door slamming. And
15   from me shooting guns so much, I knew it was a gunshot.
16   Q    And so if she has a bullet at the base of her
17   skull, you don't think a doctor can help her with that?
18   A    I'm sure they could, but I'm sure she would
19   have to get an x-ray first to even determine that it's in
20   there, which -- I still at this point don't think she's
21   gotten an x-ray taken. That's one question I forgot to
22   ask her when I was talking to her.
23   Q    And if -- if an x-ray indicates there's no
24   bullet in the scull, what's your conclusion about this
25   whole shooting incident and your sister's story?

Page 114

1    A    Then she didn't get shot and I'd wonder where
2    the scar came from on the back of her neck -- the fresh
3    wound that was there on the back of her neck.
4    Q    It could come from her picking that area,
5    couldn't it?
6    A    Huh-uh. Not like that.
7    Q    Okay.
8    A    Not that big of a hole.
9        MR. WILLETT: All right. No further
10   questions. Thank you.
11           EXAMINATION
12   BY MR. TILL:
13   Q    Mr. Bateman, during the course of the
14   questions that Mr. Willett asked you, there was a
15   question or two concerning a point in time when I think
16   you indicated that after you had been released from jail,
17   you were leaving the house at 1118 --
18   A    Uh-huh.
19   Q    -- and you found a hundred-dollar bill.
20   A    Yeah.
21   Q    Can you tell us what -- what occasion was
22   that? Was that after you got out of jail in relation
23   to --
24   A    In Brighton.
25   Q    In --

Page 115

1    A    Brighton, Colorado. And the reason I brought
2    that up was because it was one of the points where
3    Mr. Castillo had cut me off and told me he wouldn't give
4    me no more crack. So I was real sad and depressed and
5    leaving his house and just looking at the ground as I
6    walked away. And I got, like, three blocks down to his
7    house by 38th and Lipan where the bridge is for the train
8    tracks --
9    Q    Okay.
10   A    -- and I was kind of where you look down over
11   the wall to where you could see the cars going under the
12   bridge for 38th. And I was walking along that fence
13   right there, and I found a hundred-dollar bill and went
14   back to his house and bought some crack cocaine.
15       But both the bills were faded really bad where
16   they didn't even look real. And I held the first one up
17   to the light and it said -- it had a little bar code
18   through it that said 50 -- you know, something, like
19   maybe $50 or $5. I'm not sure what it meant, but some
20   kind of bar code was on the first one.
21       The second one, there was no bar code. And he
22   just -- he gave me some crack for it and was going to pay
23   me the rest later. But later they determined that it was
24   a fake hundred-dollar bill, because me and my grandma
25   took it to the bank and was trying to see if they would

Page 116

1    exchange it for a different one. And they told me and my
2    grandmother that it came back counterfeit, which we
3    didn't know it was counterfeit; it was just faded.
4    Q    Okay. Now, in relation to that incident, you
5    say you -- you got out of jail in Brighton?
6    A    Uh-huh.
7    Q    What did you go to jail for in Brighton?
8    A    I think a restraining order violation or
9    something. Maybe I -- maybe not paying a court fine or
10   something.
11   Q    Okay.
12   A    But since then, I've taken care of all the
13   Brighton court cases.
14   Q    Okay. And so if we were to look at a criminal
15   history for you and look for an occasion when you went to
16   jail, would it be for a couple of days in Brighton?
17   A    It would be for a -- the only -- it would be
18   for the occasion when I -- I went to Brighton jail --
19   I've went to county jails about 32 times out of my
20   life -- I'm 21 years old -- I went to prison once. These
21   were all for little misdemeanor violations. They're
22   repeat offenses on the same charge. You know, they
23   brought it up again or something.
24       But this would be the only -- the one and only
25   time that I got sentenced to time in Brighton, where I

EXhibit # 8-OF-8- Exhibits have
4- Pages OF Government Documents as
Exhibits, and 2-Pages of hand
Writing Report by me Fsmael, A. G.

Exhibit # 8 - of - 8.   Page 1 - of - 2.

I, Ismael Arenas aske you to notice as how Blackburn's Judge rejected my only best clear way For me to give my testimony in my behalf for my defens in my trial days.

review page 140 line 4-to-13, of my trial on 9-27-to-29, of 2010.

I, Ismael Arenas affirm that the reason as why I intented to have the Trial Judge hear my affidavit with 8-Exhibits dated 9-24, 2010 was because the barrier of English language, because my first language is spanish; And my second reason was, because in writting I can be precise with the statements that I needed to be heard without leaving issues and facts out, and without forgetting important arguments for my defense; Third reason because communicating to the court directly me talking in spanish and have an interpreter translate what I say straight from my mind is almost impossible to accomplish in a precise way all the issues and facts described in my affidavit dated 9-24, 2010; My fourth reason I always believed that I had the right to defend my rights in any legal way that will be available for me under the law; and I believe that A testimony in writting is legal Specially when I was there in person to affirm or reply any questions that they may had inregard my written testimony or Statements of my affidavit dated 9-24, 2010.

IF you review everything that was said by Judge Blackburn's in reference to his rejection of my affidavit during trial days in this case 04-Cr-00282-, you will have a better point of view as how this Judge unlawfully acted to rejected my right to have hear my written testimony or Statement in my defense in my trial days of my affidavit.

ⓞne page as Exhibit page 140.

1 | present your allegations and your statements which focus on

2 | evidence that you believe has not been presented yet is for you

3 | to exercise your right to testify.

4 | I do not require you to testify.  I leave that

5 | decision to you after careful consideration and consultation

6 | with your attorney, but I will not receive that which you

7 | consider to be evidence in this case that has been omitted

8 | without affording the Government an opportunity to view it and

9 | to challenge it and, therefore, you may, of course, consider

10 | your further strategy in this case and whether or not to

11 | testify with your attorney, but your request that I view that

12 | which is, essentially, evidence on your part is respectfully

13 | rejected.

14 | (Pause in proceedings.)

15 | *THE COURT:* One minute, please.  Allow the interpreter

16 | an opportunity to interpreter.

17 | *INTERPRETER:* Well, why don't they make a copy, then,

18 | and give it to the prosecution so he can be made aware of what

19 | I'm trying to argue here -- well, not only arguing but also

20 | actually proving because it also comes with exhibits to show

21 | that my rights have been violated since the start of this case.

22 | *THE COURT:* Mr. Arenas, this is not the time during

23 | the trial for you to attempt to make the motion that you are.

24 | After the Government has completed its case in chief, the Court

25 | will conduct mid-trial proceedings.  Perhaps, and only perhaps,

(page 180, 179, 181 are 3-pages as Exhibits)

# Exhibit # 8 of-8. Page 2-of-2.

I, Ismael Arenas ask you to notice that regardless of what the Judge said in reference to Mr. Bateman and Ms. DiPirro meeting in private during Court trial process, Ms. DiPirro and Mr. Bateman violated the law and my rights; and regardless what Mr. Bateman said to the Judge in regard that meeting, the Law and my rights were violated by Ms. DiPirro and Mr. William Bateman;

review page 179-180 and 181 of my trial days 27-to-29 of the 9-month of 2010 in regard Mr. Bateman being unlawfully meeting with ATF agent Carrie DiPirro during my trial process.

As well I want you to notice that `no body can actually know what they were talking about in their private meeting, and that is more likely for anybody to assume that Mr. Bateman was being trained to lie in my trial against me, as an obvious common sense Mr. Bateman was not going to admited that, that was the true fact of that meeting, and Ms. DiPirro was not going to admited that fact either; under this true fact Mr. Bateman and Ms. DiPirro violated the law and my rights too, and Judge Blackburn's will know and knew this facts, that the law and my rights were violated by allowing Mr. Bateman to testify after this violations were done by Ms. DiPirro and Mr. Bateman; under this true fact Mr. Blackburn's violated the law and my rights too.

1        *THE COURT:* Where did that visit occur?

2        *THE WITNESS:* Here.

3        *THE COURT:* "Here" is where?

4        *THE WITNESS:* In the visiting cell, the federal

5 courthouse.

6        *THE COURT:* Approximately what time of day did that

7 visit occur?

8        *THE WITNESS:* Approximately 3:45 p.m.

9        *THE COURT:* How long did that visit last,

10 approximately?

11        *THE WITNESS:* Maybe five to eight minutes.

12        *THE COURT:* When you say she directed you or discussed

13 with you how to present yourself, what, if anything, do you

14 recall about what she said in that regard?

15        *THE WITNESS:* She told me make sure I speak clearly in

16 the microphone and just tell everything -- she said make sure I

17 tell the truth on everything. Anything I know. She said make

18 sure I actually heard it, seen it, or was there. She said

19 don't speculate on nothing. Don't tell anything that I'm not

20 sure of.

21        *THE COURT:* Did this discussion involve any of the

22 facts of circumstances of your testimony?

23        *THE WITNESS:* No. She said, just tell the truth on

24 anything that I know. She didn't specifically pick anything

25 out and say, I want you to say this or this or this. She just

1           *THE COURT:* Mr. Bateman, I have a few questions for
2    you.

3           *THE WITNESS:* Okay.

4           *THE COURT:* I believe I heard you testify that
5    yesterday you were visited by someone, and you discussed your
6    testimony for today. Did I hear that correctly?

7           *THE WITNESS:* I didn't discuss my testimony. I was
8    just told how to answer questions in here, basically.

9           *THE COURT:* All right. Who visited you yesterday?

10          *THE WITNESS:* The ATF agent.

11          *THE COURT:* Where did that visit occur?

12          *THE WITNESS:* Here.

13          *THE COURT:* Is that ATF agent in this courtroom?

14          *THE WITNESS:* Yes.

15          *THE COURT:* Can you identify that ATF agent by where
16   he or she is seated and by what he or she is wearing, or do you
17   know the name?

18          *THE WITNESS:* It's Carrie DiPirro, I believe you
19   pronounce it. She's wearing the blue shirt over there.

20          *THE COURT:* To the best of your recollection, what did
21   she say to you or ask of you during that conversation?

22          *THE WITNESS:* She just, basically, told me how to
23   present myself when I talk and how to answer questions and use
24   full names and stuff and speak clearly. Basically, how to try
25   to do what I'm doing now.

1  said make sure I'm truthful with everything I say.

2      *THE COURT:* Have you told me all that you recollect

3  about this five- to eight-minute conversation yesterday at

4  about 3:45 in the federal courthouse?

5      *THE WITNESS:* The only thing I asked her for is when I

6  get out of custody, I told her if I ever need help, I told her

7  I would probably be homeless, if I could call you for anything.

8  Not for money. Who knows what. I know she's a good person.

9  That's what I need in my life, is good people. I don't need

10  things that are bad.

11      *THE COURT:* What response, if any, did she give you?

12      *THE WITNESS:* She said, yeah. She said if I needed

13  her to, she would write a recommendation letter for what

14  happened here. I told her I'm leaving this stuff alone. I

15  said I may need help for anything. Who knows. Maybe a good

16  place to look for a job or something or anything like that, but

17  I don't know. Maybe I'll never call her. That was just one

18  thing I wanted to ask her, if I ever needed help, can I call

19  her and ask her who I can get in contact with, if she could

20  give me good references.

21      *THE COURT:* That concludes the Court's examination.

22  Does it precipitate additional examination by any other party,

23  hearing first from the Government, Mr. Phillips?

24      *MR. PHILLIPS:* No. Thank you, Your Honor.

25      *THE COURT:* By the defense, Ms. Eskesen?